William L. Wallander (Texas Bar No. 20780750)
Matthew D. Struble (Texas Bar No. 24102544)
Kiran Vakamudi (Texas Bar No. 24106540)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
bwallander@velaw.com; mstruble@velaw.com;
kvakamudi@velaw.com
**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

David S. Meyer (*pro hac vice* pending)
Lauren R. Kanzer (*pro hac vice* pending)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; lkanzer@velaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 24-80045-11** |
| | § | |
| **KIDKRAFT, INC., *et al.*,** | § | **(Chapter 11)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION
FOR ENTRY OF INTERIM
AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507 AND FED. R. BANKR. P. 2002, 4001 AND
9014 (I) AUTHORIZING DEBTORS AND DEBTORS
IN POSSESSION TO OBTAIN POSTPETITION SENIOR
SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers or Canadian business numbers, as applicable, are:  KidKraft, Inc. (3303), KidKraft Europe, LLC (3174), KidKraft Intermediate Holdings, LLC (8800), KidKraft International Holdings, Inc. (2933), KidKraft Partners, LLC (3268), KidKraft International IP Holdings, LLC (1841), Solowave Design Corp. (9294), Solowave Design Holdings Limited (0206), Solowave Design Inc. (3073), Solowave Design LP (7201), and Solowave International Inc. (4302).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  4630 Olin Road, Dallas, TX 75244.

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 9:30 A.M. (CENTRAL TIME) ON MAY 13, 2024.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 13, 2024 AT 9:30 A.M. (CENTRAL TIME) IN COURTROOM #2, FLOOR 14, UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, 1100 COMMERCE STREET, DALLAS, TX 75242.**
>
> **PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT 1-650-479-3207. VIDEO COMMUNICATION WILL BE BY USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE LARSON'S HOME PAGE. THE MEETING CODE IS 160 135 6015. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS.  TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LARSON'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), file this *Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "***Motion***").  The facts and circumstances supporting the relief

4884-2311-9291

requested in this Motion are set forth in the *Declaration of Ajay Bijoor, Managing Director of Robert W. Baird & Co., in Support of the Debtors' Motion to Obtain Postpetition Financing* (the "**Bijoor Declaration**"), the *Declaration of Carl Moore, Managing Director of SierraConstellation Partners, LLP, in Support of the Debtors' Motion to Obtain Postpetition Financing* (the "**Moore Declaration**," and together with the Bijoor Declaration, the "**Financing Declarations**"), and the *Declaration of Geoffrey Walker in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), each filed contemporaneously herewith.[2]  In support of this Motion, the Debtors state as follows:

## SUMMARY OF TERMS OF DIP FACILITY AND USE OF CASH COLLATERAL

1.    In accordance with Bankruptcy Rules 4001(b)–(d) and Procedures for Complex Cases in the Northern District of Texas Section D, the below chart summarizes the material provisions of the proposed Interim Order (as defined below) and the DIP Term Sheet, a copy of which is attached as Exhibit A of the Interim Order (the "**DIP Term Sheet**"):[3]

| Bankruptcy Rule | Summary of Material Term |
|---|---|
| **Borrower**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | KidKraft, Inc.<br><br>*See* DIP Term Sheet, Borrower. |
| **Guarantors**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The Debtors<br><br>*See* DIP Term Sheet, Schedule I. |
| **DIP Lender**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | 1903 Partners, LLC<br><br>*See* DIP Term Sheet, DIP Lender. |
| **DIP Agent**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | GB Funding, LLC<br><br>*See* DIP Term Sheet, DIP Agent. |
| **Maturity Date; Duration for Use of DIP Collateral** | The Maturity Date shall be the earliest of (i) 60 days after the Petition Date, (ii) 30 days following the entry of the Interim Order if the Bankruptcy Court has not entered the Final Order (as defined below); (iii) the date the Debtors' receive notice of the acceleration of |

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the First Day Declaration or the DIP Term Sheet, as applicable.

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Sheet or the Interim Order, as applicable.

4884-2311-9291

| | |
|---|---|
| *FED. R. BANKR. P. 4001(b)(1)(B)(iii), 4001(c)(1)(B)* | any of the DIP Loans and the termination of the commitments to make the DIP Loans resulting from Event of Default; (iv) the effective date of the Plan; (v) the date a sale pursuant to section 363 of the Bankruptcy Code is consummated (exclusive of a Sale Toggle); and (vi) the dismissal or conversion of any of the Chapter 11 Cases or the CCAA Recognition Proceedings (or a motion by the Debtors for dismissal of either).<br><br>*See* DIP Term Sheet, Maturity Date. |
| **DIP Commitment** *FED. R. BANKR. P. 4001(c)(1)(B)* | A superpriority senior-secured priming multi-draw term loan facility (i) not to exceed at any time outstanding aggregate commitments of $10.5 million, consisting of a $4.0 million DIP Commitment after entry of the Interim Order and an incremental $6.5 million DIP Commitment after entry of the Final Order plus (ii) the Roll-Up Amount.<br><br>*See* Interim Order, Section 1.2. |
| **Roll-Up** *Complex Case Procedures (D)(10)(c)* | Roll-up of the full amount of the Rescue Financing (as defined below) (exclusive of interest and fees), $23.3 million. The roll up shall be approved upon entry of the Interim Order and deemed to have been advanced on the date thereof.<br><br>*See* Interim Order, Section 1.2. |
| **Conditions to Borrowing** *FED. R. BANKR. P. 4001(c)(1)(B)* | Usual and customary for financings of this type, including, among other things:<br><br>• no Event of Default shall have occurred;<br><br>• the applicable Chapter 11 Milestones shall have been satisfied;<br><br>• all reasonable, documented fees and out-of-pocket expenses of the DIP Secured Parties relating to the DIP Facility have been paid;<br><br>• Debtors have insurance with respect to the DIP Collateral;<br><br>• no Material Adverse Change shall have occurred;<br><br>• the non-Debtor guarantors under the Prepetition Loan Documents execute a reaffirmation and ratification agreement; and<br><br>• entry of the Interim and Final Orders.<br><br>*See* DIP Term Sheet, Conditions Precedent to Each Interim DIP Loan & Conditions Precedent to Each Final DIP Loan. |
| **Interest Rate** *FED. R. BANKR. P. 4001(c)(1)(B)* | Adjusted Term SOFR for an Interest Period (as defined in the Prepetition Credit Agreement) of one month plus 8.50%.<br><br>*See* DIP Term Sheet, Interest Rate; Interim Order Section 1.3(a) |
| **Use of Cash Collateral** *FED. R. BANKR. P. 4001(b)(1)(B)(iii); Complex Case Procedures (D)(12)* | The Debtors are authorized to use Cash Collateral, subject to the Interim Order, the DIP Term Sheet, the DIP Documents, in accordance with the Approved Budget, a copy of the latest version of which is attached to the DIP Term Sheet as **Exhibit A**, and the liens and security interests granted to Prepetition Agent and Prepetition Lender (collectively, the "***Prepetition Secured Parties***").<br><br>*See* Interim Order, Section 2.6(a). |
| **Adequate Protection for Use of Cash Collateral** *FED. R. BANKR. P. 4001(b)(1)(B)(iv) 4001(c)(1)(B)(ii)* | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the use of Cash Collateral, the subordination of their existing liens to the DIP Liens, and the imposition of the Carve-Out, the Prepetition Secured Parties shall (i) receive replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, (ii) a superpriority administrative expense claim, and (iii) payment of all reasonable, documented out-of-pocket costs and expenses of the Prepetition Secured Parties, in each case subject to the Carve Out.<br><br>*See* Interim Order, Section 2.6. |
| **Liens and Priority** | The DIP Liens on the DIP Collateral shall, in all cases, subject and subordinate to the Carve-Out, have the priority set forth as follows: |

| | |
|---|---|
| *FED. R. BANKR. P. 4001(c)(1)(B); Complex Case Procedures (D)(10)(g)* | (i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***") in the Chapter 11 Cases with priority over any and all administrative expenses; |
| | (ii) pursuant to sections 364(c)(2), secured by a perfected first priority lien on the DIP Collateral, to the extent that such DIP Collateral is not subject to valid, perfected, and non-avoidable liens as of the Petition Date (subject to the Permitted Liens); and |
| | (iii) pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral (as defined below), to the extent such DIP Collateral is subject to a Permitted Lien. |
| | *See* Interim Order, Sections 2.1 and 2.2. |
| **Prepayments** *FED. R. BANKR. P. 4001(c)(1)(B)* | Optional Prepayments:  The Debtors may prepay the DIP Loans in whole or in part at any time without premium or penalty.  All optional prepayments shall be applied to the DIP Loans in accordance with the Prepayment Waterfall.  Any amounts prepaid may not be reborrowed. |
| | Mandatory Prepayments:  The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established for the benefit of the DIP Agent to cover asserted contingent and indemnity obligations) in accordance with the Prepayment Waterfall, upon receipt of proceeds of a sale of substantially all of the Debtors' assets, sale of any assets outside of the ordinary course of business in excess of $10,000, and any extraordinary receipts. |
| | *See* DIP Term Sheet, Optional Prepayments & Mandatory Prepayments. |
| **Budget** *FED. R. BANKR. P. 4001(c)(1)(B)* | The "***Approved Budget***" shall consist of a weekly budget for the nine-week period commencing on the Petition Date and include, among other things, all projected cash receipts, sales, and cash disbursements. |
| | Commencing on the Monday of the first full calendar week after the Petition Date at 5:00 p.m. (Central Time) and continuing on the two-week anniversary thereafter (or such other time as the Debtors may elect with the consent of the DIP Lender and the Purchaser), the weekly budget shall be updated. |
| | *See* DIP Term Sheet, Approved Budget; Approved Cash Flow Projection; and Variance Reports; Interim Order Section 1.8(a). |
| **Variance Covenant** *FED. R. BANKR. P. 4001(c)(1)(B)* | "***Permitted Variances***" include: (a) up to 15% of the aggregate for all cash disbursements (other than fees and expenses of counsel to the DIP Secured Parties and Professional Persons), (b) less than 20% of the aggregate for all cash receipts in the Approved Budget, and (c) up to 15% of all fees and expenses incurred on a per-Professional Person basis, in each case calculated weekly on a rolling four week basis commencing as of the Petition Date, with the first such testing to begin three weeks from the Petition Date, except that the Professional Fee Variance shall be calculated weekly and not on a rolling four week basis. |
| | *See* DIP Term Sheet, Approved Budget; Approved Cash Flow Projection; and Variance Reports; Interim Order Section 1.8(b). |
| **Events of Default** *FED. R. BANKR. P. 4001(c)(1)(B); Complex Case Procedures (D)(10)(d)* | Events of Default include usual and customary events of default for financings of this type, including, but not limited to (i) after the first applicable testing date, the occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances; (ii) failure of any of the Chapter 11 Milestones to be satisfied; (ii) the filing of any application by the Debtors for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code; (iii) the actual amount of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Other Priority Claims (each as defined in the Plan) exceeds or is expected to exceed the Administrative Expense Claim and Priority Tax Claim Backstop Amount; and (iv) failure to pay principal, interest or other DIP Obligations in full in cash when due. |

| | See DIP Term Sheet, Events of Default. |
|---|---|
| **Indemnification**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(ix)* | The DIP Term Sheet contains indemnification provisions ordinary and customary for financings of this type.<br><br>*See* DIP Term Sheet, Indemnity. |
| **Carve-Out**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(i)* | The interim order provides a "Carve-Out" of from liens, collateral, cash collateral, adequate protection claims, superpriority claims, and other claims for the payment of certain statutory fees, allowed professional fees of the Debtors, and allowed professional fees of an official committee of unsecured creditors, including a Post-Carve Out Trigger Notice Cap, subject to the terms of the Interim Order.<br><br>The Funded Reserve Account shall be funded on the Friday of the first full calendar week following the Petition Date and on a weekly basis thereafter and be held by the Debtors in trust solely for the benefit of the Debtor Professionals subject to the terms of the Interim Order and the Approved Budget.<br><br>*See* DIP Term Sheet, Carve-Out; Interim Order, Section 2.3. |
| **Fees, Expenses, and Additional Payments**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B);*<br>*Complex Case*<br>*Procedures*<br>*(D)(14)(c)* | The Debtors shall pay the (A) DIP Lender (i) an origination fee of 2.00% of the DIP Commitment and (ii) an exit fee of 2.00% of the DIP Commitment that will be fully earned and non-refundable upon consummation of the Plan and (B) the DIP Agent, a weekly administrative fee of $7,500.<br><br>The Debtors shall also pay all reasonable, documented out-of-pocket costs and expenses of the DIP Secured Parties relating to the DIP Facility, the Debtors' Chapter 11 Cases.<br><br>*See* DIP Term Sheet, DIP Fees & DIP Secured Parties' Expenses. |
| **Section 506(c) Waiver**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(x);*<br>*Complex Case*<br>*Procedures*<br>*(D)(13)(b)* | Effective upon entry of the Final Order, the Debtors shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Prepetition Lender or the DIP Lender, upon the Prepetition Collateral or DIP Collateral, respectively.<br><br>*See* DIP Term Sheet, Events of Default; Interim Order, Section 4.3. |
| **Section 552(b) Waiver**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B);*<br>*Complex Case*<br>*Procedures*<br>*(D)(13)(c)* | Effective upon entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties, the DIP Secured Parties, the DIP Obligations, or the Prepetition Obligations.<br><br>*See* DIP Term Sheet, Events of Default; Interim Order, Section 5.9. |
| **Marshaling**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B);*<br>*Complex Case*<br>*Procedures*<br>*(D)(13)(d)* | Effective upon entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.<br><br>*See* DIP Term Sheet, Events of Default; Interim Order, Section 5.9. |
| **Liens on Avoidance Actions/Proceeds**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(iii);*<br>*Complex Case*<br>*Procedures*<br>*(D)(13)(a)* | Subject to entry of Final Order, the DIP Lender shall have a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.<br><br>*See* Interim Order, Section 2.1(a). |

4884-2311-9291

| | |
|---|---|
| **Determination Regarding Prepetition Claims** *FED. R. BANKR. P. 4001(c)(1)(B)(iii); Complex Case Procedures (D)(10)(e)* | The Interim Order contains stipulations of fact by the Debtors, including related to the validity and enforceability of the DIP Secured Parties' prepetition secured obligations. |
| | The stipulation are valid against third parties, unless (a) the third party files a complaint or motion seeking authority to commence litigation as a representative of the estate (a "***Challenge***") before the earliest of (i) the objection deadline for the Plan, (ii) 60 calendar days from the date of appointment of the Committee by the U.S. Trustee, and (iii) 75 calendar days from the Petition Date for all parties other than the Committee (if any) (the "***Challenge Period***") challenging the Prepetition Obligations or Prepetition Liens and (b) such Challenge sets for the with specificity the basis for such challenge, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred. |
| | *See* Interim Order, Section F(a)(ii). |
| **Effect of Debtors' Stipulations on Third Parties** *FED. R. BANKR. P. 4001(c)(1)(B)(iii), (viii)* | The Debtors' Stipulations are binding on each other party in interest unless (a) such party in interest with standing and requisite authority has timely commenced an adversary proceeding during the Challenge Period regarding the Prepetition Obligations or Prepetition Liens and (b) such Challenge sets for the with specificity the basis for such challenge. |
| | *See* Interim Order, Section 4.1. |
| **Milestones** *FED. R. BANKR. P. 4001(c)(1)(B)(vi); Complex Case Procedures (D)(10)(a)* | Milestones relating to the DIP include, in relevant part, |
| | • No later than one day after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement. |
| | • No later than two Business Days after the Petition Date, the Debtors shall have obtained entry of the Interim Order by the Bankruptcy Court, and no later than five Business Days thereafter, the Debtors shall have obtained entry by the CCAA Court of the Interim DIP Recognition Order. |
| | • No later than 30 days after the Petition Date, the Debtors shall have obtained entry of the Final Order by the Bankruptcy Court, and no later than five Business Days thereafter, the Debtors shall have obtained entry by the CCAA Court of the Final DIP Recognition Order. |
| | • No later than 45 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and the final Sale Order, and no later than five Business Days thereafter, the CCAA Court shall have entered an order in the CCAA Recognition Proceedings recognizing and giving effect in Canada to the Confirmation Order and the Sale Order. |
| | • No later than five Business Days after the later of entry of the Sale Order and the CCAA Sale Order, all conditions to Closing under the Purchase Agreement shall have been satisfied or waived and the Sale Transaction shall have been consummated. |
| | *See* DIP Term Sheet, Milestones. |
| **Waiver or Modification of the Automatic Stay** *FED. R. BANKR. P. 4001(c)(1)(B)(iv); Complex Case Procedures (D)(10)(d)* | The Interim Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to: |
| | (A) implement the DIP financing arrangements, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right, or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct, and receive payments with respect to the Prepetition Obligations or the DIP Obligations, as applicable. |
| | Upon the occurrence of an Event of Default: |
| | (A) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, (B) take any other action and exercise all other rights and remedies provided by the Interim Order, the DIP Documents, or applicable law other than those rights and |

| | remedies subject to the expiration of the Remedies Notice Period, and (C) charge interest at the default rate under the DIP Documents. <br><br> *See* Interim Order, Section 3.4. |
|---|---|
| **Releases, Waivers, or Limitation on any Claim or Cause of Action** *FED. R. BANKR. P. 4001(c)(1)(B)(viii); Complex Case Procedures (D)(10)(f)* | Each Debtor, on behalf of itself and its successors and assigns and other "***Releasors***" (as defined in the Interim Order) release each of the Prepetition Agent and Prepetition Lender other "Prepetition Releasees" (as defined in the Interim Order) and the DIP Lender, DIP Agent, and other "DIP Releasees" (as defined in the Interim Order) from all claims and causes of action against any Prepetition Releasees or DIP Releasees as of the date of the Interim Order, in respect of the Prepetition Obligations, the Prepetition Loan Documents, the DIP Obligations, the RSA, the Plan, the Backyard Sale, the DIP Documents, and any DIP Loans or other financial accommodations made by DIP Agent and/or DIP Lender, as applicable. <br><br> *See* Interim Order Sections F(a)(vii) & 4.5. |

2.     After exploring their options with the assistance of their independent investment banker, the Debtors have concluded that the DIP Facility is the best and only viable postpetition financing alternative available to them.  The DIP Agent and DIP Lender (collectively, the "***DIP Secured Parties***") would not have agreed to provide such financing without the terms and provisions summarized above and set forth below.  The Debtors and the DIP Secured Parties have endeavored to structure the DIP Facility and its approval in accordance with the applicable provisions of the Bankruptcy Rules and the Procedures for Complex Cases in the Northern District of Texas.  It is the Debtors' firm conviction that without the DIP Facility, the Debtors' businesses will not be able to operate, resulting in the loss of value, jobs, and the ability to consummate the Sale Transaction for the benefit of their estates and stakeholders.  In light of the foregoing, and as further set forth in the Motion and supporting declarations, the Debtors respectfully submit that the terms of the DIP Facility are appropriate under the facts and circumstances of these Chapter 11 Cases.

<u>**PRELIMINARY STATEMENT**</u>

3.     As discussed in greater detail in the Financing Declarations and the First Day Declaration and the other pleadings, these chapter 11 cases (the "***Chapter 11 Cases***") will effectuate the sale of substantially all of the Debtors' assets to Backyard Products, LLC

4884-2311-9291

("***Backyard***").  Prior to the Petition Date, the Debtors and their advisors engaged in multiple marketing processes which resulted in the Sale Transaction with Backyard.  After these multiple market tests, the Debtors believe that the proposed Sale Transaction with Backyard provides the best—and only currently available—opportunity to maximize the value of the Debtors' estates.

4.      On April 25, 2024, in order to implement the Sale Transaction while simultaneously maintaining the value of their estates, the Debtors entered into a Restructuring Support Agreement (the "***RSA***") with certain of their key stakeholders. Those stakeholders included Backyard and the Prepetition Lender who has also agreed to provide the Debtors with the proposed postpetition financing described in this Motion.  The RSA sets forth the commitments of the parties to implement the proposed Sale Transaction through the Plan, including DIP Facility (as defined below) in accordance with the DIP Term Sheet.

5.      The DIP Facility is essential for the Debtors to consummate the Sale Transaction. As described in the Moore Declaration, the Debtors will utilize the DIP Facility to pay their employees, produce inventory, and make other ordinary course payments in order to preserve their value for the Sale Transaction with Backyard.  Accordingly, the Debtors respectfully request the Court approve the proposed DIP Facility, which will provide the Debtors with a total of $10.5 in new money financing, approximately $4.0 million of which the Debtors are requesting on an interim basis.  As described further in this Motion, in exchange for this essential liquidity, the Debtors have agreed to certain reasonable protections for the DIP Secured Parties, including liens on collateral, payment of interest and fees on amounts borrowed, and a limited "roll up" of approximately $23.3 million of prepetition financing (the "***Rescue Financing***") which provided the Debtors with a liquidity runway to file these Chapter 11 Cases and maximize the value of their estates.

4884-2311-9291

6.      As set forth in greater detail below and in the Financing Declarations, the DIP Facility is the product of arm's-length negotiations and is in the best interests of the Debtors and their Estates.  The terms of the DIP Facility comply with section 364 of the Bankruptcy Code, and entry into the DIP Facility and performance of all of the Debtors' obligations is reasonable and appropriate exercise of the Debtors' business judgment under the circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors' entry into the DIP Facility, and grant other relief as requested in this Motion.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Northern District of Texas (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Bankruptcy Rules 2002, 4001, 6003, and 6004, rules 9007-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "***N.D. Tex. L.B.R.***"), and the *General Order Regarding Procedures for Complex Chapter 11 Cases* (the "***Complex Case Procedures***").

4884-2311-9291

## EMERGENCY CONSIDERATION

10.     In accordance with the N.D. Tex. L.B.R. and Complex Case Procedures, the Debtors request emergency consideration of this Motion.  The liquidity provided under the DIP Facility is necessary for the Debtors' transition into chapter 11, which is critical to the viability of their operations and the success of these Chapter 11 Cases.  As discussed in detail below and in the First Day Declaration, any delay in granting the relief requested could hinder the ultimate success of the Debtors' chapter 11 cases and cause immediate and irreparable harm.  As such, the Debtors believe that emergency consideration is necessary and request that this Motion be heard at the Debtors' first day hearings.

## BACKGROUND

11.     KidKraft, Inc. (together with its Debtor and non-Debtor affiliates, the "***Company***") is a Dallas-based privately held company that is a leader in branded, sustainable, wood-based active and imaginative play products, with operations in the U.S., Canada, Europe, and Asia.  The Company works with global supply partners to source materials and build its products, which include dollhouses, play sets, playhouses, swing sets, and more.  It distributes its products through partnerships with major global retailers and through direct-to-customer sales, with more than 3,000 points of distribution in over 90 countries.  The Company, like many in its industry, has experienced significant headwinds in recent years that have strained liquidity and operations. Unable to satisfy its funded debt obligations and certain other obligations to vendors and other parties, the Company and its advisors undertook extensive marketing and sale processes that have culminated in these Chapter 11 Cases, through which the Company aims to implement a sale to a strategic buyer pursuant to a prepackaged chapter 11 plan (or, in the alternative, pursuant to

11

consummation of a stand-alone sale pursuant to section 363 of the Bankruptcy Code) to, among other things, preserve jobs and continue the KidKraft brand as a going concern.

12.    On the date hereof (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no request for the appointment of a trustee or examiner has been made and no official committee of unsecured creditors (a "***Committee***") has been appointed in these Chapter 11 Cases.

13.    Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference.

## DEBTORS' PREPETITION CAPITAL STRUCTURE

A.    <u>Prepetition Credit Agreement.</u>

14.    As described in the First Day Declaration, the Debtors' funded debt arises from the Prepetition Credit Agreement, which was amended (the "***Fifth Amendment***") in connection with the Debt Sale to the Prepetition Secured Parties.  The Fifth Amendment increased the available priority revolving commitments under the Prepetition Credit Agreement to $26.8 million, and extended the maturity of the term loans under the Prepetition Credit Agreement from June 30, 2023, to June 30, 2024, giving the Company crucial liquidity and runway to pursue the marketing process that ultimately yielded the proposed transaction with Backyard.  The Prepetition Credit Agreement was further amended on May 9, 2024, to increase the total available priority revolving commitments to $31.5 million.

15.     As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the Prepetition Credit Agreement totaled approximately $144.9 million, comprised of (i) $81.7 million under the Prepetition First Lien Term Facility and (ii) $63.2 million under the Prepetition First Lien Revolving Facility.  In addition, the Debtors owe accrued and unpaid interest under both the Prepetition First Lien Term Facility and the Prepetition First Lien Revolving Facility.  The remainder of the Debtors' prepetition capital structure is summarized in the table below.

| Facility | Maturity | Total Approx. Amount Outstanding |
|---|---|---|
| Revolving Credit Facility | June 2024 | $63.2 million[4] |
| Term Loan Credit Facility | June 2024 | $81.7 million |
| *Total Secured Debt* | | **$144.9 million** |
| Subordinated Sponsor Debt | January 2025 | $5.0 million |
| *Total Effective Debt* | | **$149.9 million** |

**DEBTORS' LIQUIDITY NEEDS AND THE PROPOSED DIP FACILITY**

16.     As detailed in the Moore Declaration, the Debtors require access to liquidity to ensure that they are able to continue their normal business operations during these Chapter 11 Cases and to preserve the value of their Estates.  All of the Debtors' cash on hand as of the Petition Date and any proceeds of the Prepetition Collateral are subject to the liens of the Prepetition Lender.  Pursuant to the RSA, the Prepetition Lender has agreed to provide the DIP Facility on the terms set forth in the Interim Order and in accordance with the Approved Budget.

17.     The proceeds from the proposed DIP Facility will be used for, among other things, making payments integral to the Debtors' business operations, paying administrative expenses associated with these Chapter 11 Cases, and satisfying working capital needs in the ordinary course

---

[4]    The Revolving Credit Facility includes approximately $31.5 million of priority revolving commitments.

of business. Moreover, the liquidity to be provided under the DIP Facility, combined with access to existing Cash Collateral, will enable the Debtors to (i) fund their operations during the course of these Chapter 11 Cases including chapter 11 administrative costs, (ii) ensure that value is preserved during the course of the Debtors' Chapter 11 Cases, and (iii) consummate the Sale Transaction and confirm the Plan to maximize value for the Debtors' Estates.

18.     Given that substantially all of the Debtors' unrestricted cash is Cash Collateral, the Debtors need access to such Cash Collateral and the proceeds of the DIP Facility to operate their businesses in the ordinary course during these Chapter 11 Cases. Authority to use Cash Collateral and enter into the DIP Facility will provide the Debtors with necessary funds to operate their business and continue paying their postpetition obligations as they come due during these Chapter 11 Cases.

**THE ROLL UP OF A PORTION
OF THE RESCUE FINANCING IS REASONABLE.**

19.     The DIP Facility seeks to "roll up" approximately $23.3 million of the Rescue Financing upon entry of the Interim Order. The proposed Roll-Up Amount is limited to the new capital that the Prepetition Secured Parties provided the Debtors after the Debt Sale closed on January 31, 2024. Importantly, this liquidity provided a runway for the Debtors to commence the 2024 Sale Process, which in turn led to Backyard's offer and the proposed Sale Transaction and has allowed the Debtors to maintain their operations and preserve the value of their estates leading up to these Chapter 11 Cases. The roll up is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral. Additionally, the proposed roll up is reasonable in light of the ratio of new money provided by the DIP Lender to the Roll-Up Amount. The Debtors believe that given the limited size of the Roll-Up Amount in

14

4884-2311-9291

comparison to the substantial benefits the Debtors will receive from the liquidity under the DIP Facility and the substantial benefits provided by the Rescue Financing, agreeing to the roll up in the Interim Order is a reasonable exercise of their business judgment.

**THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARMS' LENGTH**

20.     As further described in the Bijoor Declaration, the terms of the DIP Facility are the product of extensive good faith, arm's-length negotiations between the Debtors and the DIP Secured Parties, each of which was represented by qualified counsel.  Beginning in March 2024, the Debtors, with the assistance of the Advisors, actively negotiated the terms and provisions of the DIP Facility.  The result of these negotiations was memorialized in the RSA and the DIP Term Sheet.  Based on the DIP financing marketing process conducted by the Debtors and Baird and the extensive arm's-length negotiations between the Debtors and the DIP Lender, the DIP Facility represents the best financing option available to the Debtors.  The terms of the DIP Facility are reasonable under the circumstances and are consistent with market terms for such financings provided to companies in circumstances similar to the Debtors.

**RELIEF REQUESTED**

21.     By this Motion, the Debtors seek entry of an interim order substantially in the form attached as **Exhibit A** (the "***Interim Order***"), and subsequently entry of a final order which shall be substantially in the same form as the Interim Order and modified to become a final order as contemplated in the Interim Order (the "***Final Order***") and scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order.

15

**BASIS FOR RELIEF**

A.    Obtaining the DIP Facility, Including the Roll-Up Amount, is a Sound Exercise of Business Judgment.

22.    After thorough marketing of their assets by independent financial advisors, the Debtors have concluded that the Sale Transaction is the best opportunity for the Debtors to maximize the value of their estates.  Further, after market testing and seeking financing alternatives via their independent financial advisors, the DIP Facility is the only financing option available to the Debtors under the circumstances of these Chapter 11 Cases.  The Court should authorize the Debtors, as an exercise of their sound business judgment, to (i) enter into the DIP Documents, (ii) obtain access to the DIP Facility, and (iii) use advances of credit under the DIP Facility and Cash Collateral in accordance with the DIP Orders and the Approved Budget.

23.    If an agreement to obtain secured credit complies with the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re Estrada*, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment."); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors correctly posit that courts will almost always defer to the business judgment of a debtor in the selection of a lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

24.     Bankruptcy courts generally will not second guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citations omitted); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts require only that the debtors "show that a sound business purpose justifies such actions") (citations omitted).

25.     Under the circumstances, the Debtors' decision to enter into the DIP Facility is a sound exercise of their business judgment following a careful evaluation of the alternatives.  *First*, without access to the DIP Facility, the Debtors will be unable to pay ongoing operating expenses necessary to sustain their operations, which in turn would jeopardize the Sale Transaction.  *Second*, the Debtors negotiated the DIP Term Sheet and the other DIP Documents with the DIP Secured Parties in good faith, at arm's length, and with the assistance of the Advisors, and the Debtors submit that the terms of the DIP Facility represent the most favorable terms on which such financing can be obtained.  *Third*, the Debtors submit that the terms of the DIP Facility are reflective of market terms for financings of this type.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

B.    The Court Should Authorize the Liens and Superpriority Claims Under Sections 364(c) and 364(d) of the Bankruptcy Code.

26.    The Debtors propose to obtain financing under the DIP Facility by providing the DIP Secured Parties with security interests and liens as set forth in the DIP Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtors are requesting providing the DIP Secured Parties with (i) first priority liens on any unencumbered assets pursuant to section 364(c) of the Bankruptcy Code and (ii) first priority, senior priming liens ("***Priming Liens***") on all encumbered assets with priority over all other claims (subject and subordinate in each case only to the Carve-Out and Permitted Liens).

(a) The Court Should Authorize the Granting of Superpriority Administrative Claims and Liens on Unencumbered Property.

27.    The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

28.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts consider whether (i) the debtor made a reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code; (ii) the credit transaction benefits the debtor as necessary to preserve estate assets; and (iii) the terms of the credit transaction are fair,

18

reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at \*11; *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991).  However, section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *Id.*; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

29.     The Debtors submit they have satisfied the requirements of section 364(c) of the Bankruptcy Code and should thus be authorized to grant liens on unencumbered property and superpriority claims to the DIP Lender on account of the DIP Facility.

30.     As set forth above and in the Financing Declarations, prior to the Petition Date, the Debtors and their advisors contacted other parties to seek proposals for third-party postpetition financing.  No potential lenders were willing to provide financing on an unsecured or junior lien basis.  Accordingly, the Debtors submit that the requirement of section 364 of the Bankruptcy Code is satisfied because alternative credit on more favorable terms is unavailable to the Debtors.

31.     The DIP Facility is necessary to preserve the value of the Debtors' Estates.  The Debtors require immediate access to the DIP Facility and use of Cash Collateral to continue operations and preserve the going-concern value of their Estates in order to consummate the Sale Transaction with Backyard.  The proceeds of the DIP Facility will allow the Debtors to address

fluctuations in their cash flows, which affects their ability to pay trade creditors and satisfy other

obligations that arise in the ordinary course of business.  Absent the new money provided under

the DIP Facility, these fluctuations may result in the inability to pay key vendors, which would

adversely impact the Debtors' operations.

32.    Finally, the terms of the DIP Facility are justified under the circumstances.  The

DIP Facility represents the only source of postpetition financing available to the Debtors and is

designed to provide the Debtors with sufficient liquidity to administer these Chapter 11 Cases and

facilitate the Sale Transaction.  Given the Debtors' circumstances, the Debtors submit that the

terms of the DIP Facility, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate.

For all of the foregoing reasons, the Debtors submit that they have satisfied the requirements of

section 364(c) of the Bankruptcy Code and that the Court should, therefore, authorize the Debtors

to provide the DIP Lender with (i) superpriority administrative expense status for the DIP

Obligations as provided for in section 364(c)(1) of the Bankruptcy Code and (ii) liens on the

Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code.

(b) The Court Should Authorize the Debtors to Grant Priming Liens.

33.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code,

courts may also authorize a debtor to obtain postpetition credit secured by a lien that is senior or

equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain

such credit and the interests of existing lien holders are adequately protected.

*See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt secured by a senior or equal lien on property of the estate that is
> subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

34.     "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'"  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  What constitutes adequate protection is decided on a case-by-case basis.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case-by-case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the existing secured creditors have consented or (ii) such existing secured creditors are adequately protected.

35.     The Debtors seek authority to grant liens to the DIP Lender on a priming basis (subject and subordinate to the Carve-Out).  The Debtors submit that the grant of Priming Liens contemplated by the DIP Facility is appropriate because the proposed priming is consensual, and the Debtors are providing adequate protection to those secured creditors whose liens are being

21

primed.  The DIP Lender is the Prepetition Lender—the primary prepetition secured creditor of

the DIP Loan Parties—and has consented to the priming features of the DIP Facility.  Indeed, the

Prepetition Lender has actively participated in negotiating the terms of the proposed financing

and/or Cash Collateral usage and agreed to the form of the Interim Order.  Furthermore, the

Debtors propose to provide adequate protection to the Prepetition Lender in the form of

superpriority claims and replacement liens as set forth in the Interim Order.  Accordingly, the

Debtors submit that they have satisfied the requirements for granting Priming Liens to the DIP

Lender pursuant to section 364(d)(1) of the Bankruptcy Code, and they request that the Court

authorize them to do so.

C.      The Court Should Approve the Proposed Adequate Protection.

36.      In addition to advances under the DIP Facility, the Debtors require use of Cash

Collateral for working capital to preserve their business operations and to administer these Chapter

11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's

cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
>> (A) each entity that has an interest in such cash collateral consents; or
>>
>> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
>> in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has

an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest."  11 U.S.C. § 363(e).

37.      Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of

interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d

553, 556 (3d Cir. 1996) (en banc).   Courts determine what constitutes sufficient adequate protection on a case-by-case basis.   *Swedeland Dev. Grp.*, 16 F.3d at 564.

38.     As highlighted above, the Debtors propose to provide the Prepetition Secured Parties with adequate protection in various forms, to protect them from any diminution in value of the Prepetition Collateral resulting from the use of the Cash Collateral and the imposition of the automatic stay.   Specifically, the Debtors propose to provide the Prepetition Secured Parties with Replacement Liens junior and subordinate only the Carve-Out, Permitted Liens, and the DIP Liens, a superpriority administrative expense claim, and the Adequate Protection Payments in exchange for access to the Prepetition Secured Parties' Cash Collateral.   Further, as additional adequate protection, the Debtors have agreed to a waiver of claims arising under section 506(c) of the Bankruptcy Code and a waiver of marshaling of assets with respect to the DIP Collateral and Prepetition Collateral.

39.     Cash Collateral will provide the Debtors with liquidity vital to sustain their operations and these Chapter 11 Cases.   Accordingly, the Debtors' proposed forms of adequate protection are not only necessary to protect against any diminution in value but are fair, reasonable, and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the DIP Documents, for the benefit of all parties in interest and their Estates.

D.     The Roll-Up of the Prepetition Credit Agreement is Appropriate.

40.     An integral component of the DIP Facility is the roll up of the Rescue Financing, which includes up to $23.3 million of principal accrued under the Prepetition Credit Agreement and shall be approved upon entry of the Interim Order concurrent with the Debtors' entry into the DIP Facility and which shall reduce the amounts due and owing on a dollar-for-dollar basis.   The

4884-2311-9291

negotiation of the roll up was a critical component of the overall DIP Facility and was necessary to achieve a consensual restructuring rather than a freefall bankruptcy.

41.     The DIP Secured Parties required approval of the roll up upon entry of the Interim Order as a condition for funding the DIP Facility.  The DIP Facility—including the proposed roll up—represents the only financing option available to address the Debtors' liquidity needs under these circumstances.  Accordingly, the proposed roll up is reasonable, appropriate, and reflective of the current market for debtor-in-possession financings under these circumstances.

42.     This Court and courts in other jurisdictions have approved similar financing facilities that include the roll up of prepetition debt.  *See, e.g.*, *In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Dec. 17, 20230) (approving a roll up loan with a ratio of 0.5:1 of new money to rolled up money); *In re Sunland Medical Foundation*, No. 23-80000 (MVL) (Bankr N.D. Tex. Nov. 1, 2022) (approving a roll up loan with a ratio of 0.7:1 of new money to rolled up money); *In re AiBUY Opco, LLC*, No. 22-31737 (SGJ) (approving a roll up loan with a ratio of 13.6:1 of new money to rolled up money); *In re Corsicana Bedding*, No. 22-90016 (ELM) (Bankr. N.D. Tex. June 25, 2022) (approving a roll up loan with a ratio of 5:1 of new money to rolled up money).

E.     <u>The Court Should Authorize the Debtors to Use Cash Collateral.</u>

43.     The Debtors should further be authorized to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor:

> [M]ay not use, sell, or lease cash collateral . . . unless:
>
>> (A) each entity that has an interest in such cash collateral consents; or
>>
>> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

24

44.     Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 362(e).

45.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the provision of adequate protection described above and provided for in the Interim Order.  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis.  *See Swedeland Dev. Grp.*, 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case-by-case basis.").

46.     As described herein and in the Moore Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' business and orderly entry into the Chapter 11 Cases, and the adequate protection offered here in exchange for the use of Cash Collateral is customary and appropriate under the circumstances.  Use of Cash Collateral is in the best interest of the Debtors' Estates and, accordingly, the Court should authorize the Debtors to use Cash Collateral pursuant to section 363(c) of the Bankruptcy Code.

F.     The Court Should Authorize the Debtors to Pay the Fees Under the DIP Documents.

47.     The DIP Secured Parties have committed substantial capital to ensure successful execution of the DIP Facility and these Chapter 11 Cases.  The Debtors have further agreed to pay certain fees of the DIP Lender in exchange for their agreement to provide the financing under the DIP Facility.  The terms of the financing, which includes the corresponding fees, is the only financing available to the Debtors under the circumstances of these cases.  The consideration being provided to the DIP Secured Parties in exchange for such commitment appropriately compensates

25

the DIP Secured Parties for their costs and commitment, was the subject of arm's-length

negotiation between the Debtors and the DIP Secured Parties and is necessary to obtain the DIP

Facility, which will enable the Debtors' continued operations and consummation of the Sale

Transaction.  The Debtors submit that under these circumstances, authorization to pay such fees is

warranted.

G.      The DIP Secured Parties Should Be Deemed a Good Faith Lender Under Section 364(e)
        of the Bankruptcy Code.

        48.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred, or
> any priority or lien so granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or lien,
> were stayed pending appeal.

11 U.S.C. § 364(e).

        49.     The terms of the DIP Documents are the result of good faith, arm's-length

negotiation and the Debtors' reasonable and informed determination that the DIP Lender has

offered the most favorable postpetition financing terms under the circumstances, which are the

only available terms pursuant to which the Debtors could obtain necessary postpetition financing.

The terms of the DIP Documents are reasonable under the circumstances, and the proceeds of the

DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in

accordance with the DIP Orders and the DIP Documents (including the Approved Budget).

Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning

4884-2311-9291

of section 364(e) of the Bankruptcy Code and are entitled to all the protections afforded by that section.

H.      The Automatic Stay Should Be Modified on a Limited Basis and the Procedure for Stay Relief Comports with  the Complex Case Procedures.

50.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order including to (i) permit the Debtors to grant the security interests, liens, and superpriority claims described herein and to perform such acts as may be required to assure the perfection and priority of such security interests and liens, and (ii) permit the DIP Secured Parties to exercise rights and remedies under certain circumstances.

51.      The proposed Interim Order provides that, upon the occurrence and during the continuance of an Event of Default under the DIP Term Sheet or any of the DIP Documents; any other breach, default, or other violation by the Debtors of the terms and provisions of the Interim Order and DIP Term Sheet after the delivery of a Carve-Out Trigger Notice, the automatic stay shall terminate solely to the extent necessary for the DIP Agent to exercise all rights and remedies in accordance with the Interim Order.  Notably, the Interim Order provides that the DIP Agent must wait for a period of five Business Days after the date a Default Notice is delivered before exercising remedies (the "***Remedies Notice Period***").  During the Remedies Notice Period, the Debtors or other parties in interest may file a motion seeking an emergency hearing before the Court (a "***Stay Relief Hearing***") and DIP Secured Parties consent to an emergency hearing that occurs within the Remedies Notice Period.  The Interim Order authorizes the DIP Agent to (i) terminate the DIP Commitments, (ii) accelerate the DIP Loans, (iii) send blocking notices or activation notices pursuant to the terms of any deposit account control agreement, and (iv) repay

any amounts owing in respect of the DIP Obligations. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases and should be approved. *See, e.g.*, *In re Sunland Medical Foundation*, Case No. 23-80000 (MVL) (Bankr. N.D. Tex. Sep. 28, 2023) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Tuesday Morning Corporation*, Case No. 23-90001 (ELM) (Bankr. N.D. Tex. Apr. 6, 2023) (same); *In re Corsicana Bedding, LLC*, Case No. 22-90016 (ELM) (Bankr. N.D. Tex. July 27, 2022) (same); *In re Northwest Senior Housing Corporation*, Case No. 22-30659 (MVL) (Bankr. N.D. Tex. June 23, 2022) (same); *In re Christian Care Centers, Inc.*, Case No. 22-80000 (SGJ) (Bankr. N.D. Tex. June 23, 2022) (same).

I.    <u>Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.</u>

52.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "a hearing on a Financing Motion . . . will routinely be conducted as a first-day hearing to consider emergency relief for interim use of cash collateral and/or interim debtor-in-possession financing." Complex Case Procedures, D.11.

28

4884-2311-9291

53.     The Debtors respectfully request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from entry of the Interim Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility and use Cash Collateral. The Debtors will suffer immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than 14 days after service of the Motion, if the Debtors are not permitted to access the financing under the DIP Facility in the aggregate principal amount of $4.0 million during the Interim Period, and if the repayment of the Rescue Financing is not approved upon entry of the Interim Order.  The Debtors require access to the DIP Facility prior to the final hearing on the Motion and entry of the Final Order approving the DIP Facility in order to continue operating, to pay their administrative expenses, and to implement the relief requested in the Debtors' other "first-day" motions.  This relief is necessary for the Debtors to preserve and maximize value and, therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' Estates and all parties in interest.

## REQUEST FOR IMMEDIATE RELIEF

54.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed herein and in the First Day Declaration, authorizing the Debtors to enter into the DIP Documents, obtain the DIP Loans, and grant the protections to the DIP Lender and the Prepetition Lender as set forth in the Interim Order, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would significantly impact the Debtors' ability to swiftly and efficiently consummate a Sale Transaction and/or obtain confirmation of the Plan.  As such, the relief requested is necessary in

29

order for the Debtors to maximize the value of their estates for the benefit of all stakeholders.

Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm"

standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

55.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

56.    For the avoidance of doubt, nothing in this Motion is intended to be, nor should it

be construed as (i) an implication or admission as to the validity or priority of any claim or lien

against the Debtors, (ii) an impairment or waiver of the Debtors' or any other party in interest's

rights to contest or dispute any such claim or lien, (iii) a promise or requirement to pay any claim,

(iv) an implication or admission that any particular claim is of a type specified or defined in the

Motion or any proposed order, or (v) a waiver of the Debtors' or any other party in interest's rights

under the Bankruptcy Code or any other applicable law.

## NOTICE

57.    Notice of this Motion has been provided by delivery to:  (i) the Office of the United

States Trustee for the Northern District of Texas; (ii) the holders of the 30 largest unsecured claims

against the Debtors (on a consolidated basis); (iii) the administrative agent under the Debtors'

prepetition secured credit agreement; (iv) Katten Muchin Rosenman LLP, as counsel to the

administrative agent under the Debtors' prepetition secured credit agreement; (v) counsel to the

buyer under the Debtors' prepetition asset purchase agreement, King & Spalding LLP,

1185 Avenue of the Americas, 34th Floor, New York, NY 10036, Attn: Roger Schwartz and Miguel

30

Cadavid; (vi) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (vii) the Internal Revenue Service; (viii) all other applicable government agencies to the extent required by the Bankruptcy Rules or the N.D. Tex. L.B.R; and (ix) the DIP Agent and DIP Lender.  In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## NO PRIOR REQUEST

58.     No prior motion for the relief requested herein has been made to this Court or any other court.

## PRAYER

The Debtors respectfully request that the Court enter the Interim Order, in the form attached

hereto as **Exhibit A,** and grant them such other and further relief to which the Debtors may be

justly entitled.

Dated:  May 10, 2024
Dallas, Texas

/s/  *William L. Wallander*

**VINSON & ELKINS LLP**
William L. Wallander (Texas Bar No. 20780750)
Matthew D. Struble (Texas Bar No. 24102544)
Kiran Vakamudi (Texas Bar No. 24106540)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
bwallander@velaw.com; mstruble@velaw.com;
kvakamudi@velaw.com

- and -

David S. Meyer (*pro hac vice* pending)
Lauren R. Kanzer (*pro hac vice* pending)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 10, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

<u>   /s/ Matthew D. Struble           </u>
One of Counsel

4884-2311-9291

# <u>EXHIBIT A</u>

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 24-80045-11 |
| | § | |
| **KIDKRAFT, INC.**, *et al.*, | § | (Chapter 11) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | Re: Docket No. |

INTERIM ORDER
PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001
AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS
IN POSSESSION TO OBTAIN POSTPETITION SENIOR
SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers or Canadian business numbers, as applicable, are: KidKraft, Inc. (3303), KidKraft Europe, LLC (3174), KidKraft Intermediate Holdings, LLC (8800), KidKraft International Holdings, Inc. (2933), KidKraft Partners, LLC (3268), KidKraft International IP Holdings, LLC (1841), Solowave Design Corp. (9294), Solowave Design Holdings Limited (0206), Solowave Design Inc. (3073), Solowave Design LP (7201), and Solowave International Inc. (4302). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 4630 Olin Road, Dallas, TX 75244.

Upon the motion (the "***Motion***") of the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of title 11 of the United States Code (the "***Bankruptcy Code***"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "***Bankruptcy Rules***"), and the General Order Regarding Procedures for Complex Cases (the "***Complex Case Procedures***") made applicable by Rules 4001-1 and 9013-1 of the Local Bankruptcy Rules (the "***N.D. Tex. L.B.R.***") for the United States Bankruptcy Court for the Northern District of Texas (the "***Court***") *inter alia* seeking, among other things:

(1)     authorization for KidKraft, Inc. ("***KidKraft***" or "***Borrower***") to obtain, and for KidKraft Intermediate Holdings, LLC ("***HoldCo***", and together with the other Guarantors listed in Schedule 1 of the DIP Term Sheet, the "***Guarantors***") to guarantee, unconditionally, on a joint and several basis, a senior secured super-priority multi-draw debtor-in-possession term loan credit facility (the "***DIP Facility***") on the terms and conditions set forth in the Priming Superpriority Debtor-In-Possession Financing Term Sheet, dated as of April 25, 2024, attached hereto as **Exhibit A** (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein and including the references to the Prepetition Credit Agreement (as defined below) specified therein, the "***DIP Term Sheet***"),[2] by and among the Borrower, the Guarantors, GB Funding, LLC, as DIP Agent ("***DIP Agent***"), and 1903 Partners, LLC, as DIP Lender ("***DIP Lender***," and, together with the DIP Agent, the "***DIP Secured Parties***"), and the other DIP Documents (as defined below) consisting of:  (i) $4.0 million of new money loans (the "***Interim DIP Commitment***") to be provided following entry of the Interim Order

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Term Sheet, as applicable.

2

by DIP Lender, (ii) $6.5 million of new money loans ("***Final DIP Commitment***") to be provided

following entry of the Final Order by DIP Lender; (iii) $23.3 million of Prepetition Obligations,

which will be deemed to have been advanced and shall convert into DIP Loans on a dollar-for-

dollar cashless basis upon entry of the Interim Order (the "***Roll-Up Amount***", and together with

the Interim DIP Commitment and Final DIP Commitment, the "***DIP Commitment***"), and in

accordance with this order (the "***Interim Order***"), secured by perfected senior priority security

interests in and liens on the DIP Collateral (as defined below) pursuant to §§ 364(c)(2), 364(c)(3),

and 364(d) of the Bankruptcy Code (subject to the Carve-Out and the Permitted Liens (each as

defined below));

(2)     authorization for Borrower and Guarantors to remit all collections, asset proceeds

and payments to the DIP Secured Parties for application, or deemed application, first to the

repayment of all DIP Obligations (as defined below) in accordance with the DIP Term Sheet and

the other DIP Documents until such obligations are fully repaid, and then to the Prepetition Secured

Parties for application until all Prepetition Obligations (as defined below) are fully repaid;

(3)     authorization for the Debtors to grant superpriority administrative claim status,

pursuant to § 364(c)(1) of the Bankruptcy Code, to DIP Agent, for the benefit of itself and DIP

Lender, in respect of all DIP Obligations (subject to the Carve-Out);

(4)     as set forth below, subject to Section 4.1 of this Interim Order, approval of certain

stipulations by the Debtors as set forth in this Interim Order in connection with the Prepetition

Credit Agreement;

(5)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses

and other amounts payable under the DIP Documents as such become due, including, without

limitation, continuing commitment fees, closing fees, audit fees, appraisal fees, liquidator fees,

3

structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of DIP Agent's and DIP Lender's respective attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the applicable DIP Documents;

(6)      as set forth below, authorization to use Cash Collateral and all other Prepetition Collateral and to provide adequate protection to Prepetition Agent and Prepetition Lender (each in their respective capacities under the Prepetition Loan Documents (as defined below)), to the extent set forth herein;

(7)      effective only upon entry of a Final Order (as defined below), the waiver of the Debtors' right to assert claims to surcharge against the DIP Collateral pursuant to § 506(c) of the Bankruptcy Code;

(8)      the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order to the extent hereinafter set forth;

(9)      the setting of a final hearing on the Motion ("*Final Hearing*") to consider entry of a final order (the "*Final Order*") authorizing, among other things, the borrowing under the DIP Documents on a final basis, as set forth in the Motion and the DIP Term Sheet filed with the Court, including the granting to DIP Agent and DIP Lender the senior security interests and liens described above and super-priority administrative expense claims (subject to the Carve-Out); and

(10)      related relief.

The initial hearing on the Motion having been held by the Court on May 13, 2024 (the "*Interim Hearing*"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Geoffrey Walker in Support of Chapter 11 Petitions and*

*First Day Pleadings*, the *Declaration of Ajay Bijoor, Managing Director of Robert W. Baird & Co. Incorporated, in Support of (I) the Debtors' Motion to Obtain Postpetition Debtor in Possession Financing and (II) the Sale Process*, the *Declaration of Carl Moore, Manager of SierraConstellation Partners, LLC in Support of the Debtors' Motion to Obtain Postpetition Debtor in Possession Financing*, and the filings and pleadings in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; notice of the Motion, the relief requested therein, and the Interim Hearing (the "***Notice***") was appropriate under the circumstances; the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on (i) the administrative agent under the Prepetition Credit Agreement (the "***Prepetition Agent***"), (ii) Katten Muchin Rosenman LLP, as counsel to the Prepetition Agent, (iii) the Office of the U.S. Trustee for the Northern District of Texas (the "***U.S. Trustee***"), (iv) King & Spalding LLP, as counsel to the buyer under the Debtors' prepetition asset purchase agreement (the "***APA***"), (v) the holders of the thirty (30) largest unsecured claims, on a consolidated basis, against the Estates (the "***30 Largest Unsecured Creditors***"), (vi) the Internal Revenue Service and applicable state taxing authorities; (vii) any party that has asserted or may assert a lien in the Debtors' assets, (viii) the office of attorneys general for the states in which the Debtors operate; (ix) the United States Attorney's Office for the Northern District of Texas, (x) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002, (xi) the United

5

States Securities and Exchange Commission, (xii) all other applicable government agencies to the extent required by the Bankruptcy Rules or the N.D. Tex. L.B.R, and (xiii) the DIP Lender (collectively, the "***Notice Parties***"); and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:

A.      Petition.  On May 10, 2024 (the "***Petition Date***"), each Debtor filed a voluntary petition (each, a "***Petition***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

B.      Disposition.  The Motion is hereby granted in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

C.      Jurisdiction and Venue.  The Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.      <u>Committee Formation</u>. As of the date hereof, the U.S. Trustee has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "***Committee***").  The statutory and legal predicates for the relief sought herein include sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and the applicable provisions of the Local Rules.

E.      <u>Notice</u>.  Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.      <u>Debtors' Acknowledgments, Stipulations, and Agreements</u>.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of any Committee appointed in these Chapter 11 Cases or other parties-in-interest as and, subject to Section 4.1 of this Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge and agree that:

(a)      <u>Prepetition Stipulations</u>

(i)      <u>Prepetition Loan Documents</u>.  Prior to the commencement of the Chapter 11 Cases, Prepetition Agent and Prepetition Lender made loans, advances and provided other financial accommodations to Borrower and KidKraft Netherlands B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of The Netherlands (the "***Dutch Borrower***"), jointly and severally with respect to the Priority Revolving Loans (as defined in the Prepetition Credit Agreement), Guarantors and certain of their non-Debtor affiliates (the Dutch Borrower, together with the other non-Debtor affiliates party to the Prepetition Credit Agreement, "***Non-Debtor Loan Parties***"), pursuant to the terms and

conditions set forth in (1) that certain Amended and Restated First Lien Credit Agreement dated as of April 3, 2020 (as amended, supplemented, or otherwise modified prior to the Petition Date, the "***Prepetition Credit Agreement***"); (2) that certain Amended and Restated First Lien Security Agreement as of dated April 3, 2020 by and among Borrower, the Guarantors, and the Non-Debtor Loan Parties (the Non-Debtor Loan Parties, together with the Borrower and the Guarantors, the "***Grantors***") and Prepetition Agent, as Secured Party (as amended, supplemented, or otherwise modified prior to the Petition Date, including the *Security Agreement Supplement*, dated January 30, 2024, the "***Prepetition Security Agreement***"); and (3) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or Prepetition Lender in connection with the Prepetition Credit Agreement or the Prepetition Security Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Prepetition Credit Agreement and the Prepetition Security Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "***Prepetition Loan Documents***").

(ii)      <u>Prepetition Obligations</u>.  As of the Petition Date, the Borrower, Guarantors and Non-Debtor Loan Parties were indebted, jointly and severally, to Prepetition Agent and Prepetition Lender under the Prepetition Loan Documents in respect of outstanding Loans (as defined in the Prepetition Credit Agreement) in an aggregate principal amount of not less than $144.9 million, plus all other Obligations (as defined in the Prepetition Credit Agreement), plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys'

fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**_Prepetition Obligations_**").  The Prepetition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Borrower, Guarantors, and the Non-Debtor Loan Parties and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, cause of action, counterclaim, setoff or defense of any kind, nature or description, in any such case, arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order, which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Obligations or liens and security interest securing the same described in clause (F)(a)(iii) below, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non- bankruptcy law.  The Debtors and their estates (a) have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against Prepetition Agent or Prepetition Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Loan Documents or Prepetition Obligations; and (b) have waived, discharged, and released any right to challenge any of the Prepetition Obligations, including the priority of the Prepetition Obligations, and the validity, extent, and priority of the liens securing the Prepetition Obligations.

4889-9030-5723

(iii)      <u>Prepetition Collateral</u>.  As of the Petition Date, the Prepetition Obligations were fully secured pursuant to the Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (except, in the case of perfection, for (A) Excluded Accounts and (B) commercial tort claims, letter of credit rights, certificate of title vehicles, and other assets, in each case of this clause (B), to the extent expressly excluded from the requirement to perfect liens thereon pursuant to the Prepetition Loan Documents) (the "***Prepetition Liens***") granted by Borrower, Guarantors, and the Non-Debtor Loan Parties for fair consideration and reasonably equivalent value to DIP Agent, for the benefit of itself and DIP Lender under the Prepetition Loan Documents, in and upon all of the of the Debtors' and Non-Debtor Loan Parties' assets and property other than Excluded Assets, Excluded Receivables, and Consumer Goods (as each such term is defined in the Prepetition Credit Agreement) (collectively, the "***Prepetition Collateral***"), including all cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors (other than Excluded Accounts), in each case, whether as Prepetition Collateral or which represents income, proceeds, products, rents or profits of non-cash Prepetition Collateral (collectively, the "***Cash Collateral***"), subject only to the liens permitted under Section 7.01 of the Prepetition Credit Agreement to the extent that such security interests, liens or encumbrances are (A) valid, perfected and non-avoidable security interests, liens or encumbrances securing valid, binding and unavoidable debt permitted under the Prepetition Loan Documents, and (B) senior to, have not been, and are not subject to being subordinated to the Prepetition Liens or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "***Prepetition Permitted Liens***").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or

4889-9030-5723

description, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, that would in any way affect the validity, enforceability and non-avoidability of any of Prepetition Agent's and Prepetition Lender's liens, claims or security interests in the Prepetition Collateral.

(iv)   <u>Default by the Debtors</u>.  The Debtors acknowledge and stipulate that one or more Events of Default (as defined in the Prepetition Credit Agreement) have occurred and are continuing as of the date hereof.

(v)   <u>Proof of Claim</u>.  The acknowledgment by the Debtors of the Prepetition Obligations and the liens, rights, priorities and protections granted to or in favor of Prepetition Agent and Prepetition Lender in respect of the Prepetition Collateral as set forth herein and in the Prepetition Loan Documents shall be deemed a timely filed proof of claim on behalf of Prepetition Agent and Prepetition Lender in these Chapter 11 Cases.

(vi)   <u>Indemnity</u>.  The DIP Agent, DIP Lender, and Prepetition Secured Parties have acted in good faith, without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of granting DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, each of the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof of in any way related thereto, provided that no such parties will be

11

indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' bad faith, gross negligence, fraud, or willful misconduct.  No exception or defense exists in contract, law, or equity to the Debtors' obligation under this paragraph to indemnify and/or hold harmless each of the Prepetition Secured Parties and the DIP Secured Parties.

(vii)      Release. Each Debtor, on behalf of itself and its successors and assigns, and their respective agents, officers, directors, employees, attorneys, professionals, predecessors, successors, and assigns (collectively, the "*Releasors*"), hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the Prepetition Agent and Prepetition Lender and each of their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (collectively, the "*Prepetition Releasees*") of and from any and all claims, demands, liabilities, damages, expenses, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, whether arising in law or otherwise, and whether known or unknown, matured, or contingent that any of the Releasors had, have or hereafter can or may have against any Prepetition Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Prepetition Obligations, the Prepetition Loan Documents, the DIP Obligations, the RSA, the Plan, the Backyard Sale, the DIP Documents and any DIP Loans or other financial accommodations made by DIP Agent and/or DIP Lender to the Debtors pursuant to the Prepetition Loan Documents or the DIP Documents including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets,

12

defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents, or the Prepetition Liens.

(viii)    <u>Non-Debtor Loan Parties</u>.  The Dutch Borrower and the Borrower are jointly and severally liable with respect to the Priority Revolving Loans (as defined in the Prepetition Credit Agreement) and each of the other Non-Debtor Loan Parties and the Debtors are jointly and severally liable with respect to the Prepetition Obligations.

G.    <u>Findings Regarding the DIP Financing</u>.

(i)    <u>DIP Financing</u>.  The Debtors have requested from the DIP Secured Parties, and the DIP Secured Parties are willing, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the DIP Term Sheet and the other DIP Documents, respectively.

(ii)    <u>Need for DIP Financing</u>.  The Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to pay their vendors, suppliers, and employees, and to otherwise fund their operations is essential to the preservation and maintenance of the going concern value of each Debtor and consummation of the Backyard Sale and the Plan.  Accordingly, the Debtors have an immediate need to enter into the

DIP Facility in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy Code, the "*Estates*") in order to maximize the value of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the DIP Facility.  In light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, the DIP Facility represents the best financing available to the Debtors at this time, and are in the best interests of the Debtors, their respective Estates, and all of their stakeholders.

(iv)    <u>Initial Budget</u>.  The Debtors have prepared and delivered to DIP Agent and DIP Lender an initial nine-week budget (the "*Initial Budget*" and each subsequent approved budget pursuant to section 1.8 hereof, an "*Approved Budget*") reflecting the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week for the covered periods, a summary of which is attached  to the DIP Term Sheet.  The Initial Budget was prepared by the Debtors, with the assistance of their professional advisors and management, and the Debtors represent that the Initial Budget is achievable in accordance with the terms of the DIP Documents and this Interim Order.  DIP Agent and DIP Lender are relying upon the Debtors' compliance with

the Initial Budget in accordance with this Interim Order in determining to enter into the DIP Facility.

(v)     Business Judgment and Good Faith Pursuant to § 364(e).  The terms of the DIP Documents and this Interim Order are fair, just and reasonable under the circumstances, ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and DIP Agent, with all parties being represented by competent counsel.  Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" by DIP Agent and DIP Lender, as that term is used in section 364(e) of the Bankruptcy Code and the DIP Obligations, the DIP Liens, and the DIP Superpriority Claim are entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(vi)    Credit Bid Rights.  To the fullest extent permitted by section 363(k) of the Bankruptcy Code, in connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral (as applicable) including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code (any of the foregoing sales or dispositions, a "*Sale*"), (a) DIP Agent (on behalf of their respective DIP Secured Parties) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations, (b) the Prepetition Agent (on behalf of and at the written direction of the Prepetition Secured

15

Parties) shall have the right to credit bid, in accordance with the Prepetition Loan Documents, up to the full amount of the Prepetition Obligations, (c) DIP Agent and Prepetition Agent shall have the absolute right (at the direction of their respective Secured Parties) to assign, transfer, sell or otherwise dispose of its rights to credit bid in connection with the assignment, transfer, sale, or disposition of the corresponding DIP Obligations, except as may be set forth in the DIP Documents, and Prepetition Obligations, respectively, and (d) each of the Debtors hereby acknowledge and agree that they shall not object, or support any objection, to or limit, or support any limitation on, any other such DIP Secured Parties' or Prepetition Secured Parties' rights to credit bid, as applicable, up to the full amount of the DIP Obligations and Prepetition Obligations, respectively.

(vii)      <u>Sections 506(c) and 552(b) Waivers</u>.  As a material inducement to (a) the DIP Secured Parties' agreement to provide the DIP Facility and the Prepetition Secured Parties' consent to the use of Cash Collateral in accordance with the Approved Budget, (b) the DIP Secured Parties' agreement to subordinate the DIP Liens and the DIP Superpriority Claim to the Carve-Out, and (c) the Prepetition Secured Parties' agreement to subordinate the Prepetition Liens, Prepetition Replacement Lien and the Prepetition Adequate Protection Superpriority Claim to the Carve-Out, the DIP Liens, and the DIP Superpriority Claim, subject to entry of the Final Order (retroactive to the Petition Date), each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to receive (1) a waiver of any equities of the case exceptions or claim sunder section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

4889-9030-5723

(viii)    Good Cause.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations in anticipation of the consummation of the Backyard Sale and Plan, (2) preserve and maximize the value of the Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(ix)    Adequate Protection. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), to the extent set forth in the Interim Order.

(x)    Immediate Entry.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party appearing in the Chapter 11 Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled. Based upon the foregoing, and after due consideration and good cause appearing therefor.

IT IS HEREBY ORDERED THAT:

Section 1.    Authorization and Conditions to Financing.

1.1    Motion Granted.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

17

1.2     <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.  Borrower is hereby authorized and empowered to immediately borrow and obtain DIP Loans and to incur indebtedness and other Obligations (as defined in the DIP Term Sheet) (collectively referred to as the "***DIP Obligations***"), and the Guarantors are hereby authorized to guarantee such DIP Obligations, all pursuant to the terms and conditions of this Interim Order, the DIP Term Sheet, and the other DIP Documents, during the period commencing on the date of entry of this Interim Order through and including the entry of the Final Order, up to an aggregate amount equal to the Interim DIP Commitment *plus* the Roll-Up Amount. Subject to the terms and conditions contained in this Interim Order and the DIP Documents, the Debtors shall use the proceeds of the DIP Loans and other credit and financial accommodations provided by DIP Agent and DIP Lender under the DIP Term Sheet and the other DIP Documents solely for payment of expenses set forth in the Approved Budget and all interest, costs, fees, amounts, and other obligations owing to the DIP Secured Parties in accordance with the terms and conditions of the DIP Documents and this Interim Order.

1.3     <u>Financing Documents</u>

(a)     <u>Authorization</u>.  The Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Term Sheet and the other DIP Documents.  Upon execution and delivery of the DIP Term Sheet and the other DIP Documents, such agreements and documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such agreements, documents and this Interim Order.  No obligation, payment, transfer or grant of security arising under the DIP Term Sheet, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any

18

applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Documents as such become due and without need to obtain further Court approval, including, without limitation, monitoring fees, agency fees, alternate transaction fees, closing fees, unused facility fees, continuing commitment fees, backstop fees, exit fees, servicing fees, yield maintenance premiums, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents. Upon execution and delivery, the DIP Term Sheet and other DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.

(b)     Approval; Evidence of Borrowing Arrangements.    All terms, conditions and covenants set forth in the DIP Documents (including, without limitation, the DIP Term Sheet) are approved to the extent necessary to implement the terms and provisions of this Interim Order.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of (a) the borrowing arrangements by and among the Debtors, DIP Agent and DIP Lender, and (b) each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Term Sheet and the other DIP Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder,

including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of DIP Agent's and DIP Lender's consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Documents.

(c)   Amendment.   Subject to the terms and conditions of the DIP Term Sheet and the other DIP Documents, Debtors and DIP Agent may amend, modify, supplement or waive any provision of the DIP Documents (a "***DIP Amendment***") without further approval or order of the Court, so long as (a) such DIP Amendment is  not materially burdensome on the Debtors or their Estates, and is undertaken in good faith by DIP Agent, DIP Lender and the Debtors; (b) the Debtors provide prior written notice of the DIP Amendment (the "***DIP Amendment Notice***") to the U.S. Trustee and counsel to any Committee, or in the event no such Committee is appointed at the time of such DIP Amendment, the 30 Largest Unsecured Creditors, and (c) the Debtors file the DIP Amendment Notice with the Court; provided, however, that neither consent of the parities notified pursuant to section (b) hereof nor approval of the Court will be necessary to effectuate any such amendment, modification or supplement.  Any material DIP Amendment to the DIP Documents must be approved by the Court to be effective.

1.4   Payment of Prepetition Debt.   The Debtors are authorized to repay all Prepetition Obligations in accordance with the DIP Term Sheet, the other DIP Documents and this Interim Order, including, without limitation, Sections 1.5 and 1.6 of this Interim Order.

1.5   Payments and Application of Payments & DIP Collateral Proceeds; Roll-Up.  The Debtors are authorized and directed to make all payments and transfers of Estate property to DIP Agent as provided for, permitted and/or required under the DIP Term Sheet and the other DIP Documents, which payments and transfers shall not be avoidable or recoverable from DIP Agent or DIP Lender under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or

20

by reason of any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  All proceeds of the DIP Collateral (as defined herein) received by DIP Agent or DIP Lender, and any other amounts or payments received by DIP Agent or DIP Lender in respect of the DIP Obligations, may be applied or deemed to be applied by DIP Agent, in its discretion, first, to the indefeasible repayment of the DIP Obligations, and then to the indefeasible repayment in full of the Prepetition Obligations, all in accordance with the DIP Term Sheet, the other DIP Documents and this Interim Order.  Without limiting the generality of the foregoing, the Debtors are authorized without further order of the Court to pay or reimburse DIP Agent and DIP Lender for future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by DIP Agent or DIP Lender in connection with the financing transactions as provided in this Interim Order and the DIP Documents, all of which shall be and are included as part of the principal amount of the DIP Obligations and secured by the DIP Collateral.

1.6     <u>Continuation of Prepetition Procedures</u>.  Except to the extent expressly set forth in the DIP Documents, all prepetition practices and procedures for the payment and collection of proceeds of the Prepetition Collateral (as defined herein), the turnover of cash, the delivery of property to Prepetition Agent and Prepetition Lender, and any blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Cases.

1.7     <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless each of the Prepetition Secured Parties and DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors,

21

members, managers, shareholders and employees, past, present, and future, and their respective

heirs, predecessors, successors and assigns in accordance with, and subject to the terms of, the DIP

Documents, which indemnification is hereby authorized and approved.

1.8    Approved Budget; Permitted Variances; Debtor Professional Reports.

(a)    The Debtors shall use Cash Collateral and the proceeds of the DIP Facility

solely in accordance with the Approved Budget and the DIP Documents.  Commencing on the

Monday of the first full calendar week after the Petition Date at 5:00 p.m. (Central Time) and

continuing on the two (2)-week anniversary thereafter (or such other times as the Debtors may

elect with the consent of DIP Lender and Backyard Products, LLP (the "*Purchaser*"), the Debtors

shall deliver to DIP Agent an updated budget with the form and level of detail set forth in the Initial

Budget, and shall include, weekly basis cash revenues, receipts, expenses, professional fees and

other disbursements (including, without limitation, any payments with respect to real property

leases), net cash flows, inventory receipts and other items on a line item basis (including all

necessary and required expenses that the Debtors expect to incur and anticipated uses of proceeds

of draws under the DIP Facilities).  If such budget is in form and substance satisfactory to DIP

Agent in its sole discretion and consented to by the Purchaser (such consent not to be unreasonably

withheld, conditioned, or delayed, other than line items of the budget pertaining to the

Reimbursement Amounts (as defined in the APA) or which impact the Purchase Price (as defined

in the APA), for which such consent shall be in the discretion of the Purchaser), it shall constitute

the "Approved Budget" for purposes of this Interim Order.  Any amendments, supplements or

modifications to the Approved Budget shall be subject to the prior written approval of DIP Lender

in its sole discretion and the prior written consent of the Purchaser (such consent not to be

unreasonably withheld, conditioned, or delayed, other than line items of the budget pertaining to

22

the Reimbursement Amounts or which impact the Purchase Price, for which such consent shall be in the discretion of the Purchaser), prior to the implementation thereof.  Notwithstanding anything to the contrary herein, Purchaser shall not have any consent rights with respect to the Approved Budget following any breach by Purchaser of the APA or termination of the APA.

(b)        Commencing on the Wednesday of the first full calendar week after the Petition Date at 5:00 p.m. (Central Time), and on a weekly basis thereafter (or at such other times as the Debtors may elect with the consent of DIP Lender) the Debtors shall deliver to DIP Lender a variance report in form and substance reasonably acceptable to DIP Lender (an "**_Approved Variance Report_**") showing comparisons of actual results for each line item against such line item in the Approved Budget.  Thereafter, the Debtors shall deliver to DIP Lender, an Approved Variance Report on a weekly basis for (a) the preceding week, and (b) the trailing four (4) week period (or, if fewer than four (4) weeks have lapsed since the Petition Date, then for the trailing one, two or three week period, as applicable).  Any amendments, supplements or modifications to an Approved Variance Report shall be subject to the prior written approval of DIP Lender in its sole discretion.

(c)        Each Approved Variance Report shall indicate whether there are any adverse variances that exceed any of the Permitted Variances.  "**_Permitted Variances_**" shall mean variances: (a) up to 15% of the aggregate for all cash disbursements line-items in the Approved Budget (other than fees and expenses of counsel to the DIP Secured Parties and Professional Persons), (b) less than 20% of the aggregate for all cash receipts in the Approved Budget, and (c) up to 15% of all fees and expenses incurred on a per-Professional Person basis (the "**_Professional Fee Variance_**"), in each case calculated weekly on a rolling four (4) week basis commencing as of the Petition Date, with the first such testing of (a) and (b) to begin three (3) weeks from the Petition

23

Date, and the Professional Fee Variance testing set forth in (c) shall be performed weekly beginning the week following the Petition Date and not on a rolling four (4) week basis.

(d)      If any Professional Person exceeds the Professional Fee Variance, such Professional Person will make a representative available to meet and confer with DIP Lender as soon as practicable and no later than two (2) Business Days after delivery of such Approved Variance Report, to discuss a good faith modification to the Approved Budget (the "***Meet and Confer***").  If DIP Lender and such Professional Person cannot mutually agree on a modification following the Meet and Confer, DIP Lender may, in its sole discretion, declare an Event of Default, consistent with the provisions herein.

(e)      Commencing on the Monday of the first full calendar week after the Petition Date and continuing weekly thereafter, each Debtor Professional shall submit a report of the prior week's accrued fees and expenses to the DIP Agent (the "***Debtor Professional Report***").  The DIP Agent shall review the Debtor Professional Reports, may test the accrued fees and expenses in the Debtor Professional Report against the Professional Fee Variance, and must submit a written objection (if any) to the applicable Debtor Professional no later than two (2) Business Days following delivery of the Debtor Professional Report (the "***Review Period***").  If the DIP Agent does not submit a written objection at the close of the Review Period, the Debtors shall fund the full amount of accrued fees and expenses in such Debtor Professional Report into the Professional Carve Out Reserve Account.  If the DIP Agent submits a written objection to the Debtor Professional Report prior to the end of the Review Period, the DIP Agent and the applicable Debtor Professional shall conduct a Meet and Confer within two (2) Business Days.  At the conclusion of the Meet and Confer, if the DIP Agent elects to declare an Event of Default, the Debtors shall only fund an amount not to exceed 150% of such Debtor Professional's budgeted amount as set forth in the Approved Budget for the period covered by such Debtor Professional Report.  For the

24

avoidance of doubt, any Event of Default or other action taken by the DIP Agent shall not impact any amounts previously funded in the Funded Reserve Account in compliance with the procedures herein. For the avoidance of doubt, the DIP Agent's request for a Meet and Confer shall not (in and of itself absent an Event of Default declaration) impact any terms of the DIP Documents, including any subsequent reporting and testing as set forth herein, nor the DIP Secured Parties' obligations to loan and the Debtors' obligations to fund the Funded Reserve Account in accordance with the DIP Documents after a Meet and Confer is requested.

Section 2.    DIP Liens; Superpriority Administrative Claim Status.

    2.1    DIP Liens.

        (a)    Granting of DIP Liens.    To secure the prompt payment and performance of any and all DIP Obligations of the Debtors to DIP Agent and DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, DIP Agent, for the benefit of itself and DIP Lender, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of any of the Estates may have (subject only to the Carve-Out and the Permitted Liens), in and upon all assets and property (whether tangible, intangible, real, personal or mixed), wherever located, whether now owned or owing to, or hereafter acquired by, or arising in favor of each Debtor and its respective chapter 11 estate, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, Cash Collateral, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, equity interests, intellectual property, and upon entry of the Final Order, the proceeds of any avoidance actions under chapter 5 of the Bankruptcy Code (all of the foregoing collectively, the "***DIP Collateral***"). The DIP Collateral shall also include any rents, issues, products, proceeds, and profits generated by any item of DIP Collateral, without the necessity of

25

any further action of any kind or nature by DIP Agent to claim or perfect such rents, issues, products, or proceeds.

(b)    <u>Priority of DIP Liens</u>.  The liens and security interests of DIP Agent and DIP Lender granted under the DIP Documents and this Interim Order on the DIP Collateral securing all DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; <u>provided, however</u>, that DIP Agent's and DIP Lender's liens on and security interests in the DIP Collateral shall be subject only to (a) such priming liens or interests imposed by applicable non-bankruptcy law that are in existence as of the Petition Date, and are otherwise unavoidable (collectively, "***Permitted Liens***") and (b) the Carve-Out.  The right of a seller of goods to reclaim any goods whether under section 546(c) of the Bankruptcy Code or otherwise shall not be a Permitted Lien or Prepetition Lien; rather, any such alleged claim arising or asserted as a right of reclamation shall have the same rights and priority with respect to the DIP Liens, Prepetition Liens and Prepetition Payment Liens, as such claims had with respect to the Prepetition Liens.

(c)    <u>Right of Repayment</u>.  The right of DIP Agent and DIP Lender to repayment in accordance with the DIP Documents and this Interim Order from the sale or other disposition of the DIP Collateral, or any proceeds thereof, shall be first and senior in priority to all other rights of repayment of every kind, nature, and description (other than the Carve-Out).

(d)    <u>Perfection of DIP Liens and Prepetition Replacement Lien</u>.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all liens and security interests granted herein, including the DIP Liens and the Prepetition

Replacement Lien, which shall be effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation control agreements with any deposit bank or with any other financial institution(s) holding a depository account or other account consisting of or containing Collateral (a "**Perfection Act**").  Notwithstanding the foregoing, if DIP Agent or Prepetition Agent, as applicable, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then such DIP Agent or Prepetition Agent is authorized to perform such act, and the Debtors and Guarantors are authorized to perform such act to the extent necessary or required by the DIP Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  DIP Agent or Prepetition Agent, as applicable, may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should DIP Agent or Prepetition Agent, as applicable, so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the DIP liens and security interests granted herein by virtue of the entry of this Interim Order.

(e)    <u>Nullifying Prepetition Restrictions to DIP Financing</u>. Notwithstanding anything contained in any prepetition agreement, contract, lease, document, note

or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the DIP Documents, any provision that restricts, limits or impairs in any way any Debtor from granting DIP Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Documents or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the DIP Documents, shall not (a) be effective and/or enforceable against any of the Debtors, DIP Agent or DIP Lender, as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to DIP Agent and DIP Lender pursuant to this Interim Order or the DIP Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

(f)    To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Prepetition Replacement Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of the Court.  By virtue of the terms of this Interim Order, to the extent that any DIP Agent or Prepetition Agent, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect

4889-9030-5723

its liens and security interests granted and confirmed by this Interim Order without further action by the applicable DIP Agent or Prepetition Agent, as applicable.

(g)      Except with respect to the Carve-Out, certain Permitted Liens, the DIP Liens, the DIP Superpriority Claims, the Prepetition Replacement Liens, and the Prepetition Adequate Protection Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases against the Debtors (such converted cases, "***Successor Cases***"), their respective Estates, any trustee, or any other estate representative appointed or elected in these Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their respective Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

2.2     Superpriority Administrative Expense Claims.  For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order or the DIP Documents, DIP Agent, for the benefit of itself and DIP Lender, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve-Out), whether or not such expenses or claims may become

29

secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof (the "***DIP Superpriority Claim***").

2.3     Carve-Out.

(a)     Carve-Out.  As used in this Interim Order, the "***Carve-Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed or permitted to be paid at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and by any Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtors' Professionals, "***Professional Persons***") at any time before or on the first business day following delivery by DIP Agent to the Debtors of a Carve-Out Trigger Notice (as defined below), but shall not include any restructuring, sale, transaction or other "success" fee except for such fee earned by Robert W. Baird & Co. Inc. in its capacity as investment banker to the Debtors during such time; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $150,000 incurred after the first business day following delivery by DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (this section (iv) the "***Post-Carve-Out Trigger Notice Cap***"); and (v) an amount up to the amount secured by and necessary to fund the Canadian Priority Charges (as defined in

the DIP Term Sheet) for the beneficiaries thereof (without duplication) in the CCAA Recognition Proceedings. For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by DIP Agent to the Debtors and the Committee (if any), which notice may be delivered in the sole discretion of DIP Agent following the occurrence of an Event of Default, and shall describe the Event of Default, state that the DIP Facility is terminated and that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    Pre-Carve-Out Trigger Notice Funding.  Commencing on the Friday of the first full calendar week following the Petition Date and on a weekly basis thereafter, the DIP Secured Parties shall loan and the Debtors shall fund, using borrowings from the DIP Facility, Cash Collateral, or cash on hand, a segregated account (the "**Funded Reserve Account**") held by the Debtors in trust and solely for the benefit of the Debtor Professionals in an amount equal to the amount of applicable Professional Fees set forth in the Approved Budget, subject to the objection procedures described in Section 1.8(d) hereof and the Prepetition Secured Parties' and DIP Secured Parties' reversionary interest in any unused amounts.  The Debtors shall pay only Allowed Professional Fees from the Funded Reserve Account, and all payments of Allowed Professional Fees incurred prior to the Carve-Out Termination Date shall be paid first from such Funded Reserve Account, provided that this shall not be a limitation on payment of Allowed Professional Fees from sources other than the Funded Reserve Account in the event the Funded Reserve Account does not have sufficient funds or has not been funded as provided above.

(c)    Post-Carve-Out Trigger Notice Funding.  On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to counsel for the Debtors and the Committee (the "**Carve-Out Termination Date**"), the Carve-Out Trigger Notice shall be deemed a draw request and notice of borrowing hereunder and also a demand to the Debtors to utilize all cash on

31

hand as of such date and any available cash thereafter held by any Debtor to fund (A) the Funded Reserve Account in an amount equal to the sum of (x) the amounts set forth in paragraphs (a)(i)-(iii) above, plus (y) the total amount of unpaid Allowed Professional Fees set forth in the "Professional Fees (Escrow Account Funding)" line item of the Approved Budget for any time before or on the first business day following the Carve-Out Termination Date, to the extent not already funded in accordance with Section 2.3(b) hereof, whether such fees have become Allowed Professional Fees prior to the Carve-Out Termination Date, plus (z) the amount set forth in paragraph (a)(v) above to an account designated by the Information Officer in the CCAA Recognition Proceedings for the beneficiaries of the Canadian Priority Charges (the "*Canadian Priority Reserve Account*"); and (B) a segregated escrow account held by the Debtors in trust for the benefit of Professional Persons in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "*Post-Carve-Out Trigger Notice Reserve Account*" and, together with the Funded Reserve Account and the Canadian Priority Reserve Account, the "*Carve-Out Reserve Accounts*"). Prepetition Agent's, Prepetition Lender's, DIP Agent's, and DIP Lender's, in each case to the fullest extent applicable, claims, liens and security interests in any property of the Debtors, including, without limitation, the Prepetition Collateral, the DIP Collateral, Cash Collateral, the Prepetition Adequate Protection Superpriority Claim (as defined below), the DIP Superpriority Claim, any other adequate protection or superpriority claim, and any junior pre- or post-petition lien, interest or claim in favor of any other party, shall be subordinate to the Allowed Professional Fee Claims of the Professional Persons and other beneficiaries thereof as to all funds in the Carve-Out Reserve Accounts.

(d)      No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the payment or

32

reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code provided that the Carve-Out Reserve Accounts shall have been fully funded from cash on hand, Cash Collateral, or proceeds of the DIP Facility.  Nothing in this Interim Order shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, provided that the Carve-Out Reserve Accounts shall have been fully funded, and provided that this shall not be a limitation on payment of Allowed Professional Fees from sources other than the Carve-Out Reserve Accounts in the event the Carve-Out Reserve Accounts does not have sufficient funds or has not be funded as provided above.  Notwithstanding anything herein, nothing shall require the DIP Secured Parties or Prepetition Secured Parties to provide any funding in excess of the DIP Commitment.

(e)      Payment of Allowed Professional Fees Prior to the Carve-Out Termination Date.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Termination Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out; *provided* that, upon the full funding of the Carve-Out Reserve Accounts following the Carve-Out Termination Date, the Debtors' authorization to use Cash Collateral to fund the Carve-Out Reserve Accounts shall cease, and the liens and claims of the DIP Agent and DIP Lender shall cease being subordinated to the Carve-Out, each with respect to and to the extent of the amounts so funded.

(f)      Payment of Carve-Out on or After the Carve-Out Termination Date.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Termination Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a

33

dollar-for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of, the

DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections

granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

2.4    Payment of Carve-Out.

Payment from the Carve-Out Reserve Accounts, whether by or on behalf of

DIP Agent or DIP Lender, shall not and shall not be deemed to reduce the DIP Obligations, and

shall not be deemed to subordinate any of any of DIP Agent's or DIP Lender's liens and security

interests in the Prepetition Collateral, any other DIP Collateral, the Prepetition Adequate

Protection Superpriority Claim, or the DIP Superpriority Claim to any junior pre- or post-petition

lien, interest or claim in favor of any other party other than the Carve-Out for Professional Persons.

2.5    Excluded Professional Fees.

(a)    Notwithstanding anything to the contrary in this Interim Order, no

DIP Collateral (or proceeds thereof) nor any DIP Loans or any other credit or financial

accommodations provided under or in connection with the DIP Documents shall be used to pay

any Allowed Professional Fees or any other fees or expenses incurred by any Professional Person

in connection with any of the following:

(i)    an assertion or joinder in any claim, counter-claim, action,

proceeding, application, motion, objection, defense or other contested matter seeking any

order, judgment, determination or similar relief: (A) challenging the legality, validity,

priority, perfection, or enforceability of (I) the Prepetition Obligations or any Prepetition

Secured Parties' liens on and security interests in the Prepetition Collateral or (II) the DIP

Obligations or any DIP Secured Parties' liens on and security interests in the DIP

Collateral; (B) invalidating, setting aside, avoiding, recharacterizing or subordinating, in

4889-9030-5723

whole or in part, (I) the Prepetition Obligations or any Prepetition Secured Parties' liens on and security interests in the Prepetition Collateral or (II) the DIP Obligations or any DIP Secured Parties' liens on and security interests in the DIP Collateral; or (C) preventing, hindering or delaying DIP Agent's or DIP Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any DIP Collateral in accordance with the terms and conditions of the DIP Term Sheet, the DIP Documents, and this Interim Order other than reasonable and documented fees in connection with a good faith challenge of an asserted Event of Default and related Carve-Out Trigger Notice;

(ii)    a request made to this Court to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of DIP Agent and Prepetition Agent;

(iii)    a request made to this Court for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or section 364(d) of the Bankruptcy Code or otherwise incur Indebtedness (as defined in the Prepetition Credit Agreement) without the prior written consent of DIP Agent (except to the extent permitted under the DIP Documents);

(iv)    the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against any DIP Secured Party or Prepetition Secured Party or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest or disgorge any payments under chapter 5 of the Bankruptcy Code or any applicable state law equivalents;

35

(v)     the cost of a Committee's investigation into any claims against any Prepetition Secured Parties arising under or in connection with the Prepetition Loan Documents in excess of $25,000 (the "**Committee Investigation Budget**"); provided that no portion of the Committee Investigation Budget may be used to seek formal discovery or commence any challenge, objection, or prosecute any such Challenge, claims or causes of actions; or

(vi)    any act which has or could directly, materially and adversely modify or compromise the rights and remedies of any of the DIP Secured Parties or Prepetition Secured Parties under this Interim Order, or which directly results in the occurrence of an Event of Default under this Interim Order or any DIP Documents.

2.6     Limited Use of Cash Collateral; Adequate Protection.

(a)     Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, the DIP Term Sheet, the DIP Documents, and in accordance with the Approved Budget, Borrower shall be and are hereby authorized to use Cash Collateral for the period commencing on the date of this Interim Order and terminating on the Carve-Out Termination Date, subject to the liens and security interests granted to Prepetition Agent and Prepetition Lender; provided that during the Remedies Notice Period (as defined herein) the Debtors may use Cash Collateral solely for the following amounts and expenses: (i) to fund the Carve-Out Reserve Accounts in accordance with paragraph 2.3 above; and (ii) to pay expenses critical to the administration of the Estates, as agreed by DIP Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds

36

resulting therefrom, except as expressly permitted in this Interim Order, the DIP Documents and in accordance with the Approved Budget.

(b)    Prepetition Replacement Lien.    As adequate protection for the diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) on account of the Borrower's use of such Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out on a dollar-for dollar basis (collectively, the "*Diminution in Value*"), Prepetition Agent, for the benefit of itself and Prepetition Lender, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all DIP Collateral (the "*Prepetition Replacement Lien*").    The Prepetition Replacement Lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Permitted Liens, and (C) the DIP Liens on the DIP Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(c)    Prepetition Adequate Protection Superpriority Claim.    As adequate protection for the Diminution in Value, Prepetition Agent, for the benefit of itself and Prepetition Lender, is hereby granted, solely to the extent of the Diminution in Value, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code in each of the Chapter 11 Cases and any successor bankruptcy cases (the "*Prepetition Adequate Protection Superpriority Claim*").    The Prepetition Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out, and (B) the DIP Superpriority Claim, and shall otherwise have priority over all administrative expense claims and

4889-9030-5723

unsecured claims against the Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

(d)    Adequate Protection Payments and Protections.  Upon entry of this Interim Order, as further adequate protection (the "***Adequate Protection Payments***") for the Diminution in Value, the Debtors are authorized and directed to provide adequate protection to the Prepetition Secured Parties in the form of payment in cash (regardless of the Approved Budget, and regardless of any Diminution in Value) for (i) the reasonable, documented fees, expenses, and disbursements (including without limitation, the reasonable and documented fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by Prepetition Secured Parties arising prior to the Petition Date, and (ii) the reasonable, documented fees, expenses, and disbursements (including without limitation, the fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by Prepetition Secured Parties arising subsequent to the Petition Date.

Section 3.    Default; Rights and Remedies; Relief from Stay.

3.1    Events of Default.  The occurrence of any of the following events shall constitute an "***Event of Default***" under this Interim Order: (a) any Debtor's failure to perform, in any respect, any of their obligations under this Interim Order; or (b) an "Event of Default" under the DIP Term Sheet or any of the other DIP Documents.

3.2    Rights and Remedies upon Event of Default.  Upon the occurrence of an Event of Default, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the DIP Term Sheet and the other DIP Documents, and (b) DIP Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.4 below) as provided in this Interim Order or the DIP Term Sheet or any of the other DIP Documents,

38

as applicable, including, without limitation, declaring all DIP Obligations immediately due and payable, accelerating the DIP Obligations, ceasing to extend DIP Loans, setting off any DIP Obligations with DIP Collateral or proceeds in DIP Agent's or DIP Lender's possession, and enforcing any and all rights with respect to the DIP Collateral.  DIP Agent and DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

    3.3 <u>Expiration of Loan Commitment</u>.  Upon the expiration, termination, or maturity of Borrower's authority to borrow or otherwise obtain other credit accommodations from DIP Agent and DIP Lender pursuant to the terms of this Interim Order and the DIP Documents (except if such authority shall be extended with the prior written consent of DIP Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by DIP Agent or DIP Lender), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.4 of this Interim Order, all of the DIP Obligations shall immediately become due and payable and DIP Agent and DIP Lender shall have no obligation whatsoever to make or extend any loans, advances, provide any financial or credit accommodations to the Debtors or permit the use of Cash Collateral.

    3.4 <u>Modification of Automatic Stay; Remedies Notice Period</u>.

    (a) The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit DIP Agent and DIP Lender to perform any act authorized or permitted under or by virtue of this

Interim Order or the DIP Documents, as applicable, including, without limitation, (I) (A) to implement the DIP financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Documents, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations or the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Documents (subject to Section 5.12 of this Interim Order) and apply such payments to the Prepetition Obligations or DIP Obligations pursuant to the DIP Documents and/or this Interim Order, as applicable, and (II) upon an Event of Default, (A) declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral, (B) to take any other action and exercise all other rights and remedies provided to it by this Interim Order, the DIP Documents or applicable law other than those rights and remedies subject to the expiration of the Remedies Notice Period, and (C) charge interest at the default rate under the DIP Documents.

(b)      In addition, and without limiting anything in Section 3.4(a) hereof, upon the delivery of a Carve-Out Trigger Notice and the expiration of the five (5) business day period thereafter (the "***Remedies Notice Period***"), DIP Agent, acting on behalf of itself and DIP Lender, without further notice, application or order of the Court, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Documents or applicable law that DIP Agent may deem appropriate in its sole discretion to proceed against and realize upon the DIP Collateral or any other assets or properties of the Estates upon which DIP Agent, for the benefit of itself and DIP Lender, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations. Notwithstanding anything to the contrary, any action that DIP Agent is otherwise permitted to take

40

4889-9030-5723

pursuant to this Interim Order to (i) terminate the DIP Commitments, (ii) accelerate the DIP Loans, (iii) send blocking notices or activation notices pursuant to the terms of any deposit account control agreement, and (iv) repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees, indemnities and expense reimbursements), in each case, shall not require any advance notice to the Debtors.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing, and DIP Agent and DIP Lender shall consent to such emergency hearing so long as it occurs within the Remedies Notice Period; provided, that, (A) the sole issue the Debtors may bring before the Court at any such emergency hearing is whether an Event of Default has occurred, and (B) if such emergency hearing cannot be scheduled prior to the expiration of the Remedies Notice Period solely as a result of the Court's unavailability, the Remedies Notice Period shall be automatically extended to the date that is one (1) business day after the first date the Court is available.

Section 4.        Representations; Covenants; and Waivers.

4.1        Reservation of Third-Party Challenge Rights.  Notwithstanding anything in this Interim Order, the stipulations, releases, agreements, and admissions contained in this Interim Order, including, without limitation, paragraph F hereof (collectively, the "***Debtors' Stipulations***"), shall be binding in all circumstances on the Debtors, their respective Estates and any successor (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto) provided that, the Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if any), unless (a) any such party in interest with standing and authority, including the Committee (if any) has timely filed a complaint or motion seeking authority to commence litigation as a representative of the estate (a "***Challenge***") before the earliest of (i) the objection deadline for the Plan, (ii) sixty (60) calendar days from the date of appointment of the Committee

41

by the U.S. Trustee, and (iii) seventy-five (75) calendar days from the Petition Date for all parties other than the Committee (if any) (the "***Challenge Period***") challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Obligations or Prepetition Liens, or otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Obligations or Prepetition Liens and (b) such Challenge sets for the with specificity the basis for such challenge, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred.  For the avoidance of doubt, a party's commencement of a timely Challenge shall preserve the Challenge Period only with respect to such party.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any), standing or authority to pursue any Challenge or cause of action belonging to the Debtors or their respective Estates, including, without limitation, claims and defenses with respect to the Prepetition Credit Agreements or the Prepetition Liens on the Prepetition Collateral.  If any Challenge is timely commenced, the Debtors' Stipulations shall nonetheless remain binding and conclusive (as provided in this paragraph) on the Debtors, the Committee (if any), and any other person or entity, except as to any specific findings and admissions that were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  If no such Challenge is timely and properly filed, or if a Challenge is timely and properly filed but denied, (i) the Prepetition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Liens on and security interest in the Prepetition Collateral shall be deemed legal, valid,

42

perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Carve-Out and Permitted Liens, and (ii) Prepetition Agent and Prepetition Lender, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Loan Documents, and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time.  Nothing contained in this Section 4.1(a) shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to DIP Agent or DIP Lender in connection with the DIP Documents, and any other post-petition financial and credit accommodations provided by DIP Agent and DIP Lender to the Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Documents.

   4.2 <u>Debtors' Waivers</u>.  Prior to the indefeasible repayment in full in cash of all Prepetition Obligations and all DIP Obligations ("***Repayment in Full***"), any request by the Debtors of this Court without the prior consent of the DIP Agent with respect to the following shall also constitute an Event of Default: (a) to use Cash Collateral under section 363 of the Bankruptcy Code other than as provided in this Interim Order, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Prepetition Collateral is less than the Prepetition Obligations, (d) to propose, support or have a plan of reorganization or liquidation that is inconsistent with the Plan, Backyard Sale or RSA, or

43

(e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of DIP Agent or DIP Lender as provided in this Interim Order and the DIP Documents or DIP Agent's or DIP Lender's exercise of such rights or remedies; *provided, however*, that DIP Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party.

4.3     Section 506(c) Claims.  Subject to entry of the Final Order, no costs or expenses of administration which have or may be incurred in the Chapter 11 Cases shall be charged against DIP Agent or DIP Lender, their respective claims, or the DIP Collateral pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise without the prior written consent of DIP Agent, and no such consent shall be implied from any other action, inaction or acquiescence by DIP Agent or DIP Lender.

4.4     DIP Collateral Rights.  Until the occurrence of Repayment in Full:

(a)     no other party shall foreclose or otherwise seek to enforce any junior lien or claim in DIP Collateral and

(b)     upon and after the delivery of a Carve-Out Trigger Notice and the expiration of the Remedies Notice Period, if requested by the DIP Agent in connection with such exercise of rights and remedies, the Debtors shall cooperate with the DIP Agent to, among other things, (i) make reasonable efforts to collect accounts receivable, without setoff by any account debtor, (ii) provide at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent (including any collateral liquidator or consultant), (iii) provide the DIP Agent and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP

44

Agent or their respective representatives, (iv) perform all other obligations set forth in the DIP

Documents, and (v) take reasonable steps to safeguard and protect the DIP Collateral.

4.5      Release of DIP Secured Parties.   Each of the Releasors hereby forever,

unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP

Secured Parties and their respective successors and assigns, and their present and former

shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys,

employees and other representatives (collectively, the "***DIP Releasees***") of and from any and all

claims, demands, liabilities, damages, expenses, responsibilities, disputes, remedies, causes of

action, indebtedness and obligations, of every kind, nature and description, whether arising in law

or otherwise, and whether known or unknown, matured, or contingent that any of the Releasors

had, have or hereafter can or may have against any DIP Releasees as of the date hereof, in respect

of events that occurred on or prior to the date hereof with respect to the Debtors, the Prepetition

Obligations, the Prepetition Loan Documents, the DIP Obligations, the RSA, the Plan, the

Backyard Sale, the DIP Documents and any DIP Loans or other financial accommodations made

by DIP Agent and/or DIP Lender to the Debtors pursuant to the Prepetition Loan Documents or

the DIP Documents including, without limitation, any so-called "lender liability" claims or

defenses, (a) any so-called "lender liability" or equitable subordination claims or defenses,

(b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under

the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights,

objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever,

whether arising at law or in equity, including any recharacterization, recoupment, subordination,

avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5

of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign

law, including, without limitation, any right to assert any disgorgement or recovery, in each case,

45

with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any

of the DIP Obligations, the DIP Documents, or the DIP Liens.

Section 5.    <u>Other Rights and DIP Obligations</u>.

     5.1    <u>No Modification or Stay of This Interim Order</u>.  The DIP Agent and DIP

Lender have acted in good faith in connection with the DIP Facility and with this Interim Order,

and their reliance on this Interim Order is in good faith, and the DIP Agent and DIP Lender are

hereby entitled to the protections of section 364(e) of the Bankruptcy Code.  Notwithstanding

(a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim

Order, the DIP Documents or any term hereunder or thereunder, (b) the failure to obtain a Final

Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more

of the Chapter 11 Cases (each, a "***Subject Event***"), (x) the acts taken by each of DIP Agent and

DIP Lender in accordance with this Interim Order, and (y) the DIP Obligations incurred or arising

prior to DIP Agent's actual receipt of written notice from the Debtors expressly describing the

occurrence of such Subject Event shall, in each instance, be governed in all respects by the original

provisions of this Interim Order, and the acts taken by DIP Agent and DIP Lender in accordance

with this Interim Order, and the liens granted to DIP Agent and DIP Lender in the DIP Collateral,

and all other rights, remedies, privileges, and benefits in favor of  DIP Agent and DIP Lender

pursuant to this Interim Order and the DIP Documents shall remain valid and in full force and

effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the

term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any

proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by the

Court or any other tribunal.

     5.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  DIP Agent and Prepetition

Agent, as applicable, shall have the right to waive any of the terms, rights and remedies provided

or acknowledged in this Interim Order that are in favor of the DIP Secured Parties and Prepetition Secured Parties, respectively (the "***Lender Rights***"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by DIP Agent or Prepetition Agent of any Lender Rights shall not be or constitute a continuing waiver unless expressly provided therein.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject any of the DIP Secured Parties or Prepetition Secured Parties to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to any of the DIP Secured Parties or Prepetition Secured Parties.

5.3     Disposition of DIP Collateral.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business, other than pursuant to the terms of the DIP Term Sheet, this Interim Order, and the Approved Budget, without the prior written consent of DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by DIP Agent or DIP Lender) and, in each case, an order of the Court.

5.4     Inventory.  The Debtors shall not, without the consent of DIP Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5     Reservation of Rights.  The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and

4889-9030-5723

Prepetition Secured Party to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Documents, the Prepetition Loan Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professional Persons or other parties seeking compensation or reimbursement from the Estates and to pursue any and all rights and remedies against any Non-Debtor Loan Party.

       5.6   <u>Binding Effect</u>.

       (a)   The provisions of this Interim Order and the DIP Documents, the DIP Obligations, the Prepetition Adequate Protection Superpriority Claim, the DIP Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of DIP Agent and DIP Lender provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Chapter 11 Cases.

       (b)   Any order dismissing one or more of the Chapter 11 Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Superpriority Claim and DIP Agent's and DIP Lender's liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and

effect notwithstanding such dismissal until Repayment in Full, and (b) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)     In the event the Court modifies any of the provisions of this Interim Order or the DIP Documents following a Final Hearing, such modifications shall not affect the rights or priorities of DIP Agent and DIP Lender pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect to such extent.

(d)     This Interim Order shall be binding upon the Debtors, all parties in interest in the Chapter 11 Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Chapter 11 Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of the Debtors, DIP Agent, DIP Lender, and each of their respective successors and assigns.

5.7     <u>Restrictions on Cash Collateral Use; Additional Financing; Plan Treatment</u>.

(a)     All post-petition advances and other financial accommodations under the DIP Term Sheet and the other DIP Documents are made in reliance on this Interim Order and there shall not at any time be entered in the Chapter 11 Cases, or in any Successor Case, any order (other than the Final Order) which authorizes the use of Cash Collateral, or the sale, lease, or other disposition of property of any Estate in which DIP Agent or DIP Lender have a lien or security interest, except as expressly permitted hereunder or in the DIP Documents, or authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property

49

in which DIP Agent or DIP Lender hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to DIP Agent and DIP Lender herein; unless, in each instance (x) Agent shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by DIP Agent or DIP Lender, or (y) such other order requires Repayment in Full.  The security interests and liens granted to or for the benefit of DIP Agent and DIP Lender hereunder and the rights of DIP Agent and DIP Lender pursuant to this Interim Order and the DIP Documents with respect to the DIP Obligations and the DIP Collateral are cumulative.

(b)      All DIP Obligations and Prepetition Obligations shall receive treatment under the Plan as set forth in the RSA, Plan Term Sheet, and DIP Term Sheet.

5.8      No Owner/Operator Liability.  In determining to make any loan under the DIP Documents (including the negotiation thereof) and authorizing the use of Cash Collateral, none of the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

4889-9030-5723

5.9    <u>Marshalling; 552(b) Waiver</u>.  Subject to entry of the Final Order, (a) none of the DIP Secured Parties or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds of DIP Collateral shall be received and applied in accordance with the DIP Documents and the Prepetition Credit Agreements as applicable, (b) the DIP Secured Parties and the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and (c) the "equities of the case" exception under section 552(b) shall not apply to any of the Prepetition Secured Parties, DIP Secured Parties, DIP Obligations, or Prepetition Obligations.

5.10    <u>Right of Setoff</u>.  To the extent any funds were on deposit with Prepetition Agent as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with Prepetition Agent or Prepetition Lender immediately prior to the filing of the Chapter 11 Cases (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "***Deposited Funds***") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of Prepetition Agent and/or Prepetition Lender, as applicable, pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

5.11    <u>Right to Credit Bid</u>.

(a)    To the fullest extent permitted by section 363(k) of the Bankruptcy Code, in connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral (as applicable) including any Sale: (a) DIP Agent (on behalf of DIP Lender) shall have the right to credit bid on a dollar-for-dollar basis, in accordance with the DIP Documents, up to the full amount of the DIP Obligations, (b) subject to the challenge rights set forth in Section 4.1

51

hereof, Prepetition Agent (on behalf of the Prepetition Lender) shall have the right to credit bid, in accordance with the Prepetition Loan Documents, up to the full amount of the Prepetition Secured Obligations, (c) each of the DIP Agent and Prepetition Agent shall have the absolute right (at the direction of their respective secured parties) to assign, transfer, sell or otherwise dispose of its rights to credit bid in connection with the assignment, transfer, sale, or disposition of the corresponding DIP Obligations, except as may be set forth in the DIP Documents, and (d) each of the Debtors, the Prepetition Secured Parties, and DIP Secured Parties acknowledge and agree that they shall not object, or support any objection, to or limit, or support any limitation on, any other such DIP Secured Parties' or Prepetition Secured Parties' rights to credit bid, up to the full amount of their respective DIP Obligations and/or Prepetition Obligations.

      5.12    <u>Payment and Review of Lender Professional Fees and Expenses</u>.    Each Debtor shall pay all reasonable and documented professional fees and other expenses of the Prepetition Secured Parties and the DIP Secured Parties, whether incurred before or after the Petition Date; <u>provided</u>, <u>that</u> the Debtors shall pay all such reasonable and documented fees and expenses within ten (10) business days of delivery of a statement or invoice for such fees and expenses (it being understood that such statements or invoices may be in summary form and shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek the Court's approval of any such payments) to the Debtors and the Committee (if appointed), unless, within such seven (7) business day period, the Debtors or the Committee (if appointed) serve a written objection upon the requesting party, in which case, the Debtors shall immediately pay such amounts that are not the subject of any objection and pay the withheld amount as subsequently agreed by the parties or ordered by the Court to be paid.

5.13    <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of DIP Agent and DIP Lender contained in this Interim Order, the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Term Sheet, upon reasonable prior written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing, DIP Agent may, subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord and DIP Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that DIP Agent shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by DIP Agent, calculated on a daily per diem basis. Nothing herein shall require DIP Agent to assume any lease as a condition to the rights afforded in this paragraph. For the avoidance of doubt, subject to (and without waiver of) the rights of DIP Agent under applicable nonbankruptcy law, DIP Agent can only enter upon a leased premises after an Event of Default in accordance with (i) a separate agreement with the landlord at the applicable leased premises, or (ii) upon entry of an order of the Court obtained by motion of DIP Agent on such notice to the landlord as shall be required by the Court.

5.14    <u>Indefeasible Payment.</u>  All payments made to or for the benefit of any of the DIP Secured Parties or Prepetition Secured Parties after the Petition Date shall be indefeasible and shall not be subject to disgorgement, counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party for any reason except as may occur pursuant to application of Section 4.1 of this Interim Order.

5.15    Term; Termination.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among the Debtors, DIP Agent and DIP Lender authorized by this Interim Order may be terminated pursuant to the terms of the DIP Term Sheet.

5.16    Limited Effect.  In the event of a conflict between the terms and provisions of any of the DIP Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

5.17    Objections Overruled.  All objections to the entry of this Interim Order are (to the extent not withdrawn, waived, or settled) hereby overruled.

5.18     Retention of Jurisdiction.  The Court retains jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Term Sheet, and the other DIP Documents.

Section 6.        Final Hearing and Objection Deadline.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for [_], 2024 before the Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with the Court and to any Committee (if appointed) and such Committee's counsel, if same shall have filed a request for notice.  Such notice is deemed good and sufficient and that no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) proposed attorneys to the Debtors, (i) Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201, Attn: Matthew D. Struble, and 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036, Attn: Lauren R. Kanzer; (ii) counsel to the DIP Secured Parties and Prepetition Secured Parties, Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020, Attn: Cindi M Giglio and Lucy F. Kweskin;

54

(iii) counsel to the Committee (if appointed); and (iv) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, Texas 75242, Attn:  Meredyth Kippes and shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas, in each case, to allow actual receipt of the foregoing no later than ten (10) days prior to the Final Hearing.

**# # # End of Order # # #**

4889-9030-5723

**Order submitted by:**

**VINSON & ELKINS LLP**

William L. Wallander (Texas Bar No. 20780750)
Matthew D. Struble (Texas Bar No. 24102544)
Kiran Vakamudi (Texas Bar No. 24106540)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
bwallander@velaw.com
mstruble@velaw.com
kvakamudi@velaw.com

- and –

David S. Meyer (*pro hac vice* pending)
Lauren R. Kanzer (*pro hac vice* pending)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com;
lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR
THE DEBTORS AND DEBTORS IN POSSESSION**

## <u>EXHIBIT A</u>

**DIP Term Sheet**

# KIDKRAFT, INC.

**Priming Superpriority Debtor-In-Possession Financing
Term Sheet**

**Dated as of April 25, 2024**

This Priming Superpriority Debtor-in-Possession Financing Term Sheet (including all schedules, annexes and exhibits hereto, this "**Term Sheet**") describes the principal terms and conditions of a proposed DIP Facility to be provided by the DIP Lender to the Borrower in connection with cases (collectively, the "**Chapter 11 Cases**") to be filed by the Debtors in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on or around May 6, 2024 (the date of filing, the "**Petition Date**") and proceedings to be commenced pursuant to Part IV of the *Companies' Creditors Arrangement Act* (Canada) ("**CCAA**" and the related recognition proceedings, the "**CCAA Recognition Proceedings**") in the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**").

The parties contemplate the sale of the Debtors' assets to Backyard Products, LLC or its designee (the "**Backyard Sale**") pursuant to that certain Asset Purchase Agreement (the "**APA**") dated as of the date hereof between KidKraft, Inc., and certain of its affiliates and Backyard Products, LLC (the "**Purchaser**") and an orderly wind down pursuant to a chapter 11 plan (the "**Plan**") to be consummated in the Chapter 11 Cases pursuant to that certain Restructuring Support Agreement to which this Term Sheet is attached (the "**RSA**") and the Plan Term Sheet attached thereto (the "**Plan Term Sheet**").

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **BORROWER:** | KidKraft, Inc. ("**KidKraft**" or "**Borrower**") |
| **GUARANTORS:** | The affiliates of KidKraft listed on Schedule 1 hereto (such affiliates and KidKraft, Inc., each a "**Debtor**" and collectively, the "**Debtors**"), as may be modified with the consent of the DIP Agent and any additional guarantor. |
| **DIP LENDER:** | 1903 Partners, LLC (the "**DIP Lender**") |
| **DIP AGENT:** | GB Funding, LLC (the "**DIP Agent**", and together with the DIP Lender, the "**DIP Secured Parties**") |
| **DIP COMMITMENT:** | The DIP Lender agrees to make senior secured superpriority priming debtor-in-possession loans (each, a "**DIP Loan**" and |

| | |
|---|---|
| | in the aggregate, the "**DIP Loans**") to Borrower from time to time pursuant to a multi-draw debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate amount (i) not to exceed at any time outstanding aggregate commitments of $10.5 million (the "**DIP Commitment**") consisting of a $4.0 million DIP Commitment as of the Interim Closing Date (the "**Interim Commitment**") and an incremental $6.5 million DIP Commitment as of the Final Closing Date (the "**Final Commitment**") *plus* (ii) the Roll-Up Amount. |
| **PURCHASE PRICE CALCULATION:** | Every Wednesday beginning the first full calendar week following the Petition Date, the Debtors shall deliver an updated calculation of the "Purchase Price at close" in accordance with Exhibit B of the APA as though the Backyard Sale was closing on such date (each such calculation, a "**Purchase Price Calculation**") to the DIP Agent and the Purchaser.  If the aggregate "Purchase Price at close" in any such Purchase Price Calculation is 20% or more below the Example Purchase Price Calculation set forth in the Exhibit B of the APA, it shall be deemed a "**Negative Purchase Variance**." |
| **ROLL UP:** | Upon entry of the Interim Order, $23.3 million of the Prepetition Obligations shall be "rolled up" and converted into DIP Loans on a dollar-for-dollar cashless basis (the "**Roll-Up Amount**"). |
| **CASH COLLATERAL:** | "**Cash Collateral**" consists of: (i) cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, including, without limitation, any accounts receivable and general intangible and any other cash or right that would be included in such definition of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code) including, without limitation, all cash or cash equivalents and other amounts, including the cash in any deposit or securities accounts, wherever located; (ii) any cash or cash equivalents received as proceeds of Prepetition Collateral or DIP Collateral; and (iii) all other cash or cash equivalents of the Debtors.<br><br>Subject to the terms of the DIP Documents, the Prepetition Secured Parties (as defined below) shall consent to the Debtors' use of Cash Collateral during the Chapter 11 Cases and CCAA Recognition Proceedings to fund (i) working capital, (ii) general corporate purposes, (iii) restructuring costs and expenses, and (iv) any other fees required under the DIP Documents and the other definitive documentation during the pendency of the Chapter 11 Cases and CCAA Recognition |

4883-5905-5795

| | Proceedings, in each case, subject to the Approved Budget (as defined below), including the Permitted Variances.<br><br>To the extent any amounts required to be funded under this Term Sheet, the DIP Documents, the RSA, the Plan, or the APA or any other document or order (including the Administrative Expense Claim,Priority Tax Claim, and Other Priority Claim Backstop Amount, Post-Sale Reserve, and Foreign Sale Reserve) are not actually expended, such amounts shall be deemed Cash Collateral and distributed to the DIP Agent or Prepetition Agent, as applicable. |
|---|---|
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to Each Interim DIP Loan" (including, without limitation, entry of the Interim Order) are satisfied or waived in accordance with this Term Sheet.<br><br>"**Final Closing Date**" means the date on which the "Conditions Precedent to Each Final DIP Loan" as set forth below (including, without limitation, entry of the Final Order) shall have been satisfied or waived in accordance with this Term Sheet. |
| **DIP LOAN DOCUMENTATION:** | At the option of the DIP Lender in its sole discretion, Debtors shall execute definitive financing documentation with respect to the DIP Loans, including, without limitation, all guaranties thereof, satisfactory in form and substance to each of the DIP Lender and Debtors (and together with this Term Sheet and other documents governing the DIP Facility, the "**DIP Documents**").  The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet. The provisions of the DIP Documents shall be substantially the same as the Prepetition Loan Documents with such changes as are necessary to reflect the terms of this Term Sheet, the DIP Orders and the Canadian DIP Recognition Orders (once entered).<br><br>"**Canadian DIP Recognition Orders**" shall mean, as applicable, an order (after hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral situated in Canada), recognizing and giving effect in Canada to: (i) the Interim Order (the "**Interim DIP Recognition Order**," and together with the Interim Order, the "**Interim Orders**"), and (ii) the Final Order (the "**Final DIP Recognition Order**" and together with the Final Order, the "**Final Orders**"). |

4883-5905-5795

| | |
|---|---|
| | In addition to the provisions set forth herein, the DIP Orders and the Canadian DIP Recognition Orders shall contain additional customary protections for the DIP Lenders. Each of the parties' rights and obligations hereunder shall be subject to entry of the DIP Orders and the Canadian DIP Recognition Orders. |
| **ACKNOWLEDGMENT; RATIFICATION:** | Each Debtor hereby acknowledges, confirms, and agrees that:<br><br>(i) as of the Petition Date, the Debtors are jointly and severally indebted under and in connection with that certain *Amended and Restated First Lien Credit Agreement* dated as of April 3, 2020, among KidKraft and KidKraft Netherlands B.V. as borrowers, KidKraft Intermediate Holdings, LLC ("**Holdings**"), the subsidiaries of Holdings that are guarantors thereto (collectively, with Holdings, the "**Guarantors**") GB Funding, LLC in its capacity as administrative agent and collateral agent (the "**Prepetition Agent**"), and 1903 Partners, LLC in its capacity as Lender (the "**Prepetition Secured Lender**", and together with the Prepetition Agent, the "**Prepetition Secured Parties**") (as may be amended, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**", and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees, the "**Prepetition Loan Documents**") in the aggregate principal amount of not less than $144.9 million (together with any other amounts outstanding under the Prepetition Credit Agreement, including interest costs, expenses, indemnification obligations, and fees (including attorneys' fees and legal expenses) (collectively, the "**Prepetition Obligations**"));<br><br>(ii) the Prepetition Obligations constitute the legal, valid and binding obligations of each Debtor enforceable against it in accordance with the terms thereof, and each Debtor has no valid defense, offset or counterclaim to the enforcement of such obligations;<br><br>(iii) the Prepetition Obligations are secured by valid, enforceable and perfected (except, in the case of perfection, for (A) Excluded Accounts and (B) commercial tort claims, letter of credit rights, certificate of title vehicles, and other assets, in each case of this clause (B), to the extent expressly excluded from the requirement to perfect liens thereon pursuant to the Prepetition Loan Documents) first priority and senior security interests in and liens (subject in priority only to those "Liens" permitted under Section 7.01 of the |

| | |
|---|---|
| | Prepetition Credit Agreement (the "**Prepetition Permitted Liens**") and the DIP Liens) upon all of the Debtors' assets and property other than Excluded Assets, Excluded Receivables and Consumer Goods (as each such term is defined in the Prepetition Credit Agreement) (collectively, the "**Prepetition Collateral**"), including Cash Collateral;<br><br>(iv) each of the Prepetition Loan Documents to which it is a party was duly executed and delivered by such Debtor, and each is in full force and effect as of the date hereof;<br><br>(v) the Prepetition Secured Parties are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition Loan Documents and the DIP Orders; and<br><br>(vi) all of the terms and conditions of the Prepetition Loan Documents, as amended and supplemented pursuant hereto and pursuant to the DIP Orders and the Canadian DIP Recognition Orders, are ratified, restated, assumed, adopted and affirmed, and each Debtor agrees (a) to be fully bound, as debtor and debtor-in-possession, by the terms of the Prepetition Loan Documents to which such Debtor is a party, (b) to pay all of the Prepetition Obligations in accordance with the terms of such Prepetition Loan Documents and in accordance with the DIP Orders, and (c) each of the Prepetition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by each Debtor, each as Debtor and debtor-in-possession, and considered as agreements between such Debtor, on the one hand, and the Prepetition Secured Parties on the other hand.<br><br>The Interim Order and Final Order shall include typical acknowledgments regarding the validity and priority of the Prepetition Secured Parties and Prepetition Obligations. |
| **CHALLENGE PERIOD:** | The "ACKNOWLEDGMENT; RATIFICATION" section of this Term Sheet and portion of the "RELEASES" sections of this Term Sheet pertaining to the Prepetition Obligations, Prepetition Loan Documents, and Prepetition Secured Parties shall be subject to a typical "challenge period" (the "**Challenge Period**") to be set forth in the Interim Order and Final Order, which Challenge Period shall expire prior to the date that the Plan is confirmed by the Bankruptcy Court. |

4883-5905-5795

| | |
|---|---|
| **CARVE-OUT:** | "**Carve-Out**" shall mean the sum of:<br><br>(i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate;<br><br>(ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;<br><br>(iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise all unpaid fees, costs, disbursements and expenses (the "**Allowed Professional Fees**") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**," and, together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the first business day following delivery by the DIP Lender to the Debtors of a Carve-Out Trigger Notice (as defined in the Interim Order and Final Order), but shall not include any restructuring, sale, transaction or other "success" fee except for such fee earned by Robert W. Baird & Co. Inc. in its capacity as investment banker to the Debtors during such time;<br><br>    (a) Commencing on the Friday of the first full calendar week following the Petition Date and on a weekly basis thereafter, the DIP Secured Parties shall loan and the Debtors shall fund, using borrowings from the DIP Facility or cash on hand, a segregated account (the "**Funded Reserve Account**") held by the Debtors in trust for the benefit of the Debtor Professionals in an amount equal to the amount of applicable Professional Fees set forth in the Approved Budget, subject to the objection procedures herein in the "Debtor Professional Budget and Reporting" section.<br><br>(iv) Allowed Professional Fees of the Professional Persons in an aggregate amount not to exceed $150,000 accrued after the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise; and<br><br>(v) an amount up to the amount secured by and necessary to fund the Administration Charge (as defined below) for the |

6

| | beneficiaries thereof (without duplication) in the CCAA Recognition Proceedings. |
|---|---|
| **USE OF PROCEEDS:** | Proceeds of the DIP Loans (and Cash Collateral) will be used solely in accordance with the Approved Budget (as defined below) for (a) working capital and general corporate purposes of the Debtors, (b) restructuring costs and expenses, (c) costs and expenses related to the DIP Facility, (d) payment of interest on the DIP Loans, and (e) other costs to ensure consummation of the Plan.<br><br>Neither proceeds of the DIP Loans nor any Cash Collateral shall be used (i) to permit the Borrower, the Guarantors or any other party-in-interest or any of their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of security interests in favor of any of the DIP Secured Parties or the Prepetition Secured Parties, or (y) the enforceability of the obligations of the Debtors under the DIP Documents or the Prepetition Loan Documents, (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the DIP Secured Parties or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives. |
| **APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; AND VARIANCE REPORTS:** | By no later than two (2) Business Days before the Petition Date, Debtors shall deliver to the DIP Lender a weekly budget for the 9-week period commencing on the Petition Date, and such weekly budget shall be approved by the DIP Lender and the Purchaser (such consent, which shall not be unreasonably withheld, conditioned, or delayed, other than line items of the budget pertaining to the Reimbursement Amounts (as defined in the APA) or which impact the Purchase Price (as defined in the APA), for which such consent shall be in the discretion of the Purchaser) and shall set forth, among other things, all projected cash receipts, sales, and cash disbursements, a copy of which is attached as **Exhibit A** hereto (the "**Approved Budget**").<br><br>Commencing on the Monday of the first full calendar week after the Petition Date at 5:00 p.m. (Central Time) and continuing on the two (2)-week anniversary thereafter (or such other time as the Debtors may elect with the consent of the DIP Lender), the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Lender and the Purchaser (such consent, which shall not be unreasonably withheld, conditioned, or delayed, other |

than line items of the budget pertaining to the Reimbursement Amounts or which impact the Purchase Price, for such consent shall be in the discretion of the Purchaser), it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders.  Commencing on the Wednesday of the first full calendar week after the Petition Date at 5:00 p.m. (Central Time), and on a weekly basis thereafter (or at such other times as the Debtors may elect with the consent of the DIP Lender) the Debtors shall deliver to the DIP Lender a variance report in form and substance reasonably acceptable to the DIP Lender (an "**Approved Variance Report**") showing comparisons of actual results for each line item against such line item in the Approved Budget.  Thereafter, Debtors shall deliver to the DIP Lender, an Approved Variance Report on a weekly basis for (a) the preceding week, and (b) the trailing four (4) week period (or, if fewer than four (4) weeks have lapsed since the Petition Date, then for the trailing one, two or three week period, as applicable).

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed any of the Permitted Variances.

"**Permitted Variances**" shall mean variances: (a) up to 15% of the aggregate for all cash disbursements (other than fees and expenses of counsel to the DIP Secured Parties and Professional Persons) line-items in the Approved Budget, (b) less than 20% of the aggregate for all cash receipts in the Approved Budget, and (c) up to 15% of all fees and expenses incurred on a per-Professional Person basis (the "**Professional Fee Variance**") in each case calculated weekly on a rolling four (4) week basis commencing as of the Petition Date, with the first such testing to begin three (3) weeks from the Petition Date, except that the Professional Fee Variance shall be calculated weekly and not on a rolling four (4) week basis.  Any amendments, supplements or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Lender in its sole discretion prior to the implementation thereof.

Other than as set forth below in the "Debtor Professional Budgeting and Reporting" section of this term sheet, if any Professional Person exceeds the Professional Fee Variance, such Professional Person will, if requested by the DIP Lender within two (2) Business Days of receipt of such adverse variance report, make a representative available to meet and

| | |
|---|---|
| | confer with the DIP Lender as soon as practicable and no later than two (2) Business Days after delivery of such Approved Variance Report, to discuss a good faith modification to the Approved Budget (the "**Meet and Confer**"). If the DIP Lender and such Professional Person cannot mutually agree on a modification following the Meet and Confer, the DIP Lender may, in its sole discretion, declare an Event of Default, consistent with the provisions herein.<br><br>To the extent the amount of actual fees and expenses of any Professional Person is less than the amount set forth in the Approved Budget on a weekly basis, such amount for such Professional Person may be rolled forward to increase the amount available to the applicable Professional Person in any subsequent week. |
| **DEBTOR PROFESSIONAL BUDGETING AND REPORTING** | Notwithstanding anything to the contrary herein, the following requirements shall apply to each Debtor Professional.<br><br>(i) Commencing on the Monday of the first full calendar week after the Petition Date and continuing weekly thereafter, each Debtor Professional shall submit a report of the prior week's accrued fees and expenses to the DIP Agent (the "**Debtor Professional Report**").<br><br>(ii) The DIP Agent shall review the Debtor Professional Reports, may test the accrued fees and expenses in the Debtor Professional Report against the Professional Fee Variance, and must submit a written objection (if any) to the applicable Debtor Professional no later than two (2) Business Days following delivery of the Debtor Professional Report (the "**Review Period**").<br><br>   (a) If the DIP Agent does not submit a written objection at the close of the Review Period, the Debtors shall fund the full amount of accrued fees and expenses in such Debtor Professional Report into the Funded Reserve Account.<br><br>   (b) If the DIP Agent submits a written objection to the Debtor Professional Report prior to the end of the Review Period, the DIP Agent and the applicable Debtor Professional shall conduct a Meet and Confer within two (2) Business Days.<br><br>   (c) At the conclusion of the Meet and Confer, if the DIP Agent elects to declare an Event of Default, the Debtors |

9

| | shall only fund an amount not to exceed 150% of such Debtor Professional's budgeted amount as set forth in the Approved Budget for the period covered by such Debtor Professional Report.  For the avoidance of doubt, any Event of Default or other action taken by the DIP Agent shall not impact any amounts previously funded in the Funded Reserve Account in compliance with the procedures herein.<br><br>For the avoidance of doubt, the DIP Agent's request for a Meet and Confer shall not (in and of itself absent an Event of Default declaration) impact any terms of the DIP Documentation, including any subsequent reporting and testing as set forth herein, nor the DIP Secured Parties' obligations to loan and the Debtors' obligations to fund the Funded Reserve Account in accordance with the DIP Term Sheet after a Meet and Confer is requested. |
|---|---|
| **ADMINISTRATIVE EXPENSE CLAIM, PRIORITY TAX CLAIM, AND OTHER PRIORITY CLAIM BACKSTOP AMOUNT:** | The amount, to be agreed upon by the Debtors and both the DIP Lender and Backyard Products, LLC, each in its sole discretion, and funded by cash on hand of the Debtors and the proceeds of the DIP Facility prior to the Confirmation Date, sufficient to satisfy the agreed upon estimated amount of the Allowed Administrative Expense Claims,  Allowed Priority Tax Claims, and Allowed Other Priority Claims excluding Allowed Professional Fee Claims; *provided*, *that* in no event will the DIP Lender's obligation to provide such funding exceed the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount (as defined and set forth in the Plan). |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations of Debtors to the DIP Secured Parties under or in connection with this Term Sheet, the DIP Documents, and the DIP Orders (collectively, the "**DIP Obligations**") shall be:<br><br>(i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code but shall be subject to the Carve-Out and, shall be payable from the proceeds of DIP Collateral;<br><br>(ii) pursuant to sections 364(c)(2), secured by a perfected first priority lien on the DIP Collateral, to the extent that such DIP |

10

Collateral is not subject to valid, perfected, and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

(iii) pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral (as defined below), to the extent such DIP Collateral is subject to a Permitted Lien;

(iv) pursuant to section 364(d) of the Bankruptcy Code, secured by the DIP Liens, which shall constitute a perfected, senior secured superpriority priming security interest and lien on the DIP Collateral (but in all cases subject to the Carve-Out); and

(v) pursuant to the Canadian DIP Recognition Orders, secured by a super-priority CCAA Court-ordered charge upon DIP Collateral which is property of a Debtor formed under the laws of Canada (the "**Canadian Debtors**") or DIP Collateral situated in Canada (all such collateral, the "**Canadian Collateral**").

For clarity, all existing liens, including the liens granted in connection with the Prepetition Loan Documents shall be primed and made subject to and subordinate to the DIP Liens.

The DIP Liens shall not be *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created), except (i) the Carve-Out, (ii) such liens or interests expressly agreed upon in writing by the DIP Agent in its sole discretion, (iii) with respect to the Canadian Collateral, (A) the super-priority administration charge to be established by the CCAA Court on the Canadian Collateral in the Supplemental Order (Foreign Main Proceeding) as security for the professional fees and disbursements of Canadian counsel to the Debtors, the information officer appointed by the CCAA Court in the CCAA Recognition Proceedings (the "**Information Officer**") and legal counsel to the Information Officer incurred in respect of the CCAA Recognition Proceedings in an amount not to exceed C$750,000 (the "**Administration Charge**"), and (B) the super-priority charge to be established by the CCAA Court on the Canadian Collateral in the Supplemental Order (Foreign Main Proceeding), securing an indemnity by KidKraft and the Canadian Debtors in favor of their directors and officers against certain Canadian obligations or liabilities that they may incur as directors and officers of KidKraft and the Canadian Debtors on or after the commencement of the

11

| | CCAA Recognition Proceedings in an amount not to exceed C$100,000 (the "**Directors' Charge,** and together with the Administration Charge, the "**Canadian Priority Charges**") or (iv) such priming liens or interests imposed by applicable non-bankruptcy law and disclosed to the DIP Agent prior to the entry of the Interim Order, are in existence as of the Petition Date, and otherwise unavoidable (collectively, the "**Permitted Liens**").  For the avoidance of doubt, the Permitted Liens shall not include any liens which are junior in priority to the liens held by the Prepetition Secured Parties. |
|---|---|
| **GRANT OF SECURITY INTEREST:** | As collateral security for the prompt performance, observance, and payment in full of the DIP Obligations, each Debtor, as debtor and debtor-in-possession, hereby grants, pledges, and assigns to the DIP Agent, for the benefit of the DIP Lender, continuing security interests in and liens upon, and rights of setoff against, all of the DIP Collateral (the "**DIP Liens**").<br><br>As collateral security for the prompt performance, observance, and payment in full of the Adequate Protection Superpriority Claim (as defined below), each Debtor, as debtor and debtor-in-possession, hereby grants, pledges, and assigns to Prepetition Agent, for the benefit of the Prepetition Secured Lender, continuing security interests in and liens upon, and rights of setoff against, all of the DIP Collateral (the "**Replacement Lien**"). |
| **ADEQUATE PROTECTION:** | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the use of Cash Collateral, the subordination of their existing liens to the DIP Liens, and the imposition of the Carve-Out, the Prepetition Secured Parties shall receive:<br><br>(i) pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, the Replacement Lien, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, and the Permitted Liens;<br><br>(ii) an administrative expense claim, junior and subordinate only to the Carve-Out and the DIP Superpriority Claim with priority over any and all other administrative expenses (the "**Adequate Protection Superpriority Claim**"); and<br><br>(iii) payment of all reasonable, documented out-of-pocket costs and expenses of the Prepetition Secured Parties relating to the DIP Facility, the Debtors' Chapter 11 Cases, and the CCAA Recognition Proceedings (including, without |

12

|  | limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors).<br><br>Such adequate protection shall in all cases be subject to the Carve-Out and shall be entitled to the full protections of Section 507(b) of the Bankruptcy Code and shall be payable from Avoidance Actions upon entry of the Interim Order.<br><br>The Prepetition Secured Parties reserve all rights with respect to additional adequate protection, including adequate protection payments substantially equal to interest on the Prepetition Obligations. |
|---|---|
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets and property (whether tangible, intangible, real, personal or mixed), wherever located, whether now owned or owing to, or hereafter acquired by, or arising in favor of each Debtor and its respective chapter 11 estate, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, Cash Collateral, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, equity interests, intellectual property, and upon entry of the Final Order, avoidance actions under chapter 5 of the Bankruptcy Code and proceeds thereof (collectively, the "**Avoidance Actions**").<br><br>For the avoidance of doubt, any amounts paid by Purchaser to the Debtors in the event of a breach or termination of the APA shall be Cash Collateral.<br><br>The DIP Collateral shall also include any rents, issues, products, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent in order to claim or perfect such rents, issues, products, or proceeds.<br><br>The Debtors shall take all action that may be reasonably necessary or desirable or that the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders, the Canadian DIP Recognition Orders and in the DIP Collateral. |
| **DIP FEES:** | The Debtors shall pay the (A) DIP Lender (i) an origination fee of 2.00% of the DIP Commitment, which shall be fully |

|  | earned and non-refundable on the Interim Closing Date, and shall be paid from the proceeds of the initial funding of DIP Loans, and (ii) an exit fee of 2.00% of the DIP Commitment, which shall be fully earned and non-refundable upon consummation of the Plan and (B) the DIP Agent, a weekly administrative fee of $7,500. |
|---|---|
| **INTEREST RATE:** | The interest rate on the DIP Loans shall be a rate per annum equal to Adjusted Term SOFR for an Interest Period (as such terms are defined in the Prepetition Credit Agreement) of one month plus 8.50%. Interest shall be paid at the end of each Interest Period in cash, using Cash Collateral or proceeds of the DIP Loans. On the last day of each Interest Period the interest rate on the outstanding DIP Loans will be automatically deemed continued at Adjusted Term SOFR for an Interest Period of one month determined as of such date. Interest shall be paid monthly on the DIP Loans in cash, using Cash Collateral or proceeds of the DIP Loans. |
| **DEFAULT RATE:** | At all times following the occurrence and during the continuance of an Event of Default, principal, interest and other amounts due on the DIP Loans shall bear interest at a rate equal to the "Interest Rate" section above *plus* 3.00%. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"):<br><br>(i) the date that is sixty (60) days after the Petition Date (the "**Outside Date**"), which may be extended in the sole discretion of the DIP Lender;<br><br>(ii) the date which is thirty (30) days following the entry of the Interim Order if the Bankruptcy Court has not entered the Final Order on or prior to such date;<br><br>(iii) the date of the Debtors' receipt of notice of the acceleration of any of the DIP Loans and the termination of the commitments to make the DIP Loans resulting from the occurrence of an Event of Default (including, without limitation, the failure to meet any Chapter 11 Milestone set forth in the RSA (collectively, the "**Chapter 11 Milestones**"));<br><br>(iv) the effective date of the Plan; |

| | |
|---|---|
| | (v) a sale of all or substantially all of the Debtors' assets is consummated under Section 363 of the Bankruptcy Code (which for the avoidance of doubt shall include the Backyard Sale after the occurrence of the Sale Toggle (as defined in the Plan Term Sheet)); and |
| | (vi) the filing of a motion by the Debtors seeking dismissal or termination of any or all of the Chapter 11 Cases or the CCAA Recognition Proceedings, the dismissal or termination of any or all of the Chapter 11 Cases or the CCAA Recognition Proceedings, the filing of a motion by the Debtors seeking to convert any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, the conversion of any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or entry of an order appointing a trustee under chapter 11 of the Bankruptcy Code, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code, the making of an assignment in bankruptcy by or entry by any Canadian court of a bankruptcy order in respect of any of the Debtors under the *Bankruptcy and Insolvency Act* (Canada) ("**BIA**"), or the entry of an order of any Canadian court appointing a receiver under the BIA over any DIP Collateral, in each case without the prior written consent of the DIP Agent. |
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part at any time without premium or penalty. All optional prepayments shall be applied to the DIP Loans in accordance with the Prepayment Waterfall set forth below. Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established for the benefit of the DIP Agent to cover asserted contingent and indemnity obligations) in accordance with the Prepayment Waterfall, in each case after funding the Carve-Out, reserving proceeds sufficient to pay accrued and unpaid expenses to the extent set forth in the Approved Budget, and reserving for amount secured by and necessary to fund the Canadian Priority Charges (without duplication), upon receipt of any of the following (each, a "**Mandatory Prepayment Event**"): |
| | (i) net proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of |

15

the Bankruptcy Code simultaneous with the consummation thereof, other than the Backyard Sale.

(ii) net proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions, having a value in excess of $10,000 (except for the sale of goods or services in the ordinary course of business, sales contemplated by the Approved Budget, and certain other sales to be agreed on); and

(iii) 100% of the net proceeds of extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions) by any Debtor, excluding any tax refunds contemplated to be received by any of the Debtors as set forth in the Approved Budget.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

All payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business (other than the Backyard Sale) will be applied in the following order of priority (the "**Prepayment Waterfall**" (unless otherwise determined by the DIP Lender in its sole discretion)), in each case after funding the Carve-Out, reserving proceeds sufficient to pay accrued and unpaid expenses to the extent set forth in the Approved Budget, and reserving for amount secured by and necessary to fund the Canadian Priority Charges (without duplication):

(i) *first*, to pay all reasonable documented out-of-pocket expenses of the DIP Secured Parties (including, without limitation, reasonable and documented out-of-pocket fees and expenses of counsel and external advisors);

(ii) *second*, to pay an amount equal to all accrued and unpaid interest (including, without limitation, any interest that accrued and was "paid in kind") owing to the DIP Secured Parties;

| | |
|---|---|
| | (iii) *third*, to repay any principal amounts outstanding in respect of the DIP Loans (including any amounts, other interest, that have been added to the principal balance); and<br><br>(iv) *fourth*, all other amounts owing to the DIP Secured Parties.<br><br>Proceeds from the Backyard Sale shall be distributed in accordance with the Plan. |
| **INDEFEASIBLE PAYMENT:** | All payments made to or for the benefit of any of the DIP Secured Parties or Prepetition Secured Parties after the Petition Date shall be indefeasible and shall not be subject to disgorgement, counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party for any reason. |
| **CONDITIONS PRECEDENT TO EACH INTERIM DIP LOAN:** | The obligations of the DIP Lender to make any Interim DIP Loans will be subject to satisfaction, or written waiver, by the DIP Lender in its sole and absolute discretion, of each of the following conditions precedent in connection with each draw request:<br><br>(i)  DIP Agent shall have received a request in writing in form approved by DIP Agent, in each case signed by Borrower, not later than 5:00 p.m. New York time (or such later time as DIP Agent may consent to in its discretion) three (3) business days prior to the date of the proposed borrowing of such Interim DIP Loan;<br><br>(ii) Debtors shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;<br><br>(iii) Debtors shall have delivered to the DIP Agent a Closing Certificate, duly executed by the chief executive officer, president, or chief financial officer of the Borrower and appropriately completed, by which such officer shall certify to the DIP Agent all of the conditions precedent to the Interim DIP Loans have been satisfied (at any time delivered, a "**Closing Certificate**");<br><br>(iv) the Debtor shall have delivered all Purchase Price Calculations as required hereunder, and there shall have been no Negative Purchase Variances; |

17

4883-5905-5795

(v) Debtors shall be in compliance with and satisfied the applicable Chapter 11 Milestones;

(vi) the interim order has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Interim Order**"), and the Debtors shall be in compliance in all respects with the Interim Order;

(vii)    the DIP Lender shall be satisfied that the DIP Liens have been properly perfected and shall constitute first-priority liens (subject only to Permitted Liens);

(viii)    all reasonable, documented fees and out-of-pocket expenses of the DIP Secured Parties relating to the DIP Facility (including, without limitation, the reasonable, documented fees and out-of-pocket expenses of their counsel and external advisors) shall have been paid in full to the extent invoiced at least two (2) business days prior;

(ix) Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is customary for companies similarly-situated to the Debtors and otherwise reasonably acceptable to the DIP Agent, and the DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect thereto, in form and substance reasonably acceptable to the DIP Agent;

(x)  the DIP Agent shall have received the results of a recent lien, tax, and judgment search in each relevant jurisdiction with respect to Debtors, and such search shall reveal no liens on any of the assets of Debtors other than Permitted Liens and Permitted Prepetition Liens;

(xi) no Event of Default shall have occurred and be continuing on the Interim Closing Date, or after giving effect to the Interim DIP Loan;

(xii)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects;

18

(xiii)    subject to Bankruptcy Court approval, (i) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order, except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect, relating to the CCAA Recognition Proceedings, or, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(xiv)    no Material Adverse Change shall have occurred;

(xv)    each of the non-Debtor borrower and the non-Debtor guarantors under the Prepetition Loan Documents shall have executed a reaffirmation and ratification agreement ratifying and confirming its obligations under each of the Prepetition Loan Documents to which it is a party and each grant of a security interest contained therein, which agreement shall be in form and substance acceptable to the Prepetition Secured Parties;

(xvi)    DIP Agent shall have received, such certificates of good standing (to the extent such concept exists) from the applicable secretary of state (or equivalent) of the state (or other jurisdiction) of organization of each Debtor, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of responsible officers of each Debtor as the DIP Agent may reasonably require evidencing the identity, authority and capacity of each responsible officer thereof authorized to act as a responsible officer in connection with this DIP Term Sheet and the other DIP Documents to which such Debtor is a party or is to be a party on the Interim Closing Date and certifying the organization documents of each Debtor; and

(xvii)    the DIP Secured Parties shall have received such other information and/or deliverables as they may reasonably require or request consistent with the Prepetition Loan Documents.

"**Material Adverse Change**" means a material adverse effect on and/or material adverse developments arising after the

| | |
|---|---|
| | Petition Date with respect to (i) the business operations, properties, assets, or financial conditions of the Debtors and their subsidiaries taken as a whole; (ii) the validity, perfection or priority of the DIP Liens granted by the Borrower and the Guarantors in favor of the DIP Secured Parties, (iii) the rights, remedies and benefits available to, or conferred upon, the DIP Secured Parties, taken as a whole; *provided that* the filing and administration of the Chapter 11 Cases and the CCAA Recognition Proceedings and related events shall not constitute a Material Adverse Change, or (iv) the Backyard Sale; *provided that* the filing and administration of the Chapter 11 Cases and the CCAA Recognition Proceedings and related events shall not constitute a Material Adverse Change. |
| **CONDITIONS PRECEDENT TO EACH FINAL DIP LOAN:** | The obligations of the DIP Lender to make any Final DIP Loans shall be subject to satisfaction or waiver of each of the following conditions:<br><br>(i) all representations and warranties of the Debtors hereunder being true and correct in all material respects;<br><br>(ii) no Event of Default shall exist or would immediately result from such proposed Final DIP Loan or from the application of the proceeds therefrom;<br><br>(iii) all reasonable, documented fees and out-of-pocket expenses, including reasonable, documented and out-of-pocket attorney's fees of the DIP Secured Parties, shall have been paid in full;<br><br>(iv) the applicable Chapter 11 Milestones shall have been satisfied;<br><br>(v) a final order approving the DIP Facility shall have been entered, which final order shall not have been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") and the Debtors shall be in compliance in all respects with the Final Order;<br><br>(vi) no Material Adverse Change shall have occurred;<br><br>(vii) the Debtors shall have delivered to the DIP Agent a Closing Certificate certifying all of the conditions precedent to such Final DIP Loan have been satisfied; |

|  | (viii) DIP Agent shall have received a request in writing in form approved by DIP Agent, in each case signed by Borrower, not later than 5:00 p.m. New York time (or such later time as DIP Agent may consent to in its discretion) three (3) business days prior to the date of the proposed borrowing of such Final DIP Loan; |
|--|--|
|  | (ix)  DIP Agent shall have received with respect to the week in which such Final DIP Loan is to be made, an Approved Budget for such week, including an Approved Variance Report; |
|  | (x) the Debtor shall have delivered all Purchase Price Calculations as required hereunder, and there shall have been no Negative Purchase Variances; and |
|  | (xi) the DIP Secured Parties shall have received such other information and/or deliverables as they may reasonably require or request consistent with the Prepetition Loan Documents. |
|  | Any modifications of the Final Orders shall require the prior written consent of the DIP Secured Parties. |
| **REPRESENTATIONS AND WARRANTIES:** | The representations and warranties set forth in Sections 5.01 through 5.04, 5.06 through 5.10, 5.12, 5.13, 5.15, 5.17, and 5.18 of the Prepetition Credit Agreement are incorporated herein by reference and shall be deemed made by the Debtors for the benefit of the DIP Secured Parties in respect of the DIP Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein, on the Interim Closing Date, on the Final Closing Date and on the date of each credit extension hereunder.  Each Debtor further represents that the proceeds of each advance hereunder shall be used solely in accordance with the "Use of Proceeds" section of this Term Sheet. |
| **AFFIRMATIVE COVENANTS:** | From and after the Closing Date, each Debtor shall: |
|  | (i) comply with the affirmative covenants set forth in Sections 6.04 through 6.08, 6.11 and 6.12 of the Prepetition Credit Agreement which are incorporated herein by reference for the benefit of the DIP Secured Parties in respect of the DIP Facility and DIP Obligations, mutatis mutandis, as if fully set forth herein; |
|  | (ii) timely deliver, or cause to be timely delivered, to the DIP Lender the Approved Budget and Approved Variance |

4883-5905-5795

Reports, and all other financial reports, budgets, forecasts, and legal and financial documentation requested by the DIP Lender (or their respective legal advisors), all in accordance with the provisions set forth herein;

(iii) deliver, or continue to deliver, to the DIP Lender all financial and other information required to be delivered by any Debtor under Sections 6.01, 6.02, and 6.03 of the Prepetition Credit Agreement which are incorporated herein by reference for the benefit of the DIP Secured Parties in respect of the DIP Facility and DIP Obligations, mutatis mutandis, as if fully set forth herein;

(iv) (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities and consistent with Section 6.09 of the Prepetition Credit Agreement, (b) cooperate, consult with, and provide to the DIP Secured Parties all such information as required or as reasonably requested by the DIP Secured Parties, (c) permit, upon three (3) business days' notice, representatives of the DIP Secured Parties to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Secured Parties to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations;

(v) comply with the Approved Budget (subject to the Permitted Variances) and with provisions of this Term Sheet, DIP Orders and the Canadian DIP Recognition Orders (as applicable);

(vi) except to the extent (a) contemplated by the Approved Budget, (b) the failure to do so could not reasonably be expected to cause a Material Adverse Change, or (c) otherwise consented to by the DIP Lender in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors'

4883-5905-5795

existence and material relationships, rights and privileges, and comply with all material contractual obligations;

(vii) take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable, to pursue and consummate the Plan in accordance with the Chapter 11 Milestones, and provide the DIP Lender with copies of any bids (including, without limitation, any information, financial or otherwise, submitted in connection with any bids) upon receipt by the Debtors;

(viii) do or cause to be done all things reasonably necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be reasonably requested by the DIP Secured Parties to carry out the provisions of this Term Sheet, the Interim Order, the Final Order or the Canadian DIP Recognition Orders;

(ix) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than Permitted Liens and Permitted Prepetition Liens;

(x) take, or cause to be taken, all appropriate action to comply with all material applicable laws with respect to the DIP Collateral;

(xi) pay when due all U.S. Trustee fees;

(xii) provide all notices received from the Purchaser under the APA, and exercise or refrain from exercising, as applicable, such rights, in each case, in accordance with the written instructions (emails suffice) of the DIP Agent, and otherwise allow the DIP Agent to participate and audit any of the Debtors' rights under the APA;

(xiii) the Debtors shall not release or otherwise terminate, or cause to be released or otherwise terminated, any security interest granted by the Debtors' non-debtor affiliates under the Prepetition Loan Documents before a substitute, valid right of pledge or similar charge has been created, consented to and perfected by such affiliate in favor of the Prepetition Secured Parties (which substitute shall include a right, pledge or charge against any proceeds of the asset on which the security interest has been released or terminated); and

(xiv) promptly provide such additional information concerning the Debtors, the Plan, or the DIP Collateral as the

4883-5905-5795

| | |
|---|---|
| | DIP Secured Parties may reasonably request and access to Debtors' officers, directors, and advisors to discuss such information at reasonable times during normal business hours (and such officers, directors, and advisors shall be directed to discuss such information with the DIP Secured Parties). |
| **NEGATIVE COVENANTS:** | Unless otherwise provided in the Approved Budget, this Term Sheet or as part of the Plan, no Debtor shall, without the express, prior written consent of the DIP Agent, do, or cause to be done, any of the following:<br><br>(i) create, incur, assume or suffer to exist any lien (other than a Prepetition Permitted Lien) upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except valid, perfected and unavoidable liens existing as of the Petition Date which, other than Permitted Liens, are junior to the liens securing the DIP Facility, and shall not cause, or permit to be caused, any direct or indirect subsidiary of Borrower that is not a Debtor to, create, incur, assume or suffer to exist any such liens;<br><br>(ii) convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, out of the ordinary course of business;<br><br>(iii) incur or make any expenditure, investment or other payment, or any Restricted Payment (as defined in the Prepetition Credit Agreement), other than in accordance with the Approved Budget, subject to the Permitted Variances;<br><br>(iv) create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;<br><br>(v) create, incur assume or suffer to exist any indebtedness other than (A) indebtedness of the Debtors under this Term Sheet, (B) indebtedness contemplated by the Approved Budget and (D) indebtedness permitted under Section 7.03(l), (o), (v) or (z) of the Prepetition Credit Agreement;<br><br>(vi) enter into any transaction of any kind with any Affiliate of Borrower without the DIP Agent's prior written consent or as otherwise permitted by the order of the Bankruptcy Court governing the Debtors' authorization to continue using its cash management system; or |

24

| | |
|---|---|
| | (vi) consummate any amendment, restatement, supplement or other modification to or waiver of any of its organization documents. |
| **EVENTS OF DEFAULT:** | Each of the following shall constitute an "**Event of Default**": |
| | (i) after the first applicable testing date, the occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances; *provided*, *that*, the DIP Lender may only declare an Event of Default arising from any deviation from the Professional Fee Variance if the DIP Lender and such Professional Person cannot mutually agree to a good faith modification during the Meet and Confer; |
| | (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents, DIP Orders, the Canadian DIP Recognition Orders or Approved Budget; |
| | (iii) any modification by the Debtors of the DIP Secured Parties' rights under the DIP Documents, DIP Orders or the Canadian DIP Recognition Orders; |
| | (iv) failure of any of the Chapter 11 Milestones to be satisfied; |
| | (v) failure by any Debtor to be in compliance in all material respects with the sections of the Term Sheet entitled "Affirmative Covenants" (and five (5) business days shall have elapsed since the DIP Lender shall have given notice to the Debtors of such failure) and "Negative Covenants" or failure to otherwise be in compliance in all material respects with any other provision of this Term Sheet, the DIP Orders and the Canadian DIP Recognition Orders; |
| | (vi) failure of any representation or warranty to be true and correct in all material respects when made; |
| | (vii) the filing of any application by the Debtors for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases or CCAA Recognition Proceedings which is *pari passu* with or senior to the DIP Superpriority Claims or the DIP Liens, excluding liens arising under the DIP Orders or the Canadian DIP Recognition Orders, or |

25

pursuant to any other financing agreement made with the prior written consent of the DIP Agent;

(viii) the filing of any application by the Debtors for the approval of (or an order is entered by the Court authorizing) compensation or other amounts under any employee or executive incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the DIP Secured Parties in their sole discretion;

(ix) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of the DIP Orders, as entered by the Bankruptcy Court or the Canadian DIP Recognition Orders, as entered by the CCAA Court, as applicable, without the prior written consent of the DIP Secured Parties;

(x) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders or the Canadian DIP Recognition Orders) against any of the DIP Secured Parties or its agents and employees, to subordinate or avoid any liens made in connection with the DIP Orders or the Canadian DIP Recognition Orders;

(xi) (1) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Orders, the Canadian DIP Recognition Orders or this Term Sheet is not valid and binding for any reason, or (2) any material provision of the DIP Orders, the Canadian DIP Recognition Orders or this Term Sheet shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), cease to be valid and binding (without the prior written consent of the DIP Secured Parties);

(xii) the filing with the Bankruptcy Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases other than the Plan;

(xiii) the appointment or entry of an order in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), unless such appointment or order has not been

reversed, stayed, or vacated within thirty (30) days after the entry of such order;

(xiv) the granting of relief from the automatic stay by the Bankruptcy Court or of the stay ordered by the CCAA Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $100,000 in value in the aggregate;

(xv) failure to pay principal, interest or other DIP Obligations in full in cash when due, including without limitation, on the Maturity Date;

(xvi) the allowance of any claim or claims under section 506(c)or 552(b) of the Bankruptcy Code against or with respect to any DIP Collateral;

(xvii) withdrawal or material modification by the Debtors of any motion in connection with the Backyard Sale, without the consent of the DIP Secured Parties;

(xviii) the Debtors seek to consummate an Alternative Transaction (as defined in the APA) without the prior written consent of the DIP Secured Parties;

(xix) the Plan is not confirmed or is changed without the DIP Secured Parties' consent, or the Plan Sponsor breaches (or is anticipated to breach) its obligations under the Plan;

(xx) the occurrence of any Material Adverse Change;

(xxi) any termination of the RSA or the APA;

(xxii) the actual amount of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims (each as defined in the Plan) exceeds or is expected to exceed the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount;

(xxiii) the occurrence of any Negative Purchase Variance under any Purchase Price Calculation;

(xxiv) such other events of default to be included in the DIP Orders as reasonably specified by the DIP Secured Parties with the reasonable consent of the Debtors; and

27

| | |
|---|---|
| | (xxv) the conversion of any Chapter 11 Case to a Chapter 7 case(s), or any Debtor shall file a motion or other pleading seeking the conversion of any Chapter 11 Case to chapter 7 of the Bankruptcy Code or the making of an assignment bankruptcy by or entry by any Canadian court of a bankruptcy order in respect of any of the Debtors under the BIA, or the entry of an order of any Canadian court appointing a receiver under the BIA over any DIP Collateral, in each case, without the prior written consent of DIP Agent. |
| **REMEDIES UPON EVENT OF DEFAULT:** | Upon the occurrence and during the continuance of any Event of Default and delivery of a Carve-Out Trigger Notice (as defined in the Interim DIP Order or the Final DIP Order, as applicable) and delivery by the DIP Agent of five (5) business days' notice to the Debtors (the "**Notice Period**"), during which time the Debtors may seek an emergency hearing before the Bankruptcy Court, the DIP Secured Parties may not exercise rights or remedies; *provided*, *that*, if a hearing cannot be scheduled prior to the expiration of the Notice Period solely as a result of the Bankruptcy Court's unavailability, the Notice Period shall be automatically extended to the date that is one (1) business day after the first date that the Bankruptcy Court is available. |
| | After the expiration of the Notice Period, the DIP Secured Parties may (except as otherwise ordered by the Bankruptcy Court or the CCAA Court): |
| | (i) declare all DIP Obligations (including principal of and accrued interest on any outstanding DIP Loans) to be immediately due and payable; |
| | (ii) terminate the DIP Facility and/or any further commitment to lend to Borrower; and |
| | (iii) exercise rights and remedies pursuant to the terms of the DIP Documents, the DIP Orders, the Canadian DIP Recognition Orders or applicable law, and if requested by the DIP Agent in connection with such exercise of rights and remedies, the Debtors shall cooperate with the DIP Agent to, among other things, (A) make reasonable efforts to collect accounts receivable, without setoff by any account debtor, (B) provide at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent (including any collateral liquidator or consultant), (B) provide the DIP Agent and their representatives or agents, at all reasonable times access to the Debtors' books and records |

4883-5905-5795

| | and any information or documents requested by the DIP Agent or their respective representatives, (C) perform all other obligations set forth in the DIP Documents, and (D) take reasonable steps to safeguard and protect the DIP Collateral, and<br><br>(iv) the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's enforcement of rights including, without limitation, the right to (W) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (X) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (Y) immediately set off any and all amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (Z) exercise any other default-related rights and remedies under the under the DIP Facility Documents, this Interim Order the DIP Orders, the Canadian DIP Recognition Orders or applicable law. |
|---|---|
| **DIP SECURED PARTIES' EXPENSES:** | All reasonable, documented out-of-pocket costs and expenses of the DIP Secured Parties relating to the DIP Facility, the Debtors' Chapter 11 Cases, and the CCAA Recognition Proceedings (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors) shall be payable by Borrower promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court or CCAA Court approval.<br><br>A copy of summary invoices for the U.S. advisors to the DIP Secured Parties and Prepetition Secured Parties shall be provided by the Debtors to the Office of the U.S. Trustee, and counsel for any statutory committee, subject to customary review periods. |
| **RELEASES:** | The Interim Order and Final Order shall provide customary releases for each of the DIP Secured Parties and the Prepetition Secured Parties and each of their respective each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and successors and predecessors in interest (in their respective capacities as such) (collectively, the "**Released Parties**") with respect to all claims and liabilities arising from |

29

| | the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Documents and the Prepetition Secured Parties with respect to the Prepetition Obligations and the Prepetition Loan Documents; *provided that*, with respect to the Prepetition Secured Parties, such releases shall be subject to the Challenge Period. |
|---|---|
| **INDEMNITY:** | Each Debtor shall indemnify, pay and hold harmless the DIP Secured Parties (and each of their directors, officers, members, employees and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, or willful misconduct, bad faith, or a material breach of DIP Documents of the indemnified party, as determined by a final, nonappealable judgment of a court of competent jurisdiction). |
| **CREDIT BID:** | The DIP Agent shall have the right to credit bid the outstanding DIP Obligations on a dollar-for-dollar basis in any sale of DIP Collateral, subject to the requirement that the DIP Agent fund all Allowed Administrative Expenses, up to the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount and the Carve-Out, and the amount secured by and necessary to fund the Canadian Priority Charges (without duplication). |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Orders, the DIP Orders shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this Term Sheet or the DIP Orders may be amended other than by an instrument in writing signed by the DIP Secured Parties and Debtors, provided, however on the Petition Date, the Parties agree to update the amounts set forth in (i) of the "Acknowledgment; Ratification" section herein and the "Roll-Up" section herein. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by mandatory provisions of the Bankruptcy Code or the CCAA) shall govern this Term Sheet.<br><br>The parties to this Term Sheet shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury.  Notwithstanding the foregoing, the CCAA Court shall have exclusive jurisdiction of the CCAA Recognition Proceedings. |

| NOTICES: | All notices required to be provided hereunder shall be delivered to:<br><br>(i) if to Debtors to:<br>KidKraft, Inc.<br>Attention: Geoffrey Walker<br>Email: Geoff.W@kidkraft.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Vinson & Elkins LLP<br>Attention: David Meyer; William Wallander; Lauren Kanzer<br>Email: dmeyer@velaw.com; bwallander@velaw.com; lkanzer@velaw.com<br><br><br>(ii) if to Prepetition Secured Parties or DIP Secured Parties to:<br><br>GB Funding, LLC<br>Attention: David Braun and Kyle Shonak<br>Email: dbraun@gordonbrothers.com; kshonak@gordonbrothers.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Katten Muchin Rosenman LLP<br>Attention: Steven Reisman; Cindi Giglio<br>Email: sreisman@katten.com; cgiglio@katten.com |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |

## Schedule 1

1. KidKraft, Inc.

2. KidKraft Intermediate Holdings, LLC

3. KidKraft International Holdings, Inc.

4. KidKraft Europe, LLC

5. KidKraft International IP Holdings, LLC

6. KidKraft Partners, LLC

7. Solowave Design Corp.

8. Solowave Design Inc.

9. Solowave Design LP

10. Solowave Design Holdings Limited

11. Solowave International Inc.

**<u>Exhibit A</u>**

**Approved Budget**

KidKraft, Inc. DIP Budget (9 Weeks)

| DIP Week>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week End>> | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | 7/5/2024 | Exit | Total |
| **Total Inflows** | 2,000,000 | 2,097,889 | 1,796,228 | 1,079,983 | 1,810,476 | 2,048,180 | 2,120,225 | 2,160,181 | 2,565,020 | - | 17,678,181 |
| | | | | | | | | | | | |
| Operating Cash Flow: | | | | | | | | | | | |
| Factory Payments | 1,089,533 | 1,041,389 | 733,769 | 594,427 | 1,796,758 | 1,806,739 | 1,737,717 | 762,125 | 694,866 | - | 10,257,323 |
| Cost of Sales (Shipping, Testing, etc.) | 301,795 | 314,211 | 444,969 | 195,409 | 203,911 | 161,007 | 387,578 | 188,353 | 214,588 | - | 2,411,821 |
| Employee Costs | 295,450 | 39,254 | 291,039 | 39,254 | 291,039 | 39,254 | 291,039 | 39,254 | 291,039 | 99,254 | 1,715,874 |
| Operating Expenses | 518,985 | 377,348 | 266,077 | 410,319 | 797,084 | 535,720 | 217,965 | 378,859 | 545,151 | 50,000 | 4,097,506 |
| Intercompany (from)/to China | 342,000 | 660,000 | - | - | - | 225,000 | 570,000 | - | - | 128,226 | 1,925,226 |
| **Total Operational Outflows** | 2,547,763 | 2,432,202 | 1,735,853 | 1,239,408 | 3,088,792 | 2,767,720 | 3,204,299 | 1,368,591 | 1,745,643 | 277,479 | 20,407,750 |
| | | | | | | | | | | | |
| Restructuring Fees: | | | | | | | | | | | |
| Professional Fees - BK Restructuring | 30,000 | 626,545 | 574,878 | 408,212 | 424,878 | 408,212 | 633,212 | 429,878 | 526,545 | 1,225,000 | 5,287,361 |
| Professional Fees - Trustee Fees (est.) | - | - | - | - | - | - | - | - | - | 250,000 | 250,000 |
| Other | 27,250 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | - | 87,250 |
| **Total Restructuring Outflows** | 57,250 | 634,045 | 582,378 | 415,712 | 432,378 | 415,712 | 640,712 | 437,378 | 534,045 | 1,475,000 | 5,624,611 |
| | | | | | | | | | | | |
| Other Obligations | | | | | | | | | | | |
| Other Employee Obligations | - | - | - | - | - | - | - | - | 58,905 | - | 58,905 |
| Priority Tax Claims | - | - | - | 300,700 | - | - | - | 175,000 | - | 275,000 | 750,700 |
| Severance | 93,257 | - | - | - | - | - | - | - | 57,848 | - | 151,105 |
| Post Sale Reserve | - | - | - | - | - | - | - | - | - | 643,000 | 643,000 |
| Pre-Petition Vendor Payments - CV/503b9/Shippers | - | 525,000 | - | 425,000 | - | - | - | - | - | - | 950,000 |
| Utility Deposit | - | 20,000 | - | - | - | - | - | - | - | - | 20,000 |
| **Total Incremental Outflows** | 93,257 | 545,000 | - | 725,700 | - | - | - | - | 291,753 | 918,000 | 2,573,710 |
| | | | | | | | | | | | |
| **Net Cash Flow** | (698,270) | (1,513,359) | (522,004) | (1,300,837) | (1,710,695) | (1,135,251) | (1,724,786) | 354,211 | (6,421) | (2,670,479) | (10,927,891) |
| | | | | | | | | | | | |
| Cash Requirement | | | | | | | | | | | |
| Beginning Book Balance | 2,129,070 | 1,430,800 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 |
| Net Cash Flow | (698,270) | (1,513,359) | (522,004) | (1,300,837) | (1,710,695) | (1,135,251) | (1,724,786) | 354,211 | (6,421) | (2,670,479) | (10,927,891) |
| DIP Financing | - | 2,211,629 | 522,004 | 1,300,837 | 1,710,695 | 1,135,251 | 1,724,786 | (354,211) | 6,421 | 541,409 | 8,798,821 |
| Ending Cash | 1,430,800 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | 2,129,070 | - | - |
| | | | | | | | | | | | |
| DIP Financing | | | | | | | | | | | |
| Interest/Origination Fee/Exit Fee | - | 210,000 | - | - | - | - | - | - | 841,994 | - | 1,051,994 |
| DIP Financing | - | 2,211,629 | 522,004 | 1,300,837 | 1,710,695 | 1,135,251 | 1,724,786 | (354,211) | 6,421 | 541,409 | 8,798,821 |
| Ending Balance | - | 2,421,629 | 522,004 | 1,300,837 | 1,710,695 | 1,135,251 | 1,724,786 | (354,211) | 848,416 | 541,409 | 9,850,815 |