William L. Wallander (Texas Bar No. 20780750)
Matthew D. Struble (Texas Bar No. 24102544)
Kiran Vakamudi (Texas Bar No. 24106540)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
bwallander@velaw.com; mstruble@velaw.com;
kvakamudi@velaw.com

David S. Meyer (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 24-80045-mvl11** |
| | § | |
| **KIDKRAFT, INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## NOTICE OF SUPPLEMENT TO THE
## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

**PLEASE TAKE NOTICE** that, on May 9, 2024, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") commenced solicitation of the *Debtors' Joint Prepackaged Chapter 11 Plan* (as it may be amended, altered, modified, or supplemented, and including all exhibits and supplements thereto, the "***Plan***")[2] by sending copies of the Plan, the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan* (as it may be amended, altered, modified, or supplemented, and together with all exhibits thereto, the "***Disclosure Statement***"), and the ballot for voting to accept or reject the Plan (the "***Ballot***," and together with the Plan and the Disclosure Statement, the "***Solicitation Materials***"), to the sole party entitled to vote to accept or reject the Plan, which is the sole Holder of Class 3 Prepetition Secured Party Claims.

**PLEASE TAKE FURTHER NOTICE** that the Debtors commenced the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") on May 10, 2024 and substantially contemporaneously

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers or Canadian business numbers, as applicable, are:  KidKraft, Inc. (3303), KidKraft Europe, LLC (3174), KidKraft Intermediate Holdings, LLC (8800), KidKraft International Holdings, Inc. (2933), KidKraft Partners, LLC (3268), KidKraft International IP Holdings, LLC (1841), Solowave Design Corp. (9294), Solowave Design Holdings Limited (0206), Solowave Design Inc. (3073), Solowave Design LP (7201), and Solowave International Inc. (4302).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  4630 Olin Road, Dallas, TX 75244.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

therewith filed the Plan [Docket No. 28] and the Disclosure Statement [Docket No. 29] on the docket in the Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this supplement to the Plan (the "***Plan Supplement***").

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time in accordance with the Plan and the Restructuring Support Agreement:

- **Exhibit A** — Purchase Agreement
- **Exhibit B** — Schedule of Assumed Executory Contracts and Unexpired Leases
- **Exhibit C** — Schedule of Retained Causes of Action
- **Exhibit D** — Liquidation Analysis

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement and any exhibits, appendices, supplements, or annexes to the Plan Supplement documents are incorporated into the Plan by reference and are a part of the Plan as if set forth therein. If the Plan is confirmed by the Court, the Plan Supplement will thereby be approved as well. The Debtors reserve the right, subject to any applicable consent rights contained in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document or exhibit in the Plan Supplement until the Effective Date or as otherwise provided in the Plan, in each case in accordance with the Plan and the Restructuring Support Agreement, as applicable; *provided*, that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect, the Debtors will file a revised version of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings in the Chapter 11 Cases, including the Solicitation Materials and the Plan Supplement, may be obtained upon request made to the Debtors' counsel at the address specified below and are also on file with the Clerk of the Court, 1100 Commerce St., Rm. 1254, Dallas, TX 75242 and available for review during the normal operating hours. Copies of all pleadings in the Chapter 11 Cases, including the Solicitation Materials and the Plan Supplement, are also available for inspection on the Court's website at www.txnb.uscourts.gov/, and such pleadings are available for inspection free of charge on the Debtors' restructuring website at https://cases.stretto.com/kidkraft/.

Dated:  June 12, 2024
Dallas, Texas

/s/  *Matthew D. Struble*

**VINSON & ELKINS LLP**
William L. Wallander (Texas Bar No. 20780750)
Matthew D. Struble (Texas Bar No. 24102544)
Kiran Vakamudi (Texas Bar No. 24106540)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
bwallander@velaw.com;
mstruble@velaw.com; kvakamudi@velaw.com

- and –

David S. Meyer (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION**

## CERTIFICATE OF SERVICE

I certify that on June 12, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Matthew D. Struble*
One of Counsel

## Exhibit A

**Purchase Agreement**

**Exhibit A**

ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL
Execution Version

**ASSET PURCHASE AGREEMENT**

by and among

**KIDKRAFT, INC.,**

**KIDKRAFT INTERNATIONAL IP HOLDINGS, LLC**

**SOLOWAVE DESIGN CORP.,**

**SOLOWAVE DESIGN INC.,**

**SOLOWAVE DESIGN LP,**

as Sellers,

AND

**BACKYARD PRODUCTS, LLC**

as Buyer,

Dated as of April 25, 2024

i

4855-2719-3528

# TABLE OF CONTENTS

**Page**

### Article I
### DEFINITIONS

Section 1.1    Defined Terms ....................................................................................2

### Article II

### PURCHASE AND SALE

Section 2.1    Purchase and Sale of Transferred Assets ................................................17
Section 2.2    Excluded Assets ....................................................................................19
Section 2.3    Assumed Liabilities ...............................................................................21
Section 2.4    Excluded Liabilities ..............................................................................21
Section 2.5    Assignment of Transferred Contracts ....................................................22
Section 2.6    Consideration ........................................................................................24
Section 2.7    Reimbursement Amounts........................................................................25
Section 2.8    Adjustment to Initial Cash Consideration...............................................26
Section 2.9    Deposit Amount; Buyer Breach Fee .......................................................30
Section 2.10   Closing .................................................................................................31
Section 2.11   Purchase Price Allocation .....................................................................33
Section 2.12   Designated Buyer(s)..............................................................................33
Section 2.13   Withholding ..........................................................................................34

### Article III

### REPRESENTATIONS AND WARRANTIES
### OF SELLERS

Section 3.1    Organization..........................................................................................34
Section 3.2    Authority ..............................................................................................35
Section 3.3    No Conflict; Required Filings and Consents ...........................................35
Section 3.4    Transferred Assets ................................................................................36
Section 3.5    Absence of Certain Changes or Events....................................................36
Section 3.6    Compliance with Law; Permits...............................................................36
Section 3.7    Litigation..............................................................................................38
Section 3.8    Labor and Employment Matters .............................................................39
Section 3.9    Real Property ........................................................................................39
Section 3.10   Intellectual Property..............................................................................39
Section 3.11   Tax Matters ..........................................................................................40
Section 3.12   Environmental Matters...........................................................................41
Section 3.13   Material Contracts.................................................................................42
Section 3.14   Financial Statements. ............................................................................42

Section 3.15    Accounts Receivable...............................................................................42
Section 3.16    Inventory .................................................................................................43
Section 3.17    Certain Payments.....................................................................................43
Section 3.18    Competition Act.......................................................................................43
Section 3.19    Financial Advisors ...................................................................................43
Section 3.20    Exclusivity of Representations and Warranties .......................................43

Article IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.1     Organization.............................................................................................44
Section 4.2     Authority ..................................................................................................44
Section 4.3     No Conflict; Required Filings and Consents ...........................................44
Section 4.4     Absence of Litigation...............................................................................45
Section 4.5     Qualification.............................................................................................45
Section 4.6     Brokers.....................................................................................................45
Section 4.7     Sufficient Funds; Solvency......................................................................45
Section 4.8     Exclusivity of Representations and Warranties .....................................46

Article V

BANKRUPTCY COURT MATTERS

Section 5.1     Debtors-in-Possession.............................................................................47
Section 5.2     Sale Order ................................................................................................47
Section 5.3     Cooperation with Respect to Approvals from the Bankruptcy Courts ....47
Section 5.4     Bankruptcy Court Filings.........................................................................47
Section 5.5     Appeal of Sale Orders .............................................................................48

Article VI

COVENANTS

Section 6.1     Conduct of Business Prior to the Closing................................................48
Section 6.2     Covenants Regarding Information............................................................50
Section 6.3     Employee Matters ....................................................................................51
Section 6.4     Consents and Filings; Further Assurances ...............................................52
Section 6.5     Refunds and Remittances.........................................................................53
Section 6.6     Public Announcements and Communications ..........................................53
Section 6.7     Collection of Accounts Receivable..........................................................54
Section 6.8     Intercompany Accounts and Arrangements.............................................55
Section 6.9     In-Transit Inventory .................................................................................55
Section 6.10    Exclusivity ...............................................................................................55
Section 6.11    Name Change............................................................................................56

## Article VII

## TAX MATTERS

Section 7.1    Transfer Taxes ........................................................................56
Section 7.2    Tax Cooperation ......................................................................56
Section 7.3    Straddle Period Allocation .......................................................57
Section 7.4    Section 22 Tax Election ...........................................................57
Section 7.5    Subsection 20(24) Tax Election ...............................................57
Section 7.6    Canadian Transferred Assets ...................................................57
Section 7.7    Tax Registrations ....................................................................58

## Article VIII

## CONDITIONS TO CLOSING

Section 8.1    General Conditions ..................................................................58
Section 8.2    Conditions to Obligations of Sellers ........................................58
Section 8.3    Conditions to Obligations of Buyer ..........................................59
Section 8.4    Information Officer's Certificate .............................................59

## Article IX

## TERMINATION

Section 9.1    Termination.............................................................................60
Section 9.2    Effect of Termination...............................................................62
Section 9.3    Termination Payment...............................................................62

## Article X

## GENERAL PROVISIONS

Section 10.1    Nonsurvival of Representations, Warranties and Covenants................63
Section 10.2    Bulk Sales ............................................................................64
Section 10.3    Fees and Expenses ................................................................64
Section 10.4    Transition of Permits.............................................................64
Section 10.5    Amendment and Modification ................................................64
Section 10.6    Waiver ..................................................................................64
Section 10.7    Notices .................................................................................64
Section 10.8    Interpretation........................................................................65
Section 10.9    Entire Agreement..................................................................66
Section 10.10   Parties in Interest..................................................................66
Section 10.11   Governing Law .....................................................................66
Section 10.12   Submission to Jurisdiction.....................................................66
Section 10.13   Personal Liability ..................................................................67
Section 10.14   Assignment; Successors........................................................67

Section 10.15  Specific Performance ........................................................................67
Section 10.16  Currency..........................................................................................68
Section 10.17  Severability ......................................................................................68
Section 10.18  Waiver of Jury Trial.........................................................................68
Section 10.19  Counterparts.....................................................................................68
Section 10.20  Jointly Drafted .................................................................................69
Section 10.21  Limitation on Damages.....................................................................69
Section 10.22  No Recourse .....................................................................................69
Section 10.23  Time of Essence...............................................................................69
Section 10.24  Disclosed Personal Information (Canada). ........................................70

**INDEX OF EXHIBITS**

EXHIBIT A            ESCROW AGREEMENT

EXHIBIT B            ILLUSTRATIVE CALCULATION OF CERTAIN PURCHASE
PRICE ELEMENTS

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>"), dated as of April 25, 2024 (the "<u>Execution Date</u>"), by and among (i) KidKraft, Inc., a Delaware corporation ("<u>KK OpCo</u>"), KidKraft International IP Holdings, LLC, a Delaware limited liability company ("<u>KK Holdings</u>"), Solowave Design Corp. d/b/a/ PlayDirect, a Delaware corporation ("<u>Solowave U.S.</u>" and, together with  KK OpCo and KK Holdings, each a "<u>U.S. Seller</u>" and collectively, "<u>U.S. Sellers</u>"), Solowave Design LP, an Alberta limited partnership ("<u>KK Canada LP</u>"), and Solowave Design Inc., an Ontario corporation ("<u>KK Canada GP</u>" and, together with KK Canada LP, each a "<u>Canadian Seller</u>" and collectively, "<u>Canadian Sellers</u>" and, together with the U.S. Sellers, each a "<u>Seller</u>" and collectively, "<u>Sellers</u>"), and (ii) Backyard Products, LLC, a Delaware limited liability company ("<u>Buyer</u>"). Capitalized terms have the definitions set forth in <u>Article I</u> below.

## RECITALS

A.      Sellers are engaged in the Business;

B.      Sellers, Buyer, GB Funding LLC, 1903 Partners, LLC, MidOcean Partners IV, L.P. and MidOcean US Advisor, L.P. have entered into that certain Restructuring Support Agreement, dated as of the date hereof (the "<u>RSA</u>"), pursuant to which the Restructuring Transactions (as defined in the RSA) will be effectuated;

C.      In accordance with the RSA, (i) each Seller and certain of their affiliates (collectively, the "<u>Debtors</u>") intend to file voluntary petitions on or about May 6, 2024 (collectively, the "<u>Chapter 11 Case</u>") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "<u>U.S. Bankruptcy Court</u>") and (ii) upon its appointment as "foreign representative" in the Chapter 11 Cases, KK OpCo, on behalf of the Debtors, intends to file proceedings (such recognition proceedings, the "<u>CCAA Recognition Proceedings</u>" and, together with the Chapter 11 Case, the "<u>Bankruptcy Cases</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act (Canada) (the "<u>CCAA</u>") in the Ontario Superior Court of Justice (Commercial List) (the "<u>CCAA Court</u>", and, together with the U.S. Bankruptcy Court, the "<u>Bankruptcy Courts</u>");

D.      Subject to the terms and conditions set forth in this Agreement and the entry and terms of the U.S. Sale Order (which may be included as part of the Confirmation Order, as defined herein) and Canadian Sale Order (collectively, the "<u>Sale Orders</u>"), Sellers desire to sell to Buyer all of the Transferred Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from Sellers all of the Transferred Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth;

E.      The Transferred Assets and Assumed Liabilities shall be purchased and assumed by Buyer (or Designated Buyer) pursuant to the Sale Orders, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to, inter alia, Sections 105, 363, 365 and 1123 of the Bankruptcy Code,  Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, the CCAA, and the local rules for the Bankruptcy Courts, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Orders; and

F.     The execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Orders, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Courts enter the Sale Orders.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     Defined Terms.  For purposes of this Agreement:

"A/R Dilution" means any reduction in the gross amount of accounts receivable of any Seller as a result of customer returns, allowances, discounts, disputes, chargebacks, credits, financing or factoring that result in a Seller collecting less than the full invoiced amount of such accounts receivable.

"A/R Dilution Amount" means the A/R Dilution applicable to the Transferred A/R (excluding (i) any A/R Dilution offered by Buyer (or a Designated Buyer or their respective Affiliates) following the Closing and (ii) any A/R Dilution occurring following the delivery of the A/R Dilution Closing Statement).

"A/R Dilution Escrow Amount" means the "Dilution Reserves" line item listed on the Estimated Closing Statement *multiplied* by 15%, together with any interest earned thereon.

"A/R Dilution Closing Statement" has the meaning set forth in Section 2.8(h).

"A/R Dilution Consideration Adjustment" has the meaning set forth in Section 2.8(k).

"Accounting Firm" has the meaning set forth in Section 2.8(e)(i).

"Action" means any action, complaint, claim, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, or appellate proceeding), hearing, inquiry, investigation or audit commenced, brought, conducted or heard by or before any Governmental Authority, other than an Avoidance Action.

"Adjustment Amount" means an amount (which can be positive or negative) equal to the sum of:

(a)     (i) the Final Purchased Inventory Payment Amount *minus* (ii) the Estimated Purchased Inventory Payment Amount; *plus*

(b)     (i) the Final Reimbursement Amount *minus* (ii) the Estimated Reimbursement Amount; *plus*

(c)    the Final Net A/R Payment Amount *minus* (ii) the Estimated Net A/R Payment Amount.

"Adjustment Closing Statement" has the meaning set forth in Section 2.8(c).

"Adjustment Escrow Amount" means $2,000,000, together with any interest earned thereon.

"Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other Representatives of such Person.

"Affiliate" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Ainsley RTV Inventory" means the Inventory located at Sellers' Arlington Warehouse and designated as "Ainsley RTV" in the KK Inventory File.

"Allocation" has the meaning set forth in Section 2.11.

"Alternative Transaction" means (a) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the U.S. Bankruptcy Court, of a material portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Buyer, or (b) any other transaction that would interfere with, materially delay or prevent the transactions contemplated hereby.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment and Assumption Agreement, the IP Assignment Agreement, and the Escrow Agreement.

"Anti-Corruption Laws" has the meaning set forth in Section 3.6(d).

"Arlington Warehouse" means the warehouse at 3221 East Arkansas Lane, Arlington, Texas 76010 that is leased to a Seller.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.10(b)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Audited Financial Statements" has the meaning set forth in Section 3.14(a).

"Avoidance Actions" has the meaning set forth in Section 2.1(k).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Courts" has the meaning set forth in the Recitals.

"Bidder Protections" has the meaning set forth in Section 9.3(a).

"Break-up Fee" has the meaning set forth in Section 9.3(a).

"Business" means the design, development, creation, making, and sale of toys and other children's play products, including, without limitation, playground, play center, and play-house products, and related products and service as conducted by Sellers on the date hereof.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware, the State of Michigan, or the State of New York.

"Buyer" has the meaning set forth in the Preamble (and additionally includes reference to the Designated Buyer as the context requires).

"Buyer Breach Fee" has the meaning set forth in Section 2.9(c).

"Buyer Breach Termination" has the meaning set forth in Section 2.9(b)(ii).

"Buyer Non-Recourse Person" has the meaning set forth in Section 10.22(a).

"Canadian Sale Order" means an Order of the CCAA Court in the CCAA Recognition Proceedings, among other things, (a) recognizing and giving full force and effect to the U.S. Sale Order in Canada, and (b) vesting the Canadian Transferred Assets in and to Buyer, free and clear of all Encumbrances other than the Permitted Encumbrances, and subject to the rights of the applicable parties under Section 2 of the RSA.

"Canadian Seller" has the meaning set forth in the Preamble.

"Canadian Transferred Assets" means (a) the Transferred Assets of the Canadian Sellers, and (b) the Transferred Assets of the Sellers other than the Canadian Sellers that are located in Canada.

"Cash and Cash Equivalents" means all of any Seller's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held (including held as a deposit), including any cash collateral supporting or otherwise relating to any letter of credit or similar instrument relating to the Business.

"Cash Breach Fee Component" has the meaning set forth in Section 2.9(c).

4

"CCAA" has the meaning set forth in the Recitals.

"CCAA Court" has the meaning set forth in the Recitals.

"CCAA Recognition Proceedings" has the meaning set forth in the Recitals.

"Chapter 11" means chapter 11 of the Bankruptcy Code.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 2.10(a).

"Closing Date" has the meaning set forth in Section 2.10(a).

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Compliance Date" means April 1, 2022.

"Conditions Certificates" means (a) a certificate signed by a duly authorized officer of Buyer and addressed to Sellers and the Information Officer (in form and substance satisfactory to Sellers and the Information Officer, acting reasonably) certifying that the closing conditions set forth in Section 8.1 and Section 8.2 have been satisfied or waived, and (b) a certificate signed by a duly authorized officer of KK OpCo and addressed to Buyer and the Information Officer (in form and substance satisfactory to Buyer and the Information Officer, acting reasonably) certifying that the Purchase Price payable upon Closing has been paid in full in accordance with this Agreement and the closing conditions set forth in Section 8.1 and Section 8.3 have been satisfied or waived.

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of November 8, 2023, entered into between KidKraft Group Holdings, LLC and Source Capital, LLC with respect to the transactions contemplated hereby.

"Confirmation Order" means an order of the U.S. Bankruptcy Court confirming the Plan, which order may include the U.S. Sale Order and shall be subject to the rights of the parties under Section 2 of the RSA.

"Contract" means any contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Controlled Group Liability" means any and all Liabilities of Sellers and their ERISA Affiliates (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 or 4971 of the Code and (d) under corresponding or similar provisions of foreign Laws.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code or the CCAA, in

connection with the assumption and assignment of the Transferred Contracts to be assumed and assigned to Buyer.

"<u>Customs and International Trade Laws</u>" means any domestic Law, license, directive, award or other decision or requirement, including any amendments, having the force or effect of Law, of any Governmental Authority, concerning the transfer, importation, exportation, reexportation or deemed exportation of products, technical data, technology and/or services.

"<u>Debtors</u>" has the meaning set forth in the Recitals.

"<u>Deposit Amount</u>" has the meaning set forth in <u>Section 2.9(a)</u>.

"<u>Designated A/R Account</u>" has the meaning set forth in <u>Section 6.7(c)</u>.

"<u>Designated Buyer</u>" has the meaning set forth in <u>Section 2.12(a)</u>.

"<u>Designated Parties</u>" has the meaning set forth in <u>Section 2.1(k)</u>.

"<u>Designation Deadline</u>" has the meaning set forth in <u>Section 2.5(f)</u>.

"<u>DIP Agent</u>" means GB Funding, LLC.

"<u>DIP Budget</u>" means the budget provided for under the DIP Order, which budget is attached to the RSA (as updated from time to time in accordance with the terms thereof with approval of Buyer).

"<u>DIP Facility</u>" means the senior secured superpriority debtor-in-possession term loan facility provided to the Debtors by 1903 Partners, LLC.

"<u>DIP Order</u>" means the interim or final (whichever is then in effect) Order entered by the U.S. Bankruptcy Court approving or authorizing the Debtors' entry into and performance under the DIP Term Sheet.

"<u>DIP Term Sheet</u>" means that certain priming super priority debtor-in-possession financing term sheet dated as of the date hereof pursuant to which 1903 Partners, LLC made the DIP Facility available to the Debtors, subject to entry of the DIP Order.

"<u>Disclosed Personal Information</u>" means Personal Data governed by applicable Canadian federal or provincial Privacy Laws that Buyer receives from Seller in connection with this Agreement.

"<u>Disclosure Letter</u>" means the disclosure letter being delivered to Buyer contemporaneously with the execution of this Agreement.  Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Letter as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the

6

Disclosure Letter shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Letter is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any Party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Letter shall be deemed neither an admission that such item is material to the business, financial condition or results of operations of any Seller or the Business, nor an admission of any liability to any third party, (e) matters reflected in the Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes and (f) headings are inserted in the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"Disclosure Limitations" has the meaning set forth in Section 6.2(a).

"Disputed Amounts" has the meaning set forth in Section 2.8(e).

"Employee Benefit Plans" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement or arrangement, in each case, (a) that is sponsored or maintained or contributed, or required to be contributed, to by any Seller or any of its ERISA Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Seller, including any dependents or beneficiaries thereof or (b) with respect to which any Seller or any of its ERISA Affiliates has any actual or contingent Liability.

"Employees" means all of the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers during the period from the Execution Date through the Closing.

"Encumbrance" means any charge, claim (including any "claim" as defined in the Bankruptcy Code), lease, sublease, mortgage, deed of trust, lien (including any "lien" as defined in the Bankruptcy Code), license, encumbrance, option, pledge, hypothecation, security interest or similar interest, preemptive right, right of first refusal, right of first offer, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment, conditional sale or title retention agreements or other similar restriction or encumbrance, whether imposed by Law, Contract, equity or otherwise.

"Enforceability Exceptions" has the meaning set forth in Section 3.2.

"Environmental Claim" means any Action, cause of action, claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which Liability is imposed under Environmental Laws, including common law.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including, Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law for the Sellers' operations as currently conducted.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included (as of the relevant time) any Seller.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means the Contract by and among Buyer, KK OpCo and Escrow Agent attached hereto as Exhibit A.

"Estimated A/R Dilution Amount" has the meaning set forth in Section 2.8(a).

"Estimated Closing Statement" has the meaning set forth in Section 2.8(a).

"Estimated Net A/R Payment Amount" has the meaning set forth in Section 2.8(a).

"Estimated Purchased Inventory Payment Amount" has the meaning set forth in Section 2.8(a).

"Estimated Reimbursement Amount" has the meaning set forth in Section 2.8(a).

"ETA" means the *Excise Tax Act* (Canada) and the regulations thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(i).

"Excluded In-Transit Inventory" has the meaning set forth in Section 6.9.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Specified Inventory" has the meaning set forth in Section 2.2(g).

"Excluded Taxes" means any Liabilities (i) for Taxes of the Sellers with respect to any taxable period, (ii) for Taxes relating to the operation of the Business or ownership of the Transferred Assets prior to (but not after) the Closing and (iii) for Taxes for which the Sellers are responsible pursuant to Section 7.3.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement" has the meaning set forth in Section 9.3(a).

"FCPA" has the meaning set forth in Section 3.6(d).

"Final A/R Dilution Amount" has the meaning set forth in Section 2.8(j).

"Final Net A/R Payment Amount" has the meaning set forth in Section 2.8(j).

"Final Purchased Inventory Payment Amount" has the meaning set forth in Section 2.8(f).

"Final Reimbursement Amount" has the meaning set forth in Section 2.8(f).

"Financial Statements" has the meaning set forth in Section 3.14(a).

"Foreign Inventory" has the meaning set forth in Section 6.9.

"Fraud" means intentional and knowing common law fraud under the laws of the State of Delaware with respect to each of the Parties' respective representations and warranties expressly set forth in Article III or Article IV this Agreement.  For the avoidance of doubt, "Fraud" does not include any claim for constructive or equitable fraud or any fraud based on negligence or recklessness.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1 (Organization), Section 3.2 (Authority), Section 3.4(a) and (b) (Title to Transferred Assets) and Section 3.19 (Financial Advisors).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Gordon Brothers" means GB Funding, LLC, 1903 Partners, LLC, or any of their Affiliates.

"<u>Governmental Authority</u>" means any United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency, court, tribunal or commission or any other judicial or arbitral body, including the Bankruptcy Courts.

"<u>Hazardous Materials</u>" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Environmental Law; or (b) forms the basis of any Liability under any Environmental Law.

"<u>In-Transit Inventory</u>" has the meaning set forth in <u>Section 6.9</u>.

"<u>In-Transit Inventory Consideration</u>" has the meaning set forth in <u>Section 6.9</u>.

"<u>In-Transit Inventory Escrow Amount</u>" has the meaning set forth in <u>Section 6.9</u>.

"<u>Income Taxes</u>" means (a) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains and alternative minimum Taxes, but excluding property, sales, real or personal property transfer or other similar Taxes), (b) Taxes based upon, measured by, or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (a) above, or (c) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (a) or (b) above.

"<u>Indoor Vendor Payments</u>" has the meaning set forth in <u>Section 2.7(b)</u>.

"<u>Information Officer</u>" means the information officer appointed by the CCAA Court in the CCAA Recognition Proceedings.

"<u>Information Officer's Certificate</u>" means the certificate issued by the Information Officer, substantially in the form attached to the Canadian Sale Order, certifying that the Information Officer has received the Conditions Certificates.

"<u>Initial Cash Consideration</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Intellectual Property</u>" means all intellectual property rights throughout the world, including all U.S. and foreign rights in (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("<u>Trademarks</u>"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("<u>Patents</u>"); (c) copyrights and copyrightable subject matter (whether registered or unregistered), works of authorship ("<u>Copyrights</u>"); (d) computer programs (whether in source code, object code, or other form), firmware, software, models, algorithms, methodologies, databases, compilations, data, all technology supporting the foregoing, and all documentation, including user manuals and training materials, programmers' annotations, notes, and other work product used to design, plan, organize, maintain, support or develop, or related to any of the

foregoing; (e) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies; (f) all applications and registrations for any of the foregoing; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Interim Financial Statements" has the meaning set forth in Section 3.14(a).

"Inventory" means all raw materials, works-in-progress, finished goods, supplies, packaging materials and other inventories owned by Sellers.

"Inventory Count" means the physical count and inspection of the Purchased Inventory by the Sellers or their Representatives completed prior to Closing. The Inventory Count will be conducted by Sellers no more than two (2) Business Days prior to the Closing Date. The Inventory Count will be taken in accordance with the historical past practice of the Business, to the extent consistent with GAAP, and otherwise in accordance with GAAP, to verify the Purchased Inventory accurately reflects the KK Inventory File. Buyer and Gordon Brothers will each have the right to have a Representative observe and participate in the verification of the Inventory Count. The results of the Inventory Count will be used to determine the amount of Purchased Inventory and the calculation of the Purchased Inventory Payment Amount.

"IP Assignment Agreement" means the Intellectual Property rights assignment agreement, in form and substance reasonably satisfactory to the Parties.

"IRS" means the Internal Revenue Service of the United States.

"KK Canada GP" has the meaning set forth in the Preamble.

"KK Canada LP" has the meaning set forth in the Preamble.

"KK Holdings" has the meaning set forth in the Preamble.

"KK Inventory File" means the excel file labeled "Inventory Detail 03.21.2024.xlsx" and made available in the Project Liftoff data room, as the volume of the inventory reflected therein is updated pursuant to the Inventory Count, or as otherwise determined by mutual agreement of Buyer and Sellers (acting reasonably) prior to Closing, to reflect actual inventory as of the Closing (for the avoidance of doubt, no such update to the KK Inventory File will amend or otherwise modify any of the grades of any of the inventory reflected therein).

"KK OpCo" has the meaning set forth in the Preamble.

"Knowledge" with respect to Sellers means the actual (but not constructive or imputed) knowledge of Geoff Walker, Johnnie Goodner and David Barr after reasonable inquiry.

"Law" means any and all federal, state, provincial, local and foreign laws, statutes, ordinances, rules, regulations, policies, orders, judgments and decrees, in each case, enacted, adopted or promulgated by a Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 3.9.

"Legal Restraint" has the meaning set forth in Section 8.1(a).

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability (including any liability that results from, arises out of, or relates to any tort or product liability claim), commitment, undertaking, expense, cost, royalty, deficiency, fee, charge or obligation (in each case, of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, mature or unmatured, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort or otherwise, and without regard to when sustained, incurred or asserted or when the relevant events occurred or circumstances existed).

"Listed Person" has the meaning set forth in Section 3.6(g).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate (a) has had, or would reasonably be expected to have, a material adverse effect on the Business or the Transferred Assets or the condition (financial or otherwise), assets, Liabilities, or operations of the Business or the Transferred Assets, taken as a whole, or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the performance by Sellers of their obligations under this Agreement, other than, in each case of the preceding clause (a), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry or geographical areas in which the Business operates, (ii) with respect to the Business or the Transferred Assets, changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation or outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any civil disturbance, embargo, natural disaster, earthquake, fire, flood, hurricane, tornado or other weather event, or the onset or continuation of any global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak (including "Coronavirus" or "COVID-19" or any variant thereof) or any quarantine, lockdown, travel restriction, business restriction or trade restriction related thereto, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the announcement or pendency of the Bankruptcy Cases (and any limitations therein pursuant to the Bankruptcy Code, the CCAA, any Order of the Bankruptcy Courts, or the DIP Facility (or limitations of funding thereunder)) or any objections in the Bankruptcy Courts to (1) this Agreement or any of the transactions contemplated hereby, (2) the reorganization or liquidation of Sellers and any related plan of reorganization or disclosure statement, (3) the Plan, (4) the assumption of any Transferred Contract or (5) any action approved by the Bankruptcy Courts, (vii) any action taken by any Seller at the written request of Buyer or that is required by this Agreement, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure to achieve and comply with any budgets (including, without limitation, the DIP Budget), projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such

underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement, (xi) any breach by Buyer of its obligations under this Agreement or (xii) any change in the cost or availability or other terms of any financing; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Net A/R" means aggregate book balance of the Transferred A/R, as updated in the Estimated Closing Statement to reflect Transferred A/R accounts receivable as of the Closing, net of (i) any A/R Dilution (excluding any A/R Dilution offered by Buyer (or a Designated Buyer or their respective Affiliates) following the Closing), (ii) any accounts receivable aged in excess of ninety (90) days past due as of the Closing and (iii) unapplied cash in respect of the Transferred A/R.

"Net A/R Payment Amount" means Net A/R *multiplied* by 90%.

"Non-Income Taxes" means any Taxes other than Income Taxes, including ad valorem, property, excise, sales, use or other similar Taxes relating to the Transferred Assets or the Business, but excluding, for the avoidance of doubt, Transfer Taxes.

"Objection Notice" has the meaning set forth in Section 2.8(d).

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice and custom of Sellers, as such practice and custom is, or may have been, modified as a result of the Bankruptcy Cases, in each case subject to (a) the filing of the Bankruptcy Cases and (b) any Orders of the Bankruptcy Courts or the Bankruptcy Code or the CCAA.

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (iii) with respect to any general partnership, any statement of partnership and its partnership agreement, (iv) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (v) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (vi) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (vii) any amendments, side letters, modifications, or other arrangements with respect to any of the foregoing.

"Outdoor Vendor Payments" has the meaning set forth in Section 2.7(a).

"Outside Date" has the meaning set forth in Section 9.1(b)(ii).

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Permits" has the meaning set forth in Section 3.6(b).

"Permitted Encumbrance" means (a) Encumbrances for Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers', suppliers', vendors' and other similar common law or statutory Encumbrances arising or incurred in the Ordinary Course of Business under applicable Law, (c) with respect to any Leased Real Property, any Encumbrance primarily affecting the interest of the landlord, sublandlord or licensor of such real property, (d) any non-exclusive licenses to Intellectual Property granted to customers of the Business in the Ordinary Course of Business, (e) public roads, highways, zoning codes, building codes, entitlements, conservation restrictions or other land use or environmental Laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over the Real Property, (f) any Encumbrances that will be removed or released by operation of the Sale Orders and (g) any other Encumbrance permitted in writing by Buyer.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Data" means any information (a) that could be used to identify, contact, or locate a natural Person, including name, contact information, financial account number, an identification number, location data, IP address, online activity or usage data, an online identifier, or one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural Person, or (b) that is considered "personally identifiable information," "personal information," or "personal data" by one or more applicable Privacy Laws.

"Petition Date" means the date of filing of the Chapter 11 Case.

"Plan" The Chapter 11 plan of Debtors (as defined in the RSA) filed in accordance with the RSA.

"Prepetition Budget" means the budget regarding applicable Vendor Payments from the effective date of the RSA through the Petition Date, which budget is attached to the RSA (as updated from time to time in accordance with the terms thereof with approval of Buyer).

"Prepetition Credit Agreement" means that certain Amended and Restated First Lien Credit Agreement dated as of April 3, 2020, among KK OpCo and KidKraft Netherlands B.V. a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of The Netherlands, as borrowers, the guarantors party thereto, GB Funding, LLC as administrative agent and collateral agent and the lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof.

"Privacy and Information Security Requirements" means (a) all applicable Laws regulating the Processing of Personal Data, data breach notification, privacy policies and practices,

14

processing and security of payment card information, including, to the extent applicable, the Federal Trade Commission Act, the California Consumer Privacy Act of 2018 ("CCPA"), the Payment Card Industry Data Security Standards, the European General Data Protection Regulation (the "GDPR"), any applicable national laws which implement the GDPR, the UK Data Protection Act 2018 (the "UK DPA"), the Personal Information Protection Law ("PIPL") of China, state data security laws and state data breach notification law, in each case as amended, consolidated re-enacted or replaced from time to time ("Privacy Laws"), (b) obligations under all Transferred Contracts that relate to Personal Data and (c) all of the Sellers' and their Subsidiaries' written internal and publicly posted policies and representations regarding the Processing of Personal Data in the conduct of the Business.

"Process" or "Processing" with regard to Personal Data means the collection, use, storage, maintenance, retention, transmission, access, processing, recording, distribution, transfer, import, export, protection (including security measures), deletion, disposal or disclosure or other activity regarding data (whether electronically or in any other form or medium).

"Purchase Price" has the meaning set forth in Section 2.6.

"Purchased Inventory" has the meaning set forth in Section 2.1(d).

"Purchased Inventory Payment Amount" means an amount calculated as follows: (a) 75% of the book value of Purchased Inventory graded A, A+, B, C, Comp, I, New,  New_FY24 or blank in the KK Inventory File; *plus* (b) 60% of the book value of Purchased Inventory graded D in the KK Inventory File; provided, in each case, the amount of Purchased Inventory shall be adjusted based on the Inventory Count and will only include Inventory located in the United States that has cleared customs, Australia (to the extent that title of such Australian inventory is transferred to a Seller prior to Closing) or Canada, or that becomes Purchased Inventory in accordance with Section 6.9, *plus* (c) the lesser of (i) 100% of the book value of the Purchased Inventory on the KK Inventory File designated as "European Inventory", and (ii) the documented landed duty paid price of such inventory styles if the Buyer had purchased such Purchased Inventory directly from vendors in China; provided, that, Buyer shall reimburse Sellers the costs of importing any Foreign Inventory into the United States in accordance with Section 2.7(f).

"Qualifying Alternative Transaction" means an Alternative Transaction that will result in Sellers receiving aggregate cash consideration which is greater than the aggregate sum of the following amounts: the implied cash portion of the Purchase Price (determined based on the KK Inventory File) *plus* the Break-up Fee *plus* the Expense Reimbursement *plus* $4,000,000 and that provides for assumption of liabilities in excess of the Assumed Liabilities.

"Registered IP" has the meaning set forth in Section 3.10(a).

"Reimbursement Amount" has the meaning set forth in Section 2.7.

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, Advisors, and other representatives of such Person.

"RSA" has the meaning set forth in the Recitals.

"Sale Hearing" means the hearing conducted by the U.S. Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Orders" has the meaning set forth in the Recitals.

"Seller" has the meaning set forth in the Preamble.

"Seller Non-Recourse Person" has the meaning set forth in Section 10.22(b).

"Solowave U.S." has the meaning set forth in the Preamble.

"Specified Indoor Inventory" has the meaning set forth in Section 2.7(b).

"Specified Outdoor Inventory" has the meaning set forth in Section 2.7(a).

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Successor" has the meaning set forth in Section 9.3(b).

"Tax Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means any and all U.S. federal, state, and local, Canadian federal, provincial, territorial and local, non-U.S./non-Canadian and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments in the nature of a tax imposed by any Governmental Authority, including net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, goods and services, harmonized sales, provincial sales, retail sales, withholding, payroll, employment, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property,

escheat or unclaimed property, windfall profits or other taxes, together with any interest, penalties, or additions to tax imposed by a Governmental Authority with respect thereto.

"Transfer Taxes" has the meaning set forth in Section 7.1.

"Transferred A/R" has the meaning set forth in Section 2.1(c).

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Contracts" has the meaning set forth in Section 2.1(e).

"Transferred Employee Records" means records of Sellers that relate to the Transferred Employees, but only to the extent that such records pertain to (a) skill and development training, (b) seniority histories, (c) salary information and (d) Occupational, Safety and Health Administration reports and records (or similar reports and records under Canadian law) that Buyer or its Affiliates are obligated to maintain as a successor employer.

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred IP" has the meaning set forth in Section 2.1(f).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"U.S. Bankruptcy Court" has the meaning set forth in the Recitals.

"U.S. Sale Order" means an Order of the U.S. Bankruptcy Court approving this Agreement and the transactions contemplated by this Agreement, and subject to the rights of the parties under Section 2 of the RSA  (for the avoidance of doubt, in form and substance acceptable to Buyer), provided that such U.S. Sale Order may be included as part of the Confirmation Order.

"U.S. Seller" has the meaning set forth in the Preamble.

"Vendor Payments" has the meaning set forth in Section 2.7(c).

"Vendor Start Up Cost Payments" has the meaning set forth in Section 2.7(c).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988 and any similar applicable local or state Laws.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Transferred Assets.  Upon the terms and subject to the conditions of this Agreement and the Sale Orders, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or, as applicable, one or more Designated Buyers), and Buyer (or, as applicable, one or more

Designated Buyers) shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances). "Transferred Assets" shall mean all right, title and interest of Sellers to or under the following properties and assets of Sellers of every kind and description, whether real, personal, mixed, intangible (but excluding in each case any Excluded Assets):

(a) all rights, claims or causes of action of Sellers against any party arising out of events occurring prior to the Closing related to other categories of Transferred Assets, including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to other categories of Transferred Assets, but excluding any rights, claims or causes of action of Sellers released pursuant to the Plan;

(b) other than Inventory, all fixed assets, equipment, machinery, furnishings, computer hardware, electronic devices, vehicles, tools, office supplies, fixtures and other tangible personal property primarily used in or necessary for the operation of the Business that is owned by a Seller organized under laws of the United States or Canada;

(c) (i) all accounts receivable of Sellers located in the United States and Canada, including all such accounts receivable set forth on Section 2.1(c) of the Disclosure Letter, as updated in the Estimated Closing Statement and the A/R Dilution Closing Statement to reflect accounts receivable as of the Closing, regardless of aged status (the "Transferred A/R") and (ii) all cash receipts received after the Closing on account of any Transferred A/R;

(d) the Inventory described in Section 2.1(d) of the Disclosure Letter, as updated prior to Closing based on the Inventory Count, to the extent such Inventory either (i) at Closing, is located in the United States, Canada or Australia (with title held by a Seller as of Closing), or (ii) constitutes In-Transit Inventory that has been delivered to the United States and cleared through customs within 120 days following Closing in accordance with Section 6.9 (the "Purchased Inventory");

(e) each of the Contracts set forth on Section 2.1(e) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(b) and Section 2.5(f) (the "Transferred Contracts");

(f) all Intellectual Property owned by any Seller and relating primarily to the Business, including but not limited to the Registered IP listed on Section 3.10(a) of the Disclosure Letter, and, to the extent transferable and subject to Section 10.24, (i) all of Sellers' rights in and to Personal Data used in the Business and (ii) Intellectual Property that is governed by any Transferred Contract (the "Transferred IP");

(g) all production molds and other tangible assets necessary to continue to produce inventory in accordance with Company's current practices;

(h) all goodwill associated with the Transferred Assets;

18

(i)     to the extent not prohibited by Law and not subject to attorney-client privilege, solicitor-client privilege or other work product privilege, all documents and other books and records, correspondence (including electronic mail communications), the Transferred Employee Records, all vendor files, information and data, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are related primarily to the Business or any Transferred Asset, in each case, except as set forth in Section 2.2(b) and Section 2.2(j); provided, however, that Sellers have the right to retain copies at Sellers' expense;

(j)     all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

(k)     all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against the following (collectively, the "Designated Parties"): (i) any of Seller's vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); provided, however, that it is understood and agreed by the parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party; and

(l)     all bank and lockbox accounts associated with the collection of proceeds from the Business or the Sellers' business, including, without limitation, all bank accounts that receive checks, ACH payments, and electronic payments related to the Transferred A/R.

Section 2.2     Excluded Assets.  Notwithstanding anything contained in Section 2.1 to the contrary, Sellers are not selling, and Buyer is not purchasing, any right, title or interest in, to or under any assets of the Sellers other than the Transferred Assets. The following assets and any asset other than the Transferred Assets shall be retained by Sellers (collectively, the "Excluded Assets"):

(a)     all assets expressly excluded or excepted from the definition of Transferred Assets;

(b)     Sellers' documents, written files, papers, books, reports and records prepared or received by any Seller or any of its Affiliates or Representatives: (i) in connection with any sale, potential sale or other strategic transaction involving KK OpCo and its Affiliates, the Business, or any portion thereof including any of the Transferred Assets (including, but not limited to, this Agreement and the transactions contemplated hereby), (ii) that are subject to any privilege in favor of Seller or any of its Affiliates, or (iii) that any Seller is required by Law or other requirement to retain;

19

(c)　　all rights, claims and causes of action to the extent relating to any Excluded Asset (and not relating to any Transferred Asset);

(d)　　all Intellectual Property owned by Sellers or any Subsidiary of any Seller that is not Transferred IP;

(e)　　shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(f)　　all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(g)　　the Inventory listed in <u>Section 2.2(g)</u> of the Disclosure Letter and any other Inventory that is not Purchased Inventory (the "<u>Excluded Specified Inventory</u>");

(h)　　all insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by any Seller or any Subsidiary of any Seller to, any individuals covered by such policies;

(i)　　each Contract of any Seller that is not a Transferred Contract (the "<u>Excluded Contracts</u>");

(j)　　(i) all books and records to the extent related to any of the Excluded Assets or Liabilities of Sellers other than Assumed Liabilities; (ii) all minute books, Organizational Documents, stock registers and such other books and records of any Seller or any Subsidiary of any Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence of such Seller or Subsidiary of any Seller, Tax Returns (and any related work papers) and any other Tax records of any Seller or any Subsidiary of any Seller (but only to the extent such Tax Returns and records relate to Income Taxes or do not primarily relate to the Transferred Assets or the Business), and corporate seal of any Seller or any Subsidiary of any Seller; (iii) all employment-related records other than the Transferred Employee Records; and (iv) all books and records that any Seller is required by Law to retain, or prohibited by Law from disclosing, or are subject to attorney-client privilege or other work product privilege;

(k)　　any and all claims of the Sellers for refunds of, credits attributable to, loss carryforwards with respect to, or similar Tax assets relating to (i) Non-Income Taxes for which Sellers are responsible pursuant to <u>Section 7.3</u>, (ii) Income Taxes, (iii) Taxes attributable to the Excluded Assets, and (iv) any other Taxes relating to the ownership or operation of the Transferred Assets that are attributable to any Tax period (or portion thereof) ending on or prior to the Closing Date;

(l)　　all Cash and Cash Equivalents;

(m)　　all Excluded In-Transit Inventory;

(n)    all rights and claims of any Seller to any deposit of any kind (including any utilities deposits and deposits made in connection with the Bankruptcy Cases);

(o)    all rights, claims and causes of action of any Person that is not a Seller (even if such Person is an Affiliate thereof or operates a business similar or identical to the Business); and

(p)    all rights, claims or causes of action of Sellers under this Agreement and the Ancillary Agreements and under any Contracts that are not Transferred Contracts.

Section 2.3    Assumed Liabilities.   In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, at and after the Closing, Buyer shall assume and pay, discharge, perform or otherwise satisfy only the following Liabilities (the "Assumed Liabilities"):

(a)    Liabilities of Sellers arising under the Transferred Contracts, but only to the extent that the Liabilities thereunder arise after the Closing Date and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing;

(b)    All Cure Claims associated with Transferred Contracts in amounts not to exceed the Cure Claim amounts for any such Transferred Contracts as set forth on Section 2.1(e) of the Disclosure Letter, as may be amended in accordance with Section 2.5(f);

(c)    All Liabilities for (i) Transfer Taxes for which Buyer is responsible pursuant to Section 7.1 and (ii) for Non-Income Taxes for which the Buyer is responsible pursuant to Section 7.3; and

(d)    all other Liabilities arising out of the operation of the Transferred Assets following the Closing Date or arising out of an event that occurs after the Closing Date.

Section 2.4    Excluded Liabilities.   Buyer shall not assume, be obligated to pay, perform, or otherwise discharge, or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, except for the Assumed Liabilities (all Liabilities not assumed by a Buyer pursuant to Section 2.3, "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers:

(a)    any Controlled Group Liability;

(b)    any Liabilities arising under or relating to any Employee Benefit Plan, including any severance or retention obligations for any Seller employee;

(c)      any Liabilities associated with any matter set forth on Section 3.7 of the Disclosure Letter;

(d)      any Excluded Taxes; and

(e)      any liabilities of the Sellers under the DIP Facility or any other indebtedness of Sellers.

Section 2.5      Assignment of Transferred Contracts.

(a)      Prior to the Sale Hearing, Sellers shall take all reasonably necessary actions in order to determine the Cure Claim with respect to any Transferred Contract entered into prior to the Petition Date, including the right to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Claims needed to cure all monetary defaults under such Transferred Contract. Notwithstanding the foregoing, prior to the Designation Deadline, Buyer may designate or remove the designation of any Contract as a Transferred Contract in accordance with Section 2.5(f).

(b)      Within three (3) Business Days after the Petition Date (or with respect to any Contract that becomes a Transferred Contract on any date following the Petition Date, within three (3) Business Days after the Buyer's designation of such later date), the Sellers shall deliver a notice, in form and substance reasonably acceptable to Buyer, of potential assumption and assignment of the Transferred Contract (a "Contract Notice")  to the applicable non-Seller counterparty thereto (each a "Contract Counterparty"), which shall specify: (a) that such contract is contemplated to be assumed and assigned to Buyer as a Transferred Contract in connection with the transactions contemplated hereunder,; (b) the proposed Cure Claim with respect to each Transferred Contract; (c) that each respective Contract Counterparty may file an objection (a "Contract Objection") to the proposed assumption and assignment of the applicable Transferred Contract or the proposed Cure Claim, if any, related thereto, which Contract Objection must (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure and any applicable local rules of the U.S. Bankruptcy Court; (iii) be filed with the Clerk of the U.S. Bankruptcy Court, together with proof of service, on or before 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days after the date the Sellers delivered the Contract Notice (the "Contract Objection Deadline"); (iv) be served, so as to actually be received on or before the Contract Objection Deadline on counsel to the Sellers, counsel to Gordon Brothers, counsel to the Buyer, and the Office of the U.S. Trustee for the Northern District of Texas; and (v) state with specificity the grounds for such objection, including, without limitation, the asserted amount of the fully liquidated Cure Claim and the legal and factual bases for any unliquidated portion of the Cure Claim that the Contract Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Transferred Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise to any such defaults.  If a Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such Contract Objection will be determined at the Sale Hearing or such other date determined by the U.S. Bankruptcy Court.

(c)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 2.5</u>, on the Closing Date, Sellers shall assign the Transferred Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Orders, subject to the provision of adequate assurance by Buyer as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Claims to the Contract Counterparty in respect of the Transferred Contracts, and Buyer shall assume such Transferred Contracts pursuant to the Assignment and Assumption Agreement. All Cure Claims in respect of all Transferred Contracts shall be paid by Buyer.

(d)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 2.5</u>, Sellers shall transfer and assign all of the Transferred Assets to Buyer, and Buyer shall accept all of the Transferred Assets from Sellers, as of the Closing, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Sale Orders and the Assignment and Assumption Agreement.

(e)     Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Authority or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Orders), the Closing shall proceed without any reduction in Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset. In the event that the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, Sellers shall use their commercially reasonable efforts at Buyer's sole expense and subject to any approval of the Bankruptcy Courts that may be required, and Buyer shall cooperate with Sellers, to obtain such consent as promptly as practicable following the Closing. Pending the receipt of such consent, the parties shall, at the Buyer's sole expense, reasonably cooperate with each other to provide Buyer with all of the benefits of use of such asset, subject to all obligations and Liabilities related to such asset. Once consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Sellers shall promptly transfer, assign, convey and deliver such asset to Buyer at Buyer's sole expense. To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Buyer, then as promptly as practicable following the Closing, Buyer and Sellers shall use commercially reasonable efforts to enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Buyer's sole expense, reasonably cooperate with each other, to provide Buyer with all of the benefits of use of such asset, subject to all obligations and Liabilities related to such asset, for a period of six (6) months following the Closing (or the closing of the Chapter 11 Case, if shorter). Sellers shall hold in trust for, and pay to Buyer, promptly upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any asset that would be a Transferred Asset in connection with the arrangements under this <u>Section 2.5(e)</u>. The Parties agree to treat any asset the benefits of which are transferred pursuant to this <u>Section 2.5(e)</u> as having been sold to Buyer for Tax purposes to the extent permitted by Law. Each of Sellers and Buyer agrees to notify the other parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this <u>Section 2.5(e)</u>) is not permitted for Tax purposes under applicable Law.

(f)     Notwithstanding anything in this Agreement to the contrary, by written notice to the Sellers, Buyer may amend or revise Section 2.1(e) of the Disclosure Letter setting forth the Transferred Contracts in order to add any Contract of any Seller to, or eliminate any Contract of any Seller from, such section at any time during the period commencing from the date hereof and ending on the date that is the earlier of (x) two (2) Business Days prior to the Closing Date and (y) two (2) Business Days prior to the date that the Bankruptcy Code or Bankruptcy Court otherwise would require a determination to assume or reject such contract (the "Designation Deadline"); provided, however, in the event a timely objection to a Cure Claim for any Transferred Contract is still pending at the time of Closing, Buyer shall have the option to remove such Transferred Contract from Section 2.1(e) of the Disclosure Letter until the earlier of (A) thirty (30) days following the date on which the Cure Claim has been determined by the Bankruptcy Court and (B) the date the Contract Counterparty for such Transferred Contract and the Buyer have agreed on the Cure Claim for such Transferred Contract, and in the case of (A) or (B), the Cure Claim for such Transferred Contract shall be updated on Section 2.1(e) of the Disclosure Letter accordingly; provided, further that the Sellers may accordingly amend or revise any section of the Disclosure Letter as they deem necessary to account for such addition or removal prior to the Closing. Sellers may amend or revise Section 2.1(e) of the Disclosure Letter at any time prior to Closing to update the Cure Claim for each Transferred Contract in accordance with Section 2.5(b); provided that any such amendment or revision following the Designation Deadline shall require the consent of Buyer. Automatically upon the addition of any Contract by Buyer to Section 2.1(e) of the Disclosure Letter, such Contract shall be a Transferred Contract for all purposes of this Agreement and Buyer shall assume the Liabilities thereunder in accordance with the Bankruptcy Code.  Automatically upon the removal of any Contract from Section 2.1(e) (i) of the Disclosure Letter such Contract shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by Buyer unless such liability is otherwise specifically assumed pursuant to Section 2.5.

Section 2.6     Consideration.     The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:

(a)     the payment by Buyer and/or one or more Designated Buyer, by wire transfer of immediately available funds to one or more accounts (each of which must be subject to deposit account control agreement with Gordon Brothers (or an Affiliate thereof)) designated in writing by KK OpCo in accordance with Section 2.10(c)(iii) (the "Initial Cash Consideration") in an aggregate amount equal to the sum of:

(i)     $4,350,000; plus

(ii)     the Estimated Net A/R Payment Amount; plus

(iii)     the Estimated Purchased Inventory Payment Amount (less the In-Transit Inventory Escrow Amount); plus

(iv)     the Reimbursement Amount; minus

(v)     the Adjustment Escrow Amount; minus

24

(vi)    the A/R Dilution Escrow Amount;

(b)    the assumption by the applicable Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers; and

(c)    the In-Transit Inventory Consideration, when and if payable pursuant to Section 6.9.

Section 2.7    Reimbursement Amounts. At Closing, Buyer shall reimburse Sellers, in cash, for the following payments on behalf of the Business (the "Reimbursement Amount"):

(a)    100% of the amount paid to the Sellers' vendors following the date hereof with respect to outdoor inventory as set forth on Section 2.7(a) of the Disclosure Letter (the "Specified Outdoor Inventory"), in an amount not to exceed the amount set forth in the "Factory Payments-Outdoor Domestic" line of the DIP Budget or Prepetition Budget, as applicable (the "Outdoor Vendor Payments");

(b)    100% of the amount paid to the Sellers' vendors following the date hereof with respect to indoor inventory as set forth on Section 2.7(b) of the Disclosure Letter (the "Specified Indoor Inventory") in an amount not to exceed the amount set forth in the "Factory Payments-Indoor Domestic" line of DIP Budget or Prepetition Budget, as applicable (the "Indoor Vendor Payments");

(c)    50% of the amount paid to Sellers' vendors following the date hereof with respect to indoor inventory start up-costs, in an amount not to exceed 50% of the amount set forth in the "Factory Payments-Start Up Costs" line of DIP Budget or Prepetition Budget, as applicable (the "Vendor Start Up Cost Payments" and together with the Outdoor Vendor Payments and Indoor Vendor Payments, the "Vendor Payments");

(d)    50% of the amount paid to Sellers' vendors in the Chapter 11 Cases pursuant to the shipper's, warehouseman's, and lienholders' order, in an amount not to exceed 50% of the amount set forth in the "Shippers Motion" line of the DIP Budget;

(e)    75% of the book value of the Ainsley RTV Inventory; and

(f)    100% of the out-of-pocket and documented costs of Sellers for any applicable customs, duties/tariffs and transportation costs incurred following the Execution Date associated with importing any Foreign Inventory (other than In-Transit Inventory) into the United States, in an amount not to exceed the amount set forth in the "Cost of Sales (Shipping, Testing, etc.) – Purchaser Reimbursement" line of the DIP Budget or Prepetition Budget, as applicable, as allowed in the DIP Budget or the Prepetition Budget (including any permitted variance).

Set forth on Exhibit B hereto, solely for illustrative purposes, is an example calculation of the Estimated Net A/R Payment Amount and Estimated Purchased Inventory Payment Amount, plus $4,350,000 of cash consideration.

Section 2.8    Adjustment to Initial Cash Consideration.

(a)    At least three (3) Business Days prior to the Closing, Sellers shall prepare and deliver to Buyer a written statement (the "Estimated Closing Statement") setting forth Sellers' good faith estimates as of Closing of (i) the Transferred A/R, (ii) the A/R Dilution Amount (the "Estimated A/R Dilution Amount") (including the Dilution Reserves with respect thereto), and the resulting Net A/R Payment Amount (the "Estimated Net A/R Payment Amount"), (iii) the Purchased Inventory Payment Amount (the "Estimated Purchased Inventory Payment Amount") and (iv) the Reimbursement Amount (the "Estimated Reimbursement Amount"), which statement shall quantify in reasonable detail such estimate, calculated in accordance with the terms of this Agreement.  Sellers shall update the Estimated Closing Statement at least one (1) Business Day prior to the Closing to reflect the most current estimates of the Estimated Net A/R Payment Amount, Estimated Purchased Inventory Payment Amount, Estimated Reimbursement Amount, and Estimated A/R Dilution Amount. During the period after the delivery of the Estimated Closing Statement and prior to the Closing, the Parties shall reasonably cooperate in connection with Buyer's review of the Estimated Closing Statement, including by (i) providing Buyer and its accountants with reasonable access to the appropriate employees of Sellers who are knowledgeable about the information contained in, or preparation of, the Estimated Closing Statement and (ii) providing all books, records and other information reasonably requested by Buyer in connection with the foregoing.  The Parties shall cooperate in good faith to mutually agree upon the Estimated Closing Statement in the event Buyer notifies Sellers of its dispute of any item proposed to be set forth on such schedule, provided, that, if Sellers and Buyer are not able to reach a mutual agreement (acting reasonably and in good faith) prior to the Closing Date, the Estimated Closing Statement provided by Sellers to Buyer shall be binding for purposes of Closing.

(b)    The Parties agree that for purposes of preparing the Estimated Closing Statement, the Adjustment Closing Statement and the A/R Dilution Closing Statement, each of the Estimated Net A/R Payment Amount, the Estimated Purchased Inventory Payment Amount, the Estimated Reimbursement Amount and the Estimated A/R Dilution Amount (and the underlying calculations supporting such amounts) shall be calculated on a basis consistent with the Sellers' historical accounting methodologies, policies, practices, estimation techniques, assumptions and principles used in the preparation of its Audited Financial Statements and the KK Inventory File; provided, that the amount of Purchased Inventory included in the Estimated Purchased Inventory Payment Amount will be calculated using the actual reports from the Inventory Count (updated to reflect projected changes through the Closing Date but calculated consistent with the KK Inventory File book values).  For the avoidance of doubt, (i) the calculation of the Purchase Price will be construed to avoid the double counting of any Vendor Payments by Buyer in accordance with Section 2.7 (i.e. Buyer will not be required to pay for Purchased Inventory or accounts receivable generated from any post-petition trade payable or critical vendor payment for which it is obligated to make, or has made, any reimbursement payment) or any other amounts payable by Buyer hereunder, and (ii) Purchased Inventory Payment Amount shall specifically exclude the value of Specified Outdoor Inventory or the Specified Indoor Inventory.

(c)    Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to KK OpCo, with a copy to Gordon Brothers, a statement (the "Adjustment Closing Statement") setting forth Buyer's good faith calculation as of the Closing in reasonable detail as of the Closing Date of the actual calculations of (i) the Purchased Inventory Payment Amount, (ii)

the Reimbursement Amount and (iii) the Net A/R Payment Amount (provided that the Estimated A/R Dilution shall be used to calculate the Net A/R Payment Amount for purposes of the Adjustment Closing Statement) and resulting Adjustment Amount. The Adjustment Closing Statement shall be prepared in accordance with Section 2.8(b). Upon delivery by Buyer of the Adjustment Closing Statement, Buyer shall provide KK OpCo with reasonable access, during normal business hours, to Buyer's accounting and other personnel and to the books and records of Buyer and any other document or information reasonably requested by KK OpCo in connection with KK OpCo's review of the Adjustment Closing Statement. If Buyer does not prepare and deliver the Adjustment Closing Statement within ninety (90) days after the Closing Date, the calculations of the Estimated Purchased Inventory Payment Amount, the Estimated Reimbursement Amount and the Estimated Net A/R Payment Amount shall be deemed final and binding.

(d)     If KK OpCo does not object to the Adjustment Closing Statement by a written notice of objection (the "Objection Notice") delivered to Buyer within thirty (30) days after KK OpCo's receipt of the Adjustment Closing Statement, the calculation of the Purchased Inventory Payment Amount, the Reimbursement Amount and the Net A/R Payment Amount set forth in the Adjustment Closing Statement shall be deemed final and binding. An Objection Notice shall set forth in reasonable detail KK OpCo's alternative calculations of the Purchased Inventory Payment Amount, Reimbursement Amount and Net A/R Payment Amount and the resulting Adjustment Amount and the basis therefor.

(e)     If KK OpCo delivers an Objection Notice to Buyer within the thirty (30) day period referred to in Section 2.8(d), then each element of the Adjustment Closing Statement that is not disputed in such Objection Notice shall be final and binding and any dispute reflected in the Objection Notice (all such amounts, the "Disputed Amounts") shall be resolved in accordance with this Section 2.8(e).

(i)     KK OpCo and Buyer shall promptly endeavor in good faith to resolve the Disputed Amounts listed in the Objection Notice. If a written agreement determining the Disputed Amounts has not been reached within ten (10) Business Days (or such longer period as may be agreed by KK OpCo and Buyer) after the date Buyer receives the Objection Notice from KK OpCo (all discussions and statements made by the Parties and their Representatives in attempting to resolve the disagreement during such period shall be subject to Rule 408 of the Federal Rules of Evidence), KK OpCo or Buyer may elect to submit the resolution of such Disputed Amounts to BDO USA, LLP or if BDO USA, LLP is not available to act as the Accounting Firm, to another independent regional accounting firm mutually selected by Buyer and KK OpCo (BDO USA, LLP or such other mutually selected accounting firm, the "Accounting Firm").

(ii)     KK OpCo and Buyer shall use their commercially reasonable efforts to cause the Accounting Firm to render a decision in accordance with this Section 2.8(e) along with a statement of the reasons therefor within thirty (30) days of the submission of the Disputed Amounts to the Accounting Firm.

(iii)     If KK OpCo or Buyer submit any Disputed Amounts to the Accounting Firm for resolution, KK OpCo (on behalf of Sellers), on the one hand, and

Buyer, on the other hand, shall each pay their own costs and expenses incurred under this Section 2.8(e) and shall each fund one half of any retainer required by the Accounting Firm and shall execute and deliver any customary engagement letter required by the Accounting Firm.  The fees and expenses of the Accounting Firm pursuant to this Section 2.8(e) shall be borne by Buyer, on the one hand, and KK OpCo (for and on behalf of Sellers), on the other hand, based upon the percentage that the aggregate portion of the contested amount not awarded to each Party bears to the aggregate amount actually contested by such Party.

(iv)    The Accounting Firm shall act as an expert and not an arbitrator.  If the Accounting Firm is retained, then KK OpCo and Buyer shall each submit to the Accounting Firm in writing, not later than five (5) Business Days after the Accounting Firm is retained, their respective positions with respect to the Disputed Amounts, together with such supporting documentation as they deem necessary or as the Accounting Firm may request and no discovery will be permitted and no arbitration hearing among the parties will be held; provided that the Accounting Firm may request additional information and/or a meeting among the Parties in connection with the Accounting Firm's determination hereunder and the Parties will use commercially reasonable efforts to provide such additional information and attend any such meeting.  The Accounting Firm shall act to determine, based upon the provisions of this Section 2.8(e), only the Disputed Amounts, which determination shall be made in accordance with the procedures set forth in Section 2.8(b) and this Section 2.8(e), and, in any event, shall not be less than the lesser of the amounts claimed by Buyer or KK OpCo, and shall not be greater than the greater of the amounts claimed by Buyer or KK OpCo.  For clarity, the Accounting Firm shall not make a determination as to any amounts or items included in the A/R Dilution Closing Statement, other than the Disputed Amounts.  KK OpCo and Buyer shall instruct the Accounting Firm to deliver a written determination (such determination to include a worksheet setting forth all material calculations used in arriving at such determination) of all Disputed Amounts and the resulting Adjustment Amount determined based on such determination, and such determination will be final, binding and conclusive on the Parties.

(f)    Upon the determination, in accordance with Section 2.8(c), Section 2.8(d) or Section 2.8(e), of the final Purchased Inventory Payment Amount (the "Final Purchased Inventory Payment Amount"), the final Reimbursement Amount (the "Final Reimbursement Amount") and the final Net A/R Payment Amount (the "Final Net A/R Payment Amount"), the final Adjustment Amount shall be calculated based on the Final Purchased Inventory Payment Amount, Final Reimbursement Amount and Final Net A/R Payment Amount.

(g)    The Adjustment Amount shall be paid as set forth below and, except for any imputed interest determined for federal income tax purposes, shall be treated as an adjustment to the purchase price for federal, state, provincial, territorial, local and foreign income Tax purposes unless otherwise required by applicable Law.

(i)    If the Adjustment Amount is positive, then (x) Buyer shall within ten (10) Business Days after the determination of such Adjustment Amount pay to Sellers the lesser of (A) the Adjustment Amount and (B) the Adjustment Escrow Amount and (y) Buyer and KK OpCo will promptly deliver a joint written instruction to the Escrow Agent

instructing it to release an amount equal to Adjustment Escrow Amount to the account specified by KK OpCo.

(ii)     If the Adjustment Amount is negative, within five (5) Business Days after the determination of such Adjustment Amount, Buyer and KK OpCo will promptly deliver a joint written instruction to the Escrow Agent instructing it to release (A) an amount equal to the absolute value of the Adjustment Amount to Buyer and (B) if any amount remains of the Adjustment Escrow Amount after giving effect to the foregoing clause, the remaining amount of the Adjustment Escrow Amount to KK OpCo (for the benefit of the Sellers). Buyer shall in no event be entitled under this Section 2.8(g)(ii) to an amount in excess of the Adjustment Escrow Amount and in the event that the absolute value of the Adjustment Amount is in excess of the Adjustment Escrow Amount, Buyer shall solely be entitled to the Adjustment Escrow Amount and Sellers shall not have any obligation to pay any amounts under this Section 2.8(g)(ii).

(h)     Within one hundred twenty (120) days after the Closing Date, Buyer shall prepare and deliver to KK OpCo, with a copy to Gordon Brothers, a statement (the "A/R Dilution Closing Statement") setting forth Buyer's good faith calculation as of the Closing in reasonable detail as of the Closing Date of the actual calculation of the A/R Dilution Amount.  The A/R Dilution Closing Statement shall be prepared in accordance with Section 2.8(b).  Upon delivery by Buyer of the A/R Dilution Closing Statement, Buyer shall provide KK OpCo with reasonable access, during normal business hours, to Buyer's accounting and other personnel and to the books and records of Buyer and any other document or information reasonably requested by KK OpCo in connection with KK OpCo's review of the A/R Dilution Closing Statement. If Buyer does not prepare and deliver the A/R Dilution Closing Statement to KK OpCo within one hundred and twenty (120) days after the Closing Date, the calculations of the Estimated A/R Dilution Amount shall be deemed final and binding.

(i)     Section 2.8(d) and Section 2.8(e) shall be applied *mutatis mutandis* with respect to the determination of all amounts set forth in the A/R Dilution Closing Statement with all references to the Adjustment Closing Statement (and amounts set forth therein) deemed to mean the A/R Dilution Closing Statement (and amounts set forth therein).

(j)     Upon the determination, in accordance with Section 2.8(h) or Section 2.8(i), of the final A/R Dilution Amount (the "Final A/R Dilution Amount"), Sellers or Buyer, as the case may be, shall make the payment required by this Section 2.8(j) as follows:

(i)     If the Final A/R Dilution Amount is less than the Estimated A/R Dilution Amount, then (x) Buyer shall within ten (10) Business Days after the determination of such Final A/R Dilution Amount pay to Sellers the *lesser* of (A) the difference between the Estimated A/R Dilution Amount and the Final A/R Dilution Amount and (B) the A/R Dilution Escrow Amount and (y) Buyer and KK OpCo will promptly deliver a joint written instruction to the Escrow Agent instructing it to release an amount equal to the A/R Dilution Escrow Amount to the account specified by KK OpCo.

(ii)     If the Final A/R Dilution Amount is greater than the Estimated A/R Dilution Amount, then a portion of the A/R Dilution Escrow Amount equal to the

difference between the Final A/R Dilution Amount and the Estimated A/R Dilution Amount will be released to Buyer and within five (5) Business Days after the determination of such A/R Dilution Amount, Buyer and KK OpCo will promptly deliver a joint written instruction to the Escrow Agent instructing it to release (A) such amount to Buyer and (B) if any amount remains of the A/R Dilution Escrow Amount after giving effect to the foregoing clause, the remaining amount of the A/R Dilution Escrow Amount to KK OpCo (for the benefit of the Sellers). Buyer shall in no event be entitled under this Section 2.8(j)(ii) to an amount in excess of the A/R Dilution Escrow Amount and in the event that the difference between the Final A/R Dilution Amount and the Estimated A/R Dilution Amount is in excess of the A/R Dilution Escrow Amount, Buyer shall solely be entitled to the A/R Dilution Escrow Amount and Sellers shall not have any obligation to pay any amounts under this Section 2.8(j)(ii).

(k)     Except for any imputed interest determined for federal income tax purposes, any amounts paid pursuant to Section 2.8(j) shall be treated as an adjustment to the purchase price for federal, state, provincial, territorial, local and foreign income Tax purposes unless otherwise required by applicable Law.

Section 2.9     Deposit Amount; Buyer Breach Fee.

(a)     On the date hereof, unless already deposited, Buyer shall deposit into escrow with Escrow Agent an amount equal to Three Million Dollars ($3,000,0000) (such amount, together with all interest and other earnings accrued thereon, the "Deposit Amount"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement duly executed by KK OpCo, Buyer and the Escrow Agent.

(b)     The Parties shall instruct the Escrow Agent to release and deliver the Deposit Amount to either (x) Buyer or (y) KK OpCo on behalf of Sellers, as follows:

(i)     if the Closing shall occur, the Deposit Amount shall be delivered to Sellers on Closing and applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a);

(ii)     if this Agreement is terminated by KK OpCo pursuant to Section 9.1(d)(i) (a "Buyer Breach Termination"), the Deposit Amount shall be delivered to KK OpCo; or

(iii)     if this Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Amount shall be delivered to Buyer.

(c)     In the event of a Buyer Breach Termination, in consideration for Sellers and Gordon Brothers having expended considerable expense following the Execution Date, and without the requirement of any notice or demand from Sellers or any other application to or order of the Bankruptcy Courts, in addition to the receipt of the Deposit Amount in accordance with Section 2.9(b)(ii), Buyer shall pay to KK OpCo an amount equal to $4,500,000 (the "Cash Breach Fee Component" and, collectively with the Deposit Amount, the "Buyer Breach Fee"). In the event Buyer becomes obligated under this Agreement to pay the Buyer Breach Fee, Buyer shall pay the

Cash Breach Fee Component in immediately available funds to such account or accounts as may be specified in written notice by KK OpCo.

(d)    The obligation to pay the Buyer Breach Fee in accordance with the provisions of this Agreement will (i) be binding upon and enforceable against Buyer immediately upon execution of this Agreement and (ii) survive the subsequent termination of this Agreement, solely to the extent permitted by applicable Law.  The obligation to pay the Buyer Breach Fee as and when required under this Agreement, is intended to be, and is, binding upon (A) any successors or assigns of Buyer and (B) any trustee, examiner or other representative of Buyer's estate as if such Person were the Buyer hereunder. For the avoidance of doubt, nothing in this Section 2.9 shall affect any Party's rights or obligations under Section 10.15.

(e)    Subject to Section 9.2(b) and Section 10.15, the Parties acknowledge that the agreements contained in this Section 2.9 are an integral part of the transactions contemplated in this Agreement, that the damages resulting from termination of this Agreement under circumstances where KK OpCo terminates this Agreement pursuant to a Buyer Breach Termination are uncertain and incapable of accurate calculation and that the payment of the Buyer Breach Fee is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Sellers in the circumstances where KK OpCo is entitled to the Buyer Breach Fee because of a Buyer Breach Termination for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, Sellers and Buyer would not enter into this Agreement.  If any Party fails to take any action necessary to cause the payment of the Deposit Amount (or the Buyer Breach Fee, as applicable) to any other Party(ies) if and when the same is due, and, in order to obtain such Deposit Amount (or the Buyer Breach Fee, as applicable), such other Party(ies) commence a suit which results in a judgment in favor of such other Party(ies), such failing Party shall pay to such other Party(ies) an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by such other Party(ies) in connection with such suit.

Section 2.10    Closing.

(a)    Subject to the Sale Orders, the purchase, sale, assignment and conveyance of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of King & Spalding LLP, located at 1180 Peachtree Street NE, Atlanta, Georgia 30309 at 10:00 a.m. Eastern Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VIII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)    a bill of sale, assignment and assumption agreement, in form and substance reasonably satisfactory to the Parties (the "<u>Assignment and Assumption Agreement</u>"), duly executed by the applicable Sellers;

(ii)    an IP Assignment Agreement, duly executed by the applicable Sellers;

(iii)    a copy of the Sale Orders;

(iv)    for each Seller (or, if a Seller is a disregarded entity for U.S. federal income tax purposes, such Seller's regarded owner for U.S. federal income tax purposes) other than Sellers who are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code), an IRS Form W-9, and for Sellers who are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code), an applicable IRS Form W-8;

(v)    a duly executed certificate of a duly authorized officer of KK OpCo certifying the satisfaction of the conditions set forth in <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>;

(vi)    Provincial sales tax clearance certificate(s) issued by the relevant Governmental Authority stating that the Sellers have paid and remitted all outstanding provincial sales Tax and any related penalties and interest under the relevant taxing legislation, if required under Section 6 of the Retail Sales Tax (Ontario) or by a corresponding provision of applicable Law in another province, if and as applicable;

(vii)    a Conditions Certificate, duly executed by KK OpCo; and

(viii)    such other documents as any Buyer may reasonably request that are not inconsistent with the terms of this Agreement and reasonably necessary to effectuate or consummate the transactions contemplated by this Agreement (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto).

(c)    At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i)    the Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    the IP Assignment Agreement, duly executed by Buyer;

(iii)    the Initial Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by Sellers;

(iv)     a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b); and

(v)     a Conditions Certificate, duly executed by Buyer.

(d)     At or prior to the Closing, Buyer shall deposit into escrow with Escrow Agent an amount equal to (i) the Adjustment Escrow Amount, (ii) the Net A/R Adjustment Amount and (iii) the In-Transit Inventory Escrow Amount, by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.

Section 2.11    Purchase Price Allocation.  For U.S. federal and applicable state, local and foreign Tax purposes, Buyer, Sellers, and their respective Affiliates shall use commercially reasonable efforts to agree to an allocation of the Purchase Price for applicable Tax purposes) among the Transferred Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (or any similar principles applicable for the purposes of the Income Tax Act (Canada) as soon as reasonably practicable after the date on which both the Adjustment Closing Statement and the A/R Dilution Closing Statement are finalized (such allocation, the "Allocation"); provided that for purposes of the Allocation the Parties agree to allocate the portion of the Purchase Price attributable to the Canadian Transferred Assets by asset class and by province in which the particular assets are located. If the Parties reach an agreement with respect to the Allocation, Buyer, Sellers and their Affiliates shall (a) file all applicable Tax Returns in accordance with the Allocation, as finally determined hereunder, and (b) not take any Tax-related action in connection with any Tax audit or proceeding that is inconsistent with the Allocation, except, in each case, to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Tax Law; provided, however, that (A) if Buyer and Seller cannot mutually agree on the Allocation, each Party shall be entitled to determine its own allocation and file its IRS Form 8594 consistent therewith and (B) neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation.

Section 2.12    Designated Buyer(s).

(a)     In connection with the Closing, without limitation by the terms of Section 10.14, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.12, one (1) or more Affiliates to purchase specified Transferred Assets, assume specified Assumed Liabilities, employ specified Transferred Employees and assume the rights and obligations under this Agreement of the Buyer, in whole or in part, on and after the Closing Date (any such Person shall be properly designated by a Buyer in accordance with this Section 2.12, a "Designated Buyer"); provided that no such designation would impede or materially delay the Closing or affect the timely receipt of any regulatory approval; provided, further, that no such designation shall be permitted if any Taxes required to be withheld under applicable Law from any amounts otherwise payable hereunder would be higher than the amount of Taxes that would be required to be withheld absent such designation and the Buyer or the Designated Buyer does not agree to gross up the amount paid to the applicable Seller so that the applicable Seller is in the same economic position it would have been in if such designation had not occurred (taking into account all Taxes payable by such Seller as a result of

33

such gross up). At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing. After the Closing, any reference to any Buyer made in this Agreement in respect of any purchase, assumption, or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. Buyer shall be liable for all obligations of any Designated Buyer(s) under this Agreement as to any particular Assumed Liability that any Designated Buyer is assuming at the Closing.

(b)      Without limitation of Section 6.4, the designation of a Designated Buyer in accordance with Section 2.12(a) shall be made by a Buyer by way of a written notice to be delivered to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets, Assumed Liabilities and Transferred Employees Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder. Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to Section 2.12(a) shall not relieve Buyer of any of its obligations under this Agreement (or otherwise) and Buyer shall remain primarily liable therefor.

Section 2.13     Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S., Canadian or foreign Tax Law. To the extent that  Buyer intends to withhold any such amounts from the Purchase Price, it shall notify the applicable Seller of such intention and shall provide such Seller with an opportunity to provide forms or evidence that would establish an exemption from, or reduction in the amount of, withholding tax and shall otherwise cooperate in good faith with Sellers and use commercially reasonable efforts to minimize or eliminate any such deductions or withholdings. To the extent that any amounts are so deducted and withheld and paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLERS

Except as set forth in the Disclosure Letter attached hereto, each Seller jointly and severally represents and warrants to Buyer as follows:

Section 3.1     Organization. Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code and the CCAA, and (c) is qualified to do business and is in good standing (or its

equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified is not and would not reasonably be expected to be material to the Business.

Section 3.2    Authority.   Subject to approval of the Bankruptcy Courts and entry of the Sale Orders, as applicable (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth on Section 3.3(a) of the Disclosure Letter and assuming that (x) entry is made by the Bankruptcy Courts of the Sale Orders and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), after giving effect to the application of the Bankruptcy Code, including Section 365 thereof, on certain legal and contractual provisions applicable to the Transferred Contracts and other Transferred Assets, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not and will not, with or without notice, lapse or time or both: (i) violate the Organizational Documents of Sellers; (ii) conflict with or violate any Law applicable to Sellers or by which any Transferred Asset is bound; (iii) result in any material breach of, constitute a material default (or an event that, with notice or lapse of time or both, would become a material default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any material Encumbrance (other than a Permitted Encumbrance) on any Transferred Asset; or (iv) result in any material breach of, constitute a material default under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any material Encumbrance on any Transferred Contract; except, in the case of clause (ii) and (iv), for any such violations, breaches, defaults or other occurrences that are not material to the Business taken as a whole.

(b)    Except as set forth on Section 3.3(b) of the Disclosure Letter, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated hereby,

except (i) requisite approvals from the Bankruptcy Courts or (ii) as may be necessary as a result of any facts or circumstances relating to any Buyer or any of its Affiliates.

Section 3.4    Transferred Assets.  Subject to entry of the Sale Orders by the Bankruptcy Courts:

(a)    Each Seller, as applicable, has good, valid and marketable title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use, in each case, in all material respects.

(b)    Assuming that the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.4(b) of the Disclosure Letter and the Sales Orders are made, given or obtained (as applicable), this Agreement and the instruments and documents to be delivered by Sellers to Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to Buyer, good, valid and marketable title to, and interest in the applicable Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims and interests, other than Assumed Liabilities, in each case, in all material respects.

(c)    The Transferred Assets are adequate for the purposes for which such assets are currently used or are held for use, conform in all material respects to all Laws applicable thereto, are in good repair and operating condition (subject to normal wear and tear), and there are no facts or conditions affecting the Transferred Assets which would, individually or in the aggregate, reasonably be expected to interfere with the use or operation thereof as currently used or operated, or their adequacy for such use, in any material respect.

Section 3.5    Absence of Certain Changes or Events.  Since February 29, 2024, through the date of this Agreement, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect. Except (i) discussions, negotiations and activities related to this Agreement and the RSA or other potential strategic transactions, including preparation for the Bankruptcy Cases, (ii) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, the negotiation and execution of this Agreement, (iii) for the preparation and commencement of the Bankruptcy Cases and Sellers' debtor in possession financing in the Bankruptcy Cases or (iv) as expressly contemplated by this Agreement, from February 29, 2024, until the date hereof, Sellers have operated only in the Ordinary Course of Business and no Seller has taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.1(b), if taken, failed to be taken or proposed to be taken, except for the execution and delivery of this Agreement.

Section 3.6    Compliance with Law; Permits.

(a)    As of the date hereof, (i) the Business is being conducted in compliance with, and Sellers are in compliance with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of Sellers, threatened, claims from any Governmental Authority relating to any non-compliance of the

Business or the Transferred Assets, except, in each case of (i) and (ii), as has not been, and would not be reasonably expected to be material to the Business, taken as a whole.

(b)    Sellers are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties, to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted. All material Permits held by Sellers: (i) are valid and in full force and effect and no Seller is in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the Sale Orders each such Permit may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Courts).

(c)    Each Seller, in relation to the Transferred Assets, is (and has been at all times during the past three (3) years) in compliance with all applicable Laws except as has not been, and would not be reasonably expected to be material, to the Business, taken as a whole. Except as set out in Section 3.6(c) of the Disclosure Letter, during the past three (3) years Sellers have not been charged with, nor received any notice that it is under investigation with respect to, and, to the Knowledge of Sellers, no Seller is otherwise now under investigation with respect to, any violation of any applicable Law or other requirement of a Governmental Authority. No Seller sells, or has ever sold, in relation to the Transferred Assets, any product or provided any services to any Governmental Authority. In respect to the Transferred Assets, no Seller is currently a party to or subject to any Contract with any Governmental Authority. Sellers are not debarred or suspended from doing business with any Governmental Authority.

(d)    Each Seller, and any such officer and director and, to the Knowledge of the Sellers, any agent acting on behalf of such Seller, in relation to the Transferred Assets, is in compliance and has since the Compliance Date complied with applicable anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), all national and international laws enacted to implement the Organization for Economic Co-operation and Development Convention on Combatting Bribery of Foreign Officials in International Business Transactions, and other similar Laws of those countries in which any Seller conducts business (collectively, "Anti-Corruption Laws"), and to Knowledge of the Sellers there are no unresolved investigations or claims concerning any Liability of Sellers with respect to such Laws. Each Seller has policies and procedures in place that are reasonably designed to (i) prevent, detect, and deter bribery and corruption in the conduct of the Business, and (ii) achieve compliance by the Business with all applicable anti-corruption Laws.

(e)    Each Seller, in relation to the Transferred Assets, is (and has been at all times during the past three (3) years) in compliance with all applicable Customs and International Trade Laws, and at no time has any Seller or, to Seller's Knowledge, any Person acting on behalf of the Business committed any violation of the Customs and International Trade Laws of those

countries in which Sellers are engaged in the Business.  Except as set forth on <u>Section 3.6(e)</u> of the Disclosure Letter, the conduct of the Business and Sellers is, and during the past three (3) years has been, in all material respects, in compliance with all Laws governing or concerning the payment of all customs duties, countervailing duties, fees and charges applicable to and due with respect to all import transactions, including any countervailing or antidumping duties.  No products, goods, parts, or accessories imported in the course of engaging in the Business are or have been subject to any countervailing or antidumping duty investigation, order, notice or other proceeding by any Governmental Authority.  There are no material unresolved questions or claims concerning any Liability of any conduct in furtherance of the Business with respect to Customs and International Trade Laws applicable to the import or export of goods.  Without limiting the foregoing, neither Sellers nor, to Seller's Knowledge, any Person acting on behalf of the Business has received any notice that it is subject to any civil or criminal investigation, audit or any other inquiry involving or otherwise relating to any alleged or actual violation of the Customs and International Trade Laws.

(f)     Each Seller, in relation to the Transferred Assets, is (and has been at all times during the past three (3) years) in compliance with all applicable Laws relating to the importation of materials into the countries in which the Sellers conduct the Business. The origin declarations made in furtherance of the Business are and, during the past three (3) years have been, accurate and based on the exercise of reasonable care.  Neither Sellers nor, to Seller's Knowledge, any Person acting on behalf of the Business has received any written, or to the Knowledge of Sellers, oral, communication with respect to the conduct of the Business during the past three (3) years from any Governmental Authority that (i) excludes products or materials or (ii) asserts that any Seller owes additional duties, liquidated damages, penalties or fees.

(g)     Neither Sellers nor, to Seller's Knowledge, any Person acting on behalf of the Business (i) has been or is designated on any list maintained by any U.S. governmental entity responsible for the implementation or enforcement of Customs and International Trade Laws (each such person a "<u>Listed Person</u>"), or (ii) is directly or indirectly 50 percent or more owned by, or otherwise controlled by or acting for (A) any Listed Person or (B) any Governmental Authority or Person that is the subject or target of a comprehensive embargo under Law, or (iii) is located, organized or resident in any country or territory that is the subject or target of a comprehensive embargo under Law (currently, Cuba, Iran, North Korea, Syria, and certain regions of Ukraine).

Section 3.7     Litigation.  Except for Actions filed in the Bankruptcy Courts, there are no Actions pending or, to the Knowledge of the Sellers, threatened in writing against the Sellers that questions or challenges (i) the validity of this Agreement or the Ancillary Agreements,(ii) any action taken or proposed to be taken by the Sellers pursuant to this Agreement or Ancillary Agreements or in connection with the transactions contemplated by this Agreement, or (iii) the Intellectual Property rights owned by the Sellers or their Subsidiaries (excluding any objections, rejections, oppositions, or other such proceedings at the United States Patent and Trademark Office, the U.S. Copyright Office, or such other filing offices, domestic or foreign, challenging the registrability of such Intellectual Property). Except as set forth on <u>Section 3.7</u> of the Disclosure Letter and except for Actions filed in the Bankruptcy Courts, there are no Actions pending or, to the Knowledge of the Sellers, threatened in writing against the Sellers that involves or affects the Transferred Assets or the Business. Except as set forth on <u>Section 3.7</u> of the Disclosure Letter and except for Actions filed in the Bankruptcy Courts, there are no material Actions pending or, to the

Knowledge of the Sellers, threatened in writing against the Sellers based on, arising out of, in connection with or otherwise relating to (i) the non-payment of wages or other compensation to employees or (ii) violation of Law with respect to the employment or termination of employment of or failure to employ any individual.

Section 3.8    Labor and Employment Matters.

(a)    No Seller is a party to or bound by a collective bargaining agreement.

(b)    Solely with respect to the Business, (i) there is no unfair labor practice charge or complaint pending or, to Sellers' Knowledge, threatened against Sellers before the National Labor Relations Board or any similar Governmental Authority, (ii) no labor union, labor organization, works council or group of Employees has made a pending demand in writing for recognition or certification as the bargaining agent of the Employees, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any similar Governmental Authority, (iii) to the Knowledge of Sellers, there are no pending or threatened union organizing or decertification activities and (iv) there are no pending or, to Sellers' Knowledge, threatened strikes, work stoppages, lockouts, slowdowns or other material labor disputes, that, in each case of (i) through (iv), would reasonably be expected to be material to the Business, taken as a whole.

(c)    Solely with respect to the Business, each Seller is and for the past three (3) years has been in compliance with all applicable Laws respecting labor, labor relations, employment and employment practices, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, vacation pay, the payment of social security and other employment Taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance, in each case, except as would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.9    Real Property.  Section 3.9 of the Disclosure Letter sets forth a correct and complete legal description of each parcel of real property leased or sub-leased by any Seller (the "Leased Real Property"). The Leased Real Property constitutes all of the real property owned, leased, occupied or otherwise used in connection with the Business.

Section 3.10    Intellectual Property.

(a)    A true, correct and complete list (in all material respects) of all (i) issued Patents and pending Patent applications, (ii) registered Trademarks and applications to register any Trademarks, (iii) registered Copyrights and applications for registration of Copyrights, and (iv) domain name registrations, in each case which is owned by any Seller and relates to the Business (the "Registered IP") is set forth on Section 3.10(a) of the Disclosure Letter.  Sellers are the sole and exclusive owners of all material Intellectual Property included in the Transferred IP that is

owned or purportedly to be owned by such Seller or such Subsidiary, including all Registered IP, and all items of such Registered IP are subsisting, and, to the Knowledge of Sellers, valid and enforceable. No claim has been made or, to the Knowledge of Sellers, threatened alleging that any such Registered IP is invalid or unenforceable in whole or in part or challenging the use or of the Intellectual Property owned by a Seller or any Subsidiaries of the Sellers. Except as disclosed on Section 3.10(a) of the Disclosure Letter, none of the Intellectual Property owned by a Seller or any Subsidiaries of the Sellers is subject to any outstanding order, judgment, or stipulation restricting the use thereof by any of the Sellers or any Subsidiary of any Seller.

(b)     The conduct of the Business (including the products and services sold or performed by the Sellers and their respective Subsidiaries in the conduct of the Business) and the use, practice or exploitation of the Transferred IP and other Intellectual Property as currently used, practiced or exploited by Sellers and any Subsidiaries of the Sellers in the conduct of the Business do not, to the Knowledge of the Sellers, infringe, misappropriate or otherwise violate (and, since January 1, 2021 have not infringed, misappropriated or otherwise violated) any Person's Intellectual Property rights, and since January 1, 2021 there has been no such Action asserted or, to the Knowledge of Sellers, threatened against any Seller or any Subsidiary of such Seller.

(c)     Other than third-party commercial "off-the-shelf" software licensed by the Sellers or their Subsidiaries on standard terms and conditions and Intellectual Property that is governed by any Excluded Contract, the Transferred IP constitutes all material Intellectual Property used in, held for use or necessary for the conduct of the Business as currently conducted.

(d)     To the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating in any material respect any Intellectual Property owned by or exclusively licensed to Sellers or any Subsidiary of any Seller that is a Transferred Asset or is used in or relates to the Business or the products and services of the Business, and since January 1, 2021, no such Actions have been asserted or threatened against any Person by any Seller or any Subsidiary of such Seller.

(e)     Sellers have taken commercially reasonable steps to safeguard and maintain the Transferred IP, including maintaining the confidentiality of all trade secrets and other material confidential or proprietary information related primarily to the Business, and none of such confidential or proprietary information has been disclosed other than to employees, contractors, representatives and agents of the Sellers and the Subsidiaries of the Sellers, and other third parties in connection with the operation of the Business, all of whom are bound by written confidentiality agreements. To the Knowledge of Sellers, no Person is in violation of any such agreement.

Section 3.11   Tax Matters.

Except as set forth in Section 3.11 of the Disclosure Letter:

(a)     All material Tax Returns required to be filed by or with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects. Except for any Taxes that need not be paid pursuant to an Order of the Bankruptcy Courts or pursuant to the Bankruptcy Code or CCAA, subject to any obligation of Sellers under the Bankruptcy Code and the CCAA, all material Taxes due and

payable by or with respect to the Transferred Assets or the Business have been timely paid (whether or not shown as due on any Tax Return).

(b)     There is no action, suit, claim, deficiency, assessment, or audit pending, proposed in writing, or, to Sellers' Knowledge, threatened in writing with respect to material Taxes of or relating to the Transferred Assets or the Business.

(c)     There are no Encumbrances for Taxes upon the Transferred Assets, other than Permitted Encumbrances.

(d)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any material Taxes or material Tax Returns of or with respect to the Transferred Assets or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent.

(e)     All material Taxes required to have been deducted, withheld, collected or deposited by the Sellers with respect to the Business have been timely deducted, withheld, collected or deposited and, to the extent required, have been paid or remitted to the relevant Tax authorities.

(f)     None of the Canadian Transferred Assets are owned by a Seller that is a non-resident of Canada for purposes of the *Income Tax Act* (Canada), other than such assets that are not "taxable Canadian property" or are "excluded property" of such other Sellers for purposes of section 116 of the *Income Tax Act* (Canada).

(g)     Solowave Design LP is a "Canadian partnership" for purposes of the *Income Tax Act* (Canada), and Solowave International Inc., Solowave Design Holdings Limited, and Solowave Design Inc. are not non-residents of Canada within the meaning of the *Income Tax Act* (Canada).

The representations and warranties set forth in this Section 3.11 and Section 3.8(c) constitute the sole and exclusive representations and warranties of Seller with respect to Tax matters in connection with the Business and the Transferred Assets, and no other provision of this Agreement shall be deemed to address or include such matters.

Section 3.12   Environmental Matters.

(a)     As of the date hereof, Sellers, the Transferred Assets and the Business are in compliance in all respects with all applicable Environmental Laws, which compliance includes, but is in no way limited to, compliance with the terms of, all Environmental Permits, except in each case, as such noncompliance would not be reasonably expected to have a Material Adverse Effect.

(b)     As of the date hereof, Sellers, the Transferred Assets and the Business are in possession of all material Environmental Permits required in connection with the lawful conduct or operation of the Business and the ownership or use of the Transferred Assets as currently operated.  There is no material claim or action currently pending or, to the Knowledge of Sellers,

threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(c)      There is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting any Seller, Transferred Asset or the Business that would be reasonably expected to have a Material Adverse Effect.  There are no environmental conditions, including the presence of any Hazardous Material at the Leased Real Property, which would be reasonably likely to form the basis of any Liability of the Business, any Transferred Asset or of any Environmental Claim against or affecting any Seller or the Business that would be reasonably expected to have, a Material Adverse Effect.

Section 3.13    Material Contracts.

(a)      Subject to requisite approvals from the Bankruptcy Courts, as applicable, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Cases, each Transferred Contract is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller and, to the Knowledge of Sellers, each of the other Parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth on <u>Section 3.13(a)</u> of the Disclosure Letter, or as would not reasonably be expected to be material to the Business, taken as a whole, no Seller is in default, or is alleged by the counterparty thereto to have breached or to be in default, under any Transferred Contract, and, to the Knowledge of Sellers, the other party to each Transferred Contract is not in default thereunder.  No Transferred Contract has been canceled or otherwise terminated, and no Seller has received any notice from any Person regarding any such cancellation or termination.

Section 3.14    Financial Statements.

(a)      True, correct and complete copies of (i) the audited consolidated balance sheets and statements of income, changes in shareholders' equity and cash flow of KK OpCo and its Subsidiaries as of March 31, 2023, together with the auditor's reports thereon (the "<u>Audited Financial Statements</u>") and (ii) an unaudited consolidated balance sheets and statements of income, changes in shareholders' equity and cash flow of the Sellers as of and for the 11-month period ended February 29, 2024 (the "<u>Interim Financial Statements</u>" and, together with Audited Financial Statements, the "<u>Financial Statements</u>") have been provided to Buyer. The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Sellers as of the dates and for the periods indicated in such Financial Statements, have been prepared in all material respects, in accordance with the books of account and other financial records of the Sellers and have been prepared, in all material respects,  in conformity with GAAP (except, in the case of the Interim Financial Statements, for the absence of footnotes and other presentation items and for normal year-end adjustments that are not material individually or in the aggregate).

Section 3.15    Accounts Receivable.  Sellers have not entered into any agreement to discount or accelerate the payment of the Transferred A/R.  The Transferred A/R has arisen from bona fide transactions entered into by the Sellers in the Ordinary Course of Business consistent with past practice and, other than A/R Dilution, are not subject in any material respect to claims

of set-off or other defenses or counterclaims other than normal cash discounts accrued in the Ordinary Course of Business.

Section 3.16    Inventory.  On and as of the Execution Date, the level of inventory and raw materials (as of type, category, style, brand and description, and proportion to all Purchased Inventory) is in all material respects consistent with the level and mix set forth in the KK Inventory File as of the date hereof.

Section 3.17    Certain Payments.  Since the Compliance Date, no Seller (nor, to the Knowledge of Sellers, any of their respective Representatives) has, in violation of Anti-Corruption Laws, (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the FCPA; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or I made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 3.18    Competition Act; Cultural Business.  For purposes of subsection 110(2) of the Competition Act (Canada), each of (a) the total value of the Transferred Assets that are assets in Canada and (b) the gross revenues from sales prescribed by that subsection, each measured in accordance with the Competition Act (Canada) and the regulations thereunder as at Closing, will be less than the review threshold amount as determined pursuant to subsections 110(8) and 110(9) of the Competition Act (Canada). The Business does not include a "cultural business" as that term is defined in subsection 14.1(6) of the Investment Canada Act.

Section 3.19    Financial Advisors.  Neither Buyer nor any Designated Buyer is and will become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Sellers.

Section 3.20    Exclusivity of Representations and Warranties.  Notwithstanding the delivery or disclosure to Buyer or any of its Affiliates or Representatives of any documentation or other information (including any financial projections or other supplemental data), except for the representations and warranties expressly set forth in this Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v), no Seller makes, or has made, (and each Seller and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty with respect to the Business or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, and Buyer and its Representatives are not relying on any representation, warranty or other information of any Seller or any Person except for those expressly set forth in this Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v).  No Seller makes (and each Seller and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and no Seller or any other Person shall be subject to any liability to Buyer or any other Person resulting from, any Seller or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or its Representatives, or resulting from the omission of, any estimate, projection, prediction, data, budget, forecast, financial information, memorandum, prospect information,

43

presentation or any other materials or information, including any oral, written, video, electronic or other materials or information presented to or made available to Buyer in connection with presentations by KK OpCo's management or information made available on any "data sites" or in the course of their due diligence investigation of the Business, the negotiation of this Agreement or the course of the transactions contemplated by this Agreement except as expressly set forth in this Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as to only itself as follows:

Section 4.1   Organization.   Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement.

Section 4.2   Authority.   Buyer has the power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.   The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will have been, duly executed and delivered by Buyer and assuming due execution and delivery by each of the other Parties and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3   No Conflict; Required Filings and Consents.

(a)   Assuming that (x) entry is made by the Bankruptcy Courts of the Sale Orders, (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable) and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by Buyer with any of the provisions hereof, do not and will not:

(i)   conflict with the Organizational Documents of Buyer;

        (ii)     conflict with or violate any Law applicable to Buyer or by which any property or asset of Buyer is bound or affected;

        (iii)    conflict with or violate any Order of any Governmental Authority; or

        (iv)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which Buyer is a party.

except, in each case of clauses (i) through (iv), as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement;

        (b)    Buyer is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

        Section 4.4    Absence of Litigation.  There is no Action pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, (a) would prevent or materially restrict, impede or delay the performance by Buyer of its obligations under this Agreement or (b) would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

        Section 4.5    Qualification.

        (a)    To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

        (b)    As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Transferred Contracts, if any, that are being transferred to it.

        Section 4.6    Brokers.  No broker, finder or investment banker is entitled to any fee, commission or expense from Buyer that would be payable by Sellers in connection with the transactions contemplated hereby.

        Section 4.7    Sufficient Funds; Solvency.  Buyer has, or will have available to it at the Closing, sufficient funds to satisfy all obligations of Buyer under this Agreement, including the payment of a portion of the Initial Cash Consideration and any associated expenses including to pay all fees, costs and expenses to be paid by Buyer related to the transactions contemplated hereby. Assuming the accuracy of the representation and warranties of the Sellers set forth in

Article III, Buyer is not insolvent (either because of its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable liabilities on its debts as they become absolute and matured). Buyer and each Designated Buyer, as applicable, has or will have available to it at the Closing, sufficient access to capital to satisfy the Assumed Liabilities. Without limiting this Section 4.7, in no event shall the receipt or availability of any funds or financing be a condition to Closing or to any of Buyer's obligations hereunder.

Section 4.8    Exclusivity of Representations and Warranties.

(a)    Except for the representations and warranties expressly set forth in this Article IV, neither Buyer nor any other Person on behalf of Buyer makes (and Buyer, on behalf of itself, its Subsidiaries, and their respective Affiliates and Representatives, hereby disclaims), and KK Parent has not relied on, any express or implied representation or warranty with respect to Buyer, its Subsidiaries or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

(b)    Except for the representations and warranties expressly set forth in Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v), Buyer acknowledges and agrees that (x) no Seller or any other Person on behalf of any Seller makes, or has made, any express or implied representation or warranty, at law or in equity, with respect to Sellers or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, including with respect to its business, operations, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities), conditions (financial or otherwise), prospects or otherwise in connection with this Agreement or the transactions contemplated by this Agreement, including any representation or warranty as to value, merchantability, fitness for any particular purpose or for ordinary purposes, and Buyer and its Representatives are not relying on any written or oral statement, representation, warranty, guaranty or other information of any Seller or any Person except for those expressly set forth in Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v) or (y) no person has been authorized by Sellers or any other Person on behalf of Sellers to make any representation or warranty relating to the Business in connection with this Agreement, and if made, such representation or warranty shall not be relied upon by Buyer as having been authorized by such entity.  Without limiting the generality of the foregoing, Buyer acknowledges and agrees that no Seller or any other Person has made a representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and no Seller or any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or their respective Representatives, or resulting from the omission of, any estimate, projection, prediction, data, financial information, memorandum, presentation or any other materials or information, including any materials or information made available to Buyer and/or its Representatives in connection with presentations by KK OpCo's management or information made available on any "data sites." Buyer acknowledges that it has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and representations and warranties set

46

forth in Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v) and has not relied directly or indirectly on any materials or information made available to Buyer and/or its Representatives by or on behalf of any Seller.  Buyer acknowledges that, should the Closing occur, Buyer shall acquire its portion of the Business and the Transferred Assets, as set forth in this Agreement, without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

Section 5.1    Debtors-in-Possession.  As of the Petition Date through the Closing, Sellers shall continue to operate their businesses as debtors-in-possession pursuant to the Bankruptcy Code and any Order of the Bankruptcy Courts.

Section 5.2    Sale Orders.  The U.S. Sale Order shall among other things, (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Transferred Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; and (b) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code. The Canadian Sale Order shall, among other things, (a) recognize and give full force and effect to the U.S. Sale Order in Canada pursuant to the CCAA, and (b) vest the Canadian Transferred Assets in and to the Buyer, free and clear of all Encumbrances other than the Permitted Encumbrances.

Section 5.3    Cooperation with Respect to Approvals from the Bankruptcy Courts.  Buyer shall take such commercially reasonable actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Courts of the Sale Orders, including furnishing affidavits or other documents or information for filing with the Bankruptcy Courts for purposes of, among other things: (a) demonstrating that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.4    Bankruptcy Court Filings.

(a)    Sellers shall consult with Buyer concerning the Sale Orders and any other Orders of the Bankruptcy Courts entered after the date hereof relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith.

(b)    Sellers shall provide Buyer with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Bankruptcy Cases that relate in any material respect to this Agreement, the Transferred Assets, or Buyer at least 24 hours prior to the making of any such filing or submission to the Bankruptcy Courts, and such documents shall be in form and substance acceptable to the Parties in their reasonable discretion to the extent of their respective consent rights set forth in Section 2 thereof.

Section 5.5    Appeal of Sale Orders.  In the event an appeal is taken or a stay pending appeal is requested from any Sale Order, Sellers shall promptly notify Buyer of such appeal or stay request and provide Buyer a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of any Sale Order, Sellers shall, in consultation with Buyer, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal. In such case, Sellers will provide Buyer with a draft copy of any filing or submission at least three (3) Business Days prior to the filing or submission to the applicable Bankruptcy Court and any such documents shall be in form and substance acceptable to the Parties to the extent of their respective consent rights set forth in Section 2 of the RSA.

## ARTICLE VI

## COVENANTS

Section 6.1    Conduct of Business Prior to the Closing.  From the date of this Agreement until the Closing Date or earlier termination of this Agreement,

(a)    except (1) as otherwise expressly required by this Agreement, (2) as expressly set forth in Section 6.1 of the Disclosure Letter, (3) as required by Law (including the Bankruptcy Code) or required by any Order, (4) for any limitations on operations imposed by the Bankruptcy Courts, the Bankruptcy Code, the CCAA, the DIP Order, or the DIP Facility or the Prepetition Credit Agreement; or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing Date or earlier termination of this Agreement, Sellers shall use commercially reasonable efforts to conduct the Business in the Ordinary Course of Business and preserve the material business relationships with customers, suppliers, distributors and others with whom Sellers deal in the Ordinary Course of Business (including timely payment of post-petition accounts payable, purchasing and maintaining appropriate levels of Inventory, performing all reasonably required maintenance and repairs, making capital expenditures and collecting receivables);

(b)    except (1) as otherwise expressly required by this Agreement (including with respect to a Qualifying Alternative Transaction), (2) as expressly set forth in Section 6.1 of the Disclosure Letter, (3) as required by Law (including the Bankruptcy Code) or required by any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Courts, the Bankruptcy Code, the CCAA, the DIP Order, or the DIP Facility or the Prepetition Credit Agreement; or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing Date or earlier termination of this Agreement, Sellers shall not:

(i)    sell, transfer, lease, sublease, license, abandon, encumber or otherwise dispose of any Transferred Assets other than immaterial dispositions thereof and/or Inventory sold or disposed of in the Ordinary Course of Business;

(ii)    acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the

48

Transferred Assets or any material assets, except acquisitions of raw materials in the Ordinary Course of Business;

      (iii)    fail to make payments in accordance with and as contemplated by the Prepetition Budget or the DIP Budget;

      (iv)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

      (v)    (1) reject, terminate (other than by expiration in accordance with its terms), or materially amend any Transferred Contract or seek approval of the Bankruptcy Courts to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain approval of the Bankruptcy Courts to terminate) any Transferred Contract;

      (vi)    make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller in the Ordinary Course of Business);

      (vii)    subject any of the Transferred Assets to any Encumbrance other than Permitted Encumbrances;

      (viii)    incur, guarantee or assume any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness except for indebtedness under the DIP Facility or the Prepetition Credit Agreement;

      (ix)    use the sale theme "going out of business";

      (x)    modify, amend, terminate or waive any rights under any Transferred Contract;

      (xi)    change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

      (xii)    except as required by applicable Law, (1) revoke or change any material Tax election or method of accounting with respect to Taxes, (2) make any material Tax election inconsistent with past practices and outside ordinary course of business, (3) file any amended Tax Return, (3) enter into any closing agreement or settle or compromise any material Tax claim or assessment, or (4) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case to the extent such action could adversely affect Buyer or any of its Affiliates in a Tax period that ends after the Closing Date;

      (xiii)    ship, sell or transfer any Inventory during the period that is between the Inventory Count and the Closing Date;

      (xiv)    amend the DIP Budget; or

(xv)    agree or commit to any of the foregoing; and

(c)    from the date of this Agreement until the Closing Date or earlier termination of this Agreement, Sellers shall use reasonable best efforts to clear any unapplied cash in respect of the Transferred A/R.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, or the Business prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.

Section 6.2    Covenants Regarding Information.

(a)    From the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, Sellers shall afford Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of Sellers, solely with respect to the Business, and shall furnish Buyer with such financial, operating and other data and information, and access to all the officers, employees, customers, vendors, accountants and other Representatives of Sellers, solely with respect to the Business, as any Buyer may reasonably request in connection with the transactions contemplated by this Agreement.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide access to or disclose any information to any Buyer or its Representatives if (i) such access or disclosure is prohibited pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) such access or disclosure would violate applicable Law, or (iii) such access or disclosure would adversely affect any attorney-client or other legal privilege or contravene and applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.

(b)    The information provided pursuant to this Section 6.2 prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein.  The Confidentiality Agreement shall terminate automatically, and with no further action required of any party thereto, upon the Closing. No Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Buyer may not rely on the accuracy of any such information (and Buyer hereby knowingly and expressly disclaims any reliance with respect to any such information), except to the extent of the representations and warranties set forth in Article III or in the officer's certificate delivered pursuant to Section 2.10(b)(v).

(c)    From and after the Closing, until the closing of the Bankruptcy Cases, Buyer will provide Sellers and their Representatives, with reasonable access, during normal business

50

hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of either Buyer or the Business, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) that are in its possession or reasonable control relating to its respective Transferred Assets, its respective Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Courts, (ii) the closing of the Bankruptcy Cases and the wind down of Sellers' estates (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under the Plan), (iii) complying with applicable Laws or (iv) other reasonable business purposes; provided that no Buyer shall be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations.  Unless otherwise consented to in writing by KK OpCo, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to KK OpCo such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

Section 6.3    Employee Matters.

(a)    Not later than three (3) Business Days prior to the Designation Deadline, Buyer shall provide (or cause an Affiliate to provide) to each Seller employee identified on Section 6.3 of the Disclosure Letter, an offer of employment which such employment shall commence as of the Closing, that provides for (i) a base annual salary or hourly wage rate, as applicable, that is not less than such employee's base annual salary or hourly wage rate, as applicable, with the applicable Seller immediately prior to the Closing, and (ii) benefits comparable to those provided by Buyer to its similarly situated employees. Buyer shall use commercially reasonable efforts to ensure that each offer of employment executed by a Transferred Employee reflects a full release by such employee of any and all Liabilities, obligations and/or causes of action of or against any Seller and its Affiliates. At any time during the period commencing from the Effective Date until the Designation Deadline, Buyer may amend or revise the employee list on Section 6.3 of the Disclosure Letter in order to (i) add any employee employed by a Seller as of the date thereof, or (ii) remove any Seller employee based on such employee's actions that would give rise to a for cause employment termination. Each Seller employee who receives and accepts (or is deemed with a base salary equal to or better than the Company's existing terms to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof on the Closing shall be a "Transferred Employee". Sellers will reasonably cooperate with Buyer with respect to such employee matters. Buyer shall, or shall cause its Affiliate to, credit each Transferred Employee with the amount of paid time off accrued, but unused by such Transferred Employee as of the Closing Date.

(b)    Sellers shall retain all Liabilities relating to all unpaid wages, salaries, commissions and other compensation amounts, earned or accrued on or before the Closing Date by or in respect of all of their current and former employees, including the Transferred Employees. During the ninety (90) days from Closing, Buyer shall not, and shall cause its Affiliates not to, take any action that causes any Seller or Affiliate of Seller to incur Liabilities under the WARN Act.

51

(c)     Nothing herein, expressed or implied, shall confer upon any Seller employees (or any of their beneficiaries or alternate payees) any rights or remedies (including any right to employment or continued employment, or any right to compensation or benefits for any period) of any nature or kind whatsoever, under or by reason of this Agreement or otherwise.  In addition, the provisions of this <u>Section 6.3,</u> are for the sole benefit of the parties to this Agreement and are not for the benefit of any third party.

Section 6.4     Consents and Filings; Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, each of the Parties shall, and shall cause its Subsidiaries to, use reasonable best efforts to cooperate with each other Party and to, promptly take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the Ancillary Agreements, in accordance with the terms hereof and thereof. This <u>Section 6.4(a)</u> does not apply with respect to Taxes.

(b)     From time to time, whether at or following the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer all the right, title, and interest in, to or under its Transferred Assets, to provide Buyer and Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.  Each of the Parties will take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.  Notwithstanding the foregoing, nothing in this <u>Section 6.4</u> shall (a) require Sellers or Buyer or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of any other Party (unless funds in the full amount thereof are advanced by such other Party in cash) or (b) prohibit Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing.

(c)     Sellers and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, take, or cause to be taken, all reasonable actions, and do, or cause to be done, all reasonable things necessary, proper or advisable under applicable Laws to obtain the transfer or reissuance to the applicable Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall take, or cause to be taken, all reasonable actions, and do, or cause to be done, all reasonable things necessary, proper or advisable under applicable Laws to (i) respond promptly to any requests for additional information made by such agencies, (ii) participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits, and (iii) cause regulatory approval to be obtained as soon as practicable after the date of filing. Each Party will bear its costs of the preparation and review of any such filing.  Sellers and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection any

filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(d)     Following Closing, Sellers shall cooperate with Buyer's reasonable requests with respect to the investigation and prosecution of any Actions related primarily to the Business or the Transferred Assets (other than in connection with disputes between the Parties), including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary, proper or advisable under applicable Laws to furnish all reasonably available information and testimony, to arrange discussions with, and the calling as witnesses of, officers, directors, employees, agents and Representatives, and to provide other reasonable assistance in connection with any such Actions, with such cooperation to be at the cost and expense of the requesting Buyer.

Section 6.5     Refunds and Remittances.

(a)     After the Closing: (i) if Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to a Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer in accordance with this Agreement and (ii) if any Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Sellers in accordance with this Agreement.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to Sellers or any of their Affiliates, Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to the applicable Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to the applicable Buyer or its designees in accordance with this Agreement, (ii) any Excluded Asset has been conveyed to or is received by a Buyer, then, without any consideration payable to Buyer or any of its Affiliates, Buyer shall convey, assign or transfer promptly such Excluded Asset to Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or their designees in accordance with this Agreement.

Section 6.6     Public Announcements and Communications.  From the date hereof through the Closing Date, neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any public report, statement, press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and KK OpCo, unless otherwise required by applicable Law, in which case such Party shall coordinate and consult with the other Party with respect to the timing, basis, scope and content before issuing any such report, statement or press release; provided, however, that nothing in this Section 6.6 shall (a) prohibit or delay any required filing or other disclosure with the Bankruptcy Courts, or any other Governmental Authority or otherwise hinder either KK OpCo's or its Representatives' ability to timely comply with all Laws (including the Bankruptcy Code, the

CCAA and the WARN Act), (b) prohibit any public announcement containing information that is otherwise generally available to the public (including as a result of any filing or other disclosure with the Bankruptcy Courts, or any other Governmental Authority) or (c) delay or prohibit any WARN Act-related notice issued by KK OpCo. Until the Closing Date, Buyer and Sellers shall use commercially reasonable efforts to develop mutually agreeable messaging for any communications to employees, customers, vendors or suppliers, or as may be necessary to obtain any required third party consent or approval in connection with this Agreement. Sellers shall consult with Buyer before any material communications (other than those made in the Ordinary Course of Business) to any employees, customers, vendors or suppliers, or as may be necessary to obtain any required third party consent or approval in connection with this Agreement.

Section 6.7    Collection of Accounts Receivable.  Subject to the terms of the DIP Order:

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer and any Buyer designee to open any and all mail addressed to any Seller relating to the Business or the Transferred Assets and delivered to the offices of the Business or otherwise to Buyer or any Buyer designee if received on or after the Closing Date and (ii) appoints Buyer, any Buyer designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer of any Buyer designee after the Closing Date with respect to Transferred A/R or accounts receivable relating to work performed or products delivered by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Seller's order, for Buyer's or any Buyer designee's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Transferred A/R or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's or any Buyer designee's benefits and accounts, and promptly upon receipt by a Seller of any such payment, such Seller shall pay over to Buyer or their designee the amount of such payments without any right of set off or reimbursement.

(c)    Without limiting the foregoing, Sellers will, and will cause their respective Subsidiaries and Affiliates to, deposit into the bank account designated by the Buyer (the "Designated A/R Account") within one (1) Business Day after receipt all amounts received by Sellers or their respective Subsidiaries and Affiliates constituting Transferred A/R.  Sellers will, and will cause their respective Subsidiaries and Affiliates to, deliver written instructions no later than one (1) Business Day following the Closing to all customers with accounts receivable constituting Transferred A/R to deliver all payments with respect thereto directly to the Designated A/R Account.  Sellers will maintain their bank accounts to accept any Transferred A/R for 120 days following the Closing.

(d)    As of the Closing Date, Buyer or any Buyer designee shall have the sole authority to bill and collect Transferred A/R and accounts receivable relating to work performed by Buyer after the Closing.

(e)    Notwithstanding anything to the contrary contained hereto, any Designated Buyers that acquire any Transferred A/R hereunder shall be express third-party beneficiaries of this Section 6.7.

54

Section 6.8    Intercompany Accounts and Arrangements.  Effective prior to the Closing, all outstanding intercompany accounts, whether payables or receivables, between any Seller, on the one hand, and any Subsidiary of Sellers, on the other hand, shall be settled in full without any cash payment required to be made, and shall be of no further force and effect, in each case, without Liability to the Business, Buyer, or the Sellers at or after the Closing.

Section 6.9    In-Transit Inventory.  Any Inventory of Sellers that is not located in Canada, the United States or Australia as of the date hereof and does not constitute Excluded Specified Inventory shall be referred to herein as "Foreign Inventory".  Foreign Inventory shall only be included in the definition of the Purchased Inventory for the purposes of the Closing to the extent it has been imported to and has cleared customs in the United States as of the Closing.  Any Foreign Inventory that is in-transit to the United States as of the Closing shall be referred to herein as "In-Transit Inventory", and shall only be purchased by Buyer in accordance with the terms of this Section 6.9.  Seller will, or will cause a designee to, (i) serve as the importer of record for such In-Transit Inventory, (ii) exercise commercially reasonable efforts to import such In-Transit Inventory into the United States and (iii) exercise commercially reasonable efforts to cause such In-Transit Inventory to clear through United States customs. At Closing, Buyer will deposit into escrow with Escrow Agent an amount equal to the Purchased Inventory Payment Amount applicable to such In-Transit Inventory _plus_ the estimated customs, duties/tariffs and transportation costs attributable to such In-Transit Inventory as mutually agreed by the Parties (such escrowed amount, the "In-Transit Inventory Escrow Amount"). Upon successful importation of such In-Transit Inventory, Seller will provide Buyer with a detailed accounting of all out-of-pocket, documented customs, duties/tariffs and transportation costs attributable to such In-Transit Inventory. Within five (5) Business Days of Buyer's receipt of such accounting, Buyer and KK OpCo will promptly deliver a joint written instruction to the Escrow Agent instructing Escrow Agent to release the amount of the In-Transit Inventory Escrow Amount attributable to such successfully imported In-Transit Inventory (the "In-Transit Inventory Consideration"). If any such In-Transit Inventory has not cleared customs within one-hundred twenty (120) days following the Closing (excluding any delays caused by _force majeure_ or other delays outside of the reasonable control of any party), such In-Transit Inventory shall be retained by the applicable Seller (the "Excluded In-Transit Inventory") and the corresponding portion of the In-Transit Inventory Escrow Amount shall be returned to Buyer. Buyer shall not, and Buyer shall cause each of its Affiliates and Representatives not to, interfere with or impede, in any manner whatsoever, the process by which any Seller (or any Representative thereof) transports, exports, imports, pays duties or fees with respect to, ships, moves or otherwise interacts with any In-Transit Inventory.

Section 6.10    Exclusivity.  Except as provided in Section 6(b) of the RSA, the Sellers will not, and will direct their Affiliates not to, directly or indirectly, through any Representative of any of them or otherwise, initiate, solicit or encourage (including by way of furnishing non-public information or assistance), or enter into negotiations or discussions of any type, directly or indirectly, or enter into a confidentiality Contract, letter of intent or purchase Contract, merger Contract or other similar Contract with any Person other than Buyer with respect to a sale of all or any substantial portion of the assets of any Seller, or a merger, consolidation, business combination, sale of all or any substantial portion of the equity any Seller, or the liquidation or similar extraordinary transaction with respect to any Seller. The Sellers will notify Buyer as promptly as practicable of any inquiry or proposal by a third party to do any of the foregoing that

the Sellers or any of their Affiliates or any of their respective Representatives may receive relating to any of such matters.

Section 6.11    Name Change.  Except as necessary to effect the transactions contemplated by this Agreement, including the winding down of the Business and any Subsidiary of any Seller, from and after the Closing, the Sellers and their Affiliates shall cease using any Transferred IP related to the Business as well as the names set forth on <u>Section 6.11</u> of the Disclosure Letter or any derivation thereof. Each Sale Order shall effectuate a change to the caption of the applicable Bankruptcy Case to exclude the words "KidKraft." In addition, Buyer hereby grants to the Sellers and their Subsidiaries a limited, non-exclusive, worldwide, irrevocable, sublicensable, non-transferable, fully paid-up, right and license to use the Transferred IP, solely as necessary to effect the transactions contemplated herein, including the winding down of the Business and any Subsidiary of any Seller.

## ARTICLE VII

## TAX MATTERS

Section 7.1    Transfer Taxes.  The Purchase Price and any other consideration payable under this Agreement are exclusive of Transfer Taxes. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, value-added, goods and services or other similar Taxes (including any Canadian federal goods and services tax or harmonized sales tax payable under Part IX of the ETA, or any similar taxes payable under applicable Canadian provincial legislation ) ("<u>Transfer Taxes</u>") payable by Buyer  solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement shall be borne by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes and the appropriate Party shall provide the information and documentation that is necessary to obtain any available exemptions or relief including the information required under subsection 169(4) of Part IX of the ETA (which shall be provided by the Seller(s) registered for goods and services tax/harmonized sales tax) and any other documentation necessary in connection with recovery by the Buyer of  Transfer Taxes.  Buyer shall prepare and file all necessary Tax Returns or applicable elections and other documents with respect thereto and, if reasonably requested or required by applicable Law, the Sellers will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation. Buyer shall promptly provide a copy of any such Tax Returns or other documents to Sellers. To the extent that Sellers do not provide a provincial sales or retail sales tax clearance certificate(s) that is required under applicable Law, Sellers shall indemnify Buyer for any Tax liability (including penalties and interest) that is assessed against Buyer arising from the failure of the particular Seller(s) to provide such certificate(s)

Section 7.2    Tax Cooperation.  Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, filing a Tax Return, making any election relating to Taxes, the claiming or recovery of any Transfer Taxes, preparing for any audit by any Governmental Authority or

prosecuting or defending any claim, suit or proceeding relating to any Tax.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 7.2</u> shall be borne by the requesting Party.

Section 7.3     Straddle Period Allocation. The Sellers shall be allocated and bear all Non-Income Taxes attributable to (A) any Tax period ending on or prior to the Closing Date, and (B) the portion of any Straddle Period ending on the Closing Date, and (ii) Buyer shall be allocated and bear all Non-Income Taxes attributable to (A) any Tax period beginning after the Closing Date and (B) the portion of any Straddle Period beginning after the Closing Date. For purposes of determining the allocation of Non-Income Taxes set forth in the first sentence of this <u>Section 7.3</u>, (i) Non-Income Taxes that are based upon or related to sales or receipts imposed on a transactional basis (other than Non-Income Taxes described in (ii)) shall be allocated to the period in which the transaction giving rise to such Non-Income Taxes occurred, and (ii) Non-Income Taxes that are ad valorem, property or other Non-Income Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated on a per diem basis between Buyer and Sellers as of the Closing Date, and the amount of such Non-Income Taxes for which Sellers are allocated shall be equal to the amount of the Non-Income Tax for the applicable Straddle Period multiplied by a fraction, the numerator of which is the number of days from the beginning of the period through and including the Closing Date and the denominator of which is the entire number of days in the period. For the avoidance of doubt, any Non-Income Taxes for which Sellers are liable under this <u>Section 7.3</u> shall not constitute Assumed Liabilities.

Section 7.4     Section 22 Tax Election.  At the reasonable request of Buyer and to the extent this election is available under applicable Law, Buyer and each Canadian Seller (as applicable) agree to elect jointly on or before the date on which such election is required to be made in accordance with applicable Law, in the prescribed form under Section 22 of the Income Tax Act (Canada) (and any equivalent or corresponding provision under applicable provincial legislation) as to the sale of the Transferred A/R described in Section 22 of the Income Tax Act (Canada) (and any equivalent or corresponding provision under applicable provincial or territorial legislation) and to designate in such election an amount equal to the portion of the Purchase Price allocated to such Transferred Assets pursuant to <u>Section 2.11</u> as the consideration paid by Buyer therefor. Each of Buyer and Canadian Seller shall prepare and file their respective Tax returns in a manner consistent with such election.

Section 7.5     Subsection 20(24) Tax Election.  Buyer and each Canadian Seller (as applicable) acknowledge that Canadian Seller is transferring Transferred Assets to Buyer with a value equal to the amount set out in the Allocation in consideration for Buyer assuming prepaid obligations of Canadian Seller to deliver goods or provide services in the future. At the reasonable request of Buyer, Canadian Seller and Buyer will, if applicable, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) and any equivalent or corresponding provision under applicable provincial legislation as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election.

Section 7.6     Canadian Transferred Assets.  At least thirty (30) days prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer a schedule listing all Transferred Assets of the Sellers (other than the Canadian Sellers) that are located in Canada or used or held by the

Sellers in a business carried on in Canada, including, for greater certainty, property that this "excluded property" for the purposes of section 116 of the *Income Tax Act* (Canada). This schedule shall contain reasonable details regarding the description such Transferred Assets and their physical location.

Section 7.7    Tax Registrations.  At least thirty (30) days prior to the Closing, Sellers shall deliver or cause to be delivered to the Buyer a schedule listing all of the Sellers' registrations for goods and services tax, harmonized sales tax and provincial sales tax, including the applicable tax registration numbers. If the Sellers have determined that such registrations are not applicable to the Sellers, the Sellers shall provide a certification that it is not registered, or required to be registered, for goods and services tax, harmonized sales tax and/or provincial sales tax purposes, and is not required to collect and remit such taxes, as the case may be.

## ARTICLE VIII

## <u>CONDITIONS TO CLOSING</u>

Section 8.1    General Conditions.  The respective obligations of Buyer and Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (<u>provided</u> that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "<u>Legal Restraint</u>").

(b)    The Bankruptcy Courts shall have entered the Sale Orders, and the Sale Orders shall not have been stayed, reversed or modified in a manner materially adverse to Buyer without the consent of Buyer.

Section 8.2    Conditions to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by KK OpCo in its sole discretion:

(a)    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)    Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Sellers shall have received the documents listed in <u>Section 2.10(c)</u>.

Section 8.3     Conditions to Obligations of Buyer.    The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived only in a writing executed by Buyer in its sole discretion:

(a)     <u>Representations and Warranties</u>.

(i)     The representations and warranties of Sellers contained in this Agreement (as qualified (but not expanded) by any section of the Disclosure Letter that is amended, supplemented or modified following the Execution Date in accordance with the terms of this Agreement), other than the Fundamental Representations of Sellers, shall be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein) as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein) as of such date or with respect to such period), in each of the foregoing cases, except where the failure of such representations and warranties to be true and correct at such time would, either individually or in the aggregate, not constitute a Material Adverse Effect.

(ii)     The Fundamental Representations of Sellers contained in this Agreement (as qualified (but not expanded) by any section of the Disclosure Letter that is amended, supplemented or modified following the Execution Date in accordance with the terms of this Agreement) shall be true and correct in all respects (other than de minimis inaccuracies) as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those Fundamental Representations of Sellers that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period).

(b)     Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it at or prior to the Closing.

(c)     No Material Adverse Effect shall have occurred after the date of this Agreement.

(d)     Buyer shall have received the documents listed in <u>Section 2.10(b)</u>.

(e)     Sellers shall have performed or complied in all material respects with all agreements and covenants required by the RSA to be performed or complied with by RSA at or prior to the Closing and the RSA shall be in full force.

Section 8.4     Information Officer's Certificate.    When the conditions to Closing set forth in this <u>Article VIII</u> have been satisfied and/or waived by Sellers and Buyer, as applicable, Sellers

and Buyer will each deliver to the Information Officer the applicable Conditions Certificate. Upon receipt of each of the Conditions Certificates, the Information Officer shall (a) issue forthwith the Information Officer's Certificate concurrently to Sellers and Buyer (with a copy legal counsel for the DIP Agent), at which time the Closing will be deemed to have occurred, and the Canadian Transferred Assets shall vest in and to Buyer (or its permitted designee) pursuant to the Canadian Sale Order, and (b) file as soon as practicable a copy of the Information Officer's Certificate with the CCAA Court (and shall provide a true copy of such filed certificate to Sellers, Buyer and Gordon Brothers). The Parties hereto acknowledge and agree that the Information Officer shall be entitled to file the Information Officer's Certificate with the CCAA Court without independent investigation upon receiving the Conditions Certificates, and the Information Officer will be relying exclusively on the basis of the Conditions Certificates and without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions and shall have no liability to Sellers or Buyer or any other Person as a result of filing the Information Officer's Certificate upon receiving such Conditions Certificates.

## ARTICLE IX

## <u>TERMINATION</u>

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of both Buyer and KK OpCo;

(b)    by either KK OpCo or Buyer, if:

(i)    a Legal Restraint is in effect that has become final and nonappealable; <u>provided</u> that no Party may terminate this Agreement pursuant to this <u>Section 9.1(b)(i)</u> whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Legal Restraint;

(ii)    the Closing shall not have occurred on or before July 19, 2024 (the "<u>Outside Date</u>"); <u>provided</u> that no Party shall be permitted to terminate this Agreement pursuant to this <u>Section 9.1(b)(ii)</u> if (A) the failure of the Closing to have occurred by the Outside Date was caused by the breach of such Party with respect to any obligation or condition of this Agreement or (B) another Party has commenced appropriate proceedings to enforce its rights pursuant to <u>Section 10.15</u>, and, thereafter, uses commercially reasonable efforts to prosecute such proceeding or proceedings(s);

(iii)    the RSA is terminated as to all parties thereof in accordance with its terms, unless such termination was following such Party's breach of the RSA;

(iv)    if Sellers consummate any Qualifying Alternative Transaction.

(c)    by Buyer, if:

(i)    at any time, Sellers shall have breached or violated any of their representations, warranties or covenants set forth in this Agreement in a manner that would

prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.3(a)</u> or <u>Section 8.3(b)</u>, and (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in <u>Section 2.10</u>, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured by the earlier of ten (10) days after written notice thereof has been given by Buyer to Seller and the Outside Date; <u>provided</u> that Buyer shall not be entitled to terminate the Agreement pursuant to this <u>Section 9.1(c)(i)</u> if Buyer is then in breach of any of its obligations under this Agreement such that the conditions in <u>Section 8.2(a)</u> or <u>(b)</u> would not be satisfied;

(ii)     (x) the U.S. Bankruptcy Court has not entered an interim DIP Order within three (3) Business Days after the Petition Date; (y) the U.S. Bankruptcy Court has not entered a final DIP Order within thirty (30) days after the Petition Date; or (z) Gordon Brothers fails to fund the DIP Facility when required, and each such event remains uncured (to the extent curable) for a period of five (5) Business Days; provided that, with respect to clause (y), such time period shall be subject to reasonable extensions (not to exceed 45 days following the Petition Date) so long as Sellers and Gordon Brothers are using commercially reasonable efforts to cause the prompt entry of the DIP Order and the funding of the DIP Facility;

(iii)     the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement or the CCAA Recognition Proceedings are dismissed;

(iv)     Sellers withdraw or seek authority to withdraw the Sale Orders; or

(v)     (A) any Seller enters into one or more Qualifying Alternative Transactions with one or more Persons or (B) Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than, in the case of this clause (B), any such plan that includes a conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code or that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement.

(d)     by KK OpCo at any time if:

(i)     (x) Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that would prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>, as the case may be, or (y) Buyer shall have materially breached any Sale Order, and in each case, (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in <u>Section 2.10</u>, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by KK OpCo to Buyer, <u>provided</u> that KK OpCo shall not be entitled to terminate the Agreement pursuant to this <u>Section 9.1(d)(i)</u> if any Seller is then in breach of any of its obligations under this Agreement such that the conditions in <u>Section 8.3(a)</u> or <u>(b)</u> would not be satisfied; or

61

(ii)    the board of directors or board of managers, as applicable, of any Seller determines, in good faith based upon advice of outside legal counsel, that proceeding with this Agreement or the transactions contemplated hereunder (including the Plan or solicitation of the Plan) or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of its fiduciary duties under applicable law.

The Party seeking to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than <u>Section 9.1(a)</u>) shall, if such Party is KK OpCo, give prompt written notice of such termination to Buyer, and if such Party is a Buyer, give prompt written notice of such termination to Sellers.

Section 9.2    Effect of Termination.

(a)    In the event of termination of this Agreement as provided in <u>Section 9.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of <u>Section 6.6</u> (Public Announcements), <u>Section 10.3</u> (Fees and Expenses), Section 10.7 (Notices), <u>Section 10.10</u> (Parties in Interest), <u>Section 10.11</u> (Governing Law), <u>Section 10.12</u> (Submission to Jurisdiction) and this <u>Article IX</u> and (ii) that, subject to <u>Section 9.2(b)</u>, no such termination shall relieve any Party from liability for Fraud.

(b)    The Parties agree that if this Agreement is terminated, then (i) KK OpCo's or Buyer's receipt of the Deposit Amount or the Buyer Breach Fee, as applicable, in accordance with this Agreement (when payable), and (ii) Buyer's receipt of the Bidder Protections (when payable) pursuant to <u>Section 9.3</u> shall be the sole and exclusive remedies of such Party against the other Party(ies) and any of its or their respective Affiliates for any Liability, damage or other loss suffered as a result of any breach of any representation, warranty, covenant or agreement in this Agreement or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts (if due), neither Buyer nor any of its respective Affiliates shall have any further monetary Liability relating to or arising out of this Agreement or the transactions contemplated by this Agreement, in each case, except in the case of Fraud. For the avoidance of doubt, the foregoing does not limit a Party's rights to seek specific performance under Section 10.15 prior to a termination of this Agreement in accordance with <u>Section 9.1</u>.

Section 9.3    Termination Payment.

(a)    In the event that this Agreement is terminated pursuant to <u>Section 9.1(b)(iv)</u>, <u>Section 9.1(c)(v)</u> or <u>Section 9.1(d)(ii)</u> (in each case, unless such termination is in connection with a transaction that involves a conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code), in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, and without the requirement of any notice or demand from Buyer or any other application to or order of the Bankruptcy Courts, (i) the Deposit Amount shall be returned to Buyer in with <u>Section 2.9(b)(iii)</u> and (ii) Sellers shall jointly and severally be liable for and shall pay (or cause to be paid to) Buyer a break-up fee equal to $1,179,673.20 (the "<u>Break-up Fee</u>") and (iii) Sellers shall jointly and severally be liable for and shall reimburse (or cause to be reimbursed to) Buyer, Buyer's reasonable and documented out-of-pocket costs, fees and expenses (including reasonable legal, financial advisory, accounting and other similar costs, fees and

expenses) incurred prior to the termination of this Agreement in connection with its evaluation and negotiation of the transactions contemplated by this Agreement (the "Expense Reimbursement" and together with the Break-up Fee the "Bidder Protections"); provided such Expense Reimbursement shall not exceed $1,000,000. In the event that this Agreement is terminated pursuant to Section 9.1(b)(iii) (other than such termination in connection with a breach of the RSA by Buyer), Section 9.1(c)(i), Section 9.1(c)(ii) or Section 9.1(c)(iv), in consideration for Buyer having expensed considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, and without the requirement of any notice or demand from Buyer or any other application to or order of the Bankruptcy Courts, (i) the Deposit Amount shall be returned to Buyer in with Section 2.9(b)(iii) and (ii) Sellers shall jointly and severally be liable for the Expense Reimbursement. In the event Sellers become obligated under this Agreement to pay any or all of the Bidder Protections, Sellers shall pay such amounts in immediately available funds to such account or accounts as may be specified in written notice by Buyer; provided that if such obligation arises from a termination pursuant Section 9.1(c)(v), then such amounts shall be paid upon the earlier of (i) the consummation of such transaction giving rise to such termination and (ii) the effective date of the Chapter 11 Case. The Bidder Protections shall constitute an allowed administrative expense claim of Sellers' estates under sections 503(b) and 507 of the Bankruptcy Code.

(b)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 9.3 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other Parties would not enter into this Agreement.  Each of the Parties further acknowledges that the payment by Sellers of the Bidder Protections is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Buyers, in the circumstances in which such Bidder Protection is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision.  The obligation to pay the Bidder Protections in accordance with the provisions of this Agreement will (i) be binding upon and enforceable jointly and severally against each Seller immediately upon execution of this Agreement and (ii) survive the subsequent termination of this Agreement, solely to the extent permitted by applicable law.  The obligation to pay the Bidder Protections as and when required under this Agreement, is intended to be, and is, binding upon (A) any successors or assigns of any Seller and (B) any trustee, examiner or other representative of a Seller's estate (each of (A) and (B), a "Successor") as if such Successor were a Seller hereunder.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1    Nonsurvival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of Sellers and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.2    Bulk Sales. Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer.

Section 10.3    Fees and Expenses.   Except as otherwise provided herein (including Section 6.4(a) and Section 7.1 or in the DIP Order, and except that the actual, documented costs of the Inventory Count shall be borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Buyer (up to a maximum, aggregate amount of $25,000) all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4    Transition of Permits.  To the extent that a Buyer has not obtained all of the Permits included in the Transferred Assets that are necessary for Buyer to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in the same manner in all material respects as it was operated by Sellers immediately prior to the Closing, Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that Buyer reasonably requests, at Buyer's sole expense, until the earlier of the time Buyer has obtained such Permits and six (6) months following the Closing (or the remaining term of any such Permit or the closing of the Chapter 11 Case, if shorter).

Section 10.5    Amendment and Modification.   This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.6    Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.7    Notices.   All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

       (i)     if to Sellers, to:

KidKraft, Inc.
Attention: Geoffrey Walker
Email:    Geoff.W@kidkraft.com

with a copy (which shall not constitute notice) to:
Vinson & Elkins LLP
Attention: Lauren Kanzer; Peter Marshall
Email:    lkanzer@velaw.com; pmarshall@velaw.com

with an additional copy (which shall not constitute notice) to:

Gordon Brothers
Attention:
Email:

       (ii)    if to Buyer, to:

Backyard Products, LLC
317 S. Main Street
Ann Arbor, Michigan 48104
Attention:    Thomas van der Meulen
Email:        tvandermeulen@backyardproducts.com

with copies (which shall not constitute notice) to:

King & Spalding LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
Attention:    Roger G. Schwartz; Spencer A. Stockdale
Email:        rschwartz@kslaw.com; sstockdale@kslaw.com

Section 10.8   Interpretation.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to

days mean calendar days unless otherwise specified. References to "Transferred Assets," "Transferred Contracts," "Transferred Employee Records," "Transferred Employees" and "Transferred IP" and the like shall (a) for purposes of the representations and warranties of Sellers, only apply to such items as of the date hereof (and shall not include items that are added to such definitions after the date hereof) and (b) for all other purposes (including Section 6.1) shall only apply to such items that meet the applicable definition as of the time of determination. By way of example, in the event that the Company amends a Contract that is, at such time, not a Transferred Contract but thereafter becomes a Transferred Contract, such amendment to such Contract shall not be a breach of Section 6.1(b)(x); however the amendment of such Contract after it becomes a Transferred Contract shall be subject to Section 6.1(b)(x).

Section 10.9   Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings, and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.10  Parties in Interest.  Except as specifically set forth in Section 10.13 and Section 10.22, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.11  Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code or the CCAA, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 10.12  Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Courts, (x) the U.S. Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the U.S. Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the U.S. Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Chapter 11 Case is closed or the U.S. Bankruptcy Court declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the Court of Chancery of the State of Delaware, or if jurisdiction is not available in the Court of

Chancery, then in the United States District Court for the Northern District of Texas, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of Texas, and of the United States District Court for the Northern District of Texas as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, the CCAA Recognition Proceedings shall be subject to the jurisdiction of the CCAA Court.

Section 10.13  Personal Liability.  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect stockholder of Sellers or Buyer or any officer, director, employee, Representative or investor of any Party hereto.

Section 10.14  Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated (except pursuant to Section 2.12), in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of Buyer, and by Buyer without the prior written consent of KK OpCo, and any such assignment without such prior written consent shall be null and void.  Notwithstanding the foregoing, (a) subject to the terms of Section 2.12, Buyer may assign any of its rights under this Agreement to any of its Affiliates and (b) Buyer may designate its rights under this Agreement pursuant to Section 2.12 to any Person, in each case without obtaining the prior written consent of KK OpCo; provided that in connection with such assignment, such assignment shall not relieve Buyer of any of its obligations under this Agreement (or otherwise).  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.15  Specific Performance.  Each Party acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause Buyer, on the one hand, and Seller, on the other hand, irreparable harm.  Accordingly, notwithstanding anything to this Agreement to the contrary, each Party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party (including failure to consummate the Closing and the transactions contemplated thereby), Buyer, on the one hand, and Sellers, on the other hand, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.  Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy

conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. Sellers, on the one hand, and Buyer, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by Sellers or Buyer, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Sellers or Buyer, as applicable, under this Agreement. In the event that, due to a Party's breach or threatened breach of this Agreement whereby such other Party(ies) commence a suit contemplated by this <u>Section 10.15</u> which results in a judgment in favor of such other Party(ies), such failing Party shall pay to such other Party(ies) an amount in cash equal to the costs and expenses (including attorney's fees) incurred by such other Party(ies) in connection with such suit.

Section 10.16 Currency. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.17 Severability. If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or the remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

Section 10.18  Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>Section 10.18</u>.

Section 10.19 Counterparts. This Agreement may be executed in any number of counterparts, including by means of email in portable document format (.pdf), each of which when

executed shall be deemed to be an original copy of this Agreement and all of which taken together shall constitute one and the same agreement.

Section 10.20  Jointly Drafted.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.  The Parties acknowledge and agree that prior drafts of this Agreement and the other agreements and documents contemplated hereby will not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto and that such drafts will be deemed to be the joint work product of the Parties.

Section 10.21  Limitation  on  Damages.    NOTWITHSTANDING  ANY  OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL ANY BUYER OR BUYER NON-RECOURSE PERSON OR ANY SELLER OR SELLER NON-RECOURSE PERSON BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

Section 10.22  No Recourse.

(a)      This Agreement may be enforced only by KK OpCo against, and any claim, action, suit, or other legal proceeding by Seller may be brought only against Buyer, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither Seller nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, stockholder, Affiliate, agent or Advisor of Buyer or of any Affiliate of Buyer or any of their successors or permitted assigns (each, a "Buyer Non-Recourse Person"), and no Buyer Non-Recourse Person shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b)      This Agreement may be enforced only by Buyer against, and any claim, action, suit, or other legal proceeding by Buyer may be brought only against, Sellers, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither of Buyer, nor any Designated Buyer, nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, stockholder, Affiliate, agent or Advisor of Sellers or of any Affiliate of Sellers or any of their successors or permitted assigns (each, a "Seller Non-Recourse Person"), and no such Seller Non-Recourse Person shall have any liability for any obligations or liabilities of Seller under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

Section 10.23  Time of Essence.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this

Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 10.24  Disclosed Personal Information (Canada).

(a)      The Parties confirm that the Disclosed Personal Information is necessary for the purposes of determining if the Buyer shall proceed with the transactions contemplated by this Agreement and, if applicable, to complete the transaction. The Buyer shall use the Disclosed Personal Information solely for purposes related to the transaction and shall not disclose such information unless authorized by applicable law. The Buyer shall protect the confidentiality of all Disclosed Personal Information in a manner consistent with security safeguards appropriate to the sensitivity of the information. If the transactions contemplated by this Agreement do not proceed, the Buyer shall return to the Seller or, at the Seller's request, securely destroy the Disclosed Personal Information within a reasonable period of time.

(b)      Following the consummation of the transactions contemplated by this Agreement, the Parties shall (i) not use or disclose the Disclosed Personal Information for any purposes other than the carrying on of the Business (with use or disclosure of the Disclosed Personal Information being restricted to those purposes for which the information was initially collected or for which additional consent was or is obtained) unless consent is obtained or as otherwise permitted or required by applicable Laws; (ii) protect the confidentiality of all Disclosed Personal Information in a manner consistent with security safeguards appropriate to the sensitivity of the information; and (iii) give effect to any withdrawal of consent with respect to the Disclosed Personal Information. Where applicable privacy Laws require impacted individuals to be notified of the transactions, Buyer will notify the affected individuals, in accordance with applicable Law (including Privacy Laws), that the transactions have been completed and that their Personal Data has been disclosed to Buyer.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**KIDKRAFT, INC.**

*Geoffrey Walker*

By: 157075C3EBC384B20D8FCABA09D766A7   contract**works**.

Name: Geoffrey Walker
Title:   Chief Executive Officer

**KIDKRAFT INTERNATIONAL IP HOLDINGS, LLC**

*Geoffrey Walker*

By: 157075C3EBC384B20D8FCABA09D766A7   contract**works**.

Name: Geoffrey Walker
Title:   Chief Executive Officer

**SOLOWAVE DESIGN CORP.**

*Geoffrey Walker*

By: 157075C3EBC384B20D8FCABA09D766A7   contract**works**.

Name: Geoffrey Walker
Title:   Chief Executive Officer

**SOLOWAVE DESIGN INC.**

*Geoffrey Walker*

By: 157075C3EBC384B20D8FCABA09D766A7   contract**works**.

Name: Geoffrey Walker
Title:   Chief Executive Officer

**SOLOWAVE DESIGN LP, by its general partner SOLOWAVE DESIGN INC.**

*Geoffrey Walker*

By: 157075C3EBC384B20D8FCABA09D766A7   contract**works**.

Name: Geoffrey Walker
Title:   Chief Executive Officer

*[Signature page to Asset Purchase Agreement]*

**BUYER:**

**BACKYARD PRODUCTS, LLC**

By: _____
    Name: Thomas van der Meulen
    Title:  Chief Executive Officer

[*Signature page to Asset Purchase Agreement*]

**EXHIBIT A**

**ESCROW AGREEMENT**

[Attached.]

EXECUTION VERSION

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of April 25, 2024 by and among BACKYARD PRODUCTS, LLC, Delaware limited liability company (the "Buyer"), KIDKRAFT, INC., a Delaware corporation (the "Seller" and, together with the "Buyer", sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of the date hereof, by and between the Buyer, the Seller and certain other parties signatory thereto (the "Purchase Agreement"), the Buyer will deposit an amount equal to $3,000,000 (the "Escrow Amount") in a separate and distinct account (the "Escrow Account") to be held by the Escrow Agent for the purposes of securing the Deposit Funds pursuant to Section 2.9 of the Purchase Agreement.

WHEREAS, each of the Parties agrees to work in good faith and use best efforts to amend to this Agreement in accordance with Section 13 herein in order to implement the terms of the Purchase Agreement prior to any closing date.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      Escrow Funds.

(a)      Simultaneous with the execution and delivery of this Agreement, the Buyer is depositing with the Escrow Agent the Escrow Amount in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "Escrow Earnings") earned with respect thereto (collectively, the "Escrow Funds") in the Escrow Account, subject to the terms and conditions of this Agreement.

(b)      For greater certainty, all Escrow Earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.      Investment of Escrow Funds.

(a)    Unless otherwise instructed in writing and executed by an Authorized Representative (as defined in Section 4(a)(iv) below) of both Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" of Citibank, N.A., insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below. Except as expressly provided herein, the Escrow Funds shall not, in any manner, directly or indirectly, be assigned, hypothecated, pledged, alienated, released from escrow or transferred within escrow.

(b)    The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)    The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.    Disposition and Termination of the Escrow Funds.

(a)    Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)    Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)    Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the fifth (5th) Business Day following receipt of such determination, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Account) in accordance with such Final Determination.  The Escrow Agent will act on such Final Determination without further inquiry.

(iii)    All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction or Final Determination, as applicable.

(iv)    Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (the "Authorized Representatives") and delivered to the Escrow Agent either (i) in writing by overnight mail or (ii) attached to an e-mail received on a Business Day sent to an e-mail address set forth in Section 11 (and receipt by the Escrow Agent confirmed) below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibit A-1 and/or A-2 annexed

2

hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not reasonably satisfied with the verification it receives, the Escrow Agent shall promptly notify the Parties of such inability to verify or non-satisfaction of verification, and it will not execute the instruction until all such issues have been resolved to the reasonable satisfaction of the Escrow Agent. The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party and actually received and acknowledged by the Escrow Agent.

(b)    Certain Definitions.

(i)    "Business Day" means any day that is not a Saturday, not a Sunday or any other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)    "Final Determination" means a final non-appealable order of any court of competent jurisdiction which may be issued, together with (A) a certificate executed by an Authorized Representative of the prevailing Party, to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions executed by an Authorized Representative of the prevailing Party, to effectuate such order.

(iii)    "Joint Release Instruction" means the joint written instruction, substantially in the form of Exhibit B annexed hereto, executed by an Authorized Representative of each of the Buyer and the Seller, directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.    Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable, in the absence of its fraud, willful misconduct or gross negligence as adjudicated by a court of competent jurisdiction, for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties. Concurrent with

3

the execution of this Agreement, the Parties shall deliver to the Escrow Agent Authorized Representative's forms in the form of <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due to it or the Escrow Funds.  In the event that the Escrow Agent, acting reasonably in accordance with its duties hereunder, shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination.  In the event of a dispute between the Escrow Agent and the Parties, after thirty (30) days' notice to each of the Parties of the Escrow Agent's intention to do so, the Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party.   To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6.    <u>Resignation and Removal of Escrow Agent</u>.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Buyer and the Seller acting jointly at any time by providing written notice executed by an Authorized Representative of each Party, to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.  The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. Any successor escrow agent shall, as a condition of its appointment, execute a counterpart of this Agreement and agree in writing to be bound as Escrow Agent hereunder. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of

4

competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.     Fees and Expenses.  The fees agreed upon for the services to be rendered hereunder are described in Schedule 1 attached hereto and are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8.     Indemnity.  Each of the Parties shall jointly and severally indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, reasonable and documented out of pocket costs or expenses actually suffered and incurred (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and reasonable and documented out of pocket  expenses of document location, duplication and shipment, but excluding any income or similar taxes imposed on the fees payable hereunder) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding under or in connection with this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from the Buyer or the Seller. To the extent any Escrow Agent Losses result from or are attributable to a Party's failure to provide fully executed IRS Forms W-8, W-9 and/or other required documentation pursuant to Section 9(a), such Party shall be solely responsible for indemnifying the Indemnities for such Escrow Agent Losses. The Escrow Agent will promptly make all claims for indemnification hereunder by written notice to the Parties of such claim, together with detailed supporting documentation related thereto, provided in accordance with the terms set forth herein. Notwithstanding anything to the contrary herein, the Buyer and the Seller agree, solely as between themselves, that any obligation for indemnification under this Section 8 (or for reasonable fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by the Buyer and one-half by the Seller. The Parties acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement. Notwithstanding anything to the contrary, the parties hereto agree that no indemnification obligations hereunder shall be satisfied from the Escrow Funds.

9.     Tax Matters.

(a)     The Buyer shall be responsible for and the taxpayer on all taxes due on the interest or other income earned, if any, on the Escrow Funds for the calendar year in which such interest or other income is earned.  The Escrow Agent shall report any interest or other income earned on the Escrow Funds, if any, to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties have provided the Escrow Agent with certified tax identification

5

numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may have reasonably requested.

(b)     The Escrow Agent shall be responsible only for income and withholding tax reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)     The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.     <u>Covenant of Escrow Agent</u>.  The Escrow Agent hereby agrees and covenants with the Buyer and the Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.     <u>Notices</u>.     Except as otherwise expressly required in <u>Section 4(a)(iv)</u>, all communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("<u>e-mail</u>") with a PDF attachment executed by an Authorized Representative of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited with the United States Postal Service.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

<u>if to the Buyer, then to</u>:

BACKYARD PRODUCTS, LLC
317 S. Main Street
Ann Arbor, Michigan 48104
Attention:     Thomas van der Meulen
Email:          tvandermeulen@backyardproducts.com:

<u>with a copy (which shall not constitute notice) to</u>:

King & Spalding LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309

Attention:      Roger G. Schwartz; Spencer A. Stockdale
Email:           rschwartz@kslaw.com; sstockdale@kslaw.com

or, if to the Seller, then to:

KidKraft, Inc.
4630 Olin Rd.
Dallas, TX 75244
Attention: Geoffrey Walker
           Johnnie Goodner
Telephone No.:  (214) 393-3804
E-mail:geoff.w@kidkraft.com;
       johnnie.goodner@kidkraft.com

with a copy (which shall not constitute notice) to:

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attention: Lauren R. Kanzer
Telephone No.: (212) 237-0166
E-mail: lkanzer@velaw.com

2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attention: Peter Marshall
Telephone No.: (214) 220 -7849
E-mail: pmarshall@velaw.com

GB Funding, LLC, as Administrative Agent
101 Huntington Avenue
Suite 1100
Boston, Massachusetts 02199
Attention: David Braun and Kyle Shonak
Telephone No.: (888) 424-1903
Email: dbraun@gordonbrothers.com
       kshonak@gordonbrothers.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
388 Greenwich Street
Tower Building, 27th Floor
New York, NY  10013

Attn: Eddy Rosero and Nelson Kercado
Telephone No.: 212-783-7073 and 212-559-8509
Facsimile No.: 212-783-7131
E-mail: eddy.rosero@citi.com and nelson.kercado@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by an Authorized Representative of Buyer and the Seller, after which this Agreement shall be of no further force and effect except that the provisions of Sections 8, 13, and 19 hereof shall survive termination.

13.    Miscellaneous.  The recitals hereto are incorporated herein as though fully set forth herein. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party hereto except as set forth in Section 6 and Section 16, without the prior consent of the other parties hereto. This Agreement shall be governed by and construed under the laws of the State of New York, without regard to the conflicts of law rules of such state. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the federal district courts located in the Southern District of New York, without regard to the conflicts of law rules of such state. The parties hereto hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each Party represents, warrants and covenants that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Section 7 and Section 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.   <u>Compliance with Court Orders</u>.   In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree being subsequently reversed, modified, annulled, set aside or vacated.

15.   <u>Further Assurances</u>.  Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.   <u>Assignment</u>.  This Agreement may not be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party, and no assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

17.   <u>Force Majeure.</u>  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.   <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other Parties hereto, or on such Party's behalf, without the prior written consent of the Escrow Agent, except as may be required by applicable law.

20.    <u>Confidentiality.</u>  Except as required by law, the Escrow Agent agrees to keep confidential, and to cause any of its affiliates or agents to keep confidential and not to disclose any and all documents, materials, and any other non-public information which it shall have obtained regarding the Parties in connection with the execution and delivery of this Agreement and its performance of its duties and obligations hereunder. This <u>Section 20</u> shall survive termination of this Agreement for a period of twelve (12) months after such termination.

21.    <u>Use of Electronic Records and Signatures</u>. As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with <u>Section 8</u> of this Agreement, Escrow Agent shall be indemnified and held harmless from any Escrow Agent Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

22.    <u>Return of Funds</u>. If the Escrow Agent releases any funds, including but not limited to the Escrow Amount or any portion of it, to a Party and subsequently determines, in its sole discretion, that the payment or any portion of it was made in error, the Party shall, upon notice, promptly refund the erroneous payment. Any such erroneous payment by the Escrow Agent, and the Party's return thereof to the Escrow Agent, shall not affect any obligation or right of either the Escrow Agent or the Parties. Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any erroneous payment.

23.    <u>Sanctions</u>.  None of the Parties or any of their parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of any Party, the affiliates of the Parties or any of their subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such Escrow Funds in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's

Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

*   *   *   *   *

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

BUYER:

**BACKYARD PRODUCTS, LLC**

By: _____
Name: Thomas van der Meulen
Its:    Chief Executive Officer

SELLER:

**KIDKRAFT, INC.**

By: _____
Name: _____
Its: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Its: _____

*Signature Page to Escrow Agreement*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

<u>BUYER</u>:

**BACKYARD PRODUCTS, LLC**

By:  _____
Name:
Its:

<u>SELLER</u>:

**KIDKRAFT, INC.**

*Johnnie Goodner*
6C8E1CE6C6DBFF05FDEF4122056E24FD          contract**works**.
By:  _____
Name:  Johnnie Goodner
Its:       Chief Financial Officer

<u>ESCROW AGENT</u>:

**CITIBANK, N.A.**

By:  _____
Name:  _____
Its:  _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: Nelson Kercado, SVP

Its: Citibank, N.A.

388 Greenwich Street, 29th flr

New York, NY 10013

212-559-8509

<u>**Schedule 1**</u>

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

<u>**Acceptance Fee**</u>
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee:  Waived**

<u>**Administration Fee**</u>
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on the total Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

**Fee: Waived**

<u>**Tax Preparation Fee**</u>
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

**Fee:  Waived**

<u>**Transaction Fees**</u>
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

**Fee:  Waived**

<u>**Other Fees**</u>
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform.  Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change.  Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder.  The Acceptance Fee, if any, is payable upon execution of the Agreement.  Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

## EXHIBIT A-1

### Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Buyer and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Buyer. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone
Specimen Signature

Thomas van der Meulen
Name

CEO
Title

404-664-5546
Phone

Jame
Mobile Phone

Dan Lawrence
Name

CFO
Title

Phone

843-816-3553
Mobile Phone

Name
Signature

Title

Telephone
Mobile Phone

*Exhibit to Escrow Agreement*

<u>EXHIBIT A-2</u>

<u>Certificate as to Seller's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as Authorized Representatives of the Seller and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Seller.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| <u>Name / Title / Telephone</u> | <u>Specimen Signature</u> |
|---|---|
| Geoffrey Walker | *Geoffrey Walker* |
| Name | Signature |
| President and Chief Executive Officer | |
| Title | |
| | 310-874-0092 |
| Phone | Mobile Phone |
| | |
| Name | Signature |
| | |
| Title | |
| | |
| Phone | Mobile Phone |
| | |
| Name | Signature |
| | |
| Title | |
| | |
| Telephone | Mobile Phone |

*Exhibit to Escrow Agreement*

EXHIBIT A-2

Certificate as to Seller's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as Authorized Representatives of the Seller and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Seller.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Geoffrey Walker | |
| Name | Signature |
| President and Chief Executive Officer | |
| Title | |
| | 310-874-0092 |
| Phone | Mobile Phone |
| Johnnie Goodner | |
| Name | Signature |
| Chief Financial Officer | |
| Title | |
| | 469-360-9789 |
| Phone | Mobile Phone |
| | |
| Name | Signature |
| | |
| Title | |
| | |
| Telephone | Mobile Phone |

*Exhibit to Escrow Agreement*

EXHIBIT B

Form of Joint Release Instruction

[Date]

[Via Email]
[Via Fax]
[212.780.7131]
Citibank, N.A.
Escrow Services
388 Greenwich Street
Tower Building, 29th Floor
New York, NY 10013
Attn: Eddy Rosero and Nelson Kercado

RE: [Name of Parties] – Escrow Agreement dated April 25, 2024
Escrow Account number [25Dxxxxxxxxx]

We refer to an escrow agreement dated April 25, 2024 between BACKYARD PRODUCTS, LLC, Delaware limited liability company (the "Buyer"), KIDKRAFT, INC., a Delaware corporation (the "Seller") and Citibank, N.A. as Escrow Agent (the "Escrow Agreement")

Capitalized terms in this letter that not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section 4(a)(i) of the above referenced escrow agreement, the Parties instruct the Escrow Agent to release [$    ] to the specified party as instructed below. This letter constitutes a "Joint Release Instruction" pursuant to Section 4 of the Escrow Agreement.

[Bank name]
[ABA number]
[Bank Address]
[Beneficiary name]
[Beneficiary Account number]

Thank you.

*[Signatures Follow]*

*Exhibit to Escrow Agreement*

IN WITNESS WHEREOF, this Joint Release Instruction has been duly executed as of the date first written above.

BUYER:

**BACKYARD PRODUCTS, LLC**


By: _____
Name: _____
Its: _____


SELLER:

**KIDKRAFT, INC.**


By: _____
Name: _____
Its: _____

*Exhibit to Escrow Agreement*

## EXHIBIT B

## ILLUSTRATIVE CALCULATION OF CERTAIN PURCHASE PRICE ELEMENTS

[Attached.]

|  |  |  | March Estimate |
|---|---|---|---|
| **Consideration for Other Purchased Assets** |  |  |  |
| IP, Obsolete, and all Other Assets |  |  | 4,000,000 |
| $350k for Europe "additional price" |  |  | 350,000 |
| **Consideration for Other Purchased Assets** |  |  | **4,350,000** |
|  |  |  |  |
| **Consideration for Accounts Receivable** |  |  |  |
| A/R of KK100 (US) as of 3/31/24 | 20,197,627 |  |  |
| Less: Over 90 Days Past Due Date | (1,763,074) |  |  |
| A/R of KK150 (Canada) as of 3/31/24 | 4,843,072 |  |  |
| Less: Over 90 Days Past Due Date | 123,679 |  |  |
| **Eligible A/R** | 23,401,305 |  |  |
| Less: Coface, RF Balance | (2,457,055) |  |  |
| Less: Dilution Reserves | (3,444,747) |  |  |
| **Consideration for Accounts Receivable** | **17,499,503** | *90%* | **15,749,553** |
|  |  |  |  |
| **Consideration for Inventory** |  |  |  |
| **KK200 Total Inventory as of 3/21/24** |  |  |  |
| KBV Excluded Inventory | 3,543,308 |  |  |
| Nerf, Barbie, American Girl Inventory - Australia | 41,098 |  |  |
| Expected to Ship from Amsterdam/UK Warehouses | 943,727 |  |  |
| Australia Warehouse | 505,474 |  |  |
| **KK200 Inventory** | **5,033,607** |  |  |
|  |  |  |  |
| **Total Inventory as of 3/21/24** | **35,526,779** |  |  |
| Less: KBV Excluded Inventory | (3,543,308) |  |  |
| Less: Nerf, Barbie, American Girl Inventory - US | (1,539,969) |  |  |
| Less: Nerf, Barbie, American Girl Inventory - Australia | (41,098) |  |  |
| Less: KK100 Inventory at Suppliers | (1,134,379) |  |  |
| **Included Inventory** | **29,268,025** |  |  |
|  |  |  |  |
| **KK100 Inventory** |  |  |  |
| First Quality* | 19,426,597 | 75% | 14,569,948 |
| Discontinued | 4,712,992 | 60% | 2,827,795 |
| Obsolete Inventory | 2,886,716 | 0% | - |
| Ainsley RTV | 792,519 | 75% | 594,389 |
| **KK200 Inventory** |  |  |  |
| First Quality - Australia | 255,494 | 75% | 191,621 |
| Discontinued - Australia | 159,805 | 60% | 95,883 |
| Obsolete Inventory - Australia | 90,175 | 0% | - |
| Amsterdam/UK Warehouse | 943,727 | 100% | 943,727 |
| **Consideration for Inventory** | **29,268,025** |  | **19,223,363** |
|  |  |  |  |
| **Total** |  |  | **39,322,916** |

**Exhibit B**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

Pursuant to Article V.A of the Plan, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by the Purchaser; (ii) is designated as a Transferred Contract pursuant to the Purchase Agreement on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order and/or Sale Approval Order, as applicable, shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease comprising a Transferred Contract shall re-vest in and be fully enforceable by the Purchaser in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Purchaser, alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than two business days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.

| Contract | Contract Debtor | Contract Counterparty | Address |
|---|---|---|---|
| NetSuite Subscription Services Agreement, dated November 30, 2016 by and between NetSuite Inc. and KidKraft, Inc. (together with all professional services addendums, statement of works and similar service documents issued thereunder, the "*Oracle Agreement*") | KidKraft, Inc. | NetSuite Inc. | N/A |

**Exhibit B**

| | | | |
|---|---|---|---|
| Estimate # 1078206, dated September 13, 2022 and executed on November 28, 2022, by and between Oracle America, Inc. and KidKraft, Inc. (the "*Oracle Binding Estimate*") | KidKraft, Inc. | Oracle America, Inc. | N/A |
| Industrial Lease, dated April 6, 2011, by and between DPF Trade Center II, L.L.C. and KidKraft, LP, as amended by that certain Commencement Date Agreement, dated September 8, 2011, that certain First Amendment to Lease, dated October 18, 2011, by and between DPF Trade Center II, L.L.C. and KidKraft, LP, that certain Second Amendment to Lease, dated May 3, 2012, by and between DPF Trade Center II, L.L.C. and KidKraft, LP, that certain Third Amendment to Lease, dated October 22, 2012, by and between DPF Trade Center II, L.L.C. and KidKraft, LP, that certain Fourth Amendment to Lease, dated March 17, 2017, by and between Airport Trade Center II, LP (as successor-in-interest to DPF Trade Center II, L.L.C.) and KidKraft, Inc., that certain Fifth Amendment to Lease, dated May 1, 2020, by and between Airport Trade Center II, LP and KidKraft, Inc. and that certain Sixth Amendment to Lease, dated May 4, 2021, by and between Airport Trade Center II, LP and KidKraft, Inc. (as amended supplemented or otherwise modified to the Effective Date, the "*DFW Warehouse Lease*") | KidKraft, LP | DPF Trade Center II, L.L.C. | 2525 Esters Blvd., Dallas, TX 75261 |

In addition to the executory contracts and unexpired leases listed above, the Debtors entered into a postpetition contract with Adobe, Inc. and intend to assign such contract to the Purchaser in connection with the Sale Transaction. Though this contract is not being assumed, the Debtors are providing this additional notice of their intent to assign the contract out of an abundance of caution.

**Exhibit B**

## Exhibit C

### List of Retained Causes of Action

Article IV.A.20 of the Plan[1] provides that:

> Except as provided in Article IV.A.20 of the Plan, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Wind Down Estate will retain and may enforce any claims, demands, rights, and causes of action that any Estate may hold against any Person to the extent not satisfied, settled, and released under the Plan or otherwise, including the Retained Causes of Action; *provided that*, **the Wind Down Estate will not retain any Causes of Action (including Avoidance Actions) that are assigned to Purchaser as Transferred Assets in connection with the Sale Transaction**. The Wind Down Administrator may pursue any such retained claims, demands, rights, or causes of action, as appropriate, in accordance with the best interests of the Wind Down Estate. Except to the extent any such claim is specifically satisfied, settled, and/or released in the Plan, in accordance with and subject to any applicable law, the Debtor's inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtors or Estates may hold against any Person. Except to the extent any such claim is specifically satisfied, settled, and/or released the Plan, the Debtor intends to preserve those claims, demands, rights, or causes of action designated as Retained Causes of Action. **For the avoidance of doubt, in no instance will any Cause of Action preserved under the Plan include any claim or Cause of Action with respect to, or against, a Released Party.**

Emphasis added.

Subject to and without limiting the foregoing, the Debtors, on behalf of the Wind Down Estate, expressly reserve all Causes of Action not expressly released or waived under the Plan, including, but not limited to, the following:

### A.       Causes of Action Related to Litigation and Possible Litigation

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all Causes of Action, including any claims, defenses, counterclaims, and/or crossclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding involving the Debtors, whether formal or informal, judicial or non-judicial, including, without limitation, proceedings involving dealers,

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings given to such term in the Plan.

### Exhibit C

creditors, counterparties, customers, employees, consultants, contractors, subcontractors, utilities, suppliers, vendors, insurers, sureties, lenders, or any other parties whatsoever.

Except to the extent any such claim is specifically satisfied, settled, and/or released herein or in the Plan, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtors or the Wind Down Estate may hold against any Entity.  For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any claim against any Debtor or the Wind Down Estate.  Any and all prepetition claims against any Debtor that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code.

Without limiting the foregoing, the Debtors expressly reserve any and all Causes of Action, including rights to payment of attorneys' fees costs and expenses, in connection with:

1. *KidKraft, Inc. v. United States, et al., Case No. 1:20-cv-02331-3JP, United States Customs and Border Protection; Office of the United States Trade Representative.*

## B.     Causes of Action Related to Tax Refunds or Credits

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax assets and refunds.

## C.     Causes of Action Related to Insurance Policies and Surety Bonds

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities based in whole or in part upon any and all insurance contracts, insurance policies, customs bonds, and surety bonds to which any of the Debtors are a party or pursuant to which any Debtor has any rights whatsoever, regardless of whether such contract, policy, or bond is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, claims or Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, or surety bond issuers related to coverage, indemnity, contribution, reimbursement, overpayment of premiums and/or fees, breach of contract, or any other matters.

## D.     Causes of Action Related to Contracts and Leases

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all claims or Causes of Action against or related to any and all contracts and/or leases and similar agreements to which any Debtor has any rights whatsoever.  The claims and Causes of Action reserved include, but are not limited to, Causes of Action against vendors, suppliers of goods and services, or any other parties for: (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment,

**Exhibit C**

or setoff; (b) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) counterclaims and defenses related to any contractual obligations; (f) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (g) unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**E.       Causes of Action Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or the Wind Down Estate, as applicable, regardless of whether such Entity is expressly identified in the Plan, the Plan Supplement, or any amendment thereto.  Furthermore, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or the Wind Down Estate, as applicable, owe money to them.

**F.       Causes of Action Related to Preferential or Fraudulent Transfers**

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all claims and Causes of Action held by the Estate for any state or federal or foreign law fraudulent transfer, preferential transfer, fraudulent conveyance, or similar claim.

**G.       Causes of Action Related to Deposits, Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan or conveyed to the Purchaser, the Debtors, on behalf of themselves or the Wind Down Estate, as applicable, expressly reserve all claims or Causes of Action based in whole, or in part, upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral paid to, or owed by, any creditor, lessor, utility, supplier, vendor, landlord, sub-lessee, assignee, or any other Entity.

**The Debtors reserve all rights to amend, revise, or supplement this <u>Exhibit C</u> to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.**

**Exhibit C**

## **Exhibit D**

**Liquidation Analysis**


**[To be Filed]**