# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 24-80045-mvl11 |
| | § | |
| **KIDKRAFT, INC.,** *et al.*, | § | (Chapter 11) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

## DEBTORS' THIRD AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN

William L. Wallander (Texas Bar No. 20780750)     David S. Meyer (admitted *pro hac vice*)
Matthew D. Struble (Texas Bar No. 24102544)       Lauren R. Kanzer (admitted *pro hac vice*)
Kiran Vakamudi (Texas Bar No. 24106540)           1114 Avenue of the Americas, 32nd Floor
2001 Ross Avenue, Suite 3900                      New York, NY 10036
Dallas, TX 75201
**VINSON & ELKINS LLP**

**ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION**

**Dated: July 10, 2024**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers or Canadian business numbers, as applicable, are: KidKraft, Inc. (3303), KidKraft Europe, LLC (3174), KidKraft Intermediate Holdings, LLC (8800), KidKraft International Holdings, Inc. (2933), KidKraft Partners, LLC (3268), KidKraft International IP Holdings, LLC (1841), Solowave Design Corp. (9294), Solowave Design Holdings Limited (0206), Solowave Design Inc. (3073), Solowave Design LP (7201), and Solowave International Inc (4302). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 4630 Olin Road, Dallas, TX 75244.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

| | | |
|---|---|---|
| A. | *Defined Terms* | 1 |
| B. | *Rules of Interpretation* | 20 |
| C. | *Computation of Time* | 21 |
| D. | *Governing Law* | 21 |
| E. | *Reference to Monetary Figures* | 21 |
| F. | *Reference to the Debtors or the Wind Down Estate* | 21 |
| G. | *Controlling Document* | 21 |

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

| | | |
|---|---|---|
| A. | *Administrative Expense Claims* | 22 |
| B. | *Professional Compensation* | 22 |
| C. | *DIP Claims* | 24 |
| D. | *Adequate Protection Claims* | 24 |
| E. | *Priority Tax Claims* | 24 |
| F. | *Statutory Fees* | 24 |
| G. | *Restructuring Expenses* | 25 |

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| A. | *Classification of Claims* | 25 |
| B. | *Treatment of Claims and Interests* | 26 |
| C. | *Special Provision Governing Unimpaired or Reinstated Claims* | 28 |
| D. | *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* | 29 |
| E. | *Elimination of Vacant Classes* | 29 |
| F. | *Voting Classes; Presumed Acceptance by Non-Voting Classes* | 29 |
| G. | *Controversy Concerning Impairment* | 29 |
| H. | *Subordinated Claims* | 29 |

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

| | | |
|---|---|---|
| A. | *Means for Implementation* | 30 |
| B. | *Restructuring Support Agreement* | 40 |
| C. | *Global Settlement* | 40 |

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

| | | |
|---|---|---|
| A. | *Assumption and Rejection of Executory Contracts and Unexpired Leases* | 45 |
| B. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases* | 45 |

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ................... 46
D.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ............ 48
E.    *Reservation of Rights* ................................................................................ 48
F.    *Nonoccurrence of Effective Date* ................................................................ 48
G.    *Indemnification Obligations* ..................................................................... 48

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed* .................................... 49
B.    *Disbursing Agent.* ................................................................................... 49
C.    *Delivery of Distributions and Undeliverable or Unclaimed Property* ............... 50
D.    *Compliance with Tax Requirements* ........................................................... 51
E.    *Foreign Currency Exchange Rate* .............................................................. 52
F.    *Surrender of Cancelled Instruments or Securities* ......................................... 52
G.    *Allocations* ........................................................................................... 52
H.    *No Postpetition Interest on Claims* ............................................................. 52
I.    *Setoffs and Recoupment* .......................................................................... 52
J.    *Claims Paid or Payable by Third Parties* .................................................... 53

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT,
### UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims* ............................................................................... 54
B.    *Claims and Interests Administration Responsibilities* .................................... 54
C.    *Adjustment to Claims or Interests Without Objection* .................................... 54
D.    *Time to File Objections to Claims* ............................................................. 55
E.    *Disallowance of Claims* ........................................................................... 55
F.    *Amendments to Claims* ............................................................................ 55
G.    *No Distributions Pending Allowance* .......................................................... 55
H.    *Single Satisfaction of Claims* ................................................................... 56

### ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies* ............... 56
B.    *Discharge of Claims and Termination of Interests* ........................................ 57
C.    *Term of Injunctions or Stays* .................................................................... 57
D.    *Release of Liens* ..................................................................................... 57
E.    *Releases by the Debtors* ........................................................................... 58
F.    *Releases by Releasing Parties* ................................................................... 59
G.    *Exculpation* ........................................................................................... 60
H.    *Injunction* .............................................................................................. 61
I.    *Protection Against Discriminatory Treatment* .............................................. 62
J.    *Recoupment* ........................................................................................... 63
K.    *Subordination Rights* .............................................................................. 63
L.    *Reimbursement or Contribution* ............................................................... 63
M.    *Document Retention.* ............................................................................... 63

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation* ............................................................ 63
B.    *Conditions Precedent to the Effective Date* .................................................... 64
C.    *Waiver of Conditions* ..................................................................................... 65

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments* ......................................................................... 66
B.    *Effect of Confirmation on Modifications* ......................................................... 66
C.    *Revocation or Withdrawal of the Plan* ............................................................. 66

## ARTICLE XI.
## RETENTION OF JURISDICTION

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect* ................................................................................ 69
B.    *Additional Documents* ..................................................................................... 69
C.    *Reservation of Rights* ..................................................................................... 70
D.    *Successors and Assigns* .................................................................................. 70
E.    *Service of Documents* ..................................................................................... 70
F.    *Term of Injunctions or Stays* .......................................................................... 72
G.    *Entire Agreement* ............................................................................................ 72
H.    *Exhibits* ........................................................................................................... 72
I.    *Nonseverability of Plan Provisions* ................................................................. 72
J.    *Votes Solicited in Good Faith* ......................................................................... 73
K.    *Request for Expedited Determination of Taxes* .............................................. 73
L.    *Closing of Chapter 11 Cases* .......................................................................... 73
M.    *No Stay of Confirmation Order* ....................................................................... 73
N.    *Waiver or Estoppel* ......................................................................................... 73
O.    *Dissolution of Statutory Committees* .............................................................. 74

## INTRODUCTION

KidKraft and its affiliated debtors, as Debtors and debtors in possession in the above-captioned chapter 11 cases, jointly propose this prepackaged chapter 11 plan for the resolution of outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, and historical financial information, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

---

**ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

---

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.     "***363 Sale***" means the sale of the Transferred Assets pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Purchase Agreement and Sale Approval Order.

2.     "***503(b)(9) Claim***" means a Claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

3.     "***549 Causes of Action***" means any Claim or Cause of Action pursuant to section 549 of the Bankruptcy Code.

4.     "***Adequate Protection Claim***" means any Claim for adequate protection within the meaning of section 361 of the Bankruptcy Code arising under applicable law or pursuant to Final Order of the Bankruptcy Court.

5.     "***Administrative Expense Claim***" means any Claim (other than any Adequate Protection Claims or DIP Claims) for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses, (ii) any Allowed requests for compensation or expense reimbursement for making a substantial

1

contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code, and (iii) any Unpaid Employee Severance Obligations.

6.      "***Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount***" means the amount set forth in the Approved Budget (or as otherwise agreed upon by the Debtors, the DIP Secured Parties, and the Purchaser), and funded by cash on hand of the Debtors and the proceeds of the DIP Facility prior to the Confirmation Date, sufficient to satisfy the agreed upon estimated amount of the Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims; *provided that* in no event will the DIP Secured Parties' obligations to provide such funding exceed the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount.

7.      "***Administrative Expense Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Expense Claims (other than 503(b)(9) Claims), which: (a) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims of Professionals, shall be 45 days after the Effective Date.

8.      "***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that controls, is controlled by, or is under common control with such Entity, other than a Debtor.

9.      "***Allowed***" means with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan and such Claim or Interest is not Disputed or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; *provided*, *however*, that notwithstanding the foregoing, the Wind Down Estate (to the extent applicable) will retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

10.      "***Approved Budget***" means the weekly budget, as defined in paragraph G(iv) of the DIP Approval Order.

11.      "***Assets***" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

12.      "***Assigned Avoidance Actions***" means all Avoidance Actions other than those against (i) any parties identified on Schedule 1 to the Global Settlement Term Sheet, unless any such party makes a GUC Settlement Opt-In Election, (ii) any other "Designated Parties" (as that term is defined in the Purchase Agreement) under Section 2.1(k)(ii) through (iv) of the Purchase Agreement, and (iii) any Released Parties.

13.      "***Assumed Liabilities***" shall have the meaning set forth in Section 2.3 of the Purchase Agreement.

2

14. "***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502, 510, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer and preference laws.

15. "***Ballots***" means the ballots distributed to certain Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

16. "***Bankruptcy Code***" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

17. "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

18. "***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

19. "***Bar Date Order***" means the order entered by the Bankruptcy Court setting the Claims Bar Date and the Governmental Bar Date.

20. "***Bidder Protections***" means, collectively, the Break-Up Fee and Expense Reimbursement.

21. "***Break-Up Fee***" shall have the meaning set forth in Section 9.3(a) of the Purchase Agreement, as may be modified by a subsequent order of the Bankruptcy Court.

22. "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

23. "***Canadian Debtors***" means, collectively, the following Debtors: Solowave Design Holdings Limited, Solowave Design LP, Solowave Design Inc., and Solowave International Inc. Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Canadian Debtors shall mean the Wind Down Estate to the extent context requires.

24. "***Canadian Property***" *means the assets, undertakings and property* of the Canadian Debtors and any other assets, undertakings and property of the Debtors that may be located in Canada.

25. "***Canadian Transferred Assets***" means the Transferred Assets of the Canadian Debtors and any other Transferred Assets of the Debtors that may be located in Canada.

26. "***Cash***" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

3

27.     "***Cause of Action***" means any action, claim, cause of action, controversy, third-party claim, dispute, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, Secured or Unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including Avoidance Actions); (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

28.     "***CCAA Court***" means the Ontario Superior Court of Justice (Commercial List).

29.     "***CCAA Recognition Proceedings***" means the recognition proceedings commenced pursuant to Part IV of the *Companies' Creditors Arrangement Act* (Canada) in respect of the Chapter 11 Cases of KidKraft and the Canadian Debtors.

30.     "***Chapter 11 Cases***" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

31.     "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

32.     "***Claims Bar Date***" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim (other than for Administrative Expense Claims and Claims held by Governmental Units), including 503(b)(9) Claims, must be Filed.

33.     "***Claims Objection Deadline***" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (a) 120 days after the Effective Date, subject to extension by order of the Bankruptcy Court, (b) 90 days after the Filing of a Proof of Claim, or (c) such other period of limitation as may be fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to a Claim.

34.     "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Noticing and Claims Agent.

35.     "***Class***" means a category of Claims against or Interests in the Debtors as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

36.     "***Committee***" means the official committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases on May 23, 2024, pursuant to section 1102 of the Bankruptcy Code.

37.     "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.     "***Confirmation Date***" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

40.     "***Confirmation Order***" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which Order may include the Sale Approval Order.

41.     "***Confirmation Recognition Order***" means an Order of the CCAA Court in the CCAA Recognition Proceedings recognizing and giving effect in Canada to the Confirmation Order.

42.     "***Consummation***" means the occurrence of the Effective Date.

43.     "***Cure Claim***" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed, or assumed and assigned by such Debtor pursuant to section 365 of the Bankruptcy Code.

44.     "***Cure Notice***" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

45.     "***D&O Liability Insurance Policies***" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

46.     "***Debtor Retained Causes of Action***" means any and all potential Claims and Causes of Action held by the Debtors against (i) the Debtors' Officers; or (ii) SCP, in each case related solely to: (a) the Debtors' reporting obligations under the DIP Approval Order or DIP Facility Documents; or (b) any payment in violation of the Prepetition Credit Agreement Documents, the Restructuring Support Agreement, and/or the DIP Documents; *provided*, that any potential recovery against the Debtors' Officers shall be limited to insurance proceeds (if any) available from the Debtors' insurance policies, including the D&O Liability Insurance Policies; *provided, further*, that such insurance limitation shall not apply to Claims and Causes of Action arising as a result of gross negligence, fraud, or willful misconduct.  Notwithstanding any other releases provided herein by the Debtors, the Debtor Retained Causes of Action shall not be released; *provided, further,* that any and all potential Claims and Causes of Action held by the

5

Debtors against any Released Party other than those parties specifically identified in clauses (i) and (ii) above shall not constitute Debtor Retained Causes of Action.

47.     "*Debtors*" means, collectively, the following: KidKraft, Inc.; KidKraft Europe, LLC; KidKraft Intermediate Holdings, LLC; KidKraft International Holdings, Inc.; KidKraft International IP Holdings, LLC; KidKraft Partners, LLC; Solowave Design Corp.; Solowave Design Holdings Limited; Solowave Design Inc.; Solowave Design LP; and Solowave International Inc.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors shall mean the Wind Down Estate to the extent context requires.

48.     "*Debtors' Officers*" means the Debtors' officers as of the Petition Date; *provided*, that any such officer shall be deemed not to be a Debtors' Officer for so long as such officer is employed by the Purchaser.

49.     "*Definitive Documentation*" means, without limitation, the following definitive documents and agreements: (a) this Plan and all exhibits hereto, including the Plan Supplement documents; (b) the Confirmation Order and Confirmation Recognition Order; (c) the Disclosure Statement; (d) the solicitation materials with respect to the Plan; (e) the Purchase Agreement, including the exhibits and schedules thereto; (f) the Sale Order, if not incorporated as part of the Confirmation Order and Confirmation Recognition Order, as applicable; (g) any documentation or budget related to the Post-Sale Reserve and Foreign Sale Reserve; (h) the DIP Order; (i) all "first day" motions, applications, and other documents that any Debtor intends to file with the Bankruptcy Court and seeks to have heard on an expedited basis at the "first-day hearing" in the Chapter 11 Cases and any proposed orders related thereto; (j) all motions, applications, and other documents that any Debtor (including a foreign representative appointed by the Bankruptcy Court for any Debtor) or any Canadian Affiliates of Debtors intend to file with the CCAA Court in the CCAA Recognition Proceedings, and any proposed orders related thereto; (k) any provision in any documentation regarding (i) releases of Claims, causes of action, and avoidance actions or (ii) Assumed Liabilities or Transferred Contracts under the Purchase Agreement; (l) such other agreements, instruments, and documentation as may be necessary or reasonably desirable to consummate and document the Restructuring and Sale Transaction (including, without limitation, in connection with the CCAA Recognition Proceedings); and (m) to the extent not included, any motions and related proposed orders seeking approval of each of the above.  For the avoidance of doubt, the Definitive Documentation shall be in form and substance acceptable to the Debtors, the Prepetition Secured Parties, the Purchaser, and with respect to MidOcean, solely with respect to any provision therein having a material effect on MidOcean or releasing Claims or causes of action by or against MidOcean or its affiliates thereunder.

50.     "*De Minimis Assets*" means assets with a total transaction value, as calculated within the Debtors' or Wind Down Administrator's reasonable discretion, in consultation with the Prepetition Secured Parties, less than or equal to $50,000.

51.     "*DIP Agent*" means GB Funding, LLC, in its capacity as administrative agent and collateral agent under the DIP Facility.

52.     "*DIP Approval Order*" means the interim order entered by the Bankruptcy Court approving the DIP Facility and the Final DIP Approval Order.

4866-4355-8095

53.    "*DIP Claim*" means any Claim of the DIP Agent or any DIP Lender on account of or arising from, under or in connection with the DIP Facility.

54.    "*DIP Facility*" means the senior secured superpriority debtor-in-possession financing facility to be provided by the DIP Lenders, all as set forth in, and consistent with and subject to, the terms and conditions of the DIP Facility Documents.

55.    "*DIP Facility Documents*" means the DIP Facility Term Sheet, the DIP Credit Agreement (as applicable) and all other agreements, documents, instruments, and amendments related thereto, including any DIP Order, and any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

56.    "*DIP Facility Term Sheet*" means that certain term sheet regarding the terms of debtor-in-possession financing between KidKraft, Inc., as borrower, certain of KidKraft's subsidiaries and affiliates, as guarantors, the DIP Agent, and the DIP Lender, attached as <u>Exhibit A</u> to the DIP Approval Order.

57.    "*DIP Lender*" means 1903 Partners, LLC, in its capacity as lender under the DIP Facility.

58.    "*DIP Liens*" mean the Liens granted to the DIP Agent under the DIP Order to secure the DIP Claims.

59.    "*DIP Order*" means the DIP Approval Order and the DIP Recognition Order, as applicable.

60.    "*DIP Recognition Order*" means one or more orders of the CCAA Court in the CCAA Recognition Proceedings recognizing and giving effect in Canada to the DIP Approval Order, including the Final DIP Recognition Order.

61.    "*DIP Secured Parties*" means collectively, the DIP Lender and the DIP Agent, in their respective capacities under the DIP Facility.

62.    "*DIP Secured Parties Advisors*" means Katten Muchin Rosenman LLP, as counsel to the DIP Secured Parties and Fasken Martineau DuMoulin LLP as Canadian Counsel to the DIP Secured Parties.

63.    "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed; *provided, however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

64.    "*Disbursing Agent*" means the Debtors, the Wind Down Estate, the GUC Trust, or the Entity or Entities selected by the Debtors, the Wind Down Estate, or the GUC Trust as applicable, to make or facilitate distributions pursuant to the Plan.

65.    "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, dated as of May 8, 2024, as may be amended, supplemented, or

modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

66. "*Disputed*" means, with respect to any Claim or Interest, that such Claim or Interest (a) is not yet Allowed, (b) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (d) is or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Bar Date Order.

67. "*Dissolution Transactions*" means the transactions that the Debtors or Wind Down Administrator, with the consent of the Prepetition Secured Parties, determine to be necessary or appropriate to implement the terms of the Plan, and ultimately result in the dissolution or other termination of the corporate entities that comprise the Debtors.

68. "*Distributable Value*" means (a) the Purchase Price *plus* (b) any of the Debtors' cash on hand as of the Effective Date *plus* (c) proceeds of the monetization of any Excluded Assets of the Debtors, whenever received by the Debtors or the Wind Down Estates *plus* (d) surrender of collateral or proceeds of any other collateral securing the DIP Claims or Prepetition Secured Party Claims, whenever received by the Debtors or the Wind Down Estates; *minus* (e) amounts held-back to secure any purchase price adjustments pursuant to the Purchase Agreement (unless and until distributed to the Debtors in accordance therewith); *minus* (f) amounts necessary to fund the Professional Fee Escrow Account in the Professional Fee Reserve Amount; *minus* (g) amounts necessary to satisfy Restructuring Expenses; *minus* (h) amounts necessary to fund the Post-Sale Reserve; *minus* (g) amounts necessary to fund the Foreign Sale Reserve; *provided that* any unused amounts remaining from the Professional Fee Escrow Account, the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount, and the Post-Sale Reserve shall be considered Distributable Value; *provided that*, for the avoidance of doubt, no GUC Trust Assets shall be included as Distributable Value.

69. "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date as designated in an order of the Bankruptcy Court.

70. "*Effective Date*" means the date selected by the Debtors on which: (a) no stay of the Confirmation Order, Confirmation Recognition Order or Sale Order (if separately entered) is in effect; (b) all conditions precedent specified in Article IX have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan becomes effective; *provided, however*, that if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

71. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

72. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

4866-4355-8095

73.     "**_Excluded Assets_**" shall have the meaning set forth in Section 2.2 of the Purchase Agreement.

74.     "**_Exculpated Party_**" means each of the following solely in its capacity as such and to the maximum extent permitted by law: (a) the Debtors; (b) the Committee; and (c) the members of the Committee, solely in their capacities as such.

75.     "**_Executory Contract_**" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

76.     "**_Expense Reimbursement_**" shall have the meaning set forth in Section 9.3(a) of the Purchase Agreement, as may be modified by a subsequent order of the Bankruptcy Court.

77.     "**_Federal Judgment Rate_**" means the federal judgment rate in effect as of the Petition Date, compounded annually.

78.     "**_File_**," "**_Filed_**," or "**_Filing_**" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Noticing and Claims Agent or the Bankruptcy Court through the PACER or CM/ECF website.

79.     "**_Final Decree_**" means the decree contemplated under Bankruptcy Rule 3022.

80.     "**_Final DIP Approval Order_**" means the Final Order entered by the Bankruptcy Court approving the DIP Facility.

81.     "**_Final DIP Recognition Order_**" means the Final Order of the CCAA Court recognizing and giving effect in Canada to the Final DIP Approval Order.

82.     "**_Final Order_**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

83.     "**_Foreign Sale Reserve_**" means the amount of the Purchase Price allocated to the inventory transferred from the Netherlands Subsidiaries to facilitate the Sale Transaction, which amount will be distributed from Debtors to the Netherlands Subsidiaries pursuant to the Plan.

9

84.    "*General Unsecured Claim*" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than an Intercompany Claim or a Subordinated Claim).

85.    "*Global Settlement*" means the global settlement between the Global Settlement Parties pursuant to the term sheet (the "*Global Settlement Term Sheet*") attached to the *Notice of Filing Global Settlement Term Sheet* [Docket No. 195].

86.    "*Global Settlement Parties*" means the Debtors, the Committee, the DIP Secured Parties, the Prepetition Secured Parties, the Purchaser, and MidOcean.

87.    "*Governmental Bar Date*" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

88.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

89.    "*GUC Critical Vendor Cash*" means any amounts permitted to be paid under the *Final Order (I) Authorizing the Debtors to Pay (A) Critical Vendors, (B) Lien Claimants, and (C) 503(b)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief* [Docket No. 200] that are unused as of the Effective Date (with the Debtors having sole discretion to pay amounts authorized under such order, except that any Allowed Claims entitled to priority status under section 503(b)(9) of the Bankruptcy Code shall be paid in full to the Holders thereof).

90.    "*GUC L/C Cash*" means 40% of any cash collateral recovered from the former prepetition agent pursuant to the Assignment and Assumption dated as of January 31, 2024 by and between (i) Antares AssetCo LP, Antares Capital LP, Antares Holdings LP, Antares CLO 2017-2, LTD., Antares CLO 2018-1, LTD., Fifth Third Bank, N.A., and PNC Bank, N.A., as assignors, and (ii) 1903 Partners, LLC, as assignee.

91.    "*GUC Purchase Price Cash*" means (i) $350,000 if, on the Effective Date, the calculation of the Purchase Price Calculation is within a 0-5% variance of $39,322,916; (ii) $250,000 if, on the Effective Date, the Purchase Price Calculation is within a 6-10% variance of $39,322,916; (iii) $200,000 if, on the Effective Date, the Purchase Price Calculation is within a 11-20% variance of $39,322,916; or (iv) $150,000 if, on the Effective Date, the Purchase Price Calculation is a more than 20% variance of $39,322,916.

92.    "*GUC Retained Causes of Action*" means, collectively, (i) the Debtor Retained Causes of Action; (ii) 549 Causes of Action; and (iii) the Professional Fee Reduction Amount.

93.    "*GUC Retained Causes of Action Potential Recovery*" means any recovery from the GUC Retained Causes of Action.  For the avoidance of doubt, the GUC Retained Causes of Action Potential Recovery shall be shared Pro Rata among the GUC Trust Beneficiaries.

94.    "*GUC Retained Causes of Action Transfer*" means the assignment, conveyance, or other transfer of the GUC Retained Causes of Action to the GUC Trust, which shall occur on the next Business Day following the GUC Settlement Opt-In Election Deadline.

95.    "***GUC Settlement Opt-In Election***" means the affirmative election by a Holder of a General Unsecured Claim to opt-in to the settlement under the Global Settlement Term Sheet and receive its Pro Rata share of 100% of the GUC Trust Interests.

96.    "***GUC Settlement Opt-In Election Deadline***" means the date that is thirty (30) days after the Effective Date.

97.    "***GUC Settlement Opt-In Form***" means the form by which a potential holder of a General Unsecured Claim may make a GUC Settlement Opt-In Election, which form shall be included in the Plan Supplement.

98.    "***GUC Settlement Opt-In Procedures***" means the procedures set forth in the GUC Settlement Opt-In Form for a potential holder of an Allowed General Unsecured Claim to make a GUC Settlement Opt-In Election.

99.    "***GUC Trust***" means the trust established pursuant to Article IV.C of the Plan to, among other things, hold and liquidate the GUC Trust Assets and GUC Retained Causes of Action and make distributions to GUC Trust Beneficiaries.

100.    "***GUC Trust Accounts***" means the bank accounts to be held in the name of the GUC Trustee that are created pursuant to Article IV.C of the Plan.

101.    "***GUC Trust Agreement***" means the agreement establishing and governing the GUC Trust, which agreement shall be included in the Plan Supplement and executed as of the Effective Date, and which agreement shall be acceptable in form and substance to the Debtors, the Committee, and the Prepetition Secured Parties.

102.    "***GUC Trust Assets***" means, in the aggregate, (i) the GUC Trust Expense Reserve; (ii) $125,000 in Cash; (iii) the Sponsor Cash Contribution; (iv) the GUC L/C Cash; (v) the GUC Purchase Price Cash; (vi) any unused amounts in the Approved Budget that are designated for fees and expenses of the Committee's professionals; (vii) the GUC Critical Vendor Cash, if any; (viii) all commercial tort claims (as that term is defined in Article 9 of the Uniform Commercial Code) of the Debtors other than any such claims against any Released Party under the Plan; and (ix) the Assigned Avoidance Actions.

103.    "***GUC Trust Assets Transfer***" means the assignment, conveyance, or other transfer of the GUC Trust Assets to the GUC Trust, which shall occur on the next Business Day following the GUC Settlement Opt-In Election Deadline.

104.    "***GUC Trust Beneficiaries***" means any Holder of an Allowed General Unsecured Claim that has made a GUC Settlement Opt-In Election and thereby obtained one or more GUC Trust Interests and the Prepetition Secured Parties.  For the avoidance of doubt, the Prepetition Secured Parties shall be deemed to have made a GUC Settlement Opt-In Election and shall be GUC Trust Beneficiaries without the need to submit any opt-in election or otherwise comply with the GUC Settlement Opt-In Procedures.

105.    "***GUC Trust Expense Reserve***" means a reserve in the amount of $75,000 funded from Cash on hand of the U.S. Debtors to the GUC Trust on the Effective Date to allow the GUC Trustee to maintain and administer the GUC Trust Assets.

106.    "***GUC Trust Interests***" means the beneficial interests in the GUC Trust.

107.    "***GUC Trustee***" means the trustee appointed pursuant to Article IV.C of the Plan (or any successor trustee), in its capacity as the trustee of the GUC Trust, who shall be solely responsible for overseeing the reconciliation, objection, settlement, or other disposition of General Unsecured Claims asserted in these Chapter 11 Cases.

108.    "***Holder***" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

109.    "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

110.    "***Indemnification Obligations***" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former directors and the officers of the Debtors.

111.    "***Intercompany Claim***" means any Claim against a Debtor held by another Debtor.

112.    "***Intercompany Interest***" means any Interest in a Debtor held by another Debtor.

113.    "***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in the Debtors, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

114.    "***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended.

115.    "***IRS***" means the Internal Revenue Service.

116.    "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

117.    "***KidKraft***" means KidKraft, Inc.

118.    "***Lender Retained Causes of Action***" means any and all potential Claims and Causes of Action held by the DIP Secured Parties or the Prepetition Secured Parties against (i) the Debtors; (ii) the Debtors' Officers; or (iii) SCP, in each case related solely to: (a) the Debtors' reporting obligations under the DIP Approval Order or DIP Facility Documents; or (b) any payment in violation of the Prepetition Credit Agreement Documents, the Restructuring Support Agreement, and/or the DIP Documents; *provided*, that any potential recovery against the Debtors

12

and the Debtors' Officers shall be limited to insurance proceeds (if any) available from the Debtors' insurance policies, including the D&O Liability Insurance Policies; *provided, further,* that such insurance limitation shall not apply to Claims and Causes of Action arising as a result of gross negligence, fraud, or willful misconduct. Notwithstanding any other releases provided herein by the DIP Secured Parties or the Prepetition Secured Parties, the Lender Retained Causes of Action shall not be released; *provided, further,* that any and all potential Claims and Causes of Action held by the DIP Secured Parties or the Prepetition Secured Parties against any Released Party other than those parties specifically identified in clauses (i), (ii), and (iii) above shall not constitute Lender Retained Causes of Action.

119.   "***Lien***" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

120.   "***List of Retained Causes of Action***" means the schedule of certain Causes of Action of the Debtors which shall be included in the Plan Supplement.

121.   "***Local Rules***" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas.

122.   "***MidOcean***" means MidOcean Partners IV, L.P. in its capacity as the holder of Preferred A Units and Preferred C Units in KidKraft Group Holdings, LLC and party to that certain *Note Purchase Agreement* dated as of January 13, 2023, pursuant to which, KidKraft agreed to issue and sell to and MidOcean agreed to purchase, notes in the aggregate principal amount of up to $5,000,000 and MidOcean US Advisor, L.P. as party to that certain *Professional Services Agreement* dated as of July 15, 2015 by and among KidKraft Group Holdings, LLC, KidKraft, and MidOcean US Advisor, L.P., as amended by that First Amendment to the Professional Services Agreement dated as of September 30, 2016.

123.   "***Netherlands Asset Sale***" has the meaning set forth in Article IV.A.3. of the Plan.

124.   "***Netherlands Liquidation***" has the meaning set forth in Article IV.A.3. of the Plan.

125.   "***Netherlands Subsidiaries***" means non-debtors KidKraft Netherlands C.V., KidKraft Holdings B.V., and KidKraft Netherlands B.V.

126.   "***Note Purchase Agreement Documents***" means that certain *Note Purchase Agreement* dated as of January 13, 2023 by and among certain of the Debtors and MidOcean and all other agreements, documents, instruments, and amendments related thereto.

127.   "***Noticing and Claims Agent***" means Stretto Inc., the noticing, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

128.   "***Other Priority Claim***" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

129.   "***Other Secured Claims***" means Secured Claims other than Priority Tax Claims, DIP Claims, or Prepetition Secured Party Claims.

130. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

131. "*Petition Date*" means the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

132. "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, which shall be consistent with, and subject to the approvals and consents as to form and substance set forth in, the Restructuring Support Agreement.

133. "*Plan Supplement*" means, to the extent applicable, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Purchase Agreement, the Schedule of Assumed Executory Contracts and Unexpired Leases, the GUC Trust Agreement, the Global Settlement Term Sheet, the GUC Settlement Opt-In Form, the identity of the Wind Down Administrator, and the List of Retained Causes of Action all of which shall be incorporated by reference into, and are an integral part of, the Plan, as may be amended, modified, replaced and/or supplemented from time to time, subject to the consent of the Prepetition Secured Parties.

134. "*Post-Sale Reserve*" means a cash reserve in the amount of $650,000 to fund the reasonably anticipated costs necessary for the wind down of the Wind Down Estate, including an estimated amount of reasonable fees and expenses that may be incurred by professionals for services rendered after the Effective Date and statutory fees, which cash reserve shall be funded into a segregated account on the Effective Date.

135. "*Prepetition Credit Agreement*" means that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 3, 2020 (as amended from time to time), by and among KidKraft, Inc. and KidKraft Netherlands B.V., jointly and severally, as borrowers, the guarantors thereto, GB Funding, LLC, as Prepetition Credit Agreement Agent, and 1903 Partners, LLC, as Lender.

136. "*Prepetition Credit Agreement Agent*" means GB Funding, LLC, in its capacity as Administrative Agent and Collateral Agent (as such terms are defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement.

137. "*Prepetition Credit Agreement Documents*" means the Prepetition Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

138. "*Prepetition Secured Parties*" means GB Funding, LLC, as Administrative Agent and Collateral Agent, and 1903 Partners, LLC, as Lender, in their respective capacities under the Prepetition Credit Agreement.

4866-4355-8095

139.    "***Prepetition Secured Party Advisors***" means Katten Muchin Rosenman LLP, as counsel to the Prepetition Secured Parties and Fasken Martineau DuMoulin LLP as Canadian counsel to the Prepetition Secured Parties.

140.    "***Prepetition Secured Party Claims***" means all Claims, including "Parallel Debts" (as defined in the Prepetition Credit Agreement Documents) held by the Prepetition Secured Parties on account of, arising under, or relating to their respective capacities as lender or agent under the Prepetition Credit Agreement Documents.

141.    "***Prepetition Secured Parties' Deficiency Claims***" means the deficiency Claims held by the Prepetition Secured Parties.  Solely for purposes of any distributions to be made from the GUC Trust Assets to GUC Trust Beneficiaries, the Prepetition Secured Parties' Deficiency Claims shall be capped at $55 million.

142.    "***Prepetition Secured Party Liens***" means all Liens granted to the Prepetition Credit Agreement Agent to secure the Prepetition Secured Party Claims.

143.    "***Priority Tax Claim***" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

144.    "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest bears to the aggregate amount of Allowed Claims, Allowed Interests, or other matter so referenced, as the context requires.

145.    "***Professional***" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

146.    "***Professional Fee Claims***" means a Claim for the compensation of the Professionals and other professionals (including, for certainty, professionals to be compensated pursuant to the orders of the CCAA Court in the CCAA Recognition Proceedings) and the reimbursement of expenses incurred by such professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid, including, for the avoidance of doubt, any costs, fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring; *provided that* to the extent a Debtor Professional (as defined in the DIP Approval Order) agrees with the DIP Lender to a modification to the Debtor Professional fees in accordance with Section 1.8 of the DIP Approval Order, the Claim as modified shall be included in the applicable Professional Fee Claim.  Professional Fee Claims of the Committee's Professionals shall not exceed the aggregate amounts set forth in the Approved Budget, consistent with the Global Settlement Term Sheet.

147.    "***Professional Fee Escrow Account***" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B.

148.    "***Professional Fee Reduction Amount***" means the amount, if any, by which the professional fee budget for SCP in the DIP Facility Documents exceeds the amount of Allowed Professional Fee Claims of SCP, where the budget savings is obtained consensually or is the result of an objection to SCP's fee application.

149.    "***Professional Fee Reserve Amount***" means the total amount of Professional Fee Claims estimated in accordance with Article II.B.

150.    "***Professional Services Agreement Documents***" means that certain *Professional Services Agreement* dated as of July 15, 2015 by and among certain of the Debtors and MidOcean and all other agreements, documents, instruments, and amendments related thereto.

151.    "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

152.    "***Purchase Agreement***" means that certain Amended and Restated Asset Purchase Agreement dated as of July 5, 2024, as amended, modified, or supplemented from time to time, among Purchaser and certain of the Debtors, including all schedules and exhibits thereto, which shall be Filed with the Plan Supplement.

153.    "***Purchase Price***" shall have the meaning set forth in the Purchase Agreement.

154.    "***Purchase Price Calculation***" means the calculation of the "Purchase Price at close" in accordance with Exhibit B of the Purchase Agreement.

155.    "***Purchaser***" means Backyard Products, LLC, and permitted successors, assigns, and designees, as applicable.

156.    "***Qualifying Alternative Transaction***" shall have the meaning set forth in the Purchase Agreement.

157.    "***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Prepetition Secured Parties and the Purchaser in their sole and absolute discretion.

158.    "***Released Party***" means each of the following solely in its capacity as such: (a) the Debtors; (b) the DIP Agent; (c) the DIP Lender; (d) MidOcean; (e) the Prepetition Secured Parties; (f) the Purchaser; (g) the Committee; and (h) with respect to each of the foregoing under (a) through (g) such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, employees, managed accounts and funds, predecessors, successors, assigns, subsidiaries, equity Holders, members, agents, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in their capacity as such.

159.    "***Releasing Party***" means each of the following solely in its capacity as such: (a) all Released Parties; (b) all Holders of Claims who affirmatively cast a timely ballot to accept the Plan and did not affirmatively opt out of the releases set forth in Article VIII.F herein; (c) all Holders of Claims and Interests that were given notice of the opportunity to opt out of granting the

releases set forth in Article VIII.F herein but did not otherwise affirmatively opt out of such releases; and (d) all GUC Trust Beneficiaries.

160. "*Restructuring*" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Plan.

161. "*Restructuring Expenses*" means the reasonable and documented professional fees and expenses incurred by the DIP Secured Party Advisors, the DIP Secured Parties, the Prepetition Secured Party Advisors and the Prepetition Secured Parties, in each case, in connection with or arising as a result of the Restructuring, the Restructuring Support Agreement, Sale Transaction, the Plan, or the Chapter 11 Cases.

162. "*Restructuring Support Agreement*" means that certain *Restructuring Support Agreement*, dated April 25, 2024, by and among the Debtors, the Prepetition Secured Parties, the DIP Secured Parties, the Purchaser, and MidOcean, as may be further amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof.

163. "*Retained Causes of Action*" means those Causes of Action identified on the List of Retained Causes of Action that are not released, waived, or transferred pursuant to the Plan or any Sale Transaction.

164. "*RSA Parties*" mean, collectively, the Debtors, the Prepetition Secured Parties, the DIP Secured Parties, the Purchaser, and MidOcean.

165. "*Sale Approval Order*" means the order of the Bankruptcy Court approving the Purchase Agreement and the Sale Transaction, which order may be, but is not required to be, part of the Confirmation Order.

166. "*Sale Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Sale Order, as such hearing may be adjourned or continued from time to time.

167. "*Sale Order*" means the Sale Approval Order and the Sale Recognition Order, as applicable.

168. "*Sale Recognition Order*" means an order of the CCAA Court in the CCAA Recognition Proceedings recognizing and giving effect in Canada to the Sale Approval Order, which order may be, but is not required to be, part of the Confirmation Recognition Order.

169. "*Sales Process*" means the marketing and sales process for the Debtors' Assets.

170. "*Sale Transaction*" means the sale by the Debtors that are party to the Purchase Agreement of all of their respective right, title, and interest in, to and under the Transferred Assets to the Purchaser in accordance with the terms of the Purchase Agreement and the Sale Order.

171. "*Sale Transaction Documents*" means the Sale Order, the Purchase Agreement, and all other documents required to consummate the Sale Transaction (with respect to such other

4866-4355-8095

documents required to consummate the Sale Transaction, in form and substance acceptable to each party thereto).

172.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed and assigned to Purchaser pursuant to the Plan, as set forth in the Plan Supplement, as may be amended from time to time prior to the Effective Date.

173.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

174.    "*SCP*" means SierraConstellation Partners, LLC.

175.    "*SEC*" means the United States Securities and Exchange Commission.

176.    "*Secured Claim*" means a Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

177.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

178.    "*Special Committee*" means the Special Committee of the Board of Directors of KidKraft, Inc.

179.    "*Sponsor Cash Contribution*" has the meaning set forth in Article IV.C.8 of the Plan.

180.    "*Sponsor Claims Waiver*" has the meaning set forth in Article IV.C.8 of the Plan.

181.    "*Subordinated Claim*" means any Claim against a Debtor arising from (a) rescission of a purchase or sale of a Security in any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

182.    "*Transferred Assets*" shall have the meaning set forth in Section 2.1 of the Purchase Agreement, *provided, however,* the Assigned Avoidance Actions shall not be Transferred Assets.

183.    "*Transferred Contracts*" shall have the meaning set forth in Section 2.1(e) of the Purchase Agreement.

4866-4355-8095

184.    "*Unclaimed Property*" means any distribution under the Plan on account of an Allowed Claim whose Holder has not: (a) accepted such distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind Down Estate of an intent to accept such distribution; (c) responded to the Debtors', Wind Down Administrator's, or GUC Trustee's (as applicable) requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

185.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

186.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

187.    "*Unpaid Employee Severance Obligations*" means those obligations owed to certain eligible employees who were terminated prior to the Petition Date and who executed a separation agreement after the Petition Date and prior to the Effective Date, which obligations shall be deemed to have been incurred after the Petition Date and treated as Administrative Expense Claims for purposes of this Plan.

188.    "*Unsecured*" means, with respect to a Claim, not Secured.

189.    "*U.S. Trustee*" means the Office of the United States Trustee for the Northern District of Texas.

190.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

191.    "*Wind Down Administrator*" means the Person or Persons identified in the Plan Supplement (as determined by the Debtors), if known, and appointed on the Effective Date, who will serve as the trustee and administrator overseeing the Wind Down Estate and dissolution of the Debtors and their Estates in accordance with the Plan.

192.    "*Wind Down Claims*" means the Prepetition Secured Party Claims that remain outstanding on the Effective Date, in an amount not to exceed $10,000,000, and the Prepetition Secured Party Liens securing such Prepetition Secured Party Claims, which Prepetition Secured Party Claims and Liens shall be automatically released and discharged following the orderly wind down of the Debtors and the other borrower and guarantors under the Prepetition Credit Agreement and after the proceeds of the Netherlands Asset Sale and Netherlands Liquidation, if any, are indefeasibly distributed in Cash to the Prepetition Secured Parties as provided in Article IV of the Plan.

193.    "*Wind Down Estate*" means, collectively, (i) the Estates of the Debtors and (ii) the Debtors' non-Debtor affiliates, as applicable, following the Effective Date.

194.    "*Wind Down Estate Assets*" means (i) any Assets of the Debtors' Estates that are not GUC Trust Assets and not sold pursuant to the Sale Transaction, including, but not limited to,

the Excluded Assets, Interests in the Debtors' non-Debtor affiliates, and any Cause of Action specifically enumerated in the List of Retained Causes of Action and (ii) Cash in the amount set forth in the Post-Sale Reserve; *provided that* proceeds of any Wind Down Estate Assets, including without limitation, Excluded Assets and such Retained Causes of Action shall become Distributable Value.  For the avoidance of doubt, no GUC Trust Assets shall be Wind Down Estate Assets.

195.    "***Wind Down Estate Expenses***" means any and all reasonable and documented fees, costs, and expenses incurred by the Wind Down Estate or the Wind Down Administrator (or any Person, entity, or professional engaged to assist the Wind Down Administrator) in connection with the Wind Down Transactions, including, without limitation, any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses and fees payable under 28 U.S.C. § 1930, costs associated with any maintenance of any going concern as part of the wind down of such going concern's business operations, or costs to maintain certain assets while they are held, in each case, in accordance with and subject to the Post-Sale Reserve.

196.    "***Wind Down Transactions***" means the transactions that the Debtors or Wind Down Administrator, as applicable, with the consent of the Prepetition Secured Parties, determines to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of KidKraft and its Affiliates.

B.      *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

4866-4355-8095

C.       *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.       *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* the corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.       *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.       *Reference to the Debtors or the Wind Down Estate*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind Down Estate shall mean the Debtors and the Wind Down Estate, as applicable, to the extent the context requires.

G.       *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order or Sale Approval Order, as applicable) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order or Sale Approval Order and the Plan, the Confirmation Order or Sale Approval Order, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims, Adequate Protection Claims, and Priority Tax

21

Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Expense Claims*

Except (i) with respect to Administrative Expense Claims that are Professional Fee Claims and Bidder Protections, or (ii) to the extent that (x) an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or (y) Wind Down Administrator (as applicable) agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash; on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* in no event shall the amount paid in the aggregate to Administrative Expense Claims (excluding Professional Fee Claims) in accordance with this Article II.A, Priority Tax Claims under Article II.E hereof, and Other Priority Claims under Article III.B hereof exceed the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount.   For the avoidance of doubt, the Bidder Protections shall be an Administrative Expense Claim in accordance with any applicable orders of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, Unpaid Employee Severance Obligations, or Bidder Protection Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors, the Wind Down Estate, or the Wind Down Administrator (as applicable), pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors, the Wind Down Estate, or the Wind Down Administrator (as applicable) a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Wind Down Estate, or their respective assets or property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Debtors, the Wind Down Estate, or the Wind Down Administrator (as applicable) and the requesting party no later than 90 days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed.

B.      *Professional Compensation*

1.      <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims of Professionals, including such Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors, the Wind Down Estate, or the Wind Down Administrator, as applicable, no later than 45 days after the Effective Date.  Each such final

request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to its full Allowed amount.

Objections to any Professional Fee Claim of Professionals must be Filed and served on the Debtors, the Wind Down Estate, or the Wind Down Administrator, as applicable, and the applicable Professional no later than 24 days after such Professional Fee Claim is Filed with the Bankruptcy Court.

2.    Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 herein. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the other professionals with Professional Fee Claims. The Debtors shall utilize the Funded Reserve Account (as defined in the DIP Approval Order) to fund the Professional Fee Escrow Account, *provided that* the Funded Reserve Account is not a limitation on the amount funded to the Professional Fee Escrow Account. The Professional Fee Escrow Account and funds therein shall not be considered property of the Estates of the Debtors or the Wind Down Estate. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Disbursing Agent or the Wind Down Administrator from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed, and the amount of all other Professional Fee Claims shall be paid in Cash to the applicable professionals by the Disbursing Agent or the Wind Down Administrator from the Professional Fee Escrow Account on the Effective Date. After all such Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Wind Down Estate and deemed Distributable Value and distributed to the holders of Prepetition Secured Party Claims without any further action or order of the Bankruptcy Court.

3.    Professional Fee Reserve Amount

No later than five Business Days prior to the Effective Date, the Debtors shall solicit Professionals and the other professionals with Professional Fee Claims for estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals and other professionals shall deliver such estimate to the Debtors in writing via email two Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any such professional's final request for payment of Professional Fee Claims. If any professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such professional.

4.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Disbursing Agent, the Wind Down Estate, or the Wind Down Administrator (as applicable) shall, in the ordinary course of business and without any further notice or application to or action,

23

order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals and other professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind Down Estate, or the Wind Down Administrator (as applicable) may employ and pay any Professional or other professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, in no circumstances shall the payment of any post-Effective Date fees and/or expenses and other Wind Down Estate Expenses exceed the amount of the Post-Sale Reserve.

C.    *DIP Claims*

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of all DIP Claims, on the Effective Date, the DIP Claims shall: (i) be indefeasibly paid in Cash in full, or (ii) receive such other treatment as agreed by the Debtors and the applicable Holder of a DIP Claim.  Notwithstanding anything herein, the Prepetition Secured Parties and DIP Secured Parties may, in their sole discretion, apply any recovery received on the DIP Claims against the Prepetition Secured Party Claims and vice versa; provided that any such application shall not affect the Prepetition Secured Parties' Deficiency Claims or the agreements set forth in the Global Settlement Term Sheet.

D.    *Adequate Protection Claims*

On the Effective Date, the Adequate Protection Claims shall (i) be paid in Cash in full or (ii) receive such other treatment as agreed by (a) to the extent such Adequate Protection Claims are held by the Prepetition Secured Parties, the Debtors and the Prepetition Secured Parties or (b) to the extent such Adequate Protection Claims are not held by a Prepetition Secured Party, the Debtors and the applicable Holder of such Adequate Protection Claims.

E.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

F.    *Statutory Fees*

All Statutory Fees due and payable prior to, and that remain unpaid as of, the Effective Date shall be paid by the applicable Debtors on the Effective Date.  No statutory fees shall be paid on the initial funding of the Post-Sale Reserve or the GUC Trust.  Statutory fees shall only be paid on subsequent disbursement of Cash by the Wind Down Estate or the GUC Trust, as applicable. Any Statutory Fees that may be owed by the Debtors, the Wind Down Estate, or the GUC Trust,

24

as applicable, after the Confirmation Date related to the reduction to Cash of non-Cash assets shall be paid by the Debtors, the Wind Down Estate, or the GUC Trust, as applicable, until the case is closed, dismissed, or converted. If no disbursements are made by the Debtors, the Wind Down Estate, or the GUC Trust for any quarter post-confirmation, only the minimum statutory fee will be owed in accordance with 28 U.S.C. § 1930(a)(6). The Wind Down Estate and the GUC Trust shall file post-confirmation operating reports with respect to their respective operations and disbursements until these Chapter 11 Cases are closed, dismissed, or converted to cases under chapter 7 of the Bankruptcy Code.

G.    *Restructuring Expenses*

The Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the Restructuring Support Agreement and the DIP Approval Order. To the extent any Restructuring Expenses remain unpaid on the Effective Date, such Restructuring Expenses shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash, subject to the Restructuring Support Agreement and the DIP Approval Order without the need to file a proof of such Claim and without further order of the Court. On the Effective Date, the Disbursing Agent or the Wind Down Estate, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es). A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition Secured Party Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |

| 5 | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept/Deemed to Reject |
| 6 | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept/Deemed to Reject |
| 7 | KidKraft Intermediate Holdings, LLC Interests | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

    1.    <u>Class 1 — Other Priority Claims</u>

        a.    *Classification*: Class 1 consists of all Other Priority Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is 10 business days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter; *provided that* in no event shall the amount paid in the aggregate for Administrative Expense Claims (excluding Professional Fee Claims) in accordance with Article II.A hereof, Priority Tax Claims under Article II.E hereof, and Other Priority Claims under this Article III.B exceed the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount.

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 — Other Secured Claims</u>

        a.    *Classification*: Class 2 consists of all Other Secured Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of Debtors or the Wind Down Estate, as applicable, each Holder shall receive either (i) cash equal to the full allowed amount of its claim, (ii) reinstatement of such holder's claim, (iii) the return to or abandonment of the collateral securing such holder's claim, or (iv) such other treatment as may otherwise be agreed to by such Holder and the Debtors.

26

      c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 — Prepetition Secured Party Claims</u>

      a.    *Classification*: Class 3 consists of all Prepetition Secured Party Claims.

      b.    *Treatment*: Except to the extent that the Holder of Prepetition Secured Party Claims agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Secured Party Claim (which satisfaction, settlement, release, and discharge shall occur (i) on the Effective Date for all Prepetition Secured Party Claims other than the Wind Down Claims, and (ii) after the orderly wind down of the Debtors and other borrower and guarantors under the Prepetition Credit Agreement for all Wind Down Claims), each Holder of an Allowed Prepetition Secured Party Claim shall receive the remaining Distributable Value following payment of Administrative Expense Claims and Priority Tax Claims, DIP Claims, Other Priority Claims, Other Secured Claims, (which amount may be paid directly by the Purchaser on the Effective Date), and GUC Trust Interests (subject to the terms of the Global Settlement) on the Effective Date and any Distributable Value that is available for distribution after the Effective Date shall be promptly distributed by the Debtors or Wind Down Estate to holders of Prepetition Secured Party Claims.

      c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Secured Party Claims will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 — General Unsecured Claims</u>

      a.    *Classification*: Class 4 consists of all General Unsecured Claims.

      b.    *Treatment*: On the Effective Date, all General Unsecured Claims will be canceled, released, extinguished and discharged, and Holders of General Unsecured Claims will receive no recovery or distribution on account of such claims; *provided*, *however*, that any Holder of Allowed General Unsecured Claims who timely makes a GUC Settlement Opt-In Election in compliance with the GUC Settlement Opt-In Procedures shall receive its Pro Rata share of 100% of the GUC Trust Interests.

      c.    *Voting*: Class 4 is Impaired under the Plan.  Holders of Class 4 General Unsecured Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 — Intercompany Claims</u>

a.  *Classification*: Class 5 consists of all Intercompany Claims.

b.  *Treatment*:   All Intercompany Claims will be unaltered and otherwise unaffected by the Plan, or canceled on the Effective Date, in the Debtors' discretion, with the consent of Purchaser.

c.  *Voting*: Class 5 is Unimpaired/Impaired under the Plan.  Holders of Class 5 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

6.  Class 6 — Intercompany Interests

a.  *Classification*: Class 6 consists of all Intercompany Interests.

b.  *Treatment*: All Intercompany Interests shall be maintained under the Plan, solely for purposes of administrative convenience or canceled on the Effective Date, in the Debtors' discretion, subject to the consent of the Prepetition Secured Parties and the Purchaser.

c.  *Voting*: Class 6 is Unimpaired/Impaired under the Plan. Holders of a Class 6 Intercompany Interests are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

7.  Class 7 — KidKraft Intermediate Holdings, LLC Interests

a.  *Classification*: Class 7 consists of all KidKraft Intermediate Holdings, LLC Interests.

b.  *Treatment*: All prepetition Interests in KidKraft Intermediate Holdings, LLC will be canceled on the Effective Date and Holders shall receive no recovery or distribution on account of their Interests.

c.  *Voting*: Class 7 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 7 KidKraft Intermediate Holdings, LLC Interests shall not receive any distribution on account of such KidKraft Intermediate Holdings, LLC Interests and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

C.  *Special Provision Governing Unimpaired or Reinstated Claims*

Nothing under the Plan shall affect the Debtors', the Wind Down Estate's, or the Wind Down Administrator's (as applicable) claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.     *Elimination of Vacant Classes*

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date

H.     *Subordinated Claims*

The allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) reserve(s) the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Means for Implementation*

1.    <u>Sale Transaction</u>

On July 5, 2024, the applicable Debtors consummated the Sale Transaction and the Transferred Assets vested in the Purchaser free and clear of all Liens, Claims, charges, or encumbrances pursuant to section 1123 of the Bankruptcy Code and the CCAA and the Sale Transaction Documents.  Upon entry of the Sale Approval Order by the Bankruptcy Court and the Sale Recognition Order by the CCAA Court, all matters provided for under the Purchase Agreement and the other Sale Transaction Documents were deemed authorized and approved without any requirement of further act or action by the Debtors or the Debtors' governing bodies. The applicable Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by the Sale Transaction Documents, as well as to execute, deliver, file, record and issue any documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court or the CCAA Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

In the alternative, the Plan shall serve as a motion under section 363 of the Bankruptcy Code to authorize the sale of the Transferred Assets pursuant to the terms of the Sale Transaction Documents.  Section 363(f) of the Bankruptcy Code provides that the Debtors' assets may be sold free and clear of any and all liens, claims, interests, and encumbrances with any such liens, claims, interests, and encumbrances attaching to the proceeds of the Sale Transaction.  The Debtors submit that the Sale Transaction satisfies the requirements of section 363(f) of the Bankruptcy Code.  To the extent a party objects to Sale Transaction on the basis that it holds a lien or encumbrance on the Transferred Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims under section 365(f)(5) of the Bankruptcy Code and the CCAA.  In addition, to the extent the Debtors discover any party may hold a lien on all, or a portion of, the Assets, the Debtors have provided such party with notice of, and an opportunity to object to, the Sale Transaction.  Absent objection, each such party will be deemed to have consented to the sale of the Transferred Assets.

Except as otherwise expressly provided in the Sale Transaction Documents, (a) the Purchaser and all of its Affiliates shall not be liable for any Claims against the Debtors or any of their predecessors or direct or indirect subsidiaries, and (b) neither the Purchaser nor any of its affiliates shall have successor or vicarious liabilities of any kind or character, including under any theory of successor or transferee liability, labor, employment, tort, products liability, or benefits law, whether known or unknown as of the closing, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, in each case, with respect to the Debtors or any obligations of the Debtors arising prior to the closing, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Debtors prior to the closing (except as otherwise expressly provided in the Sale Transaction Documents).  For the avoidance of doubt, any Avoidance Actions purchased by the Purchaser will not be pursued by the Purchaser.

4866-4355-8095

The transactions contemplated by the Sale Transaction Documents are undertaken by the applicable Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale Transaction shall not affect the validity of such sale, unless such authorization and consummation of such sale are duly stayed pending such appeal. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

On or before the Effective Date, the Purchaser shall transfer back to the Debtors any 549 Causes of Action that were included within the Transferred Assets, and such 549 Causes of Action shall be transferred to the GUC Trust in accordance and consistent with Article IV.C.2.

2. Break-Up Fee and Expense Reimbursement

Consistent with the Sale Transaction Documents, the payment of the Break-Up Fee and Expense Reimbursement for the Purchaser are hereby authorized in the event: (i) the Debtors that are party to the Purchase Agreement consummate or enter into a Qualifying Alternative Transaction and the Purchase Agreement is terminated in connection therewith; (ii) the Debtors that are party to the Purchase Agreement publicly announce or support any plan of reorganization or plan of liquidation other than the Plan and other than a plan that includes a conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code or that would not prevent or materially delay consummation of the Closing (as defined in the Purchase Agreement) in accordance with the terms of the Purchase Agreement; or (iii) the board of directors or board of managers, as applicable, of any Debtor that is party to the Purchase Agreement determines, in good faith based upon advice of outside legal counsel, that proceeding with the Purchase Agreement or the transactions contemplated thereunder (including the Plan or solicitation of the Plan) or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of its fiduciary duties under applicable law, and the Purchase Agreement is terminated in connection therewith (in each of the foregoing cases as further set forth in and subject to the terms of the Purchase Agreement). The potential remedy of the Break-Up Fee and Expense Reimbursement was a condition of the Purchaser entering into the Purchase Agreement, which is the best option for the Debtors to maximize the value of their estates. The Break-Up Fee and Expense Reimbursement are the product of arm's-length, good faith negotiations among the Debtors and the Purchaser, and as a result, the Debtors believe that the agreement to pay such fees to the Purchaser (if and when the same become due to the Purchaser pursuant to, and in accordance with the terms and conditions in, the Purchase Agreement) is a valid exercise of their business judgment and should be approved if required under the Sale Transaction Documents.

3. Transactions with Netherlands Affiliates

On or prior to the closing of the transactions contemplated by the Purchase Agreement, the assets of the Netherlands Subsidiaries that would otherwise be Transferred Assets under the Purchase Agreement if such assets were owned by a Seller (as defined in the Purchase Agreement) shall be sold to KidKraft, or another Debtor designated by KidKraft, in exchange for the portion of the Purchase Price attributable to such assets (the "***Netherlands Asset Sale***"). The transactions contemplated by the Netherlands Asset Sale are undertaken by the Netherlands Subsidiaries and

the Debtors without collusion and in good faith. The Netherlands Subsidiaries' assets that do not become Transferred Assets shall be liquidated with the consent of the Prepetition Secured Parties and the Netherlands Subsidiaries (the "***Netherlands Liquidation***"). The Netherlands Subsidiaries will create a right of pledge in favor of the Prepetition Secured Parties over the proceeds of the Netherlands Asset Sale and the proceeds of the Netherlands Liquidation.

The proceeds of the Netherlands Asset Sale (i.e. the Foreign Sale Reserve) and proceeds of the Netherlands Liquidation, in each case with the consent of the Prepetition Secured Parties, shall be used to implement the orderly out-of-court wind down of the Netherlands Subsidiaries (the "***Netherlands Wind Down***," collectively, with the Netherlands Asset Sale and Netherlands Liquidation, the "***Netherlands Transactions***").

To the extent proceeds of the Netherlands Asset Sale (i.e. the Foreign Sale Reserve) or Netherlands Liquidation remain, after the Netherlands Wind Down is complete, such proceeds shall be distributed to the Prepetition Secured Parties in a manner to be determined by the Prepetition Secured Parties, the Debtors, and the Wind Down Administrator, as applicable, and the Netherlands Subsidiaries. Following the distribution of such proceeds, the Prepetition Secured Parties and the Netherlands Subsidiaries shall execute a mutual release of all Claims and Causes of Action.

Upon the Bankruptcy Court entering the Sale Approval Order, the Netherlands Asset Sale will be deemed authorized and approved without any requirement or further act or action by the Debtors or the Debtors' governing bodies.

4.    <u>Vesting of Wind Down Estate Assets in the Wind Down Estate</u>

Except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, on the Effective Date, all Wind Down Estate Assets (including all interests, rights, and privileges related thereto) and all GUC Trust Assets (solely until the GUC Trust Assets Transfer occurs) in each Estate and all Causes of Action that are retained under the Plan shall vest in the Wind Down Estate, to be administered by the Wind Down Administrator in accordance with the Plan, free and clear of all Claims, Liens, and encumbrances (except for the Wind Down Claims) to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code; *provided that*, for the avoidance of doubt, no Assets that are, or shall be, transferred to Purchaser as Transferred Assets before or after the Effective Date in accordance with the Purchase Agreement and the Sale Approval Order shall vest in the Wind Down Estate.

The vesting of the Wind Down Estate Assets, as authorized by the Plan, shall not be construed to destroy or limit any such Assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind Down Estate as if such Asset or right was still held by the Debtors.

On the next Business Day following the GUC Settlement Opt-In Election Deadline, the Wind Down Estate shall complete the GUC Trust Assets Transfer.

5.      Wind Down Administrator

The Wind Down Administrator shall be selected by the Debtors, with the consent of the Prepetition Secured Parties and the DIP Secured Parties.  The Wind Down Administrator shall be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The powers, rights, and responsibilities of the Wind Down Administrator shall include the authority and responsibility to fulfill the obligations of the Plan consistent with the Confirmation Order.

On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtor entities comprising the Wind Down Estate shall vest in the Wind Down Administrator.  The Wind Down Administrator shall be appointed the sole manager, sole director, and sole officer of the Debtor entities comprising the Wind Down Estate, as applicable, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after the Effective Date, the Wind Down Administrator shall be the sole Representative of the Wind Down Estate and shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind Down Estate Assets without any additional notice to or approval from the Bankruptcy Court.

In the event the Wind Down Administrator becomes incapacitated or unable to continue serving in such role for any reason, the Prepetition Secured Parties shall select a suitable replacement Wind Down Administrator as promptly as possible without the need for any further action or order of the Bankruptcy Court.

6.      Wind Down Transactions

The Wind Down Administrator shall retain the authority to take all necessary actions to wind down the operations of the Wind Down Estate and dissolve the entities comprising the Wind Down Estate, to the extent required by applicable law.  Subject in all respects to the terms of this Plan, the Wind Down Administrator shall have the power and authority to take any action necessary to dissolve the entities comprising the Wind Down Estate, and may:  (i) file a certificate of dissolution for the Wind Down Estate, together with all other necessary corporate and company documents, to effect the dissolution of the Wind Down Estate under applicable laws; (ii) complete and file all final or otherwise required federal, state, and local tax returns and pay all required taxes, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, their respective Estates, or the entities comprising the Wind Down Estate for any tax incurred during the administration of these Chapter 11 Cases, as determined under applicable tax laws; and (iii) represent the interests of the Debtors, their respective Estates, and entities comprising the Wind Down Estate before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

Any applicable filing by the Wind Down Administrator of any certificates of dissolution (or similar documentation) of the entities comprising the Wind Down Estate shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholder, members, officers, board of directors, or board of managers of the Debtors or any of their respective Affiliates.  As the entities comprising the Wind

Down Estate will be dissolved upon completion of the administration of this Plan, no new corporate organizational documents will be executed by the Wind Down Administrator.

For the avoidance of doubt, the Wind Down Administrator shall not be empowered to perform any actions designated to the GUC Trust or the GUC Trustee under the Plan or the GUC Trust Agreement.

7.    Fees and Expenses of the Wind Down Administrator

The Wind Down Estate Expenses shall be paid after the Effective Date solely using the Post-Sale Reserve. The Wind Down Administrator, on behalf of the Wind Down Estate, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out duties for the Wind Down Estate and may compensate and reimburse the expenses of such professionals in the ordinary course, without further order of the Bankruptcy Court, subject to the Post-Sale Reserve.

8.    Settlement of Claims

Except as otherwise provided in the Plan, on and after the Effective Date, the Wind Down Administrator may compromise or settle any Claims related to the Wind Down Estate Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind Down Estate Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

9.    Sales of Assets by the Wind Down Estate

The Wind Down Administrator may conduct any sales or liquidations of De Minimis Assets on any terms it deems reasonable, subject to the consent of the Prepetition Secured Parties (with such consent not to be unreasonably withheld), without further order of the Bankruptcy Court. In lieu of conducting sales or liquidating its assets, with the consent of the Prepetition Secured Parties, the Wind Down Administrator may transfer any Wind Down Estate Assets to the Prepetition Secured Parties free and clear of all liens, claims, and encumbrances after the Effective Date.

10.    Abandonment of Assets by the Wind Down Estate

The Wind Down Administrator may, with the consent of the Prepetition Secured Parties, on no less than 14 days' written notice to the U.S. Trustee, abandon any Wind Down Estate Assets which the Wind Down Administrator determines are burdensome to the Wind Down Estate, including any pending adversary proceeding or other legal action commenced or commenceable by any Debtor prior to the Effective Date; *provided that* if the U.S. Trustee provides a written objection to the Wind Down Administrator prior to the expiration of such 14 day period with respect to the proposed abandonment of any Wind Down Estate Asset, then such property may be abandoned only pursuant to an order by the Bankruptcy Court.

11.     <u>Plan Distributions</u>

    a.     Sources of Consideration for Plan Distributions

On the Effective Date, the Debtors will fund the Debtors' distributions under the Plan with (i) the proceeds of the Sale Transaction, subject in all respects to amounts held-back in accordance with the Purchase Agreement, (ii) the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount, (iii) the Debtors' available Cash on hand, and (iv) with the consent of the DIP Secured Parties, the proceeds of the DIP Facility. After the Effective Date, other than with respect to funds held in the Professional Fee Escrow Account, the Post-Sale Reserve shall be held in a separate account from any other funds held by the Wind Down Estate.

    b.     Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind Down Estate for distributions or payment in accordance with the terms of Article II of the Plan.

12.     <u>Corporate Existence</u>

On or after the Effective Date, each of the Debtors will be subject to a Dissolution Transaction. The equity or membership interests of each Debtor entity that is not subject to a Dissolution Transaction on the Effective Date will vest in the Wind Down Estate pursuant to this Plan. For the avoidance of doubt, the Debtor entities that are not subject to a Dissolution Transaction on the Effective Date will continue to exist after the Effective Date for the limited purpose of completing the GUC Trust Assets Transfer and the Wind Down Transactions. Promptly after completing the Wind Down Transactions, such entities shall be dissolved by the Wind Down Administrator.

13.     <u>Dissolution Transactions</u>

On or after the Effective Date, the Debtors or the Wind Down Administrator will enter into such Dissolution Transactions and will take such actions as may be necessary or appropriate to merge, dissolve, or otherwise terminate the corporate existence of the Debtors. The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance, or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that the Wind Down Administrator determines to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

4866-4355-8095

14.   <u>Recourse Solely to Wind Down Estate Assets</u>

All Claims against the Debtors and against the GUC Trust are deemed satisfied, waived, and released as to the Debtors and the GUC Trust, as applicable, in exchange for the treatment of such Claims under the Plan or the distributions made from the GUC Trust, and Holders of Allowed Claims against any Debtor will have recourse solely to the Wind Down Estate Assets (and, in the case of the Prepetition Secured Parties, to the unused amounts, if any, of the Post-Sale Reserve and Professional Fee Escrow Account) for the payment of their Allowed Claims in accordance with the terms of the Plan.  There will be no recourse for claims other than as to non-Debtors.

15.   <u>Cancellation of Existing Securities and Agreements</u>

On the Effective Date, except to the extent otherwise expressly provided in the Plan (including with respect to the Prepetition Credit Agreement Documents), (i) all notes, bonds, debentures, instruments, certificates, credit agreements, indentures, collateral documents, guarantees, filings, recordings, registrations, and other documents and instruments evidencing, securing, or governing Claims or Interests, and any Interests that are not represented by certificates or other instruments, shall be canceled, terminated, released, and surrendered automatically without any action on the part of any party, (ii) all Liens of any nature or any assets of any Debtor securing, or purporting to secure, such Claims shall be fully, finally, and irrevocably released and extinguished automatically without any action on the part of any party (and (x) the Debtors are hereby irrevocably authorized to make such filings, recordings, registrations, and notifications, and take such other actions, as the Debtors shall deem necessary or advisable to carry out such release and extinguishment and (y) the holders of such Claims shall take such actions and execute such instruments as the Debtors may reasonably request to carry out such release and extinguishment) and (iii) the obligations of the Debtors in respect of such Claims or in any way related thereto or arising therefrom (except with respect to any Indemnification Obligations, which obligations shall be assumed and assigned as set forth in Article V.G of the Plan) shall be deemed satisfied in full, terminated, canceled, released, and of no force or effect against the Debtors or the Wind Down Estate, without any further action on the part of the Debtors, the Wind Down Estate, or any other Person.  Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.  To the extent applicable, the Debtors' corporate charters shall be deemed amended by the Confirmation Order to provide that no nonvoting equity securities will be issued and to otherwise comply with the requirements of section 1123(a)(6) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Articles IV and VI of the Plan, the Prepetition Credit Agreement Documents shall continue in effect as between all Debtors and the non-Debtors party thereto until the wind down of the Debtors and the Netherlands Wind Down is complete.  Following completion of the wind down of the Debtors and the Netherlands Wind Down and distribution of the proceeds after the Netherlands Wind Down is complete, if any, to the Prepetition Secured Parties, as provided in Article IV of the Plan, the Prepetition Credit Agreement Documents shall be canceled and surrendered and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, canceled, and of no force or effect against the Debtors or the Wind Down Estate, without any further action on the part of the Debtors, the Wind Down Estate, or any other Person.  Except as

provided in the Plan (including Article VI of the Plan), on the Effective Date, the Prepetition Credit Agreement Agent, its respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the Prepetition Credit Agreement Documents (as applicable).  The commitments and obligations (if any) of the Prepetition Credit Agreement Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, including, any non-Debtors, or any of their respective successors or assigns under the Prepetition Credit Agreement Documents shall fully terminate and be of no further force or effect on the Effective Date.

16.    <u>Release of Liens</u>

Except for the Wind Down Claims (which include the Prepetition Secured Party Liens securing such Claims), and as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date concurrently and consistent with the treatment provided for Claims and Interests in Article III, all mortgages, deeds of trust, Liens against, security interests in, or other encumbrances or interests in property of any Estate shall be deemed fully released and discharged.  After the wind down of the Debtors and the Netherlands Wind Down is complete and after the proceeds of the Netherlands Asset Sale and Netherlands Liquidation, if any, are indefeasibly distributed in Cash to the Prepetition Secured Parties as provided in Article IV of the Plan, all mortgages, deeds of trust, Liens against, security interests in, or other encumbrances or interests in property of any Estate on account of the Wind Down Claims shall be deemed fully released and discharged. Notwithstanding anything contained herein to the contrary, until completion of the wind down of the Debtors and the Netherlands Wind Down and distribution of the proceeds after the Netherlands Wind Down is complete, if any, to the Prepetition Secured Parties, as provided in Article IV of the Plan, the Plan shall not operate as a waiver of any right, power or remedy of the Prepetition Agent or Prepetition Lenders, or constitute a waiver of any provision of the Prepetition Credit Agreement Documents in respect of any non-Debtor affiliate of the Debtors party thereto and the obligations of the non-Debtor affiliates thereunder shall remain in full force and effect.

17.    <u>Corporate Governance, Directors and Officers.</u>

a.    Certificates of Incorporation and Bylaws

Consistent with the Plan, all existing certificates of incorporation and by-laws will be canceled; accordingly, no new certificates of incorporation and by-laws will be necessary for any Debtors.  Certain of the Debtor entities comprising the Wind Down Estate will continue to exist after the Effective Date for the purpose of completing the GUC Trust Assets Transfer and the Wind Down Transactions.

b.    Directors and Officers

As of the Effective Date, the term of the current members of the boards of directors or boards of managers, as applicable, of KidKraft and its Debtor Affiliates shall expire automatically and each person serving as a director of KidKraft and each of its Debtor Affiliates shall be removed and shall be deemed to have resigned and cease to serve automatically.  Consistent with the Plan, each of the Estates will vest in the Wind Down Estate effective as of the Effective Date and, thus,

no individuals will serve as directors, officers, or voting trustees after the Effective Date for any Debtors. The Wind Down Administrator will be the sole member, manager, director, officer, or other governing body or controlling authority of each Debtor entity that is not subject to a Dissolution Transaction on the Effective Date.

18.    Insurance Policies

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Debtors and assigned to the Wind Down Estate on the Effective Date. All other insurance policies shall vest in the Wind Down Estate.

19.    D&O Liability Insurance Policies

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the Debtors shall be deemed to assume and vest in the Wind Down Estate all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date. Nothing shall alter, modify, or amend, affect, or impair the terms and conditions of (or the coverage provided by) any of the D&O Liability Insurance Policies, including the coverage for defense and indemnity under any of the D&O Liability Insurance Policies, which shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies in accordance with and subject to the terms and conditions thereof regardless of whether such individuals remain in their capacity as an Insured Person after the Effective Date. For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, in accordance with and subject to the terms and conditions of the D&O Liability Insurance Policies. On the Effective Date, all D&O Liability Insurance Policies shall vest in the Wind Down Estate consistent with the Confirmation Order without further order of the Bankruptcy Court.

20.    Preservation of Causes of Action

Except as provided in the Plan, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Wind Down Estate will retain and may enforce any claims, demands, rights, and causes of action that any Estate may hold against any Person to the extent not satisfied, settled, and released under the Plan or otherwise, including the Retained Causes of Action; *provided that*, the Wind Down Estate will not retain any Causes of Action (including Avoidance Actions) that are assigned to Purchaser as Transferred Assets in connection with the Sale Transaction, or any Causes of Action that may be included in the GUC Trust Assets and transferred to the GUC Trust,

or Causes of Action that are transferred to the GUC Trust in accordance with the Plan (including the GUC Retained Causes of Action). The Wind Down Administrator may pursue any such retained claims, demands, rights, or causes of action, as appropriate, in accordance with the best interests of the Wind Down Estate. Except to the extent any such claim is specifically satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtor's inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtor or Estate may hold against any Person. Except to the extent any such claim is specifically satisfied, settled, and released herein, the Debtor intends to preserve those claims, demands, rights, or causes of action designated as Retained Causes of Action. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.A.20 include any claim or Cause of Action with respect to, or against, a Released Party.

21.    <u>Substitution in Pending Legal Actions</u>

On the Effective Date, the Wind Down Estate or the Wind Down Administrator, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (i) pending contested matters or adversary proceedings in the Bankruptcy Court or the CCAA Court, (ii) any appeals of orders of the Bankruptcy Court, and (iii) any state court or federal or state administrative proceedings or equivalent in Canada or any other applicable jurisdiction pending as of the Petition Date. The Wind Down Administrator and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

22.    <u>Effectuating Documents; Further Transactions</u>

The Debtors (prior to the Effective Date) and the Wind Down Administrator (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and evidence the terms and conditions of the Plan, the Purchase Agreement, and the Dissolution Transactions, in each case, in the name of and on behalf of any Debtor or the Wind Down Estate, as applicable, without the need for any approvals, authorizations, or consents except those expressly required pursuant to the Plan.

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment: (a) any transfer made by the Debtors to the Wind Down Estate; (b) any transfer made by the Debtors and, if applicable, the Wind Down Estate to the Purchaser pursuant to the Plan, the Purchase Agreement, and/or the Sale Order; (c) any sales made by the Wind Down Estate to liquidate such assets in the trust and convert such assets into Cash; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; and (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

B.      *Restructuring Support Agreement*

Upon the later of (i) the Effective Date or (ii) the consummation of the Sale Transaction, any surviving obligations under the Restructuring Support Agreement shall terminate on a final basis.

C.      *Global Settlement*

1.      GUC Trust

On the Effective Date, the GUC Trust will be established with the primary purpose of liquidating the GUC Trust Assets and GUC Retained Causes of Action and making distributions to GUC Trust Beneficiaries on account of their Allowed General Unsecured Claims.

Subject to and to the extent set forth in the Plan, the Confirmation Order, the GUC Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the GUC Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments, and other documents necessary to implement the terms of the Plan to the extent applicable to the GUC Trust; (b) establish, maintain, and administer the GUC Trust Accounts; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, and protect, as applicable, the GUC Trust Assets (directly or through its professionals or a Disbursing Agent), in accordance with the Plan; (d) subject to the GUC Trust Agreement, the Plan, and the Confirmation Order, as applicable, review, reconcile, settle, or object to all General Unsecured Claims that are not Allowed Claims as of the Effective Date pursuant to the procedures for allowing or disputing Claims prescribed in the Plan; (e) calculate and make distributions of the proceeds of the GUC Trust Assets to Holders of Allowed General Unsecured Claims that are GUC Trust Beneficiaries in accordance with the terms of the Plan and the GUC Trust Agreement and otherwise implement the terms of the Plan to the extent applicable to the GUC Trust; (f) retain, compensate, and employ professionals to represent or advise the GUC Trust; (g) file, in accordance with the GUC Trust Agreement, appropriate tax returns on behalf of the GUC Trust and pay any and all taxes or other obligations arising in connection therewith; (h) exercise such other powers as may be vested in the GUC Trust under the GUC Trust Agreement and the Plan, or as are deemed by the GUC Trustee to be necessary and proper to implement the provisions of the Plan and the GUC Trust Agreement; and (i) terminate the GUC Trust in accordance with the terms of the GUC Trust Agreement. For the avoidance of doubt, the GUC Trust shall not be empowered with performing any actions designated to the Wind Down Estate created pursuant to Article IV.A of the Plan and shall have no authority to pursue any Claims or Causes of Action against Released Parties or Exculpated Parties, other than the GUC Retained Causes of Action.

Notwithstanding anything to the contrary in this Article IV.C, the GUC Trust shall have no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the GUC Trust's purpose as described herein and in the GUC Trust Agreement and as may be reasonably necessary to conserve and protect the GUC Trust Assets and GUC Retained Causes of Action and provide for the orderly liquidation and distribution thereof. Accordingly, the GUC Trustee shall, in an orderly manner, liquidate the GUC Trust Assets and make timely distributions pursuant to the Plan and not unduly prolong the duration of the GUC Trust.

The GUC Trust Beneficiaries, who will be treated as grantors and deemed owners for federal income tax purposes, will be holders of GUC Trust Interests. The GUC Trust shall file federal income tax returns for the GUC Trust as a grantor trust pursuant to Section 671 of the Tax Code and the Treasury Regulations promulgated thereunder. The parties shall not take any position on their respective tax returns with respect to any other matter related to taxes that is inconsistent with treating the GUC Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance from the Internal Revenue Service.

The GUC Trust shall be responsible for paying any (i) U.S. Trustee fees accruing in relation to disbursements by the GUC Trust and (ii) taxes related to the GUC Trust Assets or the liquidation thereof.  Any professionals hired by the GUC Trustee will be compensated for services in such capacity solely from the GUC Trust Assets or proceeds thereof.

2.     Funding of and Transfer of Assets into the GUC Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the next Business Day following the GUC Settlement Opt-In Election Deadline, the Wind Down Estate shall complete the GUC Trust Assets Transfer and the GUC Retained Causes of Action Transfer, and all such assets shall vest in the GUC Trust on such date, to be administered by the GUC Trustee in accordance with the Plan and the GUC Trust Agreement.  Except as set forth in the Plan, the GUC Trust Assets and GUC Retained Causes of Action shall be transferred to the GUC Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code.  All Cash amounts and Causes of Action transferred into the GUC Trust from the Debtors shall be transferred by the U.S. Debtors.

For all federal and applicable state and local income tax purposes, all Persons (including without limitation the Debtors, the GUC Trustee and the GUC Trust Beneficiaries) will treat the transfers and assignment of the GUC Trust Assets and the GUC Retained Causes of Action to the GUC Trust for the benefit of the GUC Trust Beneficiaries as (a) a transfer of the GUC Trust Assets and the GUC Retained Causes of Action directly to the GUC Trust Beneficiaries followed by (b) the transfer of the GUC Trust Assets and the GUC Retained Causes of Action by the GUC Trust Beneficiaries to the GUC Trust. The GUC Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The GUC Trust Beneficiaries will be treated as the grantors and deemed owners of their allocable portion of the GUC Trust Assets and the GUC Retained Causes of Action for federal income tax purposes.

The fair market value of the portion of the GUC Trust Assets and the GUC Retained Causes of Action that is treated for U.S. federal income tax purposes as having been transferred to each GUC Trust Beneficiary will be determined by the GUC Trustee, and all parties (including, without limitation, the GUC Trustee and the GUC Trustee Beneficiaries) must utilize such fair market values determined by the GUC Trustee for federal and applicable state and local income tax purposes.

The GUC Trust's taxable income, gain, loss, deduction or credit will be allocated to the GUC Trust Beneficiaries in accordance with their relative beneficial interests in the GUC Trust during the applicable taxable period. Such allocation will be binding on all parties for federal and

41

applicable state and local income tax purposes, and the parties will responsible for the payment of any federal, state and local income tax due on the income and gain so allocated to them.

The act of transferring the GUC Trust Assets and GUC Retained Causes of Action, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the GUC Trust as if the asset or right was still held by the Debtors.

3.     GUC Trustee

Solely with respect to the GUC Trust Assets, the GUC Retained Causes of Action, and the administration of General Unsecured Claims, the GUC Trustee shall be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.   The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan.   Other rights and duties of the GUC Trustee and the GUC Trust Beneficiaries shall be as set forth in the GUC Trust Agreement.

The Committee shall select the GUC Trustee, subject to the consent, not to be unreasonably withheld, of the Debtors and the Prepetition Secured Parties.

4.     GUC Trust Agreement

The GUC Trust Agreement will contain certain provisions to comply with Internal Revenue Service guidance for trusts treated as liquidating trusts.   Among other things, the GUC Trust Agreement will require that the GUC Trust terminate no later than three years from the Effective Date; *provided, however*, that the Bankruptcy Court, upon motion by the GUC Trustee, may extend the term of the GUC Trust for a reasonable finite period if (a) such extension is necessary to the purpose of the GUC Trust, (b) the GUC Trustee receives an opinion of counsel or a ruling from the IRS stating that such an extension would not adversely affect the status of the GUC Trust as a liquidating trust for federal income tax purposes, and (c) such an extension is obtained within the six (6) month period prior to the GUC Trust's third (3rd) anniversary or the end of the immediately preceding extension period, as applicable; *provided, however*, each finite extension may be no more than six months (and such extension shall not exceed a total of four extensions unless the GUC Trustee received a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the GUC Trust as a grantor trust for U.S. federal income tax purposes.   The GUC Trust Agreement generally will also provide for, among other things: (i) the payment of reasonable and documented compensation to the GUC Trustee; (ii) the payment of other expenses of the GUC Trust; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the GUC Trustee within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the GUC Trust and the Debtors and the payment of taxes or other obligations owed by the GUC Trust, if any; (vi) the distribution at least annually to the GUC Trust Beneficiaries the GUC Trust's net Cash income and all other Cash proceeds received by the GUC Trust in excess of an amount reasonably necessary to meet Claims and contingent liabilities and to maintain the value of the GUC Trust Assets; (vii) the orderly liquidation of the GUC Trust Assets; and (viii) any reconciliation, administration, objection,

resolution, and distribution on account of General Unsecured Claims.  For the avoidance of doubt, any payments to be made by the GUC Trust shall be paid solely from the GUC Trust Assets or the proceeds thereof.

The Prepetition Secured Parties and DIP Secured Parties shall work in good faith with the Committee to conform the GUC Trust Agreement to the terms of the Plan, including providing the Prepetition Secured Parties and DIP Secured Parties with certain reporting and consultation rights. Additional terms of the GUC Trust and Obligations of the GUC Trustee, if any, will be addressed in the Plan Supplement or GUC Trust Agreement, as applicable.

     5.      <u>Settlement of Claims and Causes of Action</u>

Except as otherwise provided in the Plan or the GUC Trust Agreement, on and after the Effective Date, the GUC Trustee may compromise or settle any General Unsecured Claims or any Causes of Action that are GUC Trust Assets or GUC Retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for GUC Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

     6.      <u>Recourse Solely to GUC Trust Assets</u>

All Claims against the Debtors are deemed satisfied, waived, and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and Holders of Allowed General Unsecured Claims against any Debtor will have recourse solely to the GUC Trust Assets for the payment of their Allowed General Unsecured Claims, and only if such Holder made a GUC Settlement Opt-In Election, all in accordance with the terms of the Plan and the GUC Trust Agreement.  A Holder of Allowed General Unsecured Claims that does not make a GUC Settlement Opt-In Election will receive no recovery or distribution on account of such claims, as set forth in Article III.B.4 of the Plan.

Potential Avoidance Actions against a Holder of General Unsecured Claims that is listed on <u>Schedule 1</u> to the Global Settlement Term Sheet will (i) be purchased by the Purchaser as part of the Sale Transaction, subject to the occurrence of the GUC Settlement Election Opt-In Deadline, (ii) be held by the Wind Down Administrator pending the occurrence of the GUC Settlement Election Opt-In Deadline, (iii) to the extent any such Holder does not make a GUC Settlement Opt-In Election, will be conveyed to the Purchaser on the next Business Day following the GUC Settlement Opt-In Election Deadline, and (iv) will not be pursued by the Purchaser.  **For the avoidance of doubt, if a Holder of General Unsecured Claims that is listed on <u>Schedule 1</u> makes a GUC Settlement Opt-In Election, any potential Avoidance Actions against such Holder will not be conveyed to the Purchaser and instead will become GUC Trust Assets, and such potential Avoidance Actions may be pursued against such Holder.**

7. <u>Distribution of GUC Trust Assets and GUC Retained Causes of Action Potential Recovery</u>

All Holders of Allowed General Unsecured Claims that are GUC Trust Beneficiaries (including the Prepetition Secured Parties' Deficiency Claims) shall receive their Pro Rata share of the GUC Retained Causes of Action Potential Recovery, after the payment of any fees and expenses associated with the collection of the GUC Retained Causes of Action Potential Recovery.

The GUC Trust Assets, including any proceeds received by the GUC Trust on account of the prosecution or settlement of any commercial tort claims or Avoidance Actions that are GUC Trust Assets, net of any GUC Trust expenses (including professional fees) not covered by the GUC Trust Expense Reserve, shall be distributed at least annually as follows:

(i) Holders of Allowed General Unsecured Claims that are GUC Trust Beneficiaries other than the Prepetition Secured Parties and/or DIP Secured Parties shall receive their Pro Rata share of 100% of the GUC Trust Assets up to $1,000,000; and

(ii) thereafter, all Holders of Allowed General Unsecured Claims that are GUC Trust Beneficiaries (including the Prepetition Secured Parties' Deficiency Claims) shall receive their Pro Rata share of 100% of the GUC Trust Assets.

8. <u>MidOcean Waiver of Claims and Cash Contribution</u>

On the Effective Date, MidOcean will (i) contribute $100,000 in Cash to the GUC Trust (the "***Sponsor Cash Contribution***") and (ii) waive any General Unsecured Claims it may have against the Debtors, including any claims under the subordinated note and services agreement (the "***Sponsor Claims Waiver***"); *provided*, *however*, that nothing in the foregoing shall result in any of the Debtors' directors that are MidOcean designees waiving or releasing any rights to assert indemnification claims against the Debtors or any of its insurance carriers or any rights as beneficiaries of any insurance policies.

MidOcean is a Released Party under the Plan and has provided valuable consideration to the Estates in the form of the Sponsor Cash Contribution and the Sponsor Claims Waiver. Accordingly, notwithstanding anything set forth in the Plan, neither the GUC Trust nor the Debtors (nor any entity on behalf of the Debtors' Estates, including the Wind Down Estate) shall bring or be entitled to bring any claims or Causes of Action against (i) the Debtors' current and former directors and officers appointed and/or designated by MidOcean or (ii) MidOcean or any of its current and former Affiliates or it or its current and former Affiliates' current and former directors, managers, officers, employees, managed accounts and funds, predecessors, successors, assigns, subsidiaries, equity holders, members, agents, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in their capacity as such, and all such claims shall be deemed and hereby are waived and released, and each of the foregoing Persons shall be a "Released Party" for purposes of the Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by the Purchaser; (ii) is designated as a Transferred Contract pursuant to the Purchase Agreement on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order and/or Sale Approval Order, as applicable, shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract or Unexpired Lease comprising a Transferred Contract shall re-vest in and be fully enforceable by the Purchaser in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court.  Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Purchaser, alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than two business days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.

B.   *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind Down Estate, the Estates, or their property (as applicable), without the need for any objection by the Wind Down Estate or Wind Down Administrator (as**

4866-4355-8095

**applicable), or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors, the Wind Down Estate, or for the Transferred Contracts, by the Purchaser, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

1.      <u>Cure of Defaults for Transferred Contracts Under the Purchase Agreement</u>

Consistent with the Purchase Agreement and subject to the terms and conditions therein, within three business days after the Petition Date the Debtors shall deliver a Cure Notice, in form and substance reasonably acceptable to Buyer, of potential assumption and assignment and proposed cure of the Transferred Contracts to the applicable counterparty (each a "***Contract Counterparty***"), which shall specify: (a) that such contract is contemplated to be assumed and assigned to Purchaser as a Transferred Contract in connection with the Sale Transactions; (b) the proposed Cure Claim with respect to each Transferred Contract; (c) that each respective Contract Counterparty may file an objection (a "***Contract Objection***") to the proposed assumption and assignment of the applicable Transferred Contract or the proposed Cure Claim, if any.  Such Contract Objection must (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure and any applicable local rules of the U.S. Bankruptcy Court; (iii) be Filed with the Bankruptcy Court, together with proof of service, on or before 5:00 p.m. (Central Time) on the date that is 21 days after the date the Debtors delivered the Cure Notice (the "***Cure Notice Objection Deadline***"); (iv) be served, so such objection is actually received on or before the Cure Notice Objection Deadline on counsel to the Debtors, counsel to the DIP Secured Parties, counsel to the Purchaser, and the Office of the U.S. Trustee for the Northern District of Texas; and (v) state with specificity the grounds for such objection, including, without limitation, the asserted amount of the fully liquidated Cure Claim and the legal and factual bases for any unliquidated portion of the Cure Claim that the Contract Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Transferred Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise to any such defaults.  If a Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such Contract Objection will be determined at the Confirmation Hearing or such other date determined by the U.S. Bankruptcy Court.

4866-4355-8095

2.    <u>Cure of Defaults for Other Assumed Executory Contracts and Unexpired Leases</u>

For all other Executory Contracts or Unexpired Leases not deemed "Transferred Contracts," at least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind Down Estate to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least 7 days before the Confirmation Hearing. **Any counterparty that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors or the Wind Down Estate, without the need for any objection by the Wind Down Estate or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Wind Down Estate of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor shall, with the consent of the Purchaser, have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; *provided further, however*, that nothing herein shall prevent the Wind Down Estate from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Wind Down Estate also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind Down Estate or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind Down Estate, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, in each case with the consent of the Purchaser. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may, with the consent of the Purchaser, assume the Executory Contract or Unexpired Lease prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; *provided further*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor shall, with the consent of the Purchaser, have the right to reject any Executory Contract or Unexpired Lease within 30 days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

E.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Sale Transaction Documents, shall constitute an admission by the Debtors, the Wind Down Estate, the Purchaser, or the Wind Down Administrator (as applicable) that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, Wind Down Estate, the Purchaser, or the Wind Down Administrator (as applicable) has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Wind Down Estate, the Purchaser, or the Wind Down Administrator (as applicable) shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.      *Indemnification Obligations*

All Indemnification Obligations shall not be discharged or impaired by Confirmation of the Plan or entry of the Confirmation Order and shall be assumed by the Wind Down Estate and remain intact, irrevocable, and shall survive the entry of the Confirmation Order and Effective Date of the Plan on terms no less favorable to such current and former directors, officers, managers,

48

equity holders, employees, attorneys, accountants, investment bankers, and other professionals of any of  the Debtors and such current and former directors', officers', and managers' respective Affiliates than the Indemnification Obligations in place prior to the Petition Date, and to the extent any such Indemnification Obligations are obligations of a non-Debtor Affiliate of any of the Debtors, such Indemnification Obligations shall be assigned on the Effective Date to the Wind Down Estate.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.     *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind Down Estate or the GUC Trust (as applicable).

a.     Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b.     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date,

and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Purchaser, the Wind Down Estate, or the Wind Down Administrator (as applicable).

        c.      No Liability

Except on account of gross negligence, fraud, or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Property*

      1.      <u>Delivery of Distributions</u>

        a.      Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

        b.      Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors, the Purchaser, the Wind Down Administrator, or the GUC Trustee (as applicable).

        c.      Delivery of Distributions on Secured Party Claims.

The Prepetition Credit Agreement Agent shall be deemed to be the Holder of all Secured Party Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to the Prepetition Credit Agreement Agent. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the Prepetition Credit Agreement Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Secured Party Claims in accordance with the terms of the Prepetition Credit Agreement Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

d.      Delivery of Distributions on DIP Claims

The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

e.      Minimum Distributions

No Distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250.

2.      <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Wind Down Estate, as applicable, shall have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of this Article VI.C, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

D.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, Wind Down Administrator, GUC Trustee, Disbursing Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For these purposes, all distributions made on behalf of the Debtors pursuant to the Plan shall if applicable be first in satisfaction of the portion of Claims that are not subject to any withholding tax obligation. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, Wind Down Administrator, GUC Trustee, Disbursing Agent, and any applicable withholding agent to comply with all tax

4866-4355-8095

withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, Wind Down Estate, Wind Down Administrator, GUC Trustee, and Disbursing Agent (as applicable) reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

E.      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

F.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

G.      *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I.      *Setoffs and Recoupment*

The Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), may, but shall not be required to, set off against, or recoup from, any Allowed Claim (other than an Allowed General Unsecured Claim) against a Debtor of any nature whatsoever that the applicable Debtor, Wind Down Estate, Wind Down Administrator, GUC Trust, or GUC Trustee (as applicable) may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a

waiver or release by the applicable Debtor, Wind Down Estate, Wind Down Administrator, GUC Trust, or GUC Trustee (as applicable) of any such Claim it may have against the Holder of such Allowed Claim.

J.     *Claims Paid or Payable by Third Parties*

    1.    <u>Claims Paid by Third Parties</u>

The Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), shall reduce in full an Allowed Claim (including any applicable Cure Claim of a Transferred Contract paid by the Purchaser), and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Wind Down Estate, the Wind Down Administrator, GUC Trust, or the GUC Trustee (as applicable); *provided that* the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor, Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

    2.    <u>Claims Payable by Insurers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

4866-4355-8095

3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.     *Allowance of Claims*

On or after the Effective Date, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

B.     *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), by order of the Bankruptcy Court, shall together have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

C.     *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) having to File an application, motion, complaint, objection, or any

54

other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.   *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

E.   *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action (other than Causes of Action that constitute a Transferred Asset under the Purchase Agreement) against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Wind Down Estate or the Wind Down Administrator (as applicable).

**ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

F.   *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

G.   *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made to the extent that all or any portion of any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as

set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided that* any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

H.    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

In accordance with Bankruptcy Rule 9019, the Plan constitutes the good-faith compromise and settlement among the Global Settlement Parties regarding the matters set forth in the Global Settlement Term Sheet, and reflects and implements such compromise and settlement, including by the establishment and funding of the GUC Trust.  Such compromise and settlement is made in exchange for consideration and is in the best interests of the Global Settlement Parties and the Holders of General Unsecured Claims, is within the reasonable range of possible litigation outcomes, is fair, equitable, and reasonable, and is an essential element of the resolution of these Chapter 11 Cases.

56

B.     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Sale Order, the Plan and/or the Plan Supplement, the distributions, rights, and treatment that are provided in the Sale Order or the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind Down Estate or the Wind Down Administrator, as applicable), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property, including, without limitation, the Transferred Assets, shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.     *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, the Confirmation Recognition Order or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise, or ordered by the CCAA Court in the CCAA Recognition Proceeding, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.     *Release of Liens*

**Except as otherwise specifically provided in the Sale Order (solely with respect to any Permitted Encumbrances and Assumed Liabilities), the Plan, and/or the Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including, without limitation, the Transferred Assets, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind Down Estate or the GUC Trust and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court or the CCAA Court and without any action or Filing being required to be made by the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable).**

E.     *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is hereby released and discharged by the Debtors, their Estates, and the Wind Down Estate (as applicable) from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, their Estates, or the Wind Down Estate), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Wind Down Estate, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Prepetition Credit Agreement Documents, the Note Purchase Agreement Documents, the Professional Services Agreement Documents, the DIP Facility Documents (and any payments or transfers in connection therewith), the Sale Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Sale Order, the Plan, the Confirmation Order, or Confirmation Recognition Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Documents, the Sale Transaction, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the CCAA Recognition Proceedings, the filing of the Chapter 11 Cases, the filing of the CCAA Recognition Proceedings, the Sales Process, the Global Settlement, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.E do not release any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the Restructuring or the assumption of the Indemnification Obligations as set forth in the Plan; (ii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action arising from any obligations of any party under the Purchase Agreement; (iii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct; (iv) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Causes of Action specifically

58

enumerated in the List of Retained Causes of Action; and (v) nothing in this Article VIII.E shall, nor shall it be deemed to, release any of the Debtor Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

F.      *Releases by Releasing Parties*

As of the Effective Date, each Releasing Party hereby releases and discharges each Debtor, Estate, Wind Down Estate, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind Down Estate, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, or assigns would have been legally entitled to assert in his, her, or its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Wind Down Estate, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Prepetition Credit Agreement Documents, the Note Purchase Agreement Documents, the Professional Services Agreement Documents, the DIP Facility Documents (and any payments or transfers in connection therewith), the Sale Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Releasing Party on the Sale Order, the Plan, the Confirmation Order, or the Confirmation Recognition Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Documents, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the CCAA Recognition Proceedings, the filing of the Chapter 11 Cases, the filing of the CCAA Recognition Proceedings, the Sales Process, the Global Settlement, the pursuit of

Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of the Debtors on account of any Allowed Claims that are treated under the Plan.  Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.F do not release any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the Restructuring or the Global Settlement or the assumption of the Indemnification Obligations as set forth in the Plan; (ii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action arising from any obligations of any party under the Purchase Agreement; (iii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iv) nothing in this Article VIII.F shall, nor shall it be deemed to, release any of the Lender Retained Causes of Action; (v) nothing herein shall, nor shall it be deemed to, release any of the non-Debtor Affiliates of the Released Parties party to the Prepetition Credit Agreement Documents from the Wind Down Claims; and (vii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any of the Debtor Retained Causes of Action.  For the avoidance of doubt, nothing in this Article VIII.F shall, nor shall it be deemed to, release any Causes of Action specifically enumerated in the List of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

G.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Process, the Sale Transaction, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation

of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Person on the Plan or the Confirmation Order or Confirmation Recognition Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Sale Process, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the CCAA Recognition Proceedings, the filing of the Chapter 11 Cases, the filing of the CCAA Recognition Proceedings, the Sales Process, the Global Settlement, solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documentation), or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, nothing in this Article VIII.G shall, nor shall it be deemed to, exculpate the Debtors from any Lender Retained Causes of Action or any Exculpated Party from any Causes of Action (i) arising from any obligations of any party under the Purchase Agreement; or (ii) specifically enumerated in the List of Retained Causes of Action.

H.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released pursuant to Article VIII.E or Article VIII.F, discharged pursuant to Article VIII.B, or are subject to exculpation pursuant to Article VIII.G, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind Down Estate, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property, including, without limitation, the Transferred Assets, or the estates of such Entities on

account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; or **(d)** asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action. Notwithstanding anything to the contrary in the foregoing, this injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action in the Bankruptcy Court to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.  Subject in all respects to Article XI, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Debtors, the Wind Down Estate, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Sale Process, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the CCAA Recognition Proceedings, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such entity or person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind Down Estate or the Wind Down Administrator (as applicable) or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind Down Estate or the Wind Down Administrator (as applicable), or another Entity with whom the Wind Down Estate or the Wind Down Administrator (as applicable) have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

4866-4355-8095

J.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable), unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

L.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

M.      *Document Retention.*

On and after the Effective Date, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee (as applicable) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind Down Estate or the Wind Down Administrator (as applicable).

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of the Plan that the following conditions, as determined by the Debtors with the consent of the DIP Agent, the Prepetition Secured Parties, and the Purchaser shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

4866-4355-8095

1.      the Restructuring Support Agreement shall not have been breached or terminated and shall be in full force and effect;

2.      the Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

3.      a Final DIP Approval Order shall have been entered by the Bankruptcy Court and the Final DIP Recognition Order shall have been entered by the CCAA Court, and each shall not have been breached or terminated, shall be in full force and effect, and no stay thereof shall be in effect;

4.      the Purchase Agreement shall have been executed by the parties thereto, shall not have been breached or terminated and shall be in full force and effect;

5.      all provisions, terms, and conditions hereof shall have been approved in the Confirmation Order;

6.      the Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim Backstop Amount shall have been funded by cash on hand of the Debtors and the proceeds of the DIP Facility into a reserve account and shall be added to the outstanding obligations under the DIP Facility (less cash on hand);

7.      the Special Committee's investigation shall have concluded; and

8.      a motion (including any exhibits, schedules, amendments, modifications or supplements thereto) shall have been filed in the CCAA Recognition Proceedings seeking the issuance of the Sale Recognition Order pursuant the Purchase Agreement and consistent with the terms of the Restructuring Support Agreement and the Restructuring Support Agreement Documentation.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors with the consent of the DIP Agent, the Prepetition Secured Parties, and the Purchaser shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

1.      the Restructuring Support Agreement shall not have been breached or terminated and shall be in full force and effect;

2.      the Confirmation Order and Confirmation Recognition Order shall have been entered and neither the Confirmation Order nor the Confirmation Recognition Order shall have been stayed, modified, or vacated on appeal;

3.      the Sale Order shall have been entered (whether or not included as a part of the Confirmation Order and Confirmation Recognition Order, as applicable), and shall not have been stayed, modified, or vacated on appeal;

4.      the Sale Transaction (including with respect to the sale of the Canadian Transferred Assets to Purchaser pursuant to the CCAA Recognition Proceedings) shall have been consummated in accordance with the terms of the Purchase Agreement;

5.      a Final DIP Approval Order shall have been entered by the Bankruptcy Court and Final DIP Recognition Order shall have been entered by the CCAA Court, and each shall not have been breached or terminated, shall be in full force and effect, and no stay thereof shall be in effect;

6.      the Professional Fee Escrow Account shall be funded using cash on hand of the Debtors, proceeds of the DIP Facility, or proceeds of the Sale Transaction, as applicable, in an amount equal to the Professional Fee Reserve Amount;

7.      all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

8.      all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

9.      the Bankruptcy Court shall have approved the Plan's releases and such approval shall have been recognized and given effect in Canada by the CCAA Court;

10.     all Restructuring Expenses shall have been paid in Cash in full;

11.     the GUC Trust shall have been created and funded in accordance with the Plan;

12.     the Post-Sale Reserve shall have been funded using cash on hand of the Debtors, proceeds of the DIP Facility, or the Sale Transaction proceeds, as applicable; and

13.     the Foreign Sale Reserve shall have been funded using Sale Transaction proceeds and distributed to the Netherlands Subsidiaries.

C.      *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX.A and Article IX.B may be amended, modified, supplemented, or waived in writing by mutual agreement of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and the Purchaser without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

4866-4355-8095

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments*

Subject to the limitations contained herein, in the Global Settlement, and in the Restructuring Support Agreement, the Debtors reserve the right to alter, amend, or modify the Plan, subject to the consent of the Prepetition Secured Parties, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of the Plan*

Subject to the conditions and limitations set forth in the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims; *provided that*, the foregoing reservation of rights shall not in any way amend, nullify, or void any action, act, or right ratified upon the Bankruptcy Court's entry of the Sale Approval Order.

4866-4355-8095

### ARTICLE XI.
### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured, Unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5.      consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, the Sale Approval Order or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Sale Approval Order in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, the Sale Approval Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Sale Approval Order in such manner as may be necessary or appropriate to consummate the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor, the GUC Trust, or GUC Trustee;

8.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10.     enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code, including for the avoidance of doubt the Sale Approval Order;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     adjudicate, decide, or resolve any dispute and all matters related to the Sale Transaction and Sale Transaction Documents;

13.     adjudicate, decide, or resolve any dispute and all matters arising under the GUC Trust Agreement;

14.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

15.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

16.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

17.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or the Sale Approval Order;

19.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring Transactions;

20.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.     hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

24.     enforce all orders previously entered by the Bankruptcy Court;

25.     enter a final decree concluding or closing the Chapter 11 Cases;

26.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan;

27.     hear any other matter not inconsistent with the Bankruptcy Code; and

28.     the CCAA Court shall retain jurisdiction over the CCAA Recognition Proceedings and all matters, arising out of, or related to, the CCAA Recognition Proceedings including the orders of the CCAA Court.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, the Confirmation Order, and the Sale Approval Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Wind Down Estate, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the Wind Down Estate, the Wind Down Administrator, the GUC Trust, or the GUC Trustee as applicable, shall be served on:

| | |
|---|---|
| **Debtors or the Wind Down Estate** | **KidKraft Inc.**<br>4630 Olin Road<br>Dallas, TX 75244<br>Attn:  Geoffrey Walker |
| **Attorneys to the Debtors** | **Vinson & Elkins LLP**<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>Attn:  William L. Wallander<br>       Matthew D. Struble<br>       Kiran Vakamudi<br><br>and<br><br>**Vinson & Elkins LLP**<br>1114 Avenue of the Americas, 32nd Floor<br>New York, NY 10036<br>Attn:  David S. Meyer<br>       Lauren R. Kanzer |
| **Wind Down Administrator** | **SierraConstellation Partners, LLC**<br>3090 Olive St., 3rd Floor<br>Dallas, TX 75219<br>Attn: Carl Moore |

| | |
|---|---|
| **GUC Trustee** | **Jiangang Ou, Esq.**<br>1222 Howard Lane<br>Bellaire, Texas 77401 |
| **United States Trustee** | **Office of the United States Trustee**<br>**for the Northern District of Texas**<br>Earle Cabell Federal Building<br>1100 Commerce Street, Room 976<br>Attn:  Meredyth Kippes |
| **Prepetition Credit Agreement**<br>**Agent and DIP Agent** | **GB Funding, LLC**<br>101 Huntington Avenue, Suite 1100<br>Boston, Massachusetts 02199<br>Attn:  David Braun<br>        Kyle Shonak |
| **Counsel to the Prepetition Credit**<br>**Agreement Agent and DIP Agent** | **Katten Muchin Rosenman LLP**<br>50 Rockefeller Plaza<br>New York, NY 10020<br>Attn:  Cindi M. Giglio<br>        Lucy F. Kweskin |
| **Purchaser** | **Backyard Products LLC**<br>317 S. Main Street<br>Ann Arbor, MI  48104<br>Attn:  Thomas van der Meulen |
| **Counsel to Purchaser** | **King & Spalding LLP**<br>1180 Peachtree Street, NE<br>Suite 1600<br>Atlanta, GA 30309<br>Attn:  Spencer Stockdale<br>        Michael Fishel |
| **MidOcean** | **MidOcean Partners**<br>245 Park Avenue<br>38th Floor<br>New York, NY 10167<br>Attn:  Daniel Penn |

4866-4355-8095

| **Counsel to MidOcean** | **Gibson Dunn & Crutcher LLP** |
|---|---|
| | 200 Park Avenue |
| | New York, NY 10166 |
| | Attn:  Andrew Herman |

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or the CCAA Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan, the Confirmation Order, the Confirmation Recognition Order or the Sale Order shall remain in full force and effect in accordance with their terms.

G.    *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Global Settlement and the Restructuring Support Agreement and any related agreements thereto, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.stretto.com/kidkraft or the Bankruptcy Court's website at https://www.txnb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors, the DIP Agent, the Prepetition Secured Parties, and the Purchaser. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such alteration or

72

interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors', the Prepetition Secured Parties', and the Purchaser's consent; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Wind Down Estate or Wind Down Administrator (as applicable) will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

K.      *Request for Expedited Determination of Taxes*

The Debtors, the Wind Down Estate, the Wind Down Administrator, or the GUC Trustee, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

L.      *Closing of Chapter 11 Cases*

The Wind Down Estate or the Wind Down Administrator (as applicable) shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to issue a final decree closing the Chapter 11 Cases and file materials with the CCAA Court to terminate the CCAA Recognition Proceedings.

M.      *No Stay of Confirmation Order*

The Confirmation Order and Confirmation Recognition Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

N.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors,' Wind Down Estate's, or the Wind Down Administrator's (as applicable) right to enter into settlements was not

73

4866-4355-8095

disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Noticing and Claims Agent prior to the Confirmation Date.

O.      *Dissolution of Statutory Committees*

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases.

\* \* \* \*

4866-4355-8095

Respectfully submitted, as of the date first set forth below,

Dated:      July 10, 2024
            Dallas, Texas

                                KIDKRAFT, INC.
                                on behalf of itself and all other Debtors


                                _/s/ Geoffrey Walker_____
                                Geoffrey Walker
                                President & Chief Executive Officer